UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
----------------------------X Docket#
KOSHER SPORTS, INC.,          : 10-cv-2618(JBW)(RLM)
          Plaintiff,          :
                              :
   - versus -                 : U.S. Courthouse
                              : Brooklyn, New York
QUEENS BALLPARK COMPANY, LLC.,:
          Defendant           : June 28, 2011
----------------------------X
```

P A R T I A L L Y   S E A L E D

TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

A   P   P   E   A   R   A   N   C   E   S:


<u>For the Plaintiff</u>:          **Ira D. Tokayer, Esq.**
                             **Leo Klein, Esq.**
                             **Julie Fessel**
                             Ira D. Tokayer, Esq.
                             405 Lexington Avenue
                             7th Floor
                             New York, NY 10018


<u>For the Defendant</u>:          **Avery S. Mehlman, Esq.**
                             **Jonathan Adler, Esq.**
                             Herrick Feinstein, LLP
                             2 Park Avenue
                             New York, NY 10016


<u>For Non-Party Aramark</u>:      **David Field, Esq.**
                             Lowenstein Sandler
                             1251 Avenue of the Americas
                             New York, NY 10020


<u>Transcription Service</u>:      <u>**Transcription Plus II, Inc.**</u>
                             3589 Tiana Street
                             Seaford, N.Y.  11783
                             Transcriptions2@verizon.net


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  Civil Cause for Civil Hearing,

2     docket number 10-CV-2618, <u>Kosher Sports, Inc. v. Queens</u>

3     <u>Ballpark Company, LLC.</u>

4          Counsel, please state your appearances for the

5     record.

6          MR. TOKAYER:  Ira Tokayer for the Plaintiff,

7     Kosher Sports.  With me is Leo Klein.

8          THE COURT:  Welcome.

9          MR. MEHLMAN:  Avery Mehlman for QBC, along with

10    Mr. Adler, as well as in-house counsel for QBC, James

11    Denniston.  Good morning, your Honor.

12         THE COURT:  Good morning.

13         And Mr. Tokayer, if you would just introduce

14    the individuals seated with you at counsel table.

15    Mr. Katz and?

16         MR. TOKAYER:  This is Julie Fessel, who is an

17    assistant of mine.

18         THE COURT:  All right.  Ms. Fessel, how do you

19    spell your last name.

20

21         MS. FESSEL:  F like Frank, e-s-s, like Sam,

22    e-l.

23         THE COURT:  All right.  Welcome to all of you.

24    Please be seated.  All right.

25         And I understand that we also have present

Transcription Plus II, Inc.

3

Proceedings

1   counsel for non-party witness Aramark.

2           MR. FIELD:  Yes, your Honor.  My name is David

3   Field, Lowenstein Sandler, for the non-parties in this

4   matter brought here to facilitate the witnesses.

5           THE COURT:  All right.  You're also welcome.

6           And I understand we have a number of witnesses

7   who are here.  We do have two attorney conference rooms,

8   so they're welcome to use those.  I don't know if it's

9   necessary to go out and give them instructions about

10  where they should be.  Apparently not.

11          This is on for an evidentiary hearing on

12  Plaintiff's motion to -- for contempt.  I just want to

13  cover a few preliminary matters.

14          I also have cross-motions for sanctions for

15  discovery violations.  I do not intend to address those

16  now.  If we have time at the conclusion of the hearing,

17  we can address those.  But we have a number of witnesses

18  here, and it's going to be a long day.  And I would like

19  to get the contempt hearing out of the way first.  If

20  necessary, we can schedule another proceeding on the

21  other pending motions.

22          I have received from both sides their

23  respective witness lists and exhibit lists as well as

24  pre-marked copies of the exhibits that each intends to

25  offer at trial.  And I note that the Plaintiff's

4

Proceedings

1  exhibits, many of them involve e-mails to and from

2  representatives of QBC.  I would like to move this

3  proceeding along so that we can finish in a day.

4          So let me ask Mr. Mehlman, is there any dispute

5  about the authenticity of these exhibits?

6          MR. MEHLMAN:  No, Your Honor.  And

7  preliminarily, we wish to move in all the deposition

8  testimonies that we've turned over.  And I imagine that

9  the majority if not all of those exhibits were discussed

10  during the course of the deposition testimony.  I believe

11  almost all of them were.  So we do not in any way

12  question the authenticity of those exhibits.

13          THE COURT:  Of -- you're talking about the --

14  you switched gears.  You were talking about the

15  depositions.  You don't dispute the authenticity of the

16  communications?

17          MR. MEHLMAN:  No.  No.

18          THE COURT:  So that we can deem them to be in

19  evidence?

20          MR. MEHLMAN:  Correct.

21          THE COURT:  All right.  And is there any

22  objection from Plaintiff to the proffer by QBC to

23  introduce the deposition transcripts in evidence?

24          MR. TOKAYER:  Yes, Your Honor.

25          THE COURT:  On what basis?

5

Proceedings

1          MR. TOKAYER:  If the witness are available then
2    they should testify.
3          MR. MEHLMAN:  The only transcripts that I would
4    ask to move into evidence that I turned over to Mr.
5    Tokayer were the transcripts of the witnesses that are
6    going to testify.  Those are the transcripts of Mr.
7    Kleckner, Mr. Katz and Mr. Landeen.  Those are the
8    transcripts of their depositions that I asked to move
9    into evidence.  I did not ask or turn over or list on my
10   lists any other transcripts.
11         THE COURT:  All right.
12         MR. TOKAYER:  So Mr. Funk?
13         MR. MEHLMAN:  Yes.  I'm sorry.  Mr. Kleckner,
14   Mr. Funk -- I apologize -- Mr. Landeen and Mr. Katz,
15   those are the three transcripts that we're wishing and
16   we're --
17         THE COURT:  Four transcripts.
18         MR. MEHLMAN:  Four.  I apologize, Your Honor,
19   four transcripts.
20         THE COURT:  All right.  So all of these
21   witnesses are testifying.  So does Plaintiff withdraw his
22   objection?
23         MR. TOKAYER:  Well, these witnesses are all --
24   have all been subpoenaed to be here.  They're all
25   available to testify and they will testify.  There's no

6

Proceedings

1  reason or basis for the depositions therefore to be

2  admitted into evidence or the record to be otherwise

3  cluttered.

4          THE COURT:  Well, Mr. Katz is an adverse party,

5  so his transcript could be admitted as the admission of a

6  party opponent.  So I will overrule that objection.  And

7  while I certainly think this is going to delay the

8  procedure, I will allow the defense to offer designated

9  portions of the remaining transcripts into evidence.

10         MR. MEHLMAN:  Your Honor, this is an

11  evidentiary hearing; this is not a trial.  I really was

12  hoping and I don't see any legal reason why depositions

13  and statements of the witnesses that will be testifying

14  today, which are accurate reflections of their

15  testimonies, should not be moved into evidence as part of

16  the record for the purpose of evidentiary hearing.

17         If -- Mr. Tokayer could have his objection.  I

18  don't know what the basis for objection is.  Cluttering

19  the record is not really a legal basis for objecting.  I

20  do not want to have to go and re-question every witness

21  regarding all the testimony in their deposition.  We were

22  hoping that the testimony today in court would go along

23  with their deposition testimony, and I see no reason, no

24  legal reason why for the purposes of an evidentiary

25  hearing that the prior statements under oath of these

Transcription Plus II, Inc.

Proceedings

1  witnesses taken during depositions that were conducted by

2  Mr. Tokayer should not be part of the record.  And to say

3  other -- I don't see a legal reason for not allowing it.

4  Cluttering the record is not a legal reason.

5          We have a right to rely upon the statements

6  that were made under oath at the depositions, and we

7  expect to.  And I think it would be unfair to the Court's

8  time to have to go through all the testimony that is

9  already on the record in these depositions once again

10  during the course of this hearing.  This hearing is an

11  evidentiary hearing and not a trial.

12          THE COURT:  Well, what are you proposing then.

13  Because you're suggesting -- when are you going to

14  designate those portions that you believe are relevant to

15  this proceeding?  Because otherwise, you're saying that

16  the Court should go through the entire deposition

17  transcript.

18          MR. MEHLMAN:  I agree.  That's why at the

19  conclusion of the hearing QBC was going to ask the

20  Court's permission to put in post-hearing memorandums to

21  the Court outlining both our legal argument as well as

22  the factual statements that were adduced both at the

23  hearing and during the course of the depositions to

24  highlight to the Court what we believe to be the facts,

25  and then analyze those facts under what we believe to be

Transcription Plus II, Inc.

8

Proceedings

1  the appropriate law and submit that to the Court as

2  opposed to hearing memoranda.  And that is what we expect

3  to do with the Court's permission.  And we would like --

4  well, we think should be permitted to use statements made

5  by the witnesses at the depositions during the course of

6  the deposition.

7           THE COURT:  Mr. Field, do you want to be

8  seated?

9           MR. FIELD:  Your Honor, actually I would like

10 to speak when you get to the exhibits.  I have a

11 confidentiality concern not an admissibility or relevancy

12 concern.  But I want to address some of my documents,

13 which are being used by these parties, on a

14 confidentiality issue.  If you want me to do it now, I'll

15 be glad to.

16          THE COURT:  Why don't you have a seat, and I

17 will hear from you before we begin the testimony.

18          Anything else, Mr. Mehlman?  I'd like to move

19 this along.

20          MR. MEHLMAN:  No.  I just want to know if the

21 Court is going to grant us permission to cite to the

22 deposition testimony in a post-memorandum brief.  And

23 therefore, we ask that these depositions of the witnesses

24 that are being called today be made part of the record.

25          THE COURT:  Well, that -- you can ask that

9

Proceedings

1   question.  I'm not prepared to answer it because I didn't

2   -- I haven't even decided about whether there would be

3   post-hearing briefing.

4          Mr. Tokayer, you want to address the issues

5   raised by Mr. Mehlman?

6          MR. TOKAYER:  Under the federal rules, if a

7   witness is available to testify he should testify, and

8   depositions are not otherwise permissible.  If Mr.

9   Mehlman wants to designate portions, I'm prepared to take

10  a look at those portions and perhaps re-designate other

11  portions.  But I would object to that procedure.

12          If the witnesses that he identified are all

13  present, I will be calling each and every one of them,

14  and Mr. Mehlman will have an opportunity to also examine

15  those witnesses.  I believe they are also identified by

16  Mr. Mehlman in his witness list.

17          THE COURT:  Well, what is the prejudice from

18  having the full record before the Court?

19          MR. TOKAYER:  There are portions of those

20  transcripts that are not only irrelevant but that are

21  prejudicial I believe.  Those depositions were taken not

22  in a cross-examination mode.  I did not have an

23  opportunity to examine those witnesses fully on all the

24  documents nor was I anticipating that that testimony

25  would be used in court.  I was preparing myself to use --

Transcription Plus II, Inc.

10

Proceedings

1  to get those facts out and to use portions of those

2  depositions at a hearing or at a trial later to impeach

3  the witnesses.  But the -- it was not designed to be used

4  at trial, and I fully anticipated that those people would

5  be available to testify.

6          At the beginning of each deposition, I asked

7  questions about where they lived and whether or not they

8  had any plans to be outside of the jurisdiction.  And in

9  fact, each of those witnesses was identified by me for

10 purposes of this hearing as a witness and identified as

11 well by Queens Ballpark Company.

12         THE COURT:  Just remind me, prior to my

13 scheduling and evidentiary hearing I recall there was a

14 discussion with counsel about whether or not the

15 evidentiary hearing should proceed solely on the basis of

16 transcripts.  What was -- remind me, what was the

17 Plaintiff's position on that?

18         MR. TOKAYER:  That the witnesses had to appear

19 in court so that the Court could make a credibility

20 determination upon examining those witnesses and seeing

21 their demeanor and having them testify in court.  And

22 that's why Your Honor ruled that the hearing should go

23 forward.

24         THE COURT:  Mr. Mehlman, would you be prepared

25 to designate specific portions of the transcripts that

Transcription Plus II, Inc.

11
                    Proceedings

1  you wish to offer?

2           MR. MEHLMAN:  Yes, Your Honor, but not at this

3  time.  I would ask for an opportunity to do that at the

4  conclusion of the hearing, keep the hearing open, and

5  designate the portions that we believe are relevant and

6  ask that those be admitted into evidence, the relevant

7  portions of the deposition testimony.

8           THE COURT:  Well, I don't think it should be at

9  the conclusion of the hearing.  I should -- I think it

10 should be while the witnesses are still available so that

11 they can be further questioned about those portions.

12          MR. MEHLMAN:  Your Honor, if that's what the

13 Court wants we'll have to take a break and we'll have to

14 review that.  I was -- I did not expect there to be an

15 objection for admitting into evidence as part of the

16 record for hearing the depositions that were taken by

17 Plaintiff.  I mean, they're accurate representations of

18 statements made by the witnesses that are testifying.

19 They were done under oath and they were taken down by a

20 court stenographer.

21          THE COURT:  I didn't expect there to be an

22 objection either, and I have not definitively said that

23 you can't offer it.  But I think in fairness, if there

24 are specific portions that you believe are directly

25 relevant to the issues that there ought to be an

                    Transcription Plus II, Inc.

12

Proceedings

1  opportunity to explore those areas further.

2           All right.  Let's bring out the first witness.

3           MR. MEHLMAN:  Well, Your Honor, just on a

4  scheduling issue, Mr. Howard is one of the high-ranking

5  members of QBC.  I believe his title is senior executive

6  vice president.  And he has pressing matters this

7  morning.  He was here at 9 o'clock this morning.

8           If the Court will indulge QBC and allow Mr.

9  Tokayer to call him as the first witness, he has meetings

10 all day long.  And I believe based upon conversations

11 that Mr. Tokayer has had with the Court, his testimony

12 should not be lengthy.  So I'm going to ask with the

13 Court's permission if the Court could order Mr. Tokayer

14 to call him, Mr. Howard, as the first witness.

15          THE COURT:  Is there any reason not to call him

16 first?  He was the witness who in our scheduling

17 discussions a number of weeks ago, the Plaintiff was

18 hoping to be able to stipulate to his testimony.  So I

19 assume that he -- we can make quick work of him.

20          MR. TOKAYER:  I would like to have a very brief

21 opening and then call Mr. Katz.  I think it will make

22 things much --

23          THE COURT:  I don't think an opening is

24 necessary.  I'd like to get the witnesses on and off the

25 stand.  We have quite a few witnesses, and I want to get

Proceedings

1  that done today.  I'll allow you to make a closing

2  statement.

3              MR. TOKAYER:  My opening is really going to be

4  -- I want the Court to understand, you know, what the

5  roadmap is.  It will not take more than a few minutes.

6  But I was planning on having Mr. Katz.  I think it will

7  benefit the Court if we can call Mr. Katz first.

8              THE COURT:  I've -- I have reviewed the

9  exhibits, which I think lay out the roadmap, so I don't

10 think it's really necessary.  So can we take Mr. Howard?

11 Let's take Mr. Howard first.

12             MR. TOKAYER:  Okay, Your Honor.

13             MR. FIELD:  Judge, while they're getting

14 Mr. Howard can I address that confidentiality problem?

15             THE COURT:  Yes.

16             MR. FIELD:  My client was subpoenaed in this

17 case, and we produced several thousand pages of

18 documents, many of which are business records that is

19 redacted sensitive business information.  We were not

20 party to a confidentiality agreement, which these parties

21 are.  So when their discovery went forward, many of those

22 same documents were produced in unredacted form.

23             Counsel were kind enough to share with me their

24 exhibits before this hearing, and I had a chance to go

25 through them.  And I see that the ones they're using are

Transcription Plus II, Inc.

14

Proceedings

1  the unredacted ones, which are marked confidential by the

2  -- basically by the Mets Production.

3          I don't know how the evidence here is going to

4  be received in the public record, but I do have a concern

5  that the unredacted versions of these documents, such as

6  our contracts with percentages and things like that.  So

7  I call that to the Court's attention.

8          There is a confidentiality agreement in place,

9  but I'd like some assurance from the parties, and to the

10  extent Your Honor can give me that, that these documents

11  will not find their way into the public record

12  unnecessarily.

13          MR. MEHLMAN:  Your Honor, there are -- the

14  Court asked me regarding Mr. Tokayer's exhibits whether

15  they were authentic, and there's no reason to believe

16  that they're not e-mails that were mailed amongst the

17  individuals.  But there are other evidentiary issues

18  regarding those e-mails, including many of them are for

19  attorneys' eyes only.  So certainly sharing Mr. Field's

20  concerns, they should not be made part of the public

21  record.

22          And certainly during discussions of certain

23  portions of it, Mr. Katz as well as Mr. Tokayer's

24  assistant should be removed from the courtroom as they do

25  contain information that the Court has allowed QBC and

Transcription Plus II, Inc.

15

                    Proceedings

1   Aramark, for that matter, to mark as for attorneys' eyes,

2   so those are the issues.

3          THE COURT:  Well, you're going to have to alert

4   me if and when we get to portions that are attorneys'

5   eyes only.  I'm actually surprised to hear that.  But if

6   they were designated in good faith as attorneys' eyes

7   only and there hasn't been an objection to that

8   designation prior to today, I do not want to spend the

9   time now having to resolve whether or not they are

10  properly designated.

11         So if you alert me that this is attorneys' eyes

12  only, we will then ask Mr. Katz to leave the room during

13  the discussion of that document.  I'm not sure why Mr.

14  Tokayer's assistant, if she's an attorney and associate,

15  would have to leave, but I don't have the terms, the

16  protective order in front of me.

17         MR. MEHLMAN:  Certainly Mr. Katz, Your Honor.

18  Thank you.

19         THE COURT:  And in response to Mr. Field's

20  statement, I'm somewhat surprised that there was not a

21  written agreement entered into between the subpoenaing

22  party and the subpoenaed party regarding confidentiality.

23  Are these -- were these documents produced by Aramark or

24  by QBC that you're referring to?

25         MR. FIELD:  In the first instance, they were

                Transcription Plus II, Inc.

16

Proceedings

1  produced by Aramark.  We redacted the confidential

2  information so we didn't need a confidentiality agreement

3  as you suggest.

4        Apparently, I'm not privy to the discovery

5  between the Mets and the Plaintiff.  There was discovery

6  exchanged.  There was a confidentiality agreement between

7  those parties, which protected the same documents.  So we

8  have two versions of the same documents, redacted and

9  unredacted.

10        They -- in my opinion, if they were going to

11  place it into the public record they should have put the

12  unredacted -- they should have put the redacted version

13  in to protect the confidentiality.  They didn't do that.

14  I didn't have a chance to catch that horse before it left

15  the barn, but now we have that version being offered here

16  today.

17        THE COURT:  The exhibits themselves if they are

18  covered by a confidentiality agreement are going to

19  retain that protection.  They're not going to be publicly

20  filed.  They will be marked.  They will be in evidence.

21  They will be for the Court to review.  They're not going

22  to be part of the public record.

23        To the extent that there is testimony that

24  would disclose confidential information, what we'll have

25  to do is if it's for attorneys' eyes only I rely on the

Transcription Plus II, Inc.

17

                    Mr. Howard - Direct - Mr. Tokayer

1  parties to protect their information and bring that to
2  the Court's attention so that those individuals who
3  should not be privy to that information can be asked to
4  leave the courtroom as for matters that are designated
5  confidential not but confidential for attorneys' eyes
6  only.  At the present time, we do not have any outside
7  parties present, and the transcript itself can be subject
8  to a protective order unless and until the parties have
9  an opportunity to review it and to designate portions
10 that would be confidential.

11             If a member of the press or some other third
12 party walks in, then we are going to have an issue if a
13 lot of those documents are designated confidential.  But
14 I don't know that they have been.

15             MR. FIELD:  Thank you.

16             THE COURT:  All right.  Mr. Treadwell (ph), if
17 you could swear the witness.

18             (Witness takes the stand)

19             MR. CLERK:  If you could state your full name
20 and then spell your last name?

21             MR. HOWARD:  David C. Howard, H-o-w-a-r-d.

22             THE COURT:  All right.  You may proceed.

23             MR. TOKAYER:  Thank you, your Honor.

24             Does Your Honor wish me to take the podium?

25             THE COURT:  It's up to you.  I do want you to

                                                              18
                    Mr. Howard - Direct - Mr. Tokayer

1  stay close to a microphone so that all the questions can

2  be recorded.

3  D A V I D   H O W A R D

4      having been first duly sworn, was examined and

5      testified as follows:

6  DIRECT EXAMINATION

7  BY MR. TOKAYER:

8  Q.    Good morning, Mr. Howard.

9  A.    Good morning.

10 Q.    How are you today?

11 A.    Doing well, thanks.

12 Q.    Thank you.  My name is Ira Tokayer.  I'm the attorney

13 for Kosher Sports.  I don't believe we've met, have we?

14 A.    We have not.

15 Q.    What is your title with the Mets?

16 A.    Executive vice president business operations.

17 Q.    And are you also admitted to practice as an attorney

18 in the state of New York?

19 A.    I am.

20 Q.    And have you been an attorney in the state of New

21 York since 1986?

22 A.    Yes.

23 Q.    Did Queens Ballpark Company, which I'll refer to as

24 QBC, enter into a 30-year deal with Aramark for food,

25 beverage and retail merchandise services at Citi Field?

19

Mr. Howard - Direct - Mr. Tokayer

1    A.   Yes.

2    Q.   When?

3    A.   I don't recall the year that the contract was

4    actually signed, but my recollection is about a couple

5    years before Citi Field opened.  So I would say about

6    2007.

7    Q.   And Citi Field opened for the 2009 season?

8    A.   Yes.

9    Q.   And Aramark was the concessionaire at Shea Stadium,

10   was it not?

11   A.   Yes.

12   Q.   And at Shea Stadium the Mets received a percentage of

13   Aramark's gross revenues from sales of food, beverage and

14   retail merchandise, correct?

15   A.   Yeah.  I believe that's what the agreement provided.

16   Q.   Okay.  And under the new arrangement entered into

17   approximately in 2007, QBC and Aramark share a portion of

18   the net, correct?

19   A.   I think it's a little more complicated than that so

20   I'd rather let the contract speak for itself.

21   Q.   And what contract are you referring to?

22   A.   The contract between QBC and Aramark.

23   Q.   And is that called the usage agreement?

24   A.   I believe it is, yes.

25   Q.   Let me show you what we pre-marked as Exhibit 2.

20

Mr. Howard - Direct - Mr. Tokayer

1          MR. TOKAYER:  If I may approach, Your Honor, I
2     have a binder --
3          THE COURT:  You may.
4          MR. TOKAYER:  -- for the witness.
5          THE COURT:  That's Plaintiff's Exhibit 2.
6          MR. MEHLMAN:  Your Honor, we object at this
7     time.  We ask that Mr. Katz be asked to leave the
8     courtroom during the questioning regarding Exhibit 2,
9     which is the usage agreement, which is for attorneys'
10    eyes only.  It has been demarcated that way by the Court
11    with the consent and the agreement between the parties
12    when it was turned over.
13         THE COURT:  All right.  And I see from the pre-
14    marked exhibit it does say highly confidential,
15    attorneys' eyes only.  Therefore, during the testimony
16    concerning this document I'm going to ask Mr. Katz to
17    step outside.
18
19
20
21
22
23
24
25

Transcription Plus II, Inc.

28

Mr. Howard - Cross - Mr. Mehlman

1           MR. MEHLMAN:  May I inquire, Your Honor?

2    CROSS-EXAMINATION

3    BY MR. MEHLMAN:

4    Q.    Looking at Exhibit No. 1, the Sports Business Daily

5    article that Mr. Tokayer showed you early during your

6    examination, is in fact the Aramark and Mets agreement a

7    joint venture, Mr. Howard?

8           MR. TOKAYER:  Objection.

9           THE COURT:  I'll allow it.

10          THE WITNESS:  It is not a joint venture.

11   Q.    Could you explain?

12   A.    Yeah.  When -- at the Mets, whenever we have

13   significant contractual relationships we often refer to

14   them as partnerships because we highly value those

15   critical relationships, and that extends to broadcasts

16   relationships, major sponsorship relationships, certainly

17   the naming rights relationship with Citi and the

18   relationship with Aramark.  We refer to them as

19   partnerships in the sort of common parlance not in the

20   legal sense of the term.  And that is the -- essentially,

21   the gist of my comments to the Sports Business Daily.

22   Q.    What is the relationship between Aramark and QBC?

23   A.    The relationship between Aramark and QBC is a rights

24   relationship, and the rights are set forth in the usage

25   agreement.

Transcription Plus II, Inc.

29

                    Mr. Katz - Direct - Mr. Tokayer

1  Q.   Thank you very much.

2             MR. MEHLMAN:  Nothing further, Your Honor.

3             THE COURT:  All right.  Any redirect?

4             MR. TOKAYER:  No, Your Honor.

5             THE COURT:  All right.  Mr. Howard, you may

6  step down, and you're free to leave.

7             THE WITNESS:  Thank you, Judge.

8             THE COURT:  All right.  Mr. Tokayer, you can

9  call your next witness.

10             MR. TOKAYER:  I call to the stand Mr. Jonathan

11  Katz.

12             THE CLERK:  Mr. Katz, if you could remain

13  standing please.  Please raise your right hand.

14             (Witness takes the stand)

15             MR. CLERK:  If you could state your full name

16  and then spell your last name?

17             MR. KATZ:  Jonathan Katz, K-a-t-z.

18             THE COURT:  All right.  Mr. Tokayer, you may

19  proceed.

20             MR. TOKAYER:  Thank you, your Honor.

21  J O N A T H A N   K A T Z

22      having been first duly sworn, was examined and

23      testified as follows:

24  DIRECT EXAMINATION

25  BY MR. TOKAYER:

30

Mr. Katz - Direct - Mr. Tokayer

1   Q.   Good morning, Mr. Katz.

2   A.   Good morning.

3   Q.   Please introduce yourself to the Magistrate Judge.

4   A.   I'm Jonathan Katz, president of Kosher Sports.

5           THE COURT:   I'm aware of that.

6   Q.   And what is the business of Kosher Sports generally?

7   A.   To offer kosher food products at stadiums and

8   entertainment venues throughout the country.

9   Q.   How long have you had a relationship with the Mets?

10  A.   Since 2006.

11  Q.   And did you have an agreement, a written agreement

12  with the Mets from the beginning of your relationship?

13  A.   Yes.

14  Q.   With which entity did you contract at the beginning

15  of your relationship?

16  A.   Sterling Mets.

17  Q.   Did there come a time when Kosher Sports entered into

18  an agreement with respect to Citi Field?

19  A.   Yes.

20  Q.   And with whom was that agreement entered into?

21  A.   QBC.

22  Q.   What is your understanding of QBC's relationship to

23  Citi Field?

24          MR. MEHLMAN:   Objection, relevance, your Honor.

25          THE COURT:   I'll allow it for background.

31

Mr. Katz - Direct - Mr. Tokayer

1        THE WITNESS:  QBC was -- is -- operates the
2   ballpark Citi Field for the Mets.
3   Q.   Let me invite your attention to Exhibit 4 in the
4   binder before you.  Do you recognize that document?
5   A.   Yes.
6   Q.   How do you recognize that document?
7   A.   I signed this documented.
8   Q.   And what is it?
9   A.   It's the agreement between Kosher Sports and Queens
10  Ballpark Company.
11        MR. TOKAYER:  I'd like to move Exhibit 4 into
12  evidence, Your Honor.
13        MR. MEHLMAN:  No objection, Your Honor.
14        THE COURT:  Received.
15  (Plaintiff's Exhibit No. 4 received into evidence)
16  Q.   And I see the agreement is dated January 23rd, 2008.
17  Is that approximately the time that you entered into this
18  agreement?
19  A.   I believe we entered into this agreement or signed
20  the agreement on January 31st, 2008.
21  Q.   With whom did you negotiate the agreement?
22  A.   With the Mets.
23  Q.   And who specifically?
24  A.   Greg Stangel.
25  Q.   Now, did all the terms that you and Mr. Stangel

32

Mr. Katz - Direct - Mr. Tokayer

1   negotiated end up in Exhibit 4?

2        MR. MEHLMAN:  Objection, relevance, your Honor.

3   This is a contempt hearing limited to the issues of the

4   contempt motion by Mr. Tokayer.

5        THE COURT:  What is the relevance of this to

6   the issues before the Court?

7        MR. TOKAYER:  If I can have a little latitude,

8   Your Honor, these issues go to control and whether or not

9   QBC in fact controls Aramark.

10       THE COURT:  Well, I want to remind you that the

11  issue before me is not the defendant's liability on the

12  claims in the case.  It -- this is specifically a

13  contempt proceeding.  And while I will allow you some

14  latitude for purposes of background, we -- I will not

15  allow you to try your entire case in one day at a hearing

16  with a limited purpose.

17       MR. TOKAYER:  We absolutely do not wish to do

18  that.  This evidence goes towards whether or not Aramark

19  acted on behalf of the Mets, which is the issue before

20  you today.

21       MR. MEHLMAN:  Objection, Your Honor.  I don't

22  believe that's the issue before the Court.

23       THE COURT:  I don't believe that that is the

24  issue.  The issue is whether or not the defendant

25  violated the terms of a preliminary injunction.

Transcription Plus II, Inc.

33

Mr. Katz - Direct - Mr. Tokayer

1          MR. TOKAYER:  Whether or not QBC acted or any
2    of its officers, directors, agents or anyone on its
3    behalf took any action directly or indirectly with
4    respect to Kosher Sports' operations at Citi Field.  This
5    goes to that issue.
6          THE COURT:  Well, let's not linger on what
7    happened in 2008 when the issues before the Court are
8    what happened after August of 2010.
9    BY MR. TOKAYER:
10   Q.   Again, did all the terms of the agreement that you
11   negotiated with Mr. Stangel end up in Exhibit 4?
12   A.   No.
13   Q.   Okay.  Which terms did not end up in Exhibit 4?
14         MR. MEHLMAN:  Objection.  Objection, Your
15   Honor, again, relevance.  This is a contempt hearing.
16   It's specifically on a motion by Plaintiff referencing
17   specific actions that happened after August of 2010.
18   Nothing that's being discussed here is relevant to that
19   issue.  It's regarding specific allegations of actions
20   committed by members of QBC after August 2010 that
21   indirectly or directly affected Mr. Katz's operations.
22         THE COURT:  I'd like a proffer.  What do you
23   expect the witness to testify?
24         MR. TOKAYER:  It goes to the relationship
25   between Kosher Sports --

34

                    Mr. Katz - Direct - Mr. Tokayer

1            THE COURT:  That wasn't my question.  My

2    question was what do you expect him to say.

3            MR. TOKAYER:  He will testify that there were

4    Aramark deal points that were negotiated by the Mets that

5    didn't end up in Exhibit 4 because they were negotiated

6    by the Mets but they were designed to end up in Aramark's

7    agreement.  He was assured that those points would end up

8    in the Aramark agreement.

9            THE COURT:  All right.  I've heard enough.  The

10   question is what happened in 2010.

11           MR. TOKAYER:  Yes.  In order to find out what

12   happened in 2010, Your Honor needs to understand the

13   relationship between QBC and Aramark.

14           THE COURT:  I'd like to know what the

15   relationship was in 2010.

16           MR. TOKAYER:  This is establishing that.  But

17   it's the same relationship --

18           THE COURT:  I'll allow very brief testimony on

19   this.  But remember that you are limited to one hour of

20   testimony from this witness, so if I were you I would

21   move quickly to 2010.

22   BY MR. TOKAYER:

23   Q.   Which items that you negotiated with Mr. Stangel did

24   not end up in Exhibit 4?

25   A.   So-called Aramark points.

Mr. Katz - Direct - Mr. Tokayer

1  Q.   Were you concerned that the so-called Aramark items

2  that you negotiated with Mr. Stangel were not in Exhibit

3  4?

4  A.   No.

5  Q.   Why not?

6  A.   I was assured via e-mail that Michael Landeen and QBC

7  were on board with all the Aramark points and they were

8  getting to the Aramark agreement.

9  Q.   Mr. Landeen assured you that the Aramark points would

10 end up in the Aramark agreement, correct?

11 A.   Correct.

12 Q.   Okay.  And you said there's an e-mail to that effect?

13 A.   Yes.

14 Q.   Is Exhibit 3 that e-mail?

15 A.   Yes.

16        MR. TOKAYER:  And I note that Exhibit 3 is

17 already in evidence, Your Honor.

18        THE COURT:  Yes.

19        MR. MEHLMAN:  Objection.  When was Exhibit 3

20 put into evidence?

21        THE COURT:  Well, there's no dispute about

22 authenticity, and the witness has just identified this

23 document as constituting the communication that he just

24 referred to.  So is there any objection?

25        MR. MEHLMAN:  No, Your Honor.

36

Mr. Katz - Direct - Mr. Tokayer

1       THE COURT:  Received.

2   (Plaintiff's Exhibit No. 3 received into evidence)

3   Q.   Was a press release, Mr. Katz, issued announcing the

4   agreement between QBC and Kosher Sports?

5   A.   Yes.

6   Q.   Who issued that press release?

7   A.   The Mets.

8   Q.   How did you become aware of that press release?

9   A.   It was sent to me beforehand before it was published,

10  just a draft, take a look at it, and then I saw it on the

11  Internet on their website after it was published.

12  Q.   And did that press release announce the Mets' and

13  Kosher Sports' agreement for Citi Field?

14          MR. MEHLMAN:  Objection, Your Honor.  The

15  witness is being led, Your Honor.  I think an appropriate

16  question should be asked.

17          THE COURT:  Yes.  Objection sustained.

18  Q.   Look at Exhibit 6, Mr. Katz, would you?  Is that the

19  press release that you saw in or about August 2008 before

20  it was published and then after it was published?

21          MR. MEHLMAN:  Objection.

22          THE COURT:  Again, you're -- can you just ask

23  non-leading questions?  Can you identify Plaintiff's

24  Exhibit 6?

25          THE WITNESS:  Yes.  It's the press release that

37

Mr. Katz - Direct - Mr. Tokayer

1   was issued by the Mets on the Mets website announcing the

2   Mets and Kosher Sports signed a new multi-year agreement

3   for Citi Field.

4           MR. TOKAYER:  I'd like to move Exhibit 6 into

5   evidence, Your Honor.

6           THE COURT:  Any objection?

7           MR. MEHLMAN:  Only relevance, Your Honor.

8           THE COURT:  Received.

9   (Plaintiff's Exhibit No. 6 received into evidence)

10  Q.   At the time of the press release, Mr. Katz, did

11  Kosher Sports have an agreement with Aramark?

12  A.   No.

13  Q.   When was that agreement signed?

14  A.   Sometime in January of 2009.

15  Q.   Now, can a subcontractor such as Kosher Sports enter

16  into an agreement with Aramark for Citi Field without an

17  agreement with QBC first?

18          MR. MEHLMAN:  Objection, Your Honor.

19          THE COURT:  Sustained.

20  Q.   Let me direct your attention, Mr. Katz, to Exhibit

21  10.  Is that an e-mail that you received from Mr. Funk on

22  September 1st, 2009?

23  A.   Yes.

24  Q.   And let me direct your attention to Exhibit 11.  Is

25  that an e-mail that you received from Mr. Vicenzio (ph)

                                                                    38
                     Mr. Katz - Direct - Mr. Tokayer

1   in September of 2009?

2   A.   Yes.

3              MR. TOKAYER:  Your Honor, I'd like to move

4   Exhibits 10 and 11 into evidence.

5              THE COURT:  Any objection?

6              MR. MEHLMAN:  Relevance, Your Honor.  And there

7   is no --

8              THE COURT:  I'll --

9              MR. MEHLMAN:  And there is no Bates number

10  stamp on Exhibit Number 10.  I don't know when it was

11  turned over to counsel, but we never received that

12  document just to let the record reflect.  I don't believe

13  that Mr. Tokayer turned that over during the term of

14  discovery.  And I made that objection during the course

15  of the deposition when Mr. Tokayer admitted it or

16  attempted to admit it.

17             Additionally, Your Honor, Number 10

18  specifically refers to a fresh squeezed lemonade item,

19  which is wholly irrelevant to the Kosher Sports contract

20  that's at -- that is at issue in this case.

21             THE COURT:  Exhibit 10 was -- Mr. Tokayer, was

22  this turned over during discovery?

23             MR. TOKAYER:  I don't know if it was turned

24  over, but I also don't believe it was called for.

25             THE COURT:  Well, I see from the copy of it

                        Transcription Plus II, Inc.

39

Mr. Katz - Direct - Mr. Tokayer

1  that it was offered as an exhibit during a deposition on

2  May 26, 2011.  So at a minimum, the defense has had it

3  for over a month.  I will allow it.

4          I will also allow Exhibit 11, again, for

5  they're worth, and recognizing that they seem to relate

6  to lemonade.

7  (Plaintiff's Exhibit Nos. 10 and 11 received into

8  evidence)

9  Q.   What is your relationship if any to the lemonade

10 issue that is discussed in Exhibit 10?

11         MR. MEHLMAN:  Objection, Your Honor.

12         THE COURT:  I'll allow it.

13         THE WITNESS:  It's another one of my companies,

14 Fun Foods LLC.

15         THE COURT:  I'm sorry.  I didn't hear the

16 answer.

17         THE WITNESS:  It's another one of my companies,

18 Fun Foods LLC.

19         THE COURT:  So it's not Kosher Sports?

20         THE WITNESS:  Correct.

21 Q.   Now, with respect to Kosher Sports desire to operate

22 on Fridays and Saturdays, with which entity did you first

23 raise your desire to operate on Fridays and Saturdays?

24         MR. MEHLMAN:  Objection.

25         THE COURT:  I'll allow it.

40

Mr. Katz - Direct - Mr. Tokayer

1       THE WITNESS:  The Mets.

2   Q.   And with whom from the Mets specifically?

3   A.   Mike Landeen.

4   Q.   Who is Mike Landeen?

5   A.   He is the vice president of venue services for the

6   Mets.

7   Q.   And when did you first raise that issue with Mr.

8   Landeen?

9   A.   In 2007.

10  Q.   Where did you raise the Friday, Saturday operations

11  first with Mr. Landeen?

12       MR. MEHLMAN:  Objection, relevance, Your Honor.

13       THE COURT:  I'll allow it.  You can have a

14  standing objection to everything preceding August of

15  2010.

16       MR. MEHLMAN:  But, Your Honor, the objection is

17  relevance referencing the contempt hearing, and what is

18  going on here now is exactly what I thought would happen

19  when the Court ordered an evidentiary hearing.  We're not

20  trying the merits of the case.  This case is -- this --

21       THE COURT:  I'm certainly capable of focusing

22  on the evidence that I believe goes to the issues before

23  me.  And I will allow this as background but, again,

24  subject to the limitations I've previously stated.  And

25  if Mr. Katz cannot in the time allotted get to 2010, then

41

                    Mr. Katz - Direct - Mr. Tokayer

1  he's got problems.

2          MR. MEHLMAN:  Your Honor, and I never would

3  question the Court on not being able to adduce what is

4  relevant, not relevant.  I just don't think it's

5  appropriate during the course of this hearing to have

6  these questions and these answers.

7          THE COURT:  And you have a standing objection

8  for --

9          MR. MEHLMAN:  Thank you, Your Honor.

10         THE COURT:  -- that reason.  So let's move on.

11 Q.   Where did you and Mr. Landeen have that conversation?

12 A.   On the concourse of Shea Stadium before a game.

13 Q.   And did you approach Aramark at that time?

14 A.   No.

15 Q.   What did you say to Mr. Landeen in 2007 about Friday

16 and Saturday operations and what did he respond?

17 A.   I expressed my desire to him that I wanted to sell my

18 products on Fridays and Saturdays, to which he responded

19 he was all for it so long as I had the approval of the

20 rabbis.

21 Q.   Did you raise your desire to operate on Fridays and

22 Saturdays at Citi Field with anyone else at the Mets?

23 A.   Yes.

24 Q.   With whom?

25 A.   Greg Stangel.

                    Transcription Plus II, Inc.

42

Mr. Katz - Direct - Mr. Tokayer

1  Q.   When?

2  A.   September of 2007.

3  Q.   What did you say to Mr. Stangel and what did he

4  respond?

5  A.   We were discussing the agreement.  He had told me

6  that the --

7         MR. MEHLMAN:  Objection, Your Honor.  This is

8  hearsay now.

9         THE COURT:  Who is Mr. Stangel?  Who was Mr.

10  Stangel at the time?

11         THE WITNESS:  Mr. Stangel is the person that I

12  negotiated the QBC/KSI agreement with.

13         THE COURT:  I'll allow it.

14  Q.   Did you complete your answer?

15  A.   Can you repeat the question please?

16  Q.   What did you say to Mr. Stangel about Friday,

17  Saturday operations and what did he respond?

18  A.   In the course of discussing the agreement that we

19  signed ultimately, he had told me that the fee was going

20  to start at $50,000, to which I responded to him that I

21  need to sell at every game in order to afford that fee.

22  And he responded to me done deal, we shook hands, and I

23  left his office.

24  Q.   Did you raise the Friday and Saturday issue at that

25  time in September 2007 with any representative of

43

Mr. Katz - Direct - Mr. Tokayer

1  Aramark?

2  A.   No.

3  Q.   When is the next time you raised the Friday, Saturday

4  issue with the Mets?

5  A.   I sent an e-mail to Pete Helfer and Rich Johns in

6  December of 2008.

7  Q.   And who is Rich Johns?

8  A.   Rich Johns at that time was the resident district

9  manager for Aramark.

10 Q.   Who was Pete Helfer?

11 A.   Pete Helfer replaced Greg Stengel in the Mets

12 corporate sales department.

13 Q.   Did Mr. Johns respond to your e-mail?

14 A.   No.

15 Q.   Did Mr. Helfer respond to your e-mail?

16 A.   No.

17 Q.   What did you do when you did not get a response?

18 A.   I sent a copy of the e-mail that I had sent to Rich

19 Johns and Pete Helfer to Adam Barrick at the Mets.

20 Q.   And who is Adam Barrick?

21 A.   Adam Barrick at the time was my contact person at the

22 Mets.

23 Q.   And when approximately did send that e-mail to Mr.

24 Barrick?

25 A.   January of 2009.

Transcription Plus II, Inc.

44

Mr. Katz - Direct - Mr. Tokayer

1  Q.   And was there some back and forth with and Mr.
2  Barrick concerning Friday and Saturday operations at that
3  time?
4          MR. MEHLMAN:  Objection, Your Honor.
5          THE COURT:  Sustained.
6  Q.   Let me invite your attention, Mr. Katz, to Exhibit 8.
7  Do you recognize that e-mail?
8  A.   Yes.
9  Q.   How do you recognize it?
10 A.   I received it from Adam Barrick.
11 Q.   And are there e-mails in this string that you also
12 either wrote or received?
13 A.   Yes.
14 Q.   And what is Exhibit 11?  I'm sorry, Exhibit 8, which
15 was pre-marked -- which was marked at the --
16 A.   Exhibit 8?
17 Q.   Exhibit 8.
18 A.   Exhibit 8 is a string of e-mails between me and Adam
19 Barrick maybe cc'ing Pete Helfer.
20 Q.   And does this e-mail contain the first e-mail that
21 you sent to Mr. Johns and to Mr. Helfer about in 2008
22 concerning Friday and Saturday operations?
23          MR. MEHLMAN:  Objection.
24          THE COURT:  Again, I've admonished you about
25 the excessive amount of leading.  Allow the witness to

Transcription Plus II, Inc.

45

Mr. Katz - Direct - Mr. Tokayer

1  testify.  Don't put words in his mouth.

2        MR. TOKAYER:  Yes, Your Honor.

3  Q.   Let me just invite your attention to the e-mail of

4  January 27th, 2009, I'm sorry, the last page, December

5  18th, 2008 from you to Mr. Johns and Mr. Helfer.  What is

6  that document?

7  A.   It's an e-mail I sent to Rich Johns and Pete Helfer

8  back in December of 2008.

9  Q.   I note that --

10        MR. TOKAYER:  Do I need to move this into

11  evidence, Your Honor, or is it in evidence?

12        THE COURT:  Subject to the same objection, it's

13  received.

14  (Plaintiff's Exhibit No. 8 received into evidence)

15  Q.   Mr. Katz, did you operate on Fridays and Saturdays

16  during Citi Field's inaugural season in 2009?

17  A.   No.

18  Q.   Why not?

19  A.   QBC said no.

20  Q.   When?

21  A.   In March of 2009.

22  Q.   How did they communicate that to you?

23  A.   I was sent an e-mail by Adam Barrick.

24  Q.   Okay.  Let me invite your attention to Exhibit 9.

25  What is it?

46

Mr. Katz - Direct - Mr. Tokayer

1  A.   It's an e-mail I received from Adam Barrick on March

2  2nd, 2009.

3          MR. TOKAYER:  I'd like to move this into

4  evidence, Your Honor.

5          THE COURT:  I'm sorry.  What's the number, 9?

6          MR. TOKAYER:  Yes.

7          THE COURT:  Received.

8  (Plaintiff's Exhibit No. 9 received into evidence)

9  Q.   Did Kosher Sports operate at Citi Field on Fridays

10  and Saturdays in 2010?

11  A.   No.

12  Q.   Why not?

13  A.   QBC said no.

14  Q.   When?

15  A.   In February of 2010.

16  Q.   How?

17  A.   Via e-mail to my partner.

18  Q.   Okay.  Let me direct your attention to Exhibit 12.

19  What is it?

20  A.   It's an e-mail sent to me from David Kestenbaum (ph)

21  forwarding me Adam Barrick's response to our -- to Friday

22  and Saturday sales.

23          MR. TOKAYER:  I'd like to move Exhibit 12 into

24  evidence, Your Honor.

25  (Plaintiff's Exhibit No. 12 received into evidence)

Transcription Plus II, Inc.

47

Mr. Katz - Direct - Mr. Tokayer

1  Q.   Mr. Katz, did there a come a time during the 2010

2  season that you and Aramark discussed Kosher Sports

3  operations on Fridays and Saturdays at Citi Field?

4  A.   Yes.

5  Q.   How did that come about?

6         THE COURT:  I'm sorry.  What's the time period

7  we're talking about now?

8  Q.   May of 2010.  What did you and Aramark or how did it

9  come about that you and Aramark spoke about Kosher Sports

10 Friday --

11         MR. MEHLMAN:  Objection.

12 Q.   -- and Saturday --

13         THE COURT:  I'll allow it.

14 Q.   -- operations?

15 A.   Tom Funk of Aramark sent me an e-mail saying they had

16 heard rumblings that I planned on opening my carts on

17 Fridays and Saturdays, and he wanted to know who from the

18 Mets approved it.

19 Q.   What did you respond?

20 A.   I told him that we were anxious to open on Fridays

21 and Saturdays, that we were waiting final approval from

22 the Mets.

23 Q.   And is Exhibit 18 the e-mail that you just referred

24 to, to which you -- to which Mr. Funk asked you who from

25 the Mets approved it and your response?

Transcription Plus II, Inc.

48

Mr. Katz - Direct - Mr. Tokayer

1  A.   Yes, it is.

2  Q.   And did the Mets in fact -- strike that.  What

3  happened next in May of 2010 with respect to your desire

4  to operate on Fridays and Saturdays?

5  A.   A couple days later I received an e-mail from Paul

6  Schwartz of the Mets stating that it was not something

7  that they could allow.

8  Q.   Okay.  And is Exhibit 19 that e-mail that you

9  received from Mr. Schwartz stating that Friday and

10 Saturday sales was not something that the Mets could

11 allow?

12 A.   Yes.

13         MR. TOKAYER:  If I could move Exhibit 19 into

14 evidence.

15         THE COURT:  Received.

16 (Plaintiff's Exhibit No. 19 received into evidence)

17         MR. TOKAYER:  Have I moved Exhibit 18 into

18 evidence?

19         THE COURT:  No.

20         MR. TOKAYER:  I'd like to move that as well,

21 Your Honor.

22         THE COURT:  Received.

23 (Plaintiff's Exhibit No. 18 received into evidence)

24 Q.   Did any representative of Aramark, Mr. Katz, tell you

25 in 2009 that Aramark would not let Kosher Sports operate

49

Mr. Katz - Direct - Mr. Tokayer

1  at Citi Field on Fridays and Saturdays?

2  A.   No.

3  Q.   Did any representative of Aramark tell you in 2010

4  that Aramark would not let Kosher Sports operate at Citi

5  Field on Fridays and Saturdays?

6  A.   No.

7  Q.   Prior to April 6th of 2011, did any representative of

8  Aramark tell you that they would not let you operate at

9  Citi Field on Fridays and Saturdays?

10          MR. MEHLMAN:  Excuse me, what date?  I didn't

11  hear.

12  Q.   April 6th of 2011.

13  A.   Before April 6th?

14  Q.   Yes.

15  A.   No.

16  Q.   And did you meet with Rich Johns of -- Rich Grey of

17  Aramark in January of 2011?

18  A.   Yes.

19  Q.   Who was Rich Grey?

20  A.   Rich Grey is the division manager of concessions for

21  Aramark at Citi Field.

22  Q.   What kind of a meeting was that scheduled to be?

23  A.   An operational meeting.

24  Q.   And did you discuss Friday and Saturday sales with

25  Mr. Grey at that time?

50

Mr. Katz - Direct - Mr. Tokayer

1  A.   Yes.

2  Q.   What did he say?

3  A.   One thing he said was it was important for the Mets

4  to give Aramark their decision and give it to them very

5  quickly.

6  Q.   And after the meeting did any representative of

7  Aramark tell you that they would not let Kosher Sports

8  operate at Citi Field on Fridays and Saturdays?

9  A.   Yes.

10  Q.   When for the first time?

11  A.   April 6th, 2011.

12  Q.   Who told you?

13  A.   Scott Kleckner.

14  Q.   And what did he say?

15  A.   He said he was not going to let us sell on that

16  Friday, April 8th, and that Saturday, April 9th, because

17  he did not have enough notice or words to that effect.

18  Q.   Had you given Aramark notice of Kosher Sports' intent

19  to operate on Fridays and Saturdays?

20  A.   Yes.

21  Q.   How?

22  A.   I believe it was by e-mail.  You sent -- my attorney

23  sent a letter to Scott Kleckner via e-mail and via fax.

24  Q.   Let me show you Exhibit 31.  Do you recognize it?

25  A.   Yes.

51

                    Mr. Katz - Direct - Mr. Tokayer

1  Q.   How do you recognize it?

2  A.   I reviewed it prior to being sent.

3  Q.   And what is it?

4  A.   It is a letter from my attorney to Scott Kleckner

5  dated August 27th, 2010.  And in it, it says that we will

6  be taking all necessary steps to arrange for the sale of

7  products at Citi Field on Friday nights and Saturdays.

8            MR. TOKAYER:  I'd like to move Exhibit 31 into

9  evidence, Your Honor.

10           THE COURT:  Received.

11 (Plaintiff's Exhibit No. 31 received into evidence)

12 Q.   Did Mr. Kleckner object to Exhibit 31?

13 A.   No.

14           MR. MEHLMAN:  Objection.

15           THE COURT:  Sustained.

16 Q.   What did Mr. Kleckner say if anything in response to

17 Exhibit 31?

18 A.   He --

19           MR. MEHLMAN:  Objection.

20           THE COURT:  What did he say when and to whom.

21 Why don't you be more specific.

22 Q.   What did Mr. Kleckner say if anything to any

23 representative of Kosher Sports on August 27th of shortly

24 thereafter in response to Exhibit 31?

25           THE COURT:  Did Mr. Kleckner say anything to

52

Mr. Katz - Direct - Mr. Tokayer

1   you in response to the letter of August 27th, 2010?

2           THE WITNESS:  He sent me an e-mail cc'ing -- he

3   actually cc'd me, and the e-mail was actually sent to my

4   attorney with my cc on it.

5   Q.   Is Exhibit 32 that e-mail?

6   A.   Yes.

7           MR. TOKAYER:  I'd like to move Exhibit 32 into

8   evidence.

9           THE COURT:  Received.

10  (Plaintiff's Exhibit No. 32 received into evidence)

11  Q.   In the April 6th, 2011 conversation between you and

12  Mr. Kleckner, which you testified, what did Mr. Kleckner

13  say if anything about other Fridays and Saturdays?

14  A.   That he was not saying no to other Fridays or other

15  Saturdays.

16  Q.   Does Kosher Sports have any other venues where

17  Aramark is the concession manager?

18  A.   Yes.

19  Q.   Where?

20  A.   Lincoln Financial Field and M&T Bank Stadium.

21  Q.   How long have you been operating in Lincoln Financial

22  Field?

23  A.   Since 2004.

24  Q.   How long have you been operating at M&T Bank in

25  Baltimore?

53

Mr. Katz - Direct - Mr. Tokayer

1   A.   Since 2005.

2   Q.   Were Tom Funk and Scott Kleckner of Aramark at

3   Lincoln Financial Field during the period that Kosher

4   Sports was operating there?

5            MR. MEHLMAN:  Objection.

6            THE COURT:  I'm getting a little confused now,

7   so can you break this down?

8            MR. TOKAYER:  Yes.

9            THE COURT:  Were they at -- were they

10  physically at the field or --

11  Q.   Were they -- did Tom Funk and Scott Kleckner work for

12  Aramark at Lincoln Financial Field when Kosher Sports

13  operated there?

14  A.   Yes.

15  Q.   Okay.  And then they came to Citi Field sometime

16  later, correct?

17  A.   That is correct.

18  Q.   Has Aramark requested Kosher Sports sell kosher

19  products at Lincoln Financial Field on Fridays and

20  Saturdays?

21  A.   Yes.

22  Q.   While Mr. Funk and Mr. Kleckner were stationed there

23  by Aramark?

24            MR. MEHLMAN:  Objection.  If Mr. Tokayer wants

25  to testify, we can allow him to testify.  I can call him

54

Mr. Katz - Direct - Mr. Tokayer

1   as a witness.

2              THE COURT:  Yes.  Again --

3              MR. MEHLMAN:  This is inappropriate.

4              THE COURT:  I don't know how many times I have

5   to tell you not to do this, and when I do tell you,

6   you've already signaled to the witness what his testimony

7   should be.  So stop it and stop it now.

8              MR. TOKAYER:  Yes, Your Honor.

9   Q.   You testified that Aramark requested that Kosher

10  Sports sell kosher products at Lincoln Financial Field on

11  Fridays and Saturdays.  Who were the Aramark individuals

12  that were stationed at Lincoln Financial Field at that

13  time?

14  A.   Tom Funk and Scott Kleckner.

15  Q.   Did either Mr. Funk or Mr. Kleckner raise any

16  credibility or integrity concerns with your operating at

17  Financial -- on Fridays and Saturdays at Lincoln

18  Financial Field?

19  A.   No.

20  Q.   And Aramark also -- with respect to M&T Bank Field,

21  has Kosher Sports sold there on Fridays and Saturdays?

22  A.   Yes.

23  Q.   Has Aramark made a request of Kosher Sports in that

24  regard?

25  A.   Yes, they have.

55

Mr. Katz - Direct - Mr. Tokayer

1   Q.   What is the most recent time that you received a

2   request from Aramark to operate at M&T Bank Stadium on

3   Fridays and Saturdays?

4   A.   The last event that they asked us to be open on

5   Fridays and Saturdays was Memorial Day weekend 2011, so

6   about a month ago.

7   Q.   How did Aramark communicate that request to you?

8   A.   Via e-mail.

9   Q.   I'm going to show you Exhibit 43.  Do you recognize

10  it?

11  A.   Yes.

12  Q.   How do you recognize it?

13  A.   It's an e-mail I received on April 15th, 2011 from

14  Aramark at M&T Bank Stadium.

15          MR. TOKAYER:  I'd like to move Exhibit 43 into

16  evidence.

17          THE COURT:  Any objection?

18          MR. MEHLMAN:  No, Your Honor, other than the

19  relevance situation.

20          THE COURT:  Received.

21  (Plaintiff's Exhibit No. 43 received into evidence)

22  Q.   Mr. Katz, what if anything is the difference between

23  Kosher Sports' relationship with Citi Field on the one

24  hand and Lincoln Financial Field and M&T Bank Stadium in

25  Baltimore on the other?

56

Mr. Katz — Direct — Mr. Tokayer

1          MR. MEHLMAN:  Objection.

2          THE COURT:  Sustained.

3  Q.   And what is Kosher Sports' relationship to Lincoln

4  Financial Field and M&T Bank Stadium?

5          MR. MEHLMAN:  Objection.

6          THE COURT:  I'm not sure what you mean by that.

7  Can you --

8  Q.   What is your arrangement --

9          THE COURT:  Do you have a contractual

10  relationship with respect to those other stadiums?

11          THE WITNESS:  Yes, I do, but I only have the

12  contract with Aramark at Lincoln Financial Field and M&T

13  Bank Stadium.

14  Q.   So you don't have a contract with the owner-operator

15  ball club at those stadiums, correct?

16  A.   That is correct.

17  Q.   And how about at Citi Field?

18  A.   At Citi Field I have a contract with QBC, the owner-

19  operator of the ballpark, and Aramark.

20  Q.   Are you familiar with the Mets A-to-Z Guide?

21  A.   Yes.

22  Q.   What is the A-to-Z Guide?

23  A.   It is an informational guide that is published on the

24  Mets website containing self-defining itself as any

25  question or answer that a fan would want to know about

57

Mr. Katz - Direct - Mr. Tokayer

1  Citi Field.

2  Q.   Have you had an opportunity to review the Mets 2010

3  A-to-Z Guide?

4  A.   Yes.

5  Q.   What did the 2010 Mets A-to-Z Guide say about Kosher

6  Sports?

7  A.   It said where it was located, they mention menu

8  items, and that's pretty much it.

9  Q.   And did you have an opportunity to review the Mets A-

10 to-Z Guide prior to the 2011 season?

11 A.   Yes.

12 Q.   When did you review that guide?

13 A.   In March of 2011.

14 Q.   And what did it provide about kosher foods?

15 A.   It added some language that said kosher food only

16 available Sundays through Thursdays.

17 Q.   Let me show you Exhibit 45.  Do you recognize it?

18 A.   Yes.

19 Q.   How do you recognize it?

20 A.   I printed these out off the Mets website and made

21 copies of it.

22 Q.   What is it?

23 A.   It's a copy of the Mets A-to-Z Guide for 2010 and

24 2011.

25            MR. TOKAYER:  I'd like to move Exhibit 45 into

58

Mr. Katz - Direct - Mr. Tokayer

1  evidence, Your Honor.

2          THE COURT:  Received.

3  (Plaintiff's Exhibit No. 45 received into evidence)

4  Q.   Leaving the A-to-Z Guide aside for a moment, let me

5  ask you some questions about the 2011 Citi Field guest

6  services handbook.  Okay.  Did you see the Mets 2011

7  guest services handbook?

8  A.   Yes.

9  Q.   How did you see that?

10  A.   That was given to me by Aramark.

11  Q.   When?

12  A.   In April of 2011.

13  Q.   Why did you receive a copy of that from Aramark as

14  you understood it at the time?

15  A.   Every employee is required to carry it at Citi Field

16  just in case a fan were to ask a question as to where

17  something might be located.

18  Q.   And can you tell the Magistrate Judge what the 2011

19  Citi Field guest services handbook says about kosher

20  foods?

21  A.   It says that it's available on Sundays through

22  Thursdays and that the kosher food is closed on Friday

23  and Saturday.

24  Q.   I direct your attention to Exhibit 46, Mr. Katz.  Do

25  you recognize it?

Transcription Plus II, Inc.

59

Mr. Katz - Direct - Mr. Tokayer

1  A.   Yes.

2  Q.   How do you recognize it?

3  A.   It's a copy of the Citi Field guest service handbook

4  that I received and copied.

5       MR. TOKAYER:   I'd like to move Exhibit 46 into

6  evidence.

7       THE COURT:   Received.

8  (Plaintiff's Exhibit No. 46 received into evidence)

9  Q.   Let me invite your attention to September of 2010,

10 after the Court's August injunction.  Did you on behalf

11 of Kosher Sports make a request about -- to allow Kosher

12 Sports to close a portable car flotation?

13 A.   Yes.

14 Q.   Which portable car flotation?

15 A.   K-428, which is promenade level 428.

16 Q.   And why did you make that request of Aramark to close

17 K-428 at that time?

18 A.   Attendance numbers for the -- for this particular

19 series were very low, and we felt that it would be in our

20 best interest to close the stand to prevent suffering

21 losses to open it.

22 Q.   And did Aramark respond to your request to close the

23 stand for that period?

24 A.   Yes, Tom Funk responded.

25 Q.   What did he say?

```
                                                              60
                    Mr. Katz - Direct - Mr. Tokayer
 1   A.    He said no.
 2   Q.    At the time, did Mr. Funk tell you that he had
 3   consulted with the Mets before he said no?
 4              MR. MEHLMAN:  Objection.
 5              THE COURT:  Is it being offered for the truth?
 6              MR. TOKAYER:  Not at this point, Your Honor.
 7              THE COURT:  And Mr. Funk is a witness?
 8              MR. TOKAYER:  Yes.
 9              THE COURT:  All right.  We'll hear from him.
10   Q.    Did Kosher Sports in fact lose money by being forced
11   to open K-428 Pittsburgh series in September 2010?
12              MR. MEHLMAN:  Objection.
13              THE COURT:  What's the relevance?
14              MR. TOKAYER:  That this was conduct by QBC
15   directing Aramark --
16              THE COURT:  What's the relevance of whether he
17   sustained a loss or not?  We're not trying liability and
18   damages now.
19              MR. TOKAYER:  No, these are damages from --
20   because these are damages from the -- which arise
21   directly from the contempt of court.
22              THE COURT:  Does this have anything to do with
23   Fridays and Saturdays?
24              MR. TOKAYER:  No.  It has to do with the
25   operation of Kosher Sports at that location and QBC and
```

```
                                                          61
                Mr. Katz - Direct - Mr. Tokayer
 1  Aramark's interfering with that.
 2          THE COURT:  I'm not going to allow it.
 3          MR. TOKAYER:  I would just proffer, Your Honor,
 4  that if given the opportunity we would prove that in fact
 5  Kosher Sports suffered losses due to that conduct.  And
 6  with that, I have no further questions of the witness.
 7          THE COURT:  All right.  Cross-examination?
 8          MR. MEHLMAN:  Yes, Your Honor.  Can we take two
 9  minutes, Your Honor?
10          THE COURT:  All right.  Let's keep it to two.
11          MR. MEHLMAN:  Okay.  Thank you.  I've got to
12  wash my hands too.
13          THE COURT:  TMI.
14          MR. MEHLMAN:  My kids explained what that was.
15          THE WITNESS:  Hand over the --
16          THE COURT:  You may.
17          THE WITNESS:  Thank you.
18          (Court recessed.)
19          THE COURT:  Should we go back on the record
20  now?
21          MR. MEHLMAN:  Yes, Your Honor.
22          THE COURT:  All right.
23          MR. MEHLMAN:  May I cross-examine, Your Honor?
24          THE COURT:  You may.
25  CROSS-EXAMINATION
```

                    Mr. Katz - Cross - Mr. Mehlman

1   BY MR. MEHLMAN:

2   Q.   Mr. Katz, on January 6th of 2011, you had a

3   conversation with Mr. Grey; isn't that correct?

4   A.   Yes.

5   Q.   And that conversation was taped by you; isn't that

6   correct?

7   A.   Yes.

8   Q.   And that conversation was taped without Mr. Grey or

9   Mr. Kleckner's knowledge; is that correct?

10  A.   That's correct.

11  Q.   And that was an operational meeting on January 6th,

12  2011; is that correct?

13  A.   Yes.

14  Q.   And that's an operational meeting that you have

15  before each season with Aramark; isn't that correct?

16            MR. TOKAYER:  Objection.

17            THE COURT:  I'll allow it.

18            THE WITNESS:  Yes.

19  Q.   And you had an operational meeting back in 2010;

20  isn't that correct?

21  A.   Yes.

22  Q.   And that was also an operational meeting at the

23  beginning of 2010 before the season started; is that

24  correct?

25  A.   That's correct.

63

                    Mr. Katz - Cross - Mr. Mehlman

1  Q.    Similar to the operational meeting that you had in

2  January of 2011, correct?

3  A.    Yes.

4  Q.    And you taped that meeting as well; is that correct?

5  A.    That's correct.

6  Q.    And the recording of the operational meeting in 2010,

7  that's been destroyed by you; is that correct?

8            MR. TOKAYER:  Objection.

9            THE COURT:  I'll allow it.

10           THE WITNESS:  I didn't destroy anything.  I

11 discarded it.  So when you use the word destroy, you

12 might have a different definition than I do, but I didn't

13 destroy it.

14 Q.    You just --

15 A.    I discarded it.

16 Q.    Do you have those tapes or the recordation of the

17 January 2000 -- I'm sorry, the operational meeting from

18 2010?  Do you have those?  Are those in existence?

19 A.    Do I have the tapes?

20 Q.    Yes.

21 A.    Do I have the recorder?  No.

22 Q.    You discarded it; is that correct?

23 A.    That's correct.

24 Q.    It no longer exists; is that correct?

25 A.    Correct.

64

Mr. Katz - Cross - Mr. Mehlman

1  Q.   Now, during the operational meeting in 2011, besides

2  operational issues you specifically raised your intent

3  and your request to operate on Friday and Saturday with

4  Mr. Grey; is that correct?

5           MR. TOKAYER:  Objection.

6           THE COURT:  Sustained.  I'm sorry, overruled.

7           THE WITNESS:  Can you repeat that question

8  please?

9  Q.   During the January 2011 operational meeting, you

10  raised your intent to operate on Friday and Saturday with

11  Mr. Grey and Mr. Kleckner; isn't that correct?

12  A.   Mr. Grey brought up the installation of anchors at my

13  locations, and then he said that they couldn't be put in

14  there because they were moving the cart back and forth.

15  So no, I didn't bring it up.  He did.

16  Q.   He brought in moving the carts back and forth, yet

17  you raised specifically the issue and your intent and

18  your desire to operate on Friday and Saturday, didn't

19  you?

20           MR. TOKAYER:  Objection.

21           THE COURT:  What's the basis for the objection?

22           MR. TOKAYER:  Those questions are cumulative.

23           THE COURT:  Overruled.

24           THE WITNESS:  Can you repeat that question

25  again please?

Transcription Plus II, Inc.

65

                    Mr. Katz - Cross - Mr. Mehlman

1  Q.   You raised your intent to open on Friday and Saturday

2  at the January 2000 operational meeting; isn't that a

3  fact, Mr. Katz?

4           MR. TOKAYER:  Objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  Again, he brought up the anchors

7  and said it didn't apply to me because they were moving

8  the cart back and forth, and then I brought up Friday and

9  Saturday.

10 Q.   In fact, you brought up Friday and Saturday because

11 you knew the conversation was being recorded and you

12 wanted to gather evidence that you thought would assist

13 you in this lawsuit; isn't that correct?

14          MR. TOKAYER:  Objection, Your Honor.  What is

15 the relevance of this?

16          THE COURT:  Overruled.

17          MR. TOKAYER:  It's beyond the scope of the

18 direct.

19          THE COURT:  Overruled.

20          THE WITNESS:  No, I wasn't gathering evidence.

21 It came up because he brought it up.

22 Q.   It came up because he brought the anchors, and in

23 response to bringing up the anchors did you not ask Mr.

24 Kleckner the following question.

25     Question, page 9 from the transcript that I provided,

                    Transcription Plus II, Inc.

66

Mr. Katz - Cross - Mr. Mehlman

1  this is you, Mr. Katz.  Do you remember saying this?  "Is

2  it support?  Is that because they're telling you that we

3  don't want to open Fridays and Saturdays or you guys are

4  just against it?"

5      Do you remember making that statement to Mr. Kleckner

6  during the January 2011 meeting?

7  A.   We said a lot of things.  I don't think that you're

8  talking about the entire context of that conversation.

9  So I think it's a trick question and I can't really

10  answer it without you giving me a better question to

11  answer.

12  Q.   Did you --

13          MR. MEHLMAN:  I'm going to ask the witness to

14  be ordered to answer the question whether he made that

15  statement or not, Your Honor.

16          THE COURT:  Put the question to him again.

17  Q.   Did you during your conversation with Mr. Kleckner,

18  the operational meeting, in January 2011 make the

19  following statement to Mr. Kleckner:  "Is it support?  Is

20  that because they're telling you that we don't want to

21  open Fridays and Saturdays or you guys are just against

22  it?"

23          MR. TOKAYER:  Objection.

24  Q.   Did you make that statement?

25          MR. TOKAYER:  Objection on relevance ground.

Transcription Plus II, Inc.

67

                    Mr. Katz - Cross - Mr. Mehlman

1            THE COURT:  Overruled.

2            THE WITNESS:  I'm sure I did.

3    Q.   And when you made that statement, when you said

4    they're telling you, you're referring to QBC, the Mets,

5    correct?

6    A.   Correct.

7    Q.   And when you went on in that statement and says we

8    don't want it open Fridays and Saturdays or you guys are

9    just against it, the you guys, you're referring to

10   Aramark; isn't that correct?

11   A.   Yes.

12   Q.   And in fact, in response Mr. Kleckner did not say

13   it's the Mets' position, did he?

14   A.   He said -- let me back up a second.  What happened

15   with the Mets in the off season?  They were trying to

16   replace me and try to terminate me and put another vendor

17   in my place.  Okay.  That's the conversation that you're

18   referring to.

19   Q.   Oh, no.  The conversation I'm referring to is Mr.

20   Kleckner immediately in response to Mister -- your

21   statement said it's two different camps.

22   A.   No.

23   Q.   Did --

24   A.   No.  He didn't say that.

25   Q.   He did not say -- excuse me.  Excuse me.  I'll ask

                                                                68
                     Mr. Katz - Cross - Mr. Mehlman

1    the question.

2           MR. MEHLMAN:  Going to ask the Court to direct

3    the witness --

4           THE COURT:  Gentlemen, both of you --

5           MR. MEHLMAN:  -- to answer the questions.

6           THE COURT:  There's a question and then an

7    answer, and we don't have you both talking at the same

8    time.  Please try and focus on the questions and limit

9    your answers to the questions requested, put to you.

10   Your lawyer has the opportunity for redirect after the

11   cross-examination.

12          THE WITNESS:  Sorry, Your Honor.

13   Q.   Did Mr. Kleckner ever tell you the Mets told us you

14   can't open on Friday and Saturday, that's why we can't

15   allow you to open up on Friday and Saturday?  Did Mr.

16   Kleckner ever tell you that, Mr. Katz?

17   A.   No.

18   Q.   It's a yes or no.  In fact, after you said or you

19   guys are just against it, Mr. Kleckner went on right away

20   in that same conversation a second after you made that

21   statement to explain why Aramark was against you being

22   open on Friday and Saturday; isn't that correct?

23          MR. TOKAYER:  Objection.

24          THE COURT:  Overruled.

25          THE WITNESS:  He was giving his opinion and

                     Transcription Plus II, Inc.

69

                    Mr. Katz — Cross — Mr. Mehlman

1  Scott Wiegert's opinion.

2  Q.    And Mr. Kleckner holds what title at Aramark?

3  A.    Resident district manager.

4  Q.    Of Aramark.  Is he the highest ranking individual at

5  Aramark in January of 2011 when he made that statement at

6  Citi Field?

7  A.    To my understanding, yes.

8  Q.    And what was Mr. Wiegert's title?

9  A.    I'm not sure.

10  Q.    Mr. Wiegert was a pretty high-ranking member as well

11  of the Aramark team at Citi Field in that -- during that

12  time period; isn't that correct?

13  A.    I'm not sure if he took leave before that, but he's

14  pretty high up there.  Yeah.

15  Q.    You weren't talking to an Aramark employee that was

16  packing the frankfurters into a cart.  You were talking

17  to the high end and the upper management individuals;

18  isn't that correct?

19  A.    Yes.

20  Q.    And in fact, what Mr. Kleckner said is, you know

21  Scott Wiegert's school of thought, which is that he feels

22  that the original contract didn't include Fridays and

23  Saturdays.  Didn't he say that to you, Mr. Katz?

24  A.    Yes, he did say that.

25  Q.    And then you said with the Aramark contract, and then

Mr. Katz - Cross - Mr. Mehlman

1   Mr. Kleckner responded yeah; is that correct?

2   A.   Yes.

3   Q.   And then he went on, Mr. Kleckner, and explained why

4   in fact Aramark did not want you to operate on Fridays

5   and Saturdays.  And he said as far as his take is, if we

6   were to do something Fridays and Saturdays it would be

7   different terms than what exists now; is that correct?

8   A.   Yes, that is what he said.  That was his opinion.

9   Q.   That's his opinion as the -- what was his title again

10  at Aramark, I'm sorry?

11  A.   Resident district manager.

12  Q.   And when he said the terms, different terms than what

13  exist now, he meant different terms referencing the

14  Aramark contract; isn't that correct?

15  A.   I don't know what he was referring to.

16          MR. MEHLMAN:  Objection, Your Honor.  I'm going

17  to ask that Mr. Klein not shake his head and tip off the

18  witness regarding his answers.

19          THE COURT:  I wasn't focusing on Mr. Klein, and

20  I will assume that he wasn't doing it.  And no attorney

21  should be coaching a witness through gestures or

22  otherwise.

23          MR. MEHLMAN:  Thank you, Your Honor.

24  Q.   He was talking about the Aramark contract, wasn't he?

25  A.   His opinion of the Aramark contract.

71
Mr. Katz - Cross - Mr. Mehlman

1   Q.   His opinion as an Aramark -- as the highest ranking
2   member of Aramark at Citi Field; is that correct?
3   A.   He is the highest ranking Aramark employee at Citi
4   Field.
5            THE COURT:  Mr. Mehlman, that's about the third
6   time you've said that.  Can we just move on and not go
7   over the same ground?
8            MR. MEHLMAN:  Yes, Your Honor.
9   Q.   And in fact, Mr. Kleckner went on and said that's
10  Scott's take on as far as commission structure, correct?
11  A.   Something to that effect, yes.
12  Q.   And the commission structure is referencing the
13  commission structure between your company, KSI, and
14  Aramark; isn't that correct?
15  A.   Yes.
16  Q.   And then Mr. Kleckner goes on and says my take is I
17  think it hurts your credibility and your reputation
18  because you do everything right, you know, within the
19  letter of the law, of the kosher law on the other days.
20  I feel that there's simply no growth being kosher styles
21  Sundays, not that you wouldn't do things right the other
22  days, but I feel.  He gave you his opinion regarding the
23  fact that he felt that a kosher establishment should not
24  be open on Friday to Saturdays as it would hurt the
25  credibility of the company.  Did Mr. Kleckner not tell

72

                    Mr. Katz - Cross - Mr. Mehlman

1  that to you?

2  A.   Yes.  That was his --

3              MR. TOKAYER:  Objection.

4              THE COURT:  Sustained.

5  Q.   Did Mister --

6              THE COURT:  I'm sorry.  Overruled.

7              THE WITNESS:  Yes.  That was his opinion at the

8  time.

9  Q.   Now, during the January 2011 meeting with Mr.

10 Kleckner, you raised the Friday night and Saturday issue

11 to see if in fact Aramark would permit you to operate on

12 Friday and Saturday; isn't that correct?

13 A.   No.  First of all, the meeting with Mr. Grey and Mr.

14 Kleckner walked in.  But we've been through this already

15 on my deposition so you already know the answers to these

16 questions.

17             MR. MEHLMAN:  Your Honor, I'm going to ask the

18 witness to answer the question.  I believe that's an

19 inappropriate response, Your Honor.

20             THE COURT:  It's an inappropriate response.

21 Please answer the questions put to you unless the

22 objection is sustained.

23             THE WITNESS:  Okay.  Will you please ask me

24 that question again?

25 Q.   Mr. Katz, isn't it a fact that during the January

73

                    Mr. Katz - Cross - Mr. Mehlman

1   2011 meeting you discussed with Mr. Kleckner that you

2   wanted to be open on Friday and Saturday; isn't that

3   correct?

4   A.   I didn't ask him to open on Fridays and Saturdays,

5   no.

6   Q.   Did you discussed your intent to open on Fridays and

7   Saturdays?

8   A.   We discussed Fridays and Saturdays.  I don't know if

9   we discussed my intent, but he knew my intent back in

10  August.

11  Q.   And in fact, he responded that Aramark was not going

12  to permit you to open up on Friday and Saturday, didn't

13  he?

14           MR. TOKAYER:  Objection.

15           THE COURT:  Overruled.

16           THE WITNESS:  No, I don't think he said that.

17           MR. MEHLMAN:  Your Honor, I'm going to ask that

18  the transcript of the January 6, 2011 conversations that

19  were taped by Mr. Katz be moved into evidence in their

20  entirety as Exhibit C for impeachment purposes to allow

21  the Court to review that transcript to decide the

22  credibility of Mr. Katz's responses here today.

23           THE COURT:  And that was pre-marked as an

24  exhibit?

25           MR. MEHLMAN:  That's correct, Exhibit C.

74

Mr. Katz - Cross - Mr. Mehlman

1          MR. TOKAYER:  I would object to that, Your

2   Honor.

3          THE COURT:  On what ground?

4          MR. TOKAYER:  Grounds that the transcript is

5   not accurate and that the evidence is the tape that Mr.

6   Mehlman has.

7          MR. MEHLMAN:  Your Honor, we were before you

8   but three weeks ago and, Your Honor, I offered to jointly

9   come up with a transcript.  Mr. Tokayer refused.  He did

10  not want to fund the preparation of the transcript.  And

11  I believe Your Honor instructed Mr. Tokayer at that time

12  that if QBC did prepare a transcript the Court did not

13  want to hear from Mr. Tokayer that that transcript was

14  not accurate.

15         THE COURT:  Well, I assume you're also offering

16  the tape, correct?

17         MR. MEHLMAN:  Absolutely, which the Court

18  already has.

19         THE COURT:  All right.  I'll use the transcript

20  as a guide.  That's what fact finders do.

21         MR. MEHLMAN:  Thank you, Your Honor.

22  BY MR. MEHLMAN:

23  Q.   Now, this conversation was in January of 2011; is

24  that correct?

25  A.   Yes.

Transcription Plus II, Inc.

                    Mr. Katz - Cross - Mr. Mehlman

1   Q.   And you saved that recording.  You didn't discard

2   that recording, did you?

3   A.   No, I did not discard it.

4   Q.   And in preparation for responses to certain discovery

5   demands and interrogatories, you reviewed preparations

6   made by your attorney and responses to certain demands;

7   is that correct in this case?  Is that correct?

8   A.   I don't understand your question.

9   Q.   Did you review certain responses to discovery demands

10  that your attorney prepared with regard to this lawsuit?

11           MR. TOKAYER:  Objection.

12           THE COURT:  You want to make a proffer on this?

13           MR. MEHLMAN:  Your Honor, I could make it easy.

14  Defendant's Exhibit A -- I could make a proffer but I

15  would rather make a proffer not with the witness sitting

16  nearby if the Court would like me to make a proffer.

17           THE COURT:  Just tell me where this is going.

18           MR. MEHLMAN:  I believe that Mr. Katz's

19  verification to his responses to the objections and

20  interrogatories are inaccurate and untrue.

21           THE COURT:  So you're offering this on

22  credibility?

23           MR. MEHLMAN:  Absolutely.

24           THE COURT:  I'll allow it.

25           MR. MEHLMAN:  May I ask the witness be shown

76
                    Mr. Katz - Cross - Mr. Mehlman
1  what has been marked Defendant's Exhibit A?  May I
2  approach the witness, Your Honor?
3          THE COURT:  You may.
4  BY MR. MEHLMAN:
5  Q.  I'm going to ask you to look at the last page of that
6  exhibit.  Is that your signature on the last page of this
7  exhibit?
8  A.  Yes.
9  Q.  And does that last page indicate that you reviewed
10 these responses and you verified the truth to your
11 knowledge?
12 A.  Yes.
13 Q.  And did you sign that?
14 A.  Yes.
15 Q.  And was it notarized by your attorney?
16 A.  Yes.
17 Q.  And did you sign that on January 14, 2011?
18 A.  Yes.
19          MR. MEHLMAN:  Your Honor, I'd like to offer
20 Defendant's Exhibit A into evidence at this time because
21 I'm going to ask the witness some questions regarding his
22 responses.
23          THE COURT:  Subject to connection, it will be
24 received.
25 (Defendant's Exhibit No. A received into evidence)

77

Mr. Katz - Cross - Mr. Mehlman

1  Q.   Mr. Katz, prior to you signing the verification in

2  which you verified the truth of these responses, did you

3  review the responses?

4  A.   Yes.

5  Q.   And did you review the responses to make sure that

6  they were accurate?

7  A.   To the best of my knowledge, yes.

8  Q.   And you understood by signing the verification you

9  were in fact verifying that the responses were truthful

10  and accurate; isn't that correct?

11  A.   Yes.

12  Q.   I'd ask you to look specifically at your response to

13  interrogatory number 5, which is on page 4.  Do you have

14  that in front of you, Mr. Katz?

15  A.   Yes.

16  Q.   Number 5 request the following:

17          "Describe chronologically and in all detail

18       each fact, agreement, occurrence, event,

19       communication, meeting, discussion, documents and

20       tangible things concerning KSI's request of Aramark

21       operation as to whether KSI can operate on Friday

22       nights and Saturdays during the Jewish Sabbath,

23       including but not limited to Aramark's corporations

24       response."

25          Do you see that request?

78

Mr. Katz - Cross - Mr. Mehlman

1   A.   Yes.

2   Q.   And this verification and this response was prepared

3   January 14th; is that correct?

4   A.   Yes.

5   Q.   That would have been a little bit more than a week

6   after your January 6th, 2011 discussion with Mr. Grey and

7   Mr. Kleckner; is that correct?

8   A.   That's correct.

9   Q.   Is it fair to say that you -- that the conversation

10  between Mr. Grey and Mr. Kleckner itself on January 6,

11  2011 was pretty fresh in your mind, wasn't it?

12  A.   I can't say that for sure.

13  Q.   You remember that you had a conversation with them,

14  didn't you?

15  A.   Yes.

16  Q.   You remember that during the course of the

17  conversation you discussed your intent to operate on

18  Friday night and Saturday; isn't that correct?

19  A.   We had a conversation about Friday and Saturday.

20  Q.   And you remember a week later that Mr. Kleckner

21  responded and stated that if you're going to operate on

22  Friday night and Saturday the terms of the agreement

23  would have to change.  Do you remember that at the time?

24  A.   This interrogatory is talking about a request.

25            MR. MEHLMAN:  Your Honor, I'm going to ask the

Transcription Plus II, Inc.

79

Mr. Katz - Cross - Mr. Mehlman

1  witness to be directed to answer the question.  The

2  question calls for a yes or no answer.

3          THE COURT:  Yes.  The question now is about

4  your recollection.  It's not about a response.

5          THE WITNESS:  Okay.

6          THE COURT:  So please answer the question put

7  to you.

8          THE WITNESS:  Can you please repeat the

9  question?

10 Q.   January 14th, 2011, as you verified the truth of your

11 responses, you knew that on January 6th, 2011 Mr.

12 Kleckner told you that Mr. Wiegert would not allow you to

13 operate on Friday nights and Saturdays or the terms of

14 your deal would have to change, and Mr. Kleckner

15 discussed the credible issues with you operating on

16 Friday night and Saturday; is that correct?

17          MR. TOKAYER:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  No, that's not what happened.  He

20 gave Mr. Wiegert's opinion and he gave Mr. Kleckner's

21 opinion.  At no time did he tell me no definitively.

22 Q.   So he --

23 A.   I didn't ask him.

24 Q.   He gave -- in your mind, Mr. Kleckner and Mister --

25 Mr. Kleckner gave Mr. Wiegert's opinion and his opinion;

80

Mr. Katz - Cross - Mr. Mehlman

1  is that correct?

2  A.   That's correct.

3  Q.   And that opinion was about you operating on Friday

4  night and Saturday; isn't that correct?

5  A.   It was his opinion, yes.

6  Q.   About you operating on Friday night and Saturday,

7  correct?

8  A.   Yes, his opinion.

9  Q.   And their opinion, did you forget their opinion on

10 January 14th while you were drafting these responses?

11 A.   No.

12 Q.   So you had in your mind, you remembered the

13 conversation referencing their opinions; is that correct?

14 A.   Yes.

15 Q.   And you knew that when you were responding to the

16 discovery demands; isn't that correct?

17          MR. TOKAYER:  Objection.

18          THE COURT:  Sustained as to form.

19 Q.   In your discovery response, specifically to 5 or

20 anyone else -- anywhere else in your discovery responses,

21 did you in any way detail your conversation between Mr.

22 Kleckner, Mr. Grey and yourself on January 6th, 2011, yes

23 or no?

24          MR. TOKAYER:  Objection.

25          THE COURT:  Overruled.

81

Mr. Katz - Cross - Mr. Mehlman

1       THE WITNESS:  No, I did not.

2  Q.   And the reason that you didn't is because you did not

3  want to reveal the fact that you had these secretly taped

4  conversations; isn't that correct?

5       MR. TOKAYER:  Objection.

6       THE COURT:  Overruled.

7       THE WITNESS:  No, that is not true.

8  Q.   Yet your response to number 5 was none; is that

9  correct?

10  A.   Correct.

11       MR. TOKAYER:  Objection.

12  Q.   And when you responded none in number 5, you in your

13  mind did not forget about the January 6, 2011

14  conversation; is that correct, yes or no?

15  A.   Can you repeat that question?

16  Q.   When you responded none you did not forget the

17  January 6, 2011 conversation between yourself, Mr.

18  Kleckner and Mr. Grey; is that correct?

19  A.   I knew we had a conversation.

20  Q.   And you knew the contents of the conversation, didn't

21  you?

22       MR. TOKAYER:  Objection.

23  Q.   Yes or no.

24       THE COURT:  Overruled.

25       THE WITNESS:  Parts of it, yes.

Transcription Plus II, Inc.

82

                    Mr. Katz - Cross - Mr. Mehlman

1   Q.    Parts about Friday night and Saturday, correct?

2              MR. TOKAYER:  Objection.

3              THE COURT:  Overruled, but let's move on.

4   Would you answer the question?

5              THE WITNESS:  I remember parts of that

6   conversation, yes.

7   Q.    Now, on April 15th you sought --

8              THE COURT:  Are we talking about 2011?

9              MR. MEHLMAN:  I apologize, Your Honor.

10  Q.    April 15th, 2011, you signed a declaration.  I'm

11  going to with the Court's permission -- it's been marked

12  Defendant's Exhibit B -- show it to the witness.

13             MR. MEHLMAN:  May I approach, Your Honor?

14             THE COURT:  You may.

15  Q.    Did you sign this declaration?

16  A.    Yes, I did.

17  Q.    And did you sign this declaration in preparation of

18  your attorneys' motion for contempt, the hearing that

19  we're holding here today?

20  A.    Yes, I did.

21  Q.    And did you review it before you signed it?

22  A.    Yes.

23  Q.    And is it truthful and accurate?

24  A.    Yes.

25  Q.    And you signed it or it was not signed, I apologize,

                    Transcription Plus II, Inc.

83

Mr. Katz - Cross - Mr. Mehlman

1    it was authorized for your signature on April 15th, 2011;

2    is that correct?

3    A.    That's correct.

4             MR. MEHLMAN:  I'm going to offer Defense

5    Exhibit B into evidence at this time, Your Honor.

6             THE COURT:  Any objection?

7             MR. TOKAYER:  No objection, Your Honor.

8             THE COURT:  Received.

9    (Defendant's Exhibit B received into evidence)

10   Q.    Now, this declaration was sworn out a few days after

11   April 6, 2011 conversation, correct, between you and Mr.

12   Kleckner over the phone?

13   A.    That's correct.

14   Q.    And that was another conversation that you taped; is

15   that correct?

16   A.    Yes.

17   Q.    And during the course of that conversation, you

18   intentionally taped that conversation in order to gather

19   what you thought would be evidence that would be helpful

20   during the course of this hearing and during the course

21   of the lawsuit; isn't that correct?

22            MR. TOKAYER:  Objection.

23            THE COURT:  Overruled.

24            THE WITNESS:  I wanted to get his honest and

25   forthcoming answer, and I wanted to memorialize his

84

Mr. Katz - Cross - Mr. Mehlman

1  answer.

2  Q.   In hopes of gathering evidence that would be helpful

3  for this lawsuit; isn't that correct?

4  A.   That's not what I said.

5  Q.   I'm going to ask if you remember giving a deposition

6  just a few days ago on June 20th, 2011, page 413 through

7  page 414.  Do you remember giving this -- asking this

8  question and giving this answer?

9        "Question:  And you taped the conversations

10  because you knew you may want to use it as evidence

11  during the course of the lawsuit; isn't that correct?

12        "Answer:  I wanted to know his position, I

13  wanted to know his stance, and then I would discuss it

14  afterwards with my attorneys if necessary.

15        "Question:  Because there was a pending

16  lawsuit, correct?

17        "Answer:  Yes."

18     Do you remember giving those -- asked -- being asked

19  those questions and giving those answers?

20  A.   Yes.

21  Q.   So the purpose of you going in there was to try to

22  gather evidence, get statements from Mr. Kleckner, review

23  them with your attorneys to see whether it would be

24  helpful to you in the contempt proceeding or in the

25  lawsuit in chief; isn't that correct?

85

Mr. Katz - Cross - Mr. Mehlman

1    MR. TOKAYER:  Objection.

2    THE COURT:  Overruled.

3    THE WITNESS:  No.

4  Q.  Were you telling the truth during your deposition or

5  are you telling the truth now, Mr. Katz?

6    MR. TOKAYER:  Objection.

7    THE COURT:  Sustained.

8  Q.  Now, prior to reviewing your declaration, Exhibit B,

9  did you review the tapes or the recordings of the January

10  6th, 2011 discussion that we discussed earlier and the

11  April 6th, 2011 discussion?

12  A.  When are you asking me if I reviewed them?

13  Q.  Prior to you -- excuse me, during your review of the

14  declaration or while you were preparing the declaration?

15  A.  I reviewed pieces of it.

16  Q.  And that would have been just about the same time

17  that you were assisting in the preparation of the

18  declaration, correct?

19  A.  I can't say for certain when it was, but it was -- I

20  definitely reviewed pieces of it.

21  Q.  In connection with you --

22    THE COURT:  I'm sorry, you say it.  Are you

23  referring to recordings of both conversations?

24    THE WITNESS:  No.  I think he's referring to

25  the April 6th recording.

Transcription Plus II, Inc.

86
                    Mr. Katz - Cross - Mr. Mehlman

1           THE COURT:  What about parts of the January
2    recording?
3           THE WITNESS:  With regards to this declaration?
4           THE COURT:  With regards to your April 15th,
5    2011 declaration, Defendant's Exhibit B?
6           THE WITNESS:  I also reviewed pieces of that as
7    well, yes.
8    Q.   And this declaration was prepared in the middle of
9    January -- middle of April, I apologize; is that correct?
10   A.   Yes, that's correct.
11   Q.   So it's fair to say that pieces of the conversations
12   -- I assume the relevant ones, is that what you reviewed?
13          MR. TOKAYER:  Objection.
14          THE COURT:  Overruled.
15          THE WITNESS:  I reviewed pieces that I felt
16   were relevant, yes.
17   Q.   May 9th is approximately three weeks after the
18   declaration was signed; is that fair to say?
19   A.   Yes.
20   Q.   And were those pieces of relevant review of the
21   January 6th and April 6th conversation pretty fresh in
22   your mind would you say?
23   A.   They were in my mind.  I wouldn't say they were
24   fresh.  I have a lot going on.
25   Q.   They were in your mind, correct?

                    Transcription Plus II, Inc.

87

Mr. Katz - Cross - Mr. Mehlman

1      MR. TOKAYER:  Objection.

2      THE COURT:  Overruled.

3  Q.   Yes or no.

4  A.   I remembered having conversations but I wouldn't say

5  that I remembered the substance completely about it.

6  Q.   Is it fair to say that you remembered the fact that

7  the Mets issue was discussed during those conversations?

8      MR. TOKAYER:  Objection.

9      THE COURT:  Overruled.

10     THE WITNESS:  What do you mean the Mets -- what

11 do you mean by that?

12 Q.   The Mets issue regarding you being open on Friday and

13 Saturday, Mr. Katz.

14 A.   It was discussed.

15 Q.   And is it fair to say on May 9th, a couple of weeks

16 after you reviewed these tapes, you knew that the Mets or

17 QBC or issues relating to them were discussed in the

18 January 6th and April 6th conversations?

19 A.   I don't recall back then, no.  I don't recall May

20 9th.

21 Q.   So January 5th, excuse me, April 15th, 2011, you

22 review relevant snippets of these taped conversations; is

23 that correct, yes or no?

24 A.   That's not what I said.  I said I reviewed it

25 somewhere between April 6th and April 15th.  I didn't say

88

Mr. Katz - Cross - Mr. Mehlman

1  April 15th.

2  Q.   Around April 15th you reviewed relevant snippets of

3  these conversations; is that correct?

4  A.   Yes.

5  Q.   And you reviewed them in connection with this

6  declaration; isn't that correct?

7  A.   Yes.

8  Q.   In fact, the declaration references these two

9  conversations in paragraph 2, doesn't it?

10 A.   Yes.

11 Q.   In fact, in paragraph 2 you wrote down:

12              "On or about January 6, 2011 and

13              April 6th, 2011 Scott Kleckner, a

14              representative of Aramark's Sports

15              and Entertainment Services told me

16              during the off season QBC sought to

17              have KSI terminated and replaced at

18              Citi Field with another vendor."

19      Did you make that statement in this declaration?

20 A.   Yes.

21 Q.   So when you made this declaration in April of 2011,

22 April 15th of 2011, you knew that during the January 6th,

23 2011 and April 6th, 2011 conversation QBC was raised; is

24 that correct?

25 A.   Yes.

89

Mr. Katz - Cross - Mr. Mehlman

1   Q.   May 9th, three weeks later, did you forget whether

2   QBC was raised during the January and April conversations

3   that you had with Mr. Kleckner and Mr. Grey?

4   A.   No, I don't think so.

5   Q.   So you would remember May 9th that the April 6th

6   conversation and the January 6th conversation you

7   discussed QBC, correct?

8   A.   We discussed QBC, yes.

9   Q.   And you remembered that on May 9th; isn't that

10   correct, when you were sitting for your deposition; isn't

11   that correct?

12   A.   I believe I did, yes.

13   Q.   Do you remember being asked this question and giving

14   these answers at your May 9th deposition, page 243?

15           "Question:  Did Mr. Kleckner raise any issues

16   that QBC had at that time with operating on Friday and

17   Saturday?

18           "Answer:  I don't recall.

19           "Question:  Do you know if Mr. Kleckner even

20   raised QBC during the conversation?

21           "Answer:  I don't recall.

22           "Question:  And do you know if Mr. Kleckner

23   raised QBC or any issues that QBC at all during the

24   January conversation?

25           "Answer:  I don't recall."

Transcription Plus II, Inc.

90

Mr. Katz - Cross - Mr. Mehlman

1    Do you remember giving those answer -- being asked
2  those questions and giving those answers?
3  A.   Yes, I do.
4  Q.   Do you remember being asked this question, page 221
5  line 18?
6           "Question:  Did you discuss operating on Friday
7  nights and Saturdays at that meeting?
8           "Answer:  I don't recall.
9           "Question:  So you don't remember if you
10 discussed operating on Friday nights and Saturday at that
11 meeting; is that correct?
12           "Answer:  I don't recall."
13    Do you remember being asked those questions and
14 giving those answers?
15           MR. TOKAYER:  Objection.
16           THE COURT:  Overruled.
17           THE WITNESS:  Can you repeat that back?
18 Q.   Do you remember being asked the following questions,
19 page 221 of the May 9th deposition.
20           "Question:  Did you discuss operating on Friday
21 nights and Saturdays at the meeting?
22           "Answer:  I don't recall."
23    Do you remember being asked that question and giving
24 that answer?
25 A.   If you have it on the transcript I guess it's how I

                    Mr. Katz - Cross - Mr. Mehlman

1   answered it.

2   Q.   Question, page 221, line 1:

3            "Q  So you don't remember if you

4            discussed operating on Friday nights

5            and Saturdays at that meeting; is

6            that correct?

7            A  I don't recall."

8        Do you remember giving that -- being asked that

9   question and giving that answer?

10  A.   I don't remember that, no.

11           MR. MEHLMAN:  I'm going to ask that the counsel

12  stipulate as to the accurate reading of the transcript.

13           MR. TOKAYER:  I don't have the transcript with

14  me unfortunately.

15           MR. MEHLMAN:  They were provided for counsel on

16  Friday, Your Honor.

17           THE COURT:  Show Mr. Tokayer a copy.

18           MR. TOKAYER:  I have it but it's small.

19           MR. MEHLMAN:  Exhibit -- it's Defendant's

20  Exhibit H, Your Honor, which I believe is admitted into

21  evidence pursuant to the Court's earlier ruling as it is

22  the deposition of Mr. Katz.

23           THE COURT:  It is.

24           MR. MEHLMAN:  Would you like me to show it to

25  the witness, Your Honor, or counsel?

92

Mr. Katz - Cross - Mr. Mehlman

1          THE COURT:  Show it to Mr. Tokayer.

2          MR. MEHLMAN:  Reading from the transcript:

3          "Q  So you don't remember if you

4          discussed operating on Friday nights

5          and Saturdays at that meeting; is

6          that correct?"

7          "MR. TOKAYER:  Object."

8     The witness says I don't recall.

9     Is there a stipulation that that is the accurate --

10         MR. TOKAYER:  It's --

11         MR. MEHLMAN:  -- response to that question?

12         MR. TOKAYER:  Yes.

13         THE COURT:  The question is read back on 20 --

14    222 going over to 223, at which point Mr. Tokayer says

15    you have my objection to that, right.  And the

16    questioning continues.

17         MR. TOKAYER:  Yes.

18         THE COURT:  All right.  So I assume there is a

19    stipulation with respect to accuracy.

20         MR. TOKAYER:  Yes.

21         THE COURT:  All right.  Mr. Mehlman, you may

22    proceed, and let's wrap up with this witness.

23         MR. MEHLMAN:  Yes, Your Honor.

24         THE COURT:  We have a number of other

25    witnesses.

                    Mr. Katz - Cross - Mr. Mehlman

1   BY MR. MEHLMAN:

2   Q.   And do you remember being asked during your

3   deposition, Mr. Katz, page 231, going -- page 231 going

4   to 233, Your Honor, it's probably 232:

5               "Okay.  And do you know, if and I

6               assume you don't remember, whether

7               Aramark had a position regarding

8               operating on Friday nights and

9               Saturdays at the January meeting,

10              correct?  You don't remember what

11              that position was or did you?  Do you

12              know what their position was?"

13      And you responded, "I don't recall;" is that correct?

14              MR. TOKAYER:  Can I have a copy of that

15  deposition as well?  What page are you reading from?  I'm

16  sorry.

17              MR. MEHLMAN:  Two hundred and thirty-two.

18  Q.   Do you remember being asked that question and giving

19  that answer, Mr. Katz?

20              MR. TOKAYER:  Where did you read?  I'm sorry.

21  What did you read from?

22              MR. MEHLMAN:  Line 11 page -- on page 233.

23              "Okay.  And do you know if, and I

24              assume you don't remember, whether

25              Aramark had a position regarding

Case 1:10-cv-02618-JBW-RLM   Document 79   Filed 07/06/11   Page 87 of 329 PageID #: 1320

Mr. Katz - Cross - Mr. Mehlman

1              operating on Friday nights and

2              Saturdays at the January meeting,

3              correct?  You don't remember what

4              that position was or did you?  Do you

5              know what that position -- what their

6              position was?"

7         Mr. Tokayer, you objected.  The witness, line 21

8    through line 22, "I don't recall."

9              MR. TOKAYER:  Yes.  I objected to that

10   question.  And --

11             MR. MEHLMAN:  And did Mr. Katz respond I don't

12   recall?

13             MR. TOKAYER:  I would ask for a ruling on that

14   objection.

15             THE COURT:  The objection is overruled.

16   BY MR. MEHLMAN:

17   Q.  And Mr. Katz, you didn't --

18             THE COURT:  I'm sorry.  Did the witness respond

19   to the --

20             MR. MEHLMAN:  I'm sorry.

21             THE COURT:  -- to the latest question?

22   Q.  Do you remember giving that answer --

23   A.  What question was that?

24   Q.  -- to that question?

25   A.  If that's what it says I said, then that's what I

95

                    Mr. Katz - Cross - Mr. Mehlman

1   said.

2            MR. MEHLMAN:  I'm going to ask for a

3   stipulation that the transcript is in fact accurate.

4            MR. TOKAYER:  That's what the transcript says.

5            MR. MEHLMAN:  Is that a stipulation, Your

6   Honor, or are we going to ask for the transcript tapes to

7   be reviewed by Mr. Tokayer?

8            THE COURT:  Please, the document is in evidence

9   and there isn't an objection to accuracy whether you get

10  a formal stipulation or not.

11           MR. MEHLMAN:  Thank you, Your Honor.

12  BY MR. MEHLMAN:

13  Q.   Isn't a fact, Mr. Katz, that during the May 2011

14  deposition where you gave those I don't recall responses

15  you did remember the answers to those questions, didn't

16  you?

17           MR. TOKAYER:  Objection.

18           THE COURT:  Overruled.

19           THE WITNESS:  I don't recall if I knew the

20  answers then.  I wouldn't lie under oath.

21  Q.   And your intent at that deposition was to keep the

22  secrecy of those January and April taped conversations;

23  isn't that correct, Mr. Katz?

24  A.   No.

25           MR. TOKAYER:  Objection.

                    Transcription Plus II, Inc.

96

Mr. Katz - Cross - Mr. Mehlman

1  Q.   Now, Mr. Katz, you testified earlier that you never,

2  ever discussed operating on Friday and Saturday with

3  Aramark until when?

4  A.   I don't understand that question.

5  Q.   You testified earlier during direct examination that

6  you never requested to be open on Friday night and

7  Saturday from Aramark until what date did you testify?

8  A.   I did not request of Aramark to be open until April

9  6th, 2011.

10 Q.   Now, the Mets had told you back in 2008 that they

11 weren't going to allow you to open on Friday night and

12 Saturday; is that your testimony?

13            MR. TOKAYER:  Objection.

14            THE COURT:  Overruled.

15            THE WITNESS:  Can you repeat that question

16 please?

17 Q.   Is it your testimony on direct examination the Mets

18 had told you as early as 2008 that they weren't going to,

19 quote, allow you to operate on Friday night and Saturday;

20 is that correct?

21 A.   No, 2009.

22 Q.   And 2009 was the first season; is that correct --

23 A.   First --

24 Q.   -- for Citi Field?

25 A.   Yes.

97

Mr. Katz - Cross - Mr. Mehlman

1   Q.   You did not -- your testimony here today is that you

2   didn't approach Aramark during that entire 2009 season

3   about operating on Friday night and Saturday; is that

4   correct?

5   A.   That's correct.

6   Q.   And your testimony here today is that during the

7   entire 2010 season you did not approach Aramark about

8   operating on Friday night and Saturday; is that correct?

9   A.   That's correct.  I did not approach them at all.

10  That's correct.

11  Q.   Did you have any discussions with them at all?

12  A.   Other than Tom Funk sending me that e-mail asking me

13  who from the Mets approved it, no.

14  Q.   Now, you entered into an agreement with Aramark; is

15  that correct?

16  A.   Yes.

17  Q.   And that agreement, I believe you have the exhibit

18  book is Exhibit Number --

19          MR. MEHLMAN:  A moment, Your Honor.

20  Q.   -- Number 7.  Can you turn to that?  Is that a copy

21  of your agreement with Aramark that allows you to operate

22  and sell your frankfurters and products, Mr. Katz?

23  A.   Yes.  This is my contract with Aramark at Citi Field.

24  Q.   And did you execute that?

25  A.   Yes, I did.

Transcription Plus II, Inc.

98

Mr. Katz - Cross - Mr. Mehlman

1      MR. MEHLMAN:  Your Honor, I offer Exhibit 7

2  into evidence at this time.

3      THE COURT:  I assume there's no objection.

4      MR. TOKAYER:  No objection.

5      THE COURT:  Received.

6  (Plaintiff's Exhibit No. 7 received into evidence)

7  Q.  If you could read Article 6 please out loud.

8  A.  "The events at which the products will be sold shall

9  be determined by Aramark in consultation with

10  concessionaire.  Concessionaire shall conduct its

11  operations only during such hours as shall be specified

12  by Aramark."

13  Q.  So under the contract, it's fair to say that Aramark

14  decided the events and the hours of operation; is that

15  correct?

16  A.  No.  The events it says shall be determined by

17  Aramark in consultation with concessionaire.

18  Q.  Oh, so Aramark has to consult with the

19  concessionaire, correct?

20  A.  That is correct.  However, in this instance where

21  there's a sponsorship agreement with QBC in place --

22  Q.  I didn't -- there's no question pending.  I asked the

23  question.  You give your answer.  If you have anything

24  additional to say, I'm your attorney is more than

25  qualified to ask you questions on redirect.

99

Mr. Katz - Cross - Mr. Mehlman

1          THE COURT:  Again, any directions to the
2   witness will come from the Court --
3          MR. MEHLMAN:  I apologize, Your Honor.
4          THE COURT:  -- and not from counsel.
5   Q.    Yet, Article 6, which states concessionaire shall
6   conduct its operations only during such hours as shall be
7   specified by Aramark, that is in Article 6; is that
8   correct?
9   A.    Yes, it is.
10  Q.    And you wanted to operate on Friday night and
11  Saturday; isn't that correct?
12  A.    I'm sorry?
13  Q.    Did you want to operate on Friday night and Saturday?
14  A.    Yes.
15  Q.    In fact, there were voluminous e-mails and
16  discussions with QBC about your intent, your need and
17  your desire to operate on Friday night and Saturday; is
18  that correct?
19  A.    That's correct.
20  Q.    Yet it's your testimony here today, knowing Article
21  6, that you waited until two days before opening day
22  2011, April 6th, 2011, to ask Aramark whether you could
23  operate on Friday night and Saturday; is that correct?
24  A.    Yes.  I did not ask Aramark until April 6, 2011.  QBC
25  made that point very clear to me.

100

Mr. Katz - Cross - Mr. Mehlman

1    MR. MEHLMAN:  Your Honor, there's no question
2    pending.  I ask that the end of that response be stricken
3    for the record.  And if I could have a moment.
4          THE COURT:  I'll deny it.
5          MR. MEHLMAN:  I'm sorry, Your Honor.  I did
6    have one question, just one short series of questions.  I
7    apologize.
8    Q.   You discussed that there are other venues that you
9    were open on Friday and Saturday where Aramark was the
10   concessionaire; is that correct?
11   A.   That is correct.
12   Q.   And those were in two football stadiums, correct?
13   A.   Correct.
14   Q.   And the football season is how long?
15   A.   Sixteen games over four months or so.
16   Q.   And how many home games are there usually?
17   A.   Ten home games plus a couple of special events.
18   Q.   How many home games?
19   A.   Ten.
20   Q.   Ten home games in each of the two venues that you
21   referenced earlier in your testimony?
22   A.   Yes, ten in each venue plus special events.
23   Q.   How many home baseball games are there?
24   A.   Eighty-one.
25   Q.   Now, you also testified, and I believe you referred

101

Mr. Katz - Cross - Mr. Mehlman

1    to Exhibit 43, that you were asked to operate on Memorial

2    Day weekend, Saturday, Sunday and Monday, at an NCAA LAX

3    weekend; is that correct?

4    A.    That's correct.

5    Q.    What kind of event was that?

6    A.    Lacrosse, special event.

7    Q.    And in that e-mail, Ms. Fenstermaker (ph) of Aramark

8    specifically requested that you have your personnel

9    available to man those stands; is that correct?

10   A.    Yes.

11   Q.    And in fact, you manned your own stadiums in the

12   stadium -- in this stadium as well as the other stadium?

13   A.    What do you mean by manned my own --

14   Q.    Do you have your own employees?

15   A.    I have my own employees but I use a nonprofit group

16   to staff these stands.

17   Q.    Okay.  So you use your own employees.  You don't use

18   Aramark employees, correct?

19   A.    That's correct.

20   Q.    And in fact, Ms. Fenstermaker in the e-mail, quote,

21   says:

22              "In the past we have brought down

23              staff from Philadelphia to help run

24              some stands and would like to avoid

25              this if at all possible, so we are

102

Mr. Katz - Cross - Mr. Mehlman

1          keeping all our options open.  If you

2          think that you will have any extra

3          staff who would be interested in

4          picking up another location, please

5          let me know and we could work out the

6          details."

7     She said that to you, correct?

8 A.   Yes, but this e-mail was sent to everybody not just

9 me.

10 Q.   It says Jonathan on top.

11 A.   Yes.  But the original e-mail will say to Brianne

12 Fenstermaker, which will have all of her contacts in it

13 as --

14 Q.   Does any other --

15 A.   -- well.

16 Q.   Does any other concessionaire man their own stands, I

17 apologize, have their employees but you?

18 A.   I'm sorry?

19 Q.   Does any other concessionaire at this location --

20 A.   Concessionaire is Aramark.

21 Q.   I'm sorry.  Any other concessions at these -- this

22 location have their own employees?

23 A.   I have no idea.  I'm sure they do.

24 Q.   You have no idea but you're sure they do.

25 A.   I'm sure that they have somebody there managing, at

103

Mr. Katz - Cross - Mr. Mehlman

1   least one.

2   Q.   Right.  How many do you have by the way?

3   A.   I have one.

4   Q.   You only have one.

5   A.   Uh-huh.

6   Q.   You have nobody else.

7   A.   That's correct.

8           THE COURT:  I'm sorry.  You have one what,

9   employee?

10          THE WITNESS:  I have one employee and I use a

11  nonprofit organization to staff the rest of the stand.

12  Q.   And how many nonprofit employees do you use to staff

13  the rest of the stands?

14  A.   Six to eight depending on how busy we'll be.

15  Q.   And those are employees that you're responsible for

16  that you bring -- that you ensure are at the stadium,

17  correct?

18  A.   Yes.  I coordinate it with the nonprofit group.

19  Q.   They're not coming from Aramark, correct?

20  A.   They are not Aramark employees.

21  Q.   It's fair to say that the rest of the people

22  operating and selling frankfurters, hotdogs and other

23  goods at the stadium are Aramark employees, correct?

24  A.   At this stadium?

25  Q.   Yes.

104

Mr. Katz - Redirect - Mr. Tokayer

1  A.   No.

2          THE COURT:   What stadium are we talking about

3  now?  When you say this stadium, what stadium are you

4  talking about?

5          THE WITNESS:   M&T Bank Stadium, I'm sorry.

6  Q.   Who are they employed by?

7  A.   I don't know.  You'd have to find out for yourself.

8  I'm not sure.

9  Q.   But you know they're not Aramark employees.

10  A.   There are some Aramark employees but not all of them.

11  You asked me if all of them were Aramark employees.

12  Q.   Majority of them Aramark employees?

13  A.   I have no idea.

14  Q.   Thank you.

15          MR. MEHLMAN:   I have nothing further.

16          THE COURT:   All right.   Redirect?

17  REDIRECT EXAMINATION

18  BY MR. TOKAYER:

19  Q.   On April, I'm sorry, on January 6, 2011, did Mr. Grey

20  tell you that he was waiting on the Mets for a decision

21  or words to that effect?

22  A.   Yes.

23  Q.   And did Mr. Kleckner at any time during that meeting

24  tell you that Aramark would not permit Kosher Sports to

25  conduct Friday, Saturday sales?

                  Mr. Katz - Redirect - Mr. Tokayer

1  A.   No.

2  Q.   Did he tell you that on April 6, 2011?

3  A.   He told me that I could not sell at that Friday and

4  that Saturday because he did not have enough notice.

5  Q.   And what did he say with respect to other Friday and

6  Saturday sales?

7  A.   He said he was not saying no to other Friday,

8  Saturday sales.

9  Q.   And that's as late as April 6, 2011, correct?

10 A.   Yes.

11 Q.   Why didn't you ask Aramark prior to April 6?  Why

12 didn't you make a request to Aramark to sell on Fridays

13 and Saturdays?

14 A.   Because it was QBC's decision and QBC had said no to

15 me in '09 and in '10.

16 Q.   And were you aware in April of 2011 of the Judge's

17 injunction prohibiting QBC from stopping you themselves?

18 A.   Yes.

19 Q.   You were asked a couple of questions about the April

20 -- the May 9th, 2011 deposition.  Do you specifically

21 recall sitting here today what you remembered at that

22 time?

23 A.   No.

24          MR. TOKAYER:  No further questions, Your Honor.

25          MR. MEHLMAN:  Just one question, Your Honor.

106

Mr. Katz - Recross - Mr. Mehlman

1  RECROSS-EXAMINATION

2  BY MR. MEHLMAN:

3  Q.   Mr. Katz, the injunction was issued in August 2010;

4  is that correct?

5  A.   Yes.

6  Q.   Not April of 2011; is that correct?

7  A.   That's correct.

8  Q.   Thank you.

9          MR. MEHLMAN:  Nothing further.

10         THE COURT:  All right.  You may step down.

11         We'll take a five-minute break.

12         MR. MEHLMAN:  Your Honor, I was hoping to make

13  the record clear that the transcript and the tape that's

14  being offered by the defendant is for impeachment

15  purposes only, and that's why it's being offered so the

16  Court can accurately assess the credibility of the

17  witness and the credibility of the witness's answers.

18         THE COURT:  All right.  We'll take a five-

19  minute break.

20         (Court recessed.)

21         THE CLERK:  Back on.

22         MR. TOKAYER:  Kosher Sports calls Mike Landeen.

23         (Witness takes the stand)

24         MR. CLERK:  If you could state your full name

25  and then spell your last name?

107

Mr. Landeen - Direct - Mr. Tokayer

1          MR. LANDEEN:  Michael Landeen, L-a-n-d-e-e-n.

2          THE CLERK:  Thank you.  And you can take your

3     seat.

4          THE COURT:  Counsel may proceed.

5          MR. TOKAYER:  Thank you, your Honor.

6     M I C H A E L   L A N D E E N

7          having been first duly sworn, was examined and

8          testified as follows:

9     DIRECT EXAMINATION

10    BY MR. TOKAYER:

11    Q.   Good morning, Mr. Landeen.

12    A.   Good morning.  Oh, sorry.

13    Q.   Are you ready to proceed?

14    A.   Yes.

15    Q.   Mr. Landeen, you're employed by QBC, correct?

16    A.   Correct.

17    Q.   Before you took a job with the Mets you used to work

18    for Aramark, right?

19    A.   Correct.

20    Q.   At Shea Stadium?

21    A.   Correct.

22    Q.   And you were the director of concessions there for

23    two years?

24    A.   That is correct.

25    Q.   Then you came over and started working with the Mets,

Transcription Plus II, Inc.

108

Mr. Landeen - Direct - Mr. Tokayer

1  right?

2  A.   Correct.

3  Q.   You are the vice president of venue services?

4  A.   Correct.

5  Q.   And you have been the vice president of venue

6  services since April 2007, correct?

7  A.   Yes.

8  Q.   And you are an officer of QBC, the defendant in this

9  action?

10  A.   Yes.

11  Q.   Aramark is QBC's concessionaire at Citi Field,

12  correct?

13  A.   Yes, they are.

14  Q.   And as Aramark performs its duties as the

15  concessionaire at Citi Field is it also their duty to

16  take into account what the Mets want?

17          MR. MEHLMAN:  Objection.

18          THE COURT:  Sustained.

19  Q.   Do you recall being asked the following question and

20  giving the following response at your deposition in this

21  case, and I'm referring to page 143 line 24.

22          MR. MEHLMAN:  Objection, Your Honor.

23  Q.   "Question:  Did you understand --

24          THE COURT:  I haven't even seen it.  Let me

25  hear the question.

109

Mr. Landeen - Direct - Mr. Tokayer

1  Q.  "Question:  Did you understand it to be Aramark's

2  duty to take your feeling, Mr. Landeen's feelings, on

3  customer service into account in exercising their

4  judgment, meaning Aramark's?

5      "Answer:  Yes."

6          MR. MEHLMAN:  Objection.

7  Q.  Do you recall being asked that question --

8          THE COURT:  Same --

9  Q.  -- and giving that answer?

10         THE COURT:  Same objection.  I already ruled on

11 this.

12 Q.  Can you direct your attention if I would to the

13 binder in front of you, Exhibit 5?  It's an e-mail from

14 you, Mr. Landeen, to Mr. Katz.  You authored that e-mail?

15 A.  Yes.

16         MR. TOKAYER:  I'd like to move Exhibit 5 into

17 evidence, Your Honor.

18         MR. MEHLMAN:  Objection.

19         THE COURT:  On what grounds?

20         MR. MEHLMAN:  The e-mail is from May 2nd, 2008,

21 Your Honor.

22         THE COURT:  I'll allow it consistent with my

23 rulings regarding the other e-mails from that period of

24 time.

25 (Plaintiff's Exhibit No. 5 received in evidence)

Transcription Plus II, Inc.

110

                    Mr. Landeen - Direct - Mr. Tokayer

1   Q.   Have you ever seen the Aramark/Kosher Sports

2   agreement?

3   A.   Yes.

4   Q.   And in fact, in May of 2008 didn't you, Mr. Landeen,

5   direct Aramark to prepare it?

6             MR. MEHLMAN:  Objection.

7             THE COURT:  I'm sorry.  Can you repeat the two

8   questions?

9             MR. TOKAYER:  Okay.

10            THE COURT:  Which -- I'm a little behind here.

11  Which agreement are you talking about here?

12            MR. TOKAYER:  The Aramark/Kosher Sports

13  agreement, he said he reviewed it.  And I asked him that

14  didn't he in fact direct Aramark to prepare it.

15            THE COURT:  Overruled.

16            THE WITNESS:  I wouldn't say I directed them

17  but I would say that I -- again, as I have stated, I was

18  the liaison so I was helping both parties work together

19  to come to an agreement.  But actually making them come

20  to an agreement, I wouldn't say that was the case.

21  Q.   My question was whether or not you asked Aramark to

22  draw up the Kosher Sports/Aramark agreement.

23  A.   I did not ask them to draw it up.

24  Q.   Okay.  Let me -- do you remember taking a deposition

25  in that case -- this case?

111

Mr. Landeen - Direct - Mr. Tokayer

1  A.   Yes.

2  Q.   The deposition was taken at my office, correct?

3  A.   Yes.

4  Q.   And you were accompanied by your attorneys, Mr.

5  Mehlman and Mr. Denniston?

6  A.   Yes.

7  Q.   And you knew you were going to be asked questions

8  about this case?

9  A.   Yes.

10 Q.   And in fact, you prepared for that deposition, did

11 you not?

12 A.   Yes.

13 Q.   And you prepared by conferring with your counsel as

14 well as reviewing documents?

15 A.   Some documents, yes.

16 Q.   And before you answered the questions, you raised

17 your right hand and swore to tell the truth?

18 A.   I did.

19 Q.   And that's the same oath you took today?

20         THE COURT:   There's no jury here.   Let's just

21 get to the point.

22 Q.   At the deposition, Mr. Landeen, were you asked the

23 following question and give the following response, page

24 144 line 21:

25         "Question:   Does this e-mail refresh your

112

Mr. Landeen - Direct - Mr. Tokayer

1  recollection that on May 21st, 2008 you asked Aramark to

2  draw up the Kosher Sports agreement?

3        "Answer:  Yes."

4     Were you asked that question and did you give that

5  response?

6  A.   Apparently I was, but I don't recall it being that

7  way but again, going off of my recollection right now.

8  Q.   And in fact, before any subcontractor enters into an

9  agreement with Aramark, isn't it true that they have to

10  have an agreement with the Mets?

11  A.   No, that's not the case.

12  Q.   Do you remember at your deposition being asked the

13  following question and giving the following response,

14  page 116, line 7:

15        "Q  Why do the sales people have to

16        funnel the information to Aramark?

17        Why can't the vendor and Aramark deal

18        directly on these kinds of Aramark

19        concerns and questions?"

20     Line 15:

21        "A  Because they have to reach an

22        advertising agreement with us first,

23        and then they have the ability to go

24        into an agreement with Aramark."

25     Do you remember being asked that question and giving

113

Mr. Landeen - Direct - Mr. Tokayer

1  that response?

2          MR. MEHLMAN:  Well, there's a --

3          THE WITNESS:  There --

4          MR. MEHLMAN:  There was a further response that

5  Mr. Tokayer --

6          THE COURT:  And that's what cross-examination

7  is for.

8          MR. MEHLMAN:  Your Honor, just I think the

9  answer has to be accurately reflected.

10          THE COURT:  Let me take a look at the

11  transcript.

12          I'm sorry.  Your argument is that it --

13          MR. MEHLMAN:  He didn't read the last line.

14          THE COURT:  -- goes on where?

15          MR. MEHLMAN:  He didn't read the last line of

16  the answer.  "It's not going to permit Aramark --

17          THE COURT:  It's pretty --

18          MR. MEHLMAN:  -- it's pretty status quo on all

19  of our agreements."  That's an important part to the

20  answer, Your Honor.

21          THE COURT:  All right.  That will be included

22  in the question put to the witness.

23  Q.  Were you asked that question and did you give that

24  response?

25  A.  I was asked that question, and the response that I

114

Mr. Landeen - Direct - Mr. Tokayer

1  gave was in most cases we have an advertising agreement.
2  But as we sit here today and as we have in the past,
3  there are agreements that Aramark has that there are not
4  advertising agreements.  It depends on the category.
5  There are a lot of factors that go into it.
6  Q.   So that answer was not completely accurate that you
7  gave at your deposition.  Is that what you're saying?
8           MR. MEHLMAN:  Objection.
9           THE COURT:  Overruled.
10          THE WITNESS:  I can't recall the actual answer,
11  but that's what it is.  That's what I remember.
12  Q.   Are you familiar with the usage agreement between
13  Aramark and QBC?
14  A.   Yes.
15  Q.   Have you read it?
16  A.   I know bits and pieces of it.  I can't say I know it
17  entirely.  It's a very large agreement.
18  Q.   Have you read it in its entirety?
19  A.   No.
20  Q.   Do you remember being asked the following question
21  and giving the following response, page 25, line 14:
22          "Question:  Are you familiar with the usage
23  agreement between Aramark and Kosher Sports?
24          "Answer:  Yes.
25          "Question:  You've read that?

Transcription Plus II, Inc.

115

                    Mr. Landeen - Direct - Mr. Tokayer
1            "Answer:  Yes."
2       Did you give that answer to those questions?
3    A.   Apparently I did.
4    Q.   And is that usage agreement available to you during
5    the ordinary course of your duties?
6    A.   Yes.
7            MR. MEHLMAN:  Objection, Your Honor.
8            THE COURT:  What ground?
9            MR. MEHLMAN:  He's impeaching his own witness,
10   Your Honor.  I mean, he's -- it's kind of -- if he's
11   looking for Mr. Landeen to be a credible witness
12   regarding issues, he's impeaching his own witness.
13           THE COURT:  I think it's fair to say that as a
14   representative of QBC he's a hostile witness.
15           MR. MEHLMAN:  Okay.
16           THE COURT:  Objection overruled.
17   Q.   Do you understand, Mr. Landeen, that the usage
18   agreement governs the relationship between Aramark and
19   QBC respecting concession services at Citi Field?
20   A.   Yes.
21           MR. MEHLMAN:  Objection, Your Honor.  Are you
22   going to allow him to lead as well?
23           THE COURT:  He's a hostile witness, yes.
24           MR. TOKAYER:  I have a few questions about the
25   usage agreement, Your Honor.  So I would ask that Mr.

                    Transcription Plus II, Inc.

Mr. Landeen - Direct - Mr. Tokayer

1  Katz --

124

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Is Exhibit 14 an e-mail string that you both wrote

2  and received in May of 2010?

3  A.   Yes.

4        MR. MEHLMAN:  It's actually March of 2010, if

5  that's the exhibit you're referring to.  Is it 14?

6        MR. TOKAYER:  Did I misspeak?  I meant March of

7  2010.

8        MR. MEHLMAN:  Objection, relevance, Your Honor.

9  March 2010 is months before the injunction.  None of this

10 --

11       THE COURT:  I've already ruled on this.  I will

12 allow it --

13 Q.   Was Kosher --

14       THE COURT:  -- as background.

15 Q.   Was Kosher Sports in default of its agreement with

16 QBC at the time of your e-mail string, Exhibit 14, March

17 18th, 2010?

18 A.   I'm not sure.

19 Q.   Were you asked the following questions at your

20 deposition and give the following response?

21       MR. TOKAYER:  Page?

22 Q.   Page 251 Line 20:

23       "Q  At the time that you authored

24       that e-mail on March 18th, 2010, was

25       Kosher Sports in default of any of

Transcription Plus II, Inc.

125

Mr. Landeen - Direct - Mr. Tokayer

1           its obligations?

2           "A  With whom?

3           "Q  To Kosher Sports.

4           "MR. MEHLMAN:  You mean QBC?

5           "MR. TOKAYER:  Yes, I did mean that.

6           A  I'm not sure.  Again, I don't know

7           the time period.  I just know that at

8           some point, I don't think this would

9           have been it, that he was delinquent

10          on bills, but I don't know if it was

11          at this point.

12          Q  Right.  Because in fact, his

13          sponsorship fees weren't due until

14          April 1st.

15          A  Right.  So it probably wouldn't

16          have been."

17     Were you asked that question?  Did you give those

18  responses?

19  A.   Yes.

20  Q.   And in fact was Kosher Sports in default of its

21  agreement with Aramark at the time of the March 18, 2010

22  e-mail?

23  A.   I don't believe so.

24  Q.   At the same time in March of 2010 was Mr. Barrick --

25  step back a little.  Who is Adam Barrick?

Transcription Plus II, Inc.

126

Mr. Landeen - Direct - Mr. Tokayer

1   A.   Adam Barrick works in our corporate sponsorship.

2   Q.   He works for QBC?

3   A.   Correct.

4   Q.   Okay.  And in March 2010, was Mr. Barrick looking

5   into Kosher Sports' agreement with Aramark?

6           MR. TOKAYER:  Objection.

7           THE COURT:  Sustained as to form.

8   Q.   In March of 2010, was Mr. Barrick -- did Mr. Barrick

9   request a copy of the Kosher Sports agreement with

10  Aramark from Aramark?

11  A.   I believe so.

12  Q.   And in fact, that request was made by e-mail,

13  correct?

14  A.   Yes.

15  Q.   And in response to that request, Mr. Funk asked you

16  by e-mail whether you were okay with him sending Mr.

17  Barrick the Kosher Sports/Aramark agreement, right?

18  A.   Yes.

19  Q.   And is Exhibit 13 a copy of Barrick's e-mail to Mr.

20  Funk and Mr. Funk's e-mail to you?

21  A.   Yes.

22          MR. TOKAYER:  I'd like to move Exhibit 13 into

23  evidence, Your Honor.

24          THE COURT:  Received.

25  (Plaintiff's Exhibit No. 13 received into evidence)

Transcription Plus II, Inc.

127

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Is Mr. Barrick looking into Kosher Sports' agreement

2  with Aramark at this time for the purpose of seeing if

3  Kosher Sports' relationship with Citi Field could be

4  terminated?

5            MR. MEHLMAN:  Objection.

6            THE COURT:  Do you know -- do you have personal

7  knowledge as to why Mr. Barrick wanted to see the

8  contract?

9            THE WITNESS:  I don't recall.  It could have

10 been for what he's -- you know, goods that he was

11 contracted to sell.  I don't know.  There was no reason

12 why he couldn't have it or many other reasons why he

13 wanted it, but I don't recall exactly why he wanted it at

14 that point.

15 Q.   In March of 2010, wasn't QBC contemplating legal

16 action against Kosher Sports?

17           MR. MEHLMAN:  Objection.

18           THE COURT:  If you know.

19           THE WITNESS:  Can you repeat the question?

20 Q.   Sure.  In March of 2010, was Queens Ballpark Company

21 contemplating legal action against Kosher Sports?

22 A.   I know at some point we were but I don't know the

23 actual date.

24 Q.   Can I invite your attention to Exhibit 15?  Is this

25 an e-mail string that you participated in back in March

128

Mr. Landeen - Direct - Mr. Tokayer

1  of 2010?

2  A.   Yes, I see my name on here.

3  Q.   And does Mr. Barrick write you an e-mail referring to

4  legal action on march 26th, 2010 at 8:25 p.m.?

5          MR. MEHLMAN:  Objection.  I believe to be

6  accurate the entire string should be reviewed not just

7  two words.

8          THE COURT:  He can draw the witness's attention

9  to a particular portion of the string, and if it comes in

10  presumably the entire string will come in.  Is it in

11  evidence already?

12          MR. TOKAYER:  I have not moved it in yet, but

13  after the question I will.

14          THE WITNESS:  I -- where are you directing my

15  attention because as I read through it I don't see

16  anything that indicates --

17          MR. TOKAYER:  Well, first let me move Exhibit

18  15 into evidence, Your Honor.

19          THE COURT:  Any objection other than the time

20  issue?

21          MR. MEHLMAN:  No.

22          THE COURT:  All right.  Received.

23  (Plaintiff's Exhibit No. 15 received into evidence)

24  Q.   Okay.  Let me invite your attention to the e-mail --

25  the second e-mail on the first page.  It's dated March

                    Mr. Landeen - Direct - Mr. Tokayer
1   26, 2010 at 8:25 p.m. from Mr. Barrick to you, among

2   others.  Do you see that?

3   A.   Yes.

4   Q.   Does that refresh your recollection that at that time

5   QBC was contemplating legal action against Kosher Sports?

6   A.   Again, from this e-mail I can't interpret that.  So I

7   just see that legal has advised us to move forward with

8   his sponsorship as is.  So as far as I'm concerned,

9   everything from this e-mail at this point is status quo.

10  I don't see anything stating that QBC is taking legal

11  action against Kosher Sports.

12  Q.   Okay.  Second sentence says that his first payment is

13  due on April 1.  We will proceed with any legal action if

14  need be after that.  Do you see that?

15  A.   Correct.

16  Q.   Do you recall getting that?

17  A.   Correct.

18  Q.   Now, in April of 2010 isn't it true that QBC was

19  looking to get rid of Kosher Sports and replace it with a

20  vendor, Hain Celestial?

21  A.   Again, we weren't looking to get rid of Kosher

22  Sports.  We were making contingency plans because we had

23  heard that Jonathan was not happy.

24  Q.   The answer --

25  A.   He had left us in Brooklyn.

                    Transcription Plus II, Inc.

130

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Yeah.   The answer is yes or no.  Were they looking to

2  get rid of Kosher Sports and replace it with Hain

3  Celestial?

4           MR. MEHLMAN:  Objection.  I'm going to ask that

5  the witness be allowed to answer the question he started

6  his answer.

7           THE COURT:  Well, he can answer yes or no to

8  that.

9           THE WITNESS:  No.

10 Q.   Okay.  Let me invite your attention to Exhibit 17.

11 Is that an e-mail string that you wrote and received in

12 April of 2010?

13 A.   I didn't write any e-mails here.  I'm included on the

14 e-mails but I did receive it obviously.  But I did write

15 anything on this e-mail.

16 Q.   Yeah.  But you received these e-mails back in April

17 of 2010?

18 A.   I did.

19           MR. TOKAYER:  I'd like to move Exhibit 17 into

20 evidence.

21           THE COURT:  Any objection?

22           MR. MEHLMAN:  He didn't write them, Your Honor.

23 I don't know that receiving an e-mail is a proper

24 foundation for moving something into evidence.  That

25 being said, I want to expedite the hearing.

Transcription Plus II, Inc.

131

Mr. Landeen - Direct - Mr. Tokayer

1    THE COURT:  Received.

2  (Plaintiff's Exhibit No. 17 received into evidence)

3  Q.   Okay.  Did you receive that top e-mail from Mr.

4  Helfer dated April 14th, 2010 at 3:21 p.m.?

5  A.   Yes.

6  Q.   Okay.  And did Mr. Helfer write you, quote, in the

7  second sentence, "Let's get rid of this punk and make it

8  happen with Irwin"?

9  A.   Yes.

10  Q.   Was Mr. Helfer looking to get rid of Kosher Sports

11  back in April of 2010 and replace it with Irwin from Hain

12  Celestial?

13          MR. MEHLMAN:  Objection.

14          THE COURT:  Sustained.

15  Q.   Did you understand that it was Mr. Helfer -- Mr.

16  Helfer wanted to get rid of Jon Katz and Kosher Sports on

17  April 14th, 2010?

18          MR. MEHLMAN:  Objection.

19          THE COURT:  Sustained.

20  Q.   Who was Irwin?

21  A.   Irwin is a -- he's a sponsor of Hain Celestial Group

22  we do some advertising with.

23  Q.   And did you understand when you received Mr. Helfer's

24  e-mail that the word punk was a reference to Mr. Katz?

25  A.   Yes.

132

Mr. Landeen - Direct - Mr. Tokayer

1   Q.   Who's Mr. Helfer?

2   A.   Mr. Helfer was an employee of QBC in the sales

3   department.

4   Q.   On April 14th, 2010?

5   A.   Correct.

6   Q.   And who was Paul Asencio?

7   A.   Paul is his direct boss.

8   Q.   And what's your relationship with Mr. Asencio?

9   A.   As far as just within the organization?

10  Q.   Yes.

11  A.   He's a peer.

12  Q.   Okay.

13  A.   He's at my level or --

14  Q.   Okay.  So you're in the venue service department and

15  he's your counterpart in the sales department.

16  A.   Correct.

17  Q.   And who is Mr. Schwartz?

18  A.   Mr. Schwartz works for me.

19  Q.   Now, were you aware in April of 2010 that Mr. Helfer

20  was discussing replacing Kosher Sports with Hain

21  Celestial?  Were you aware of those conversations?

22  A.   I was aware of the conversations.

23  Q.   And did you ever instruct anyone to cease those

24  conversations of replacing Kosher Sports with Hain

25  Celestial at any time?

133

Mr. Landeen - Direct - Mr. Tokayer

1   A.   No.

2   Q.   Are you aware of anyone who directed that those

3   discussions cease?

4   A.   No.

5   Q.   In May of 2010 it was clear to you, was it not, Mr.

6   Landeen, that Kosher Sports' relationship with Citi Field

7   had to be terminated; isn't that true?

8   A.   No.

9   Q.   Let me ask you to look at Exhibit 20 if you would.

10  That top e-mail dated May 24th, 2010 at 9:29 p.m., is

11  that authored by you?

12  A.   It is.

13          MR. TOKAYER:   I'd like to move Exhibit 20 into

14  evidence.

15          THE COURT:   Any objection?

16          MR. MEHLMAN:   None.

17          THE COURT:   Received.

18  (Plaintiff's Exhibit No. 20 received into evidence)

19  Q.   Okay.   And did you say in May of 2010, quote, "This

20  only makes it much more clear to me that the relationship

21  needs to end," unquote?

22  A.   Yes.

23  Q.   And you're referring to the relationship with Kosher

24  Sports, correct?

25  A.   For this particular instance, yes.

134

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Now, QBC's efforts to replace Kosher Sports, whether

2  with Hain Celestial or somebody else, continued even

3  after Kosher Sports commenced its action against QBC,

4  correct?

5           "MR. MEHLMAN:  Objection to the word "replace"

6  Your Honor.  That was not the witness's testimony.

7           THE COURT:  Can I hear the question again?

8  Q.   QBC's efforts to replace Kosher Sports with Hain

9  Celestial or another kosher vendor continued after the

10  lawsuit was commenced.

11           THE COURT:  Overruled.

12           THE WITNESS:  Again, if I have to answer the

13  question yes or no, again, it's yes but it wasn't a

14  replacement.  It was a contingency plan, as I've stated

15  in my deposition several times.

16  Q.   And QBC's venue service department had weekly

17  meetings with Aramark, correct?

18  A.   Yes.

19  Q.   These weekly meetings occurred both during the season

20  and during the off season, correct?

21  A.   Correct.

22  Q.   And these weekly meetings did not stop when the

23  lawsuit commenced, correct?

24  A.   Correct.

25  Q.   Nor did it stop after Judge Weinstein issued his

Transcription Plus II, Inc.

135

Mr. Landeen - Direct - Mr. Tokayer

1  injunction, correct?

2  A.   Correct.

3  Q.   Do you recall on June 15th, 2010 you, Mr. Landeen,

4  put Kosher Sports on the agenda for one of those weekly

5  meetings?

6  A.   Yes.

7  Q.   Okay.  And at that meeting on June 15th, Paul

8  Schwartz undertook to set up meetings with alternative

9  kosher vendors, correct?

10  A.   Correct.

11  Q.   And Exhibit 23 are the -- is the agenda and the

12  minutes of that June 15th, 2010 weekly venue services

13  department meeting between venue services and Aramark,

14  correct?

15  A.   Correct.

16  Q.   Okay.  These agenda and minutes were prepared by one

17  of your employees, Ms. Garza?

18  A.   Yes.

19  Q.   And was it her custom and practice to then circulate

20  the minutes by e-mail after the meeting?

21  A.   Yes.

22       MR. TOKAYER:  I'd like to move Exhibit 23 into

23  evidence, Your Honor.

24       MR. MEHLMAN:  No objection.

25       THE COURT:  Received.

Transcription Plus II, Inc.

136

Mr. Landeen - Direct - Mr. Tokayer

1   (Plaintiff's Exhibit No. 23 received into evidence)

2           MR. MEHLMAN:  Just a note that it's June 15th,

3   2010.

4           THE COURT:  Yes, I'm aware of that.

5   Q.   At some point, Mr. Katz told you, Mr. Landeen, of his

6   desire to have Kosher Sports operate on Fridays and

7   Saturdays, correct?

8   A.   Correct.

9   Q.   And in fact, that's how you first learned of it,

10  right?

11  A.   Correct.

12  Q.   And at that time, you asked Mr. Katz for a letter

13  from a rabbi stating that he could operate on Fridays and

14  Saturdays --

15          MR. MEHLMAN:  Objection.

16  Q.   -- correct?

17          THE COURT:  Overruled.

18          THE WITNESS:  Correct.

19  Q.   And he provided you with that letter shortly

20  thereafter, right?

21  A.   Again, I don't remember the time frame, but yes from

22  what I recall.

23  Q.   And after receiving that letter, you spoke with

24  people in the Mets organization including Dave Howard,

25  right?

Transcription Plus II, Inc.

137

Mr. Landeen - Direct - Mr. Tokayer

1  A.   That is correct.

2  Q.   And the Mets at that point -- and Mr. Howard and you

3  had concerns about Kosher Sports operating on Fridays and

4  Saturdays, correct?

5        MR. MEHLMAN:  Objection, relevance, Your Honor.

6        THE COURT:  Overruled.

7        THE WITNESS:  Yes.

8  Q.   And you conveyed those concerns about Kosher Sports

9  operating on Friday and Saturdays to Aramark, right?

10 A.   Yes.

11 Q.   After the lawsuit was commenced, those conversations

12 were before or after -- that was before the lawsuit was

13 commenced, correct, the conversation with Mr. Howard and

14 the concern that you relayed to Aramark?

15 A.   Correct.

16 Q.   Okay.  And after the lawsuit, you and Mr. Howard had

17 another conversation about Kosher Sports' interest in

18 operating on Fridays and Saturdays?

19 A.   We may have.  I don't recall exactly.

20 Q.   Do you recall telling Mr. Howard after this lawsuit

21 was commenced that you were not comfortable letting

22 Aramark let Kosher Sports operate on Fridays and

23 Saturdays?

24       MR. MEHLMAN:  Objection.

25       THE COURT:  Overruled.

Transcription Plus II, Inc.

138

Mr. Landeen - Direct - Mr. Tokayer

1          THE WITNESS:  I don't recall.

2  Q.  Can we just again refer to your deposition on May

3  24th, 2011, page 6 line 6?

4          "Question:  Did you see -- Question:  Did you

5  see a copy of the complaint?

6          "Answer:  I did."

7      Line 16:

8          "Question:  Have you discussed the allegations

9  of the complaint with any representatives of the New York

10  Mets?

11          "Answer:  Yes."

12      Page 7, line 13:

13          "Question:  What did you and Mr. Howard discuss

14  with respect to the allegations of the complaint?

15          "Answer:  We discussed the -- basically

16  discussed the fourth location issue and the

17  Friday/Saturday request."

18      Line -- page 8, line 19:

19          "Question:  What did you and Mr. Howard discuss

20  about the Friday/Saturday sales?

21          "Answer:  Friday/Saturday we discussed.  We

22  basically -- it was something that we had never done at

23  Shea and something we weren't comfortable letting Aramark

24  provide Jonathan in doing so based on PR ramifications as

25  well as potential sponsorship issues with Nathan's and

Transcription Plus II, Inc.

139

Mr. Landeen - Direct - Mr. Tokayer

1    Premio (ph.).

2        Were you asked those questions and did you give that

3    -- those responses?

4    A.   Yes.

5    Q.   Did you come to learn that the judge in this case

6    held a hearing on Kosher Sports' request for an

7    injunction?

8    A.   Yes.

9    Q.   And you heard that Judge Weinstein had actually

10   issued an injunction, right?

11   A.   Yes.

12   Q.   And you understood that the judge had prohibited QBC

13   from interfering with Kosher Sports' operations in any

14   way or persuading Aramark in any way, correct?  That was

15   your understanding.

16             MR. MEHLMAN:  Objection.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.

19   Q.   Yet on August 13th of 2010, hours after learning

20   about the injunction, you reached out to Aramark,

21   correct?

22   A.   Yes.

23   Q.   First you called Scott Wiegert and left a message,

24   right?

25   A.   Correct.

140

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Then you spoke with Clint Westbrook.

2  A.   Yes, I believe so.

3  Q.   And then you e-mailed Scott Wiegert to tell him that

4  you had filled Mr. Westbrook in, correct?

5  A.   That's correct.

6  Q.   Okay.  And let me just show you Exhibit 27 if you

7  would turn to it.  Is that an e-mail that you received

8  and wrote on August 13, 2010 at approximately 7:00 p.m.?

9  A.   Yes.

10          MR. TOKAYER:  I'd like to move Exhibit 27 into

11  evidence.

12          MR. MEHLMAN:  No objection.

13          THE COURT:  Received.

14  (Plaintiff's Exhibit No. 27 received into evidence)

15  Q.   Who is Scott Wiegert?

16  A.   Scott Wiegert is -- I don't know his title.  I

17  believe he's resident district manager for Aramark and is

18  housed out of Citi Field.

19  Q.   Is it outside of Citi Field?

20  A.   He is housed out of -- his office is out of Citi

21  Field.

22  Q.   Okay.  And you understand Mr. Kleckner reports

23  directly to him?

24  A.   That's correct.

25  Q.   And who is Mr. Westbrook?

141

Mr. Landeen - Direct - Mr. Tokayer

1   A.   Mr. Westbrook is a regional vice president with

2   Aramark who Scott Wiegert reports to.

3   Q.   And Exhibit 27 is the e-mail that you sent to Mr.

4   Wiegert just hours after learning about Judge Weinstein's

5   injunction, correct?

6   A.   Yes.

7   Q.   Now, when you say you filled Clint in, didn't you

8   tell Mr. Westbrook as that -- as a result of the

9   injunction you were not going to speak to Aramark about

10  Kosher Sports anymore?

11  A.   Yes, relating to his -- the operations.

12  Q.   And didn't you tell Clint Westbrook that Kosher

13  Sports' operations at Citi Field should remain status

14  quo?

15  A.   I believe so, yes.

16  Q.   And the status quo on August 13th, 2010 was that

17  Kosher Sports was not operating on Fridays and Saturdays,

18  correct?

19  A.   No, that was not the intent.

20  Q.   What was the status quo?  Was Kosher Sports operating

21  on Fridays and Saturdays on August 13th, 2010?

22         MR. MEHLMAN:  Objection.

23         THE COURT:  I'll allow the question.

24         THE WITNESS:  Can you repeat the question?

25  Q.   Was Kosher Sports operating on Fridays and Saturdays

Transcription Plus II, Inc.

142

Mr. Landeen - Direct - Mr. Tokayer

1   on or about August 13th, 2010?

2   A.   No.

3   Q.   Do you remember giving this -- being asked this

4   question and giving this response, page 17 line 22?

5            "Q  What did you say to Mr. Westbrook

6            on August 13th and what did he

7            respond?

8            "A  I just basically told him what

9            was communicated to me from our

10           attorney on the outcome of it and

11           that, you know, he and Scott can

12           connect on it.  That was really it.

13           "Q  What did you tell him about the

14           outcome?

15           "A  Just that we were not going to

16           speak of Kosher Sports and they were

17           to -- they were basically -- you

18           know, they were status quo as far as

19           I was concerned."

20      You -- were you asked that question and did you give

21   those responses?

22           MR. MEHLMAN:  Objection, Your Honor.

23           THE COURT:  Overruled.

24           THE WITNESS:  I believe I answered that, but

25   yes.

143

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Okay.  Did you ultimately see a copy of Judge
2  Weinstein's order?
3  A.   I believe I may have.
4  Q.   Did you in fact see a copy of the order?
5              MR. MEHLMAN:  Objection, asked and answered.
6              THE COURT:  Did you see a copy of the order?
7              THE WITNESS:  I think I did.
8  Q.   Okay.  Let me again direct you to your deposition on
9  page 95 line 18.
10             "Q  If I asked you this I apologize,
11             but did you see a copy of the
12             injunction issued by Judge Weinstein?
13             "A  A copy of the ... yes.
14             "Q  Did you see -- Question:  Did you
15             see it at or about the time it was
16             issued?
17             "A  Thereabouts."
18      Were you asked those questions and did you give those
19  responses?
20  A.   Yes.
21  Q.   You testified that Mr. Schwartz works for you,
22  correct?
23  A.   Yes.
24  Q.   Was Mr. Schwartz aware of the Court's injunction as
25  well?

Transcription Plus II, Inc.

144

Mr. Landeen - Direct - Mr. Tokayer

1          MR. MEHLMAN:  Objection.

2          THE COURT:  Sustained.

3  Q.    Do you know whether Mr. Schwartz was aware of the

4  Court's injunction?

5  A.    At what period of time, now?

6  Q.    At the time that it was issued.

7  A.    I believe he was made aware somehow.  I don't know

8  exactly when, but I know he was made aware.

9  Q.    Did you learn in September of 2010 that

10  notwithstanding the Court's injunction Paul Schwartz told

11  Tom Funk of Aramark not to allow Kosher Sports to close

12  location K-428 for the Pittsburgh series?

13          MR. MEHLMAN:  Objection.

14          THE COURT:  Do you have any personal knowledge

15  of that?

16          THE WITNESS:  I do recall I think I was cc'd on

17  an e-mail, but I didn't respond or have any input on it.

18  Q.    Okay.  Exhibit 33, are those the e-mails that you

19  were aware of in September of 2010?

20          MR. MEHLMAN:  Exhibit?

21          MR. TOKAYER:  Thirty-three.

22          THE COURT:  Thirty-three.

23          MR. MEHLMAN:  Thank you.

24          THE WITNESS:  Yes.

25  Q.    Okay.  And you were aware of the third e-mail I

145

Mr. Landeen - Direct - Mr. Tokayer

1  believe it is from Mr. Schwartz to Mr. Funk with a copy

2  to you, Mr. Landeen, dated September 7th, 2010 at 9:55

3  a.m. and it reads, "This is not okay from our

4  perspective"?  Do you see that?

5  A.   Yes.

6  Q.   Does this refresh your recollection that in September

7  of 2010 you were aware that Mr. Schwartz told Mr. Funk

8  not to allow Kosher Sports to close its stand K-428 on

9  the promenade level for the Pittsburgh series?

10 A.   Yes.

11        MR. TOKAYER:  I'd like to move Exhibit 33 into

12 evidence.

13        THE COURT:  Received.

14 (Plaintiff's Exhibit No. 33 received into evidence)

15 Q.   We talked about the venue service department meetings

16 with Aramark, those weekly meetings.  KSI was discussed

17 at those meetings during the off season at the end of

18 2010, correct?

19 A.   Yes.

20 Q.   And that's after the judge's injunction, right?

21 A.   Yes.

22 Q.   In any of those meetings did you and Aramark discuss

23 terminating Kosher Sports' relationship at Citi Field?

24 A.   No.

25 Q.   In any of those meetings did you ask Aramark whether

Transcription Plus II, Inc.

146
Mr. Landeen - Direct - Mr. Tokayer

1  Kosher Sports was in breach of its contract with Aramark?

2  A.  Yes.

3  Q.  And I'd ask you to turn to Exhibit 34.  Are those the

4  official meeting minutes of a weekly venue services

5  Aramark meeting on October 12th, 2010?

6  A.  Yes.

7        MR. TOKAYER:  I'd like to move Exhibit 34 into

8  evidence.

9        THE COURT:  Received.

10  (Plaintiff's Exhibit No. 34 received into evidence)

11  Q.  Now, item A refers to Kosher Sports, correct?

12  A.  No.

13  Q.  Who was the kosher guy from MCU referred to in that

14  first line?

15  A.  The kosher guy was a vendor that our general manager

16  at the time had found since Jonathan had packed up and

17  left us out to dry.  We didn't have a kosher vendor down

18  there, so that was someone that he replaced him with --

19  Q.  I'm referring --

20  A.  -- because Jonathan had left.

21        THE COURT:  Down there --

22        THE WITNESS:  Brooklyn Cyclones.

23  Q.  Okay.  MCU is the MCU Park, correct?

24  A.  That's correct.

25  Q.  Okay.  And the MCU -- the kosher guy from MCU is

147

Mr. Landeen - Direct - Mr. Tokayer

1  Super Sal?

2  A.   I have no idea who it is.

3  Q.   Okay.  And why was Mr. Wiegert at this time setting

4  up a meeting with the kosher guy from MCU?

5  A.   I believe he was going to try and set up a contract

6  with him to be a subcontractor down there with Aramark.

7  Q.   And when it says Aramark to figure out legal side

8  with existing kosher, who's the existing kosher in that

9  line?

10  A.   I couldn't tell you.

11  Q.   Did you at that time have a relationship with Kosher

12  Sports, October 12th of 2010?

13         MR. MEHLMAN:  Objection.

14         THE COURT:  Overruled.  Well, sustained as to

15  form.  Are you talking about a relationship with Kosher

16  Sports with respect to MCU?

17         MR. TOKAYER:  No.

18  Q.   Was --

19         THE COURT:  Well, I'm confused now.  As the

20  fact finder I'd like a little clarification.

21         MR. TOKAYER:  Yes.

22         THE COURT:  You referred to Jonathan packing up

23  and leaving.  I assumed you mean Mr. Katz?

24         THE WITNESS:  Yes, correct.

25         THE COURT:  Leaving where?

148

                Mr. Landeen - Direct - Mr. Tokayer

1           THE WITNESS:  MCU.

2           THE COURT:  What was the previous relationship

3  with the Plaintiff at MCU?

4           THE WITNESS:  He was the kosher provider there.

5  And again, I can't speak to it because I didn't deal with

6  him down there, but they had various issues where he

7  wouldn't open all of the locations.  So I know there were

8  some issues in the time period.  I know it was 2009.  So

9  from this, that's -- this has to do with everything from

10  MCU, which is a separate contract.  It's a separate

11  Aramark contract that has nothing to do with QBC.

12  Q.   And my question to you is whether or not Kosher

13  Sports at this time was an existing vendor of QBC's at

14  Citi Field.

15  A.   I couldn't tell you.  I have no idea.

16  Q.   On October 12th, 2010 you don't know whether or not

17  --

18  A.   For who, for MCU or for QBC?

19  Q.   QB --

20  A.   There's -- they're two different agreements.

21  Q.   QBC at Citi Field.

22  A.   Yes.

23  Q.   So Kosher Sports was an existing vendor of QBC's at

24  Citi Field, correct?

25  A.   At Citi Field, but this clearly talks about MCU.

149

                    Mr. Landeen - Direct - Mr. Tokayer

1   Q.   Well, okay.  That's what I want to explore with you.

2   A.   Okay.

3   Q.   Okay.  At this time were you looking to replace Mr.

4   Katz and Kosher Sports at Citi Field with the kosher

5   vendor from MCU?

6              MR. MEHLMAN:  Objection.

7              THE COURT:  I'm sorry.  Can I have the question

8   again?

9              MR. TOKAYER:  Sure.

10  Q.   On October 12th, 2010 was QBC seeking to replace Mr.

11  Katz and Kosher Sports, the existing vendor at Citi

12  Field, with the kosher vendor from MCU?

13             THE COURT:  Overruled.

14             THE WITNESS:  To my knowledge, no.

15  Q.   Is -- let me ask you to turn to Exhibit 36.  Okay.

16  Did you put Kosher Sports on the November 2nd, 2010

17  weekly meeting agenda?

18  A.   I did not.  Tom Funk did from this exhibit.

19  Q.   Okay.  And you refer to -- in 3C to kosher.  What are

20  you referring to?

21  A.   I don't recall.

22  Q.   And are these the official agenda meeting minutes --

23  agenda -- is it the official agenda of the November 2nd,

24  2010 minutes?

25  A.   Yes.

150

Mr. Landeen - Direct - Mr. Tokayer

1       MR. TOKAYER:  I'd like to move Exhibit 36 into

2  evidence.

3       THE COURT:  Any objection?

4       MR. MEHLMAN:  No.

5       THE COURT:  Received.

6  (Plaintiff's Exhibit No. 36 received into evidence)

7  Q.   Have you seen the minutes of the November 2nd

8  meeting?

9  A.   Have I seen them?

10  Q.   I'll withdraw the question.  Where are the minutes

11  for the November 2nd meeting?

12  A.   Where are the minutes?  Again, I would assume they

13  were distributed via e-mail if there were any.

14  Q.   At the November 2nd meeting was Kosher Sports'

15  agreement with Aramark discussed?

16  A.   I don't remember exactly what was discussed, but

17  again --

18  Q.   Was the termination of Kosher -- of the agreement

19  between Kosher Sports and Aramark discussed?

20  A.   No.

21  Q.   Was replacing Kosher Sports with another vendor

22  discussed at the November 2nd, 2010 meeting?

23  A.   Contingency plans, yes.

24  Q.   And when you say contingency plan, you mean that you

25  were afraid that Mr. Katz would leave Citi Field and

Transcription Plus II, Inc.

151
Mr. Landeen - Direct - Mr. Tokayer

1  would need to be replaced, correct?

2  A.   That's correct.

3  Q.   Did Mr. Katz ever express in writing to you that he

4  was intent on leaving Citi Field?

5  A.   Not to me.

6  Q.   Did he ever say that in writing to anybody as far as

7  you know?

8  A.   I couldn't tell you.  I heard it verbally from

9  others.

10        MR. TOKAYER:  I move to strike that last

11  portion, Your Honor, as unresponsive and hearsay.

12        MR. MEHLMAN:  Objection, Your Honor.  He asked

13  the question.  He's got to allow the answer.

14        THE COURT:  I'll allow it to stand.

15  Q.   Did you ask that Kosher Sports be put on the agenda

16  for the November 11th weekly meeting?

17  A.   Again, we're -- I'm -- I couldn't -- I may have.  I

18  may have not.

19  Q.   Okay.  Let me ask --

20  A.   I couldn't remember.

21  Q.   Okay.  Let's see if Exhibit 37 refreshes your

22  recollection.  Is that an e-mail that you wrote to Ms.

23  Garza and Mr. Schwartz concerning the November 11th, 2010

24  upcoming weekly meeting?

25  A.   Yes.

Transcription Plus II, Inc.

152

Mr. Landeen - Direct - Mr. Tokayer

1   Q.   Okay.  Does kosher update refer to Kosher Sports?

2   A.   I don't know if it refers to Kosher Sports or just

3   kosher in general.

4   Q.   What was discussed about kosher in general at the

5   meeting if you remember?

6   A.   I don't recall.

7   Q.   At the November 11th weekly meeting was Kosher

8   Sports' agreement with Aramark discussed?

9   A.   Can you repeat that please?

10  Q.   Sure.  At the November 11, 2010 meeting did you and

11  Aramark discuss Kosher Sports' agreement with Aramark?

12  A.   I don't recall.

13  Q.   Did you discuss terminating or having Aramark

14  terminate Kosher Sports' agreement with Aramark?

15

16  A.   No never terminating.

17  Q.   Was replacing Mr. Katz with another vendor discussed

18  at that 11/11 meeting?

19  A.   Potentially.

20  Q.   Let me ask you to turn to Exhibit 38.  Is that the

21  official agenda for the November 11th meeting and the

22  minutes?

23  A.   Yes.

24         MR. TOKAYER:  I'd like to move in Exhibit 38,

25  if I can.

Transcription Plus II, Inc.

153

Mr. Landeen - Direct - Mr. Tokayer

1    THE COURT:  Received.

2  (Plaintiff's Exhibit No. 38 received in evidence)

3  Q.   If you would refer to Item J on the second page, it

4  says all outstanding issues have been cleared up with

5  Katz.  Do you know what outstanding issues were

6  discussed?

7  A.   I don't recall off the top of my head.

8  Q.   Is Katz a reference to John Katz?

9  A.   Yes.

10  Q.   When it says Scott Wiegert will follow up with vendor

11  from MCU, do you recall discussing replacing Mr. Cass

12  with that vendor from MCU at this meeting?

13  A.   No, I don't.

14  Q.   Who said that all the outstanding issues with Mr.

15  Katz were cleared up?

16  A.   Scott Wiegert.

17  Q.   Why did he say that?

18  A.   I have no idea.

19  Q.   Was that in response to your question as to whether

20  or not Aramark would terminate Kosher Sports' agreement?

21  A.   No.  He obviously had a conversation with Mr. Katz

22  and whatever issues there were he cleared up and just let

23  me know.

24  Q.   What does it mean then that Scott Wiegert was still

25  following up with the vendor from MCU, what was discussed

Transcription Plus II, Inc.

154

Mr. Landeen - Direct - Mr. Tokayer

1   in that regard?

2   A.   Again, I don't recall but I'm going to go back to

3   what I believe I remember which was it had everything to

4   do with MCU and nothing to do with Citi Field.

5   Q.   So at this time did MCU have a kosher vendor on the

6   contract or not?

7   A.   To my knowledge, no.

8   Q.   Who had been the vendor there in 2010 during the

9   season?

10  A.   I don't know.

11  Q.   Who was the vendor in 2011?

12  A.   I still couldn't tell you, I don't know.

13  Q.   Was Kosher Sports on the agenda for the December 7th

14  weekly meeting in 2009?

15  A.   I guess you'd have to show me the, show me the

16  exhibit because I --

17  Q.   Okay, sure.

18       MR. TOKAYER:  Exhibit 39.

19  Q.   You'll see the front page as from Christina Garza --

20  A.   Yes.

21  Q.   -- to you and Mr. Schwartz and Mr. Kleckner and Mr.

22  Funk, right?

23  A.   Correct.

24  Q.   And this typically the way the minutes were -- the

25  agenda and the minutes, sorry -- is this typically the

155

Mr. Landeen - Direct - Mr. Tokayer

1  way the minutes would be circulated after the meeting?

2  A.   Yes.

3  Q.   As far as who would e-mail the minutes to the

4  attendees?

5  A.   Correct.

6  Q.   The second page was a redacted version which you

7  received from Aramark, so let me refer you to the last

8  page which is the minutes which were received from you

9  from QBC.  Do you have that page in front you?

10  A.   Yes.

11  Q.   Does that refresh your recollection that in fact

12  Kosher Sports was discussed at the December 7th 2010

13  meeting?

14  A.   Yes.

15        MR. TOKAYER:  I'd like to move Exhibit 39 into

16  evidence.

17        THE COURT:  Received.

18  (Plaintiff's Exhibit No. 39 received in evidence)

19  Q.   And do you recall at this meeting asking Aramark

20  whether or not Kosher Sports was in breach of it's

21  agreement with Aramark?

22  A.   Yes.

23  Q.   And that was for the purpose of getting Aramark to

24  terminate Kosher Sports; correct?

25  A.   No.

Transcription Plus II, Inc.

156

Mr. Landeen - Direct - Mr. Tokayer

1  Q.   Leaving the meetings aside, during the off season did

2  you discuss with any representative of Aramark

3  terminating Kosher Sports?

4  A.   At what point in time?

5  Q.   During the off season, at the end of 2010?

6  A.   No.

7  Q.   Between the end of the 2010 season and the beginning

8  of the 2011 season?

9  A.   No.

10  Q.   Do you know if anyone, did any representative of QBC

11  discuss with any representative if Aramark terminating

12  Kosher Sports?

13  A.   To my knowledge, no.

14  Q.   At that time of during the off season between 2010

15  and 2011 season was QBC looking to have another vendor on

16  the shelf so you could tell Kosher Sports to pound sand?

17  A.   Those weren't my words, so I couldn't comment on

18  that.  But as far as having someone ready from a

19  contingency standpoint, we needed someone ready because

20  we needed to serve that clientele.  We always have so

21  therefore we needed to have that service ready.  It

22  wasn't just an easy fix.

23  Q.   But you didn't want to terminate Kosher Sports,

24  right, you were just concerned that he would leave on his

25  own; correct?

Transcription Plus II, Inc.

157

Mr. Landeen - Cross - Mr. Mehlman

1   A.   Correct.

2          MR. TOKAYER:  No further questions for this

3   witness.

4          THE COURT:  All right.

5          MR. TOKAYER:  Hold on one minute, Your Honor.

6   I just want to confer with my co-counsel here.

7          (Pause)

8          MR. TOKAYER:  Just for the record I note that

9   your Honor said that you would visit the issue of the

10  sanctions and our cross motion at the end of the day.

11         THE COURT:  No, I didn't.  I said I wouldn't do

12  it in the beginning.

13         MR. TOKAYER:  Do it now.  Okay.

14         We believe that there is still minutes that

15  have not been produced yet so to that extent I can't

16  examine Mr. Landeen any further about that and, you know,

17  I would just on the record reserve the ability to

18  question to the extent that there are additional minutes

19  that haven't been produced, Your Honor.  Other than that

20  I have no questions..

21         THE COURT:  All right.  Let's finish up with

22  this witness then we'll take our lunch break.

23  CROSS EXAMINATION

24  BY MR. MEHLMAN:

25  Q.   Mr. Landeen who has the individual, or QBC was in

158
Mr. Landeen - Cross - Mr. Mehlman

1   charge of vendor services.  It's important to insure that

2   there is kosher food available for those who strictly

3   observe and want to eat kosher; is that correct?

4   A.   Yes.

5            MR. TOKAYER:  Objection, it's leading, your

6   Honor.

7            MR. MEHLMAN:  Cross examination, your Honor.

8            THE COURT:  I'll allow it.

9   Q.   In fact, it's important to you and for QBC to assure

10  that all guests are served the products that they're

11  looking for at the stadium; isn't that correct?

12  A.   Correct.

13  Q.   And you have various specialty menus to insure that

14  these guests are served; correct?

15  A.   Correct.

16  Q.   In fact you even have gluten free cart that sells

17  gluten free foods; is that correct?

18  A.   That's correct.

19  Q.   And that's because guests come to the ballpark and

20  they're looking for gluten free food; is that correct?

21  A.   Yes.

22  Q.   And as, in your capacity working for QBC it's

23  essential to insure that there's a kosher provider of

24  kosher fare; correct?

25  A.   Correct.

159

Mr. Landeen - Cross - Mr. Mehlman

1  Q.   And you stated during direct examination that back in

2  April of 2010 before there even was a lawsuit filed, you

3  had interviewed or you were aware of interviews of

4  various other kosher providers; is that correct?

5  A.   Correct.

6  Q.   And Mr. Katz was still operating at the stadium; is

7  that correct, at the time?

8  A.   Correct.

9  Q.   And in fact in April of 2010 -- excuse me, withdrawn.

10          And Mr. Katz was still serving the Glatt Kosher

11  food; is that correct?

12  A.   Yes.

13  Q.   So why was that you were interviewing other providers

14  and other kosher vendors at the time?

15  A.   Again, I had heard that Mr. Katz was unhappy.  I know

16  that --

17          MR. TOKAYER:  Objection.  Hearsay, your Honor.

18          THE COURT:  How did you hear this?

19          THE WITNESS:  I heard it from, specifically

20  Peter Helfer who works in our corporate sales department

21  and from Tom Funk from Aramark.

22          THE COURT:  All right.  I don't want to hear

23  specifically what they said to you, and Mr. Funk will be

24  testifying so we can hear from him.

25          THE WITNESS:   Right.

Transcription Plus II, Inc.

160

Mr. Landeen - Cross - Mr. Mehlman

1  Q.    But based on those conversations you thought it was

2  important to at least have a contingency plan; is that

3  correct?

4  A.    Absolutely.

5  Q.    And in fact you asked Aramark to meet with these

6  individuals as well; correct?

7  A.    Correct.

8  Q.    And you asked Aramark to meet with these individuals

9  prior to August 2010; is that correct?

10 A.    Correct.

11 Q.    Did you ask them to meet with these individuals after

12 August 2010?

13 A.    No.

14 Q.    Do you know if Aramark was meeting with these

15 individuals after August 2010?

16 A.    I don't recall.  They may have.

17 Q.    Now there were minutes that were shown to you of

18 certain meetings that took place after August 2010; is

19 that correct?

20 A.    Yes.

21 Q.    And on the agenda is listed kosher?

22 A.    Yes.

23 Q.    And do you know why the agenda lists kosher?  Or

24 kosher update, something to that effect?

25 A.    Again, we continued talking about, you know,

Transcription Plus II, Inc.

161

Mr. Landeen - Cross - Mr. Mehlman

1  contingency plans.  We were very concerned that if

2  Jonathan decided to get up and leave that we needed to be

3  ready to provide our guests with a Glatt Kosher product

4  Q.   So even though you knew there was an injunction in

5  place, it was still important as the vendor services

6  operations manager at QBC to insure that there'd be

7  kosher food served at the ballpark; is that correct?

8         MR. TOKAYER:  Objection.

9         THE COURT:  Overruled.

10         THE WITNESS:  Correct.

11  Q.   And that was the bulk of the conversations that you

12  had with Aramark during those meetings post to August

13  2010; is that correct?

14         MR. TOKAYER:  Objection.

15         THE COURT:  Sustained as to form.

16  Q.   Were those the purpose of your conversations

17  referencing Kosher Sports after August 2010?

18         MR. TOKAYER:  Objection.

19         THE COURT:  Overruled.

20         THE WITNESS:  Yes.

21  Q.   And when you asked at a meeting of which minutes are

22  in front of you, M. Landeen to relay message re kosher

23  not in breach with Aramark, did you ask Aramark whether

24  Kosher Sports was in breach?

25  A.   Yes.

Transcription Plus II, Inc.

162

Mr. Landeen - Cross - Mr. Mehlman

1   Q.   And what was the reason that you asked Aramark

2   whether Kosher Sports was in breach?

3   A.   We had, Aramark had various issues with operational

4   instances with Kosher Sports during the season --

5            MR. TOKAYER:   Objection, hearsay.

6            THE COURT:   I will not take it for the truth of

7   the matter asserted.

8   Q.   You can finish.

9   A.   And the -- as well as were worried about Jonathan

10  leaving, we were also wanted to make sure that he was not

11  in breach with Aramark because again if Aramark

12  terminated agreement, I wanted to know what's our next

13  steps.   And that's really --

14  Q.   Now I want to refer you to Exhibit 33, it's in the

15  binder in front of you.   Mr. Tokayer asked you questions

16  about whether it was decided that Mr. Tokayer -- I'm

17  sorry, Mr. Katz, could not close a certain stand K428 of

18  from the Pittsburgh series.   Remember those questions?

19  A.   Yes.

20  Q.   Do you have Exhibit 33 in front of you?

21  A.   Yes.

22  Q.   The Mets give a reason why they did not want that

23  promenade location closed?

24  A.   Yes.

25  Q.   And that reason is in the e-mail; isn't it?

Transcription Plus II, Inc.

163

Mr. Landeen ~ Cross ~ Mr. Mehlman

1  A.   Correct.

2  Q.   And what is the reason that QBC got involved and that

3  they didn't want, the stadium they didn't want the

4  promenade closed?

5  A.   It was from a customer service perspective, we didn't

6  want people not being able to who were sitting in one

7  section have to walk all the way across the concourse to

8  get a kosher product.  It was more of a convenience for

9  our customers.

10 Q.   Because coming to Citi Field is about fans, about the

11 guests; correct?

12       MR. TOKAYER:  Objection.

13       THE COURT:  Sustained.

14 Q.   Is coming to Citi Field about catering to the fans?

15       MR. TOKAYER:  Objection.

16       THE COURT:  Sustained.

17       MR. MEHLMAN:  Grounds?  I'll rephrase the

18 question, I don't need the grounds I'm sorry, your Honor.

19       THE COURT:  I'm not sure what, it's objection

20 as, sustained as to form.

21       MR. MEHLMAN:  I'll rephrase.

22 Q.   It's an essential part of your job to insure that the

23 fans are happy; correct?

24 A.   Yes.

25 Q.   And that they're provided with the food and the fare

164

                   Mr. Landeen - Cross - Mr. Mehlman

1   they are coming to the ballpark for?

2              MR. TOKAYER:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:   Yes.

5   Q.   And you were concerned that if they shut this down,

6   there'd be complaints from the fans; is that correct?

7   A.   Yes.

8   Q.   And I'm sure you deal with complaints from the fans

9   every single day, don't you Mr. Landeen?

10  A.   I deal with all of them.

11  Q.   And your job is to try to insure that there aren't

12  that many complaints from the fans; is that right?

13  A.   Yes.

14             MR. MEHLMAN:  Give me a moment, your Honor.

15             (Pause)

16  Q.   Mr. Landeen, you were asked early in your testimony

17  regarding the Aramark usage agreement; is that correct?

18             MR. MEHLMAN:  Two quick questions if I could

19  Mr. Katz --

20             THE COURT:  Mr. Katz is here.

21             MR. MEHLMAN:  Thank you.

22             THE COURT:  Mr. Katz could you step outside,

23  please.

24             (Pause)

25

                   Transcription Plus II, Inc.

166

                    Mr. Landeen - Redirect - Mr. Tokayer

1   REDIRECT EXAMINATION

2   BY MR. TOKAYER:

3   Q.   Are you aware that it was QBC that sent Mr. Katz --

4           MR. TOKAYER:  Oh, can I call Mr. Katz back in?

5           THE COURT:  You may.

6           (Pause)

7           THE COURT:  Unless you're going to be asking

8   about the usage agreement.

9           (Pause)

10  Q.   Wasn't it true that prior to when this lawsuit was

11  commenced it was QBC that terminated Kosher Sports

12  agreement; are you aware of that?

13  A.   I'm not aware of that.

14  Q.   Are you aware of the letter from Mr. Denniston to

15  Kosher Sports terminating Kosher Sports' agreement?

16          MR. MEHLMAN:  Objection, relevance.

17          THE COURT:  I'm sorry.  Which agreement are we

18  talking about?

19          MR. TOKAYER:  The Mets terminating Kosher

20  Sports' agreement with QBC.

21          THE COURT:  I believe this witness said he

22  didn't know.

23          MR. TOKAYER:  If he's not familiar with, it was

24  actually a letter from Mr. Denniston to Kosher Sports

25  terminating the QBC agreement?

167

Mr. Landeen - Redirect - Mr. Tokayer

1      THE COURT:  Are you familiar with that?

2      THE WITNESS:  No, that wouldn't be my

3  department.

4  Q.   Were you familiar with the fact that Mr. Katz in this

5  lawsuit is fighting that termination?

6      MR. MEHLMAN:  Objection.

7      THE COURT:  I'll allow it.

8      THE WITNESS:  Honestly I couldn't tell you.

9  Q.   Did you ever ask Mr. Katz why he moved in court for

10  an injunction if he was intending to leave Citi Field?

11      MR. MEHLMAN:  Objection, assuming a fact.

12      THE COURT:  Overruled.

13      THE WITNESS:  Did I ever ask him?

14      MR. TOKAYER:  Yeah.

15  A.   No.

16      MR. TOKAYER:  I have no further questions of

17  this witness.

18      THE COURT:  All right.  Thank you very much,

19  you're excused Mr. Landeen.  We will break for lunch.

20  Let's resume at 2:00 o'clock, will that give everyone

21  enough time?

22      MR. TOKAYER:  Yes, your Honor.

23      THE COURT:  All right.  And we have three

24  witnesses this afternoon, well that's just plaintiff's.

25      MR. FIELD:  Judge, we have two witnesses this

Transcription Plus II, Inc.

168

          Mr. Landeen - Redirect - Mr. Tokayer

1   afternoon.  One of those scheduling conferences or

2   telephone calls that referenced when we were discussing

3   Mr. Howard's testimony the possibility that it would be

4   stipulated to, we raised the issue of three witnesses and

5   you directed that we bring Mr. Kleckner and Mr. Funk who

6   are here.  Mr. Grey was excused from the hearing that was

7   scheduled back --

8            THE COURT:  So that was, that was back in June.

9   That was not for today, and it was for the specific issue

10  that was raised about the soccer game for which Aramark,

11  the Aramark witnesses were needed.  He was not excused

12  for today.

13           MR. FIELD:  Well I advised counsel that we were

14  proceeding with the two and nobody objected, earlier this

15  week when I told them that.  So I'm just -- when you said

16  there's three, there's only two outside is my point.

17           THE COURT:  Mr. Grey is the missing witness?

18           MR. FIELD:  Yes, your Honor.

19           THE COURT:  Well how soon can he get here?

20           MR. FIELD:  I don't know the answer to that,

21  but I will check at lunch.

22           THE COURT:  I take it we cannot stipulate to

23  his testimony?

24           MR. TOKAYER:  Correct.

25           THE COURT:  Was he deposed?

169

Mr. Landeen - Redirect - Mr. Tokayer

1      MR. TOKAYER:  No.

2      THE COURT:  And --

3      MR. FIELD:  As you heard --

4      THE COURT:  -- Mr. Field when did you advise

5  plaintiff's counsel that you would not be producing

6  Mr. Grey today?

7      MR. FIELD: The second or third time was

8  yesterday when I personally did it by facsimile.  My

9  colleague Mr. Brennan (ph) who has been on this case more

10 than I, for the duration, I saw at least two e-mails to

11 plaintiff's counsel which I was copied on.  Earlier, the

12 last week before he left on vacation so there were

13 multiple times, nobody ever said no we have to have him.

14      As we suggested to your Honor, we had the

15 discussion in June Mr. Grey's involvement here is de

16 minimis.  It's that one meeting, all you heard is his

17 testimony was is how that January 6th meeting which

18 apparently was recorded and Mr. Kleckner is here.  Mr.

19 Kleckner is much more knowledgeable.  Mr. Grey at best

20 would be duplicative on a very limited issue.

21      THE COURT:  Well I had, I had indicated in an

22 earlier ruling that the plaintiff while not being

23 precluded from using the tape for any purpose, would be

24 precluded from using it as affirmative evidence and could

25 it use it only for impeachment purposes.  Would both

170

                    Mr. Landeen - Redirect - Mr. Tokayer

1    sides be willing to have that, I think that tape may be

2    in evidence as it is, but can we have that in lieu of Mr.

3    Grey's testimony?

4              MR. TOKAYER:  Can we discuss that over lunch?

5              THE COURT:  No.  Because we need to know

6    whether it's going to be necessary to get Mr. Grey here

7    and I hear from Mr. Field that at least a week ago

8    plaintiff's counsel was advised that he wasn't being

9    produced.  So this should have been resolved before

10   today.

11             MR. MEHLMAN:  Your Honor, I want to make clear

12   the tape was moved into evidence, I made clear only for

13   impeachment purposes.  The Court issued a ruling based

14   upon a motion that was made that the tape would only be

15   allowed to be used for impeachment purposes and it's

16   QBC's position that the tape --

17             THE COURT:  So you wouldn't stipulate to that

18   coming in for any other purpose.

19             MR. MEHLMAN:  No, I would not.  I would not.

20             MR. FIELD:  Judge, at this time could we get

21   maybe an agreement that the only reason that Mr. Grey

22   would possibly be necessary is to discuss that January

23   6th meeting that I've been hearing about today which

24   Mr. Kleckner was also in the meeting, you're going to

25   hear from him and again if Mr. Kleckner's testimony it

171

Mr. Landeen - Redirect - Mr. Tokayer

1  may not be necessary to bring another person in to say

2  the same thing about the same meeting.

3         THE COURT:  But if it is then it's going to be

4  late in the day and you're going to tell me that you

5  can't get Mr. Grey in.

6         MR. FIELD:  I'll check but at the pace this is

7  going anyway with some of the examination here, I'm not

8  sure Mr. Grey is going to be reached today that's another

9  concern I have.  Maybe we can get some representation

10  from the attorney that he will be reached, all three will

11  be finished today if I do get him down here.

12         THE COURT:  Well I have no reason to think we

13  won't finish today if in fact we only have two other

14  witnesses other than Mr. Grey because I had said that we

15  were going to, if we need to go beyond normal business

16  hours we will.  So I would think that we're going to be

17  finished with the other witnesses no later than 5:00

18  o'clock.

19         MR. FIELD:  The other two by five is that what

20  I heard?

21         THE COURT:  Yes.

22         MR. FIELD:  Okay.

23         THE COURT:  If we start at 2:00 o'clock and Mr.

24  Tokayer had indicated he expects their direct, the direct

25  of each to be one hour and the cross examination probably

172

Mr. Landeen - Redirect - Mr. Tokayer

1   won't exceed 30 minutes I would guess, maybe even less.

2          Mr. Tokayer did you receive a notice a week ago

3   that Mr. Grey was not going to be produced?

4          MR. TOKAYER:  I really don't recall.  I have

5   received a lot of e-mails over the time.  I've never

6   indicated that Mr. Grey would not be introduced, we

7   exchanged witness lists.  I PDF'd it to counsel.

8          THE COURT:  Well whether you said he --

9          MR. TOKAYER:  I never, never ever said that Mr.

10  Grey was not going to be called and he's on my witness

11  list.

12         THE COURT:  Were you told that he wasn't --

13  were you told in substance that the other, that the other

14  Aramark witnesses were being produced and he was not?

15         MR. TOKAYER:  If he has the letters and the

16  e-mails, I'll look at them.  I don't recall.

17         MR. FIELD:  No, there's no doubt.  I said --

18  and I personally put the letter in the fax machine

19  yesterday.

20         MR. TOKAYER:  Yesterday.

21         MR. FIELD:  And I --

22         THE COURT:  Well that's the -- I'm not talking

23  about yesterday.

24         MR. TOKAYER:  That's yesterday.

25         THE COURT:  I'm talking about --

173

Mr. Landeen - Redirect - Mr. Tokayer

1    MR. FIELD:  And last week undoubtedly

2    Mr. Brennan sent e-mails.

3    THE COURT:  When does Mr. Grey's meeting end, I

4    accommodated Ms. -- well when does his meeting end?

5    MR. FIELD:  I'm not sure what your question is?

6    When does Mr. Grey's meeting end?

7    THE COURT:  Did you say that Mr. Grey is in a

8    series of meetings?

9    MR. FIELD:  No, I said Mr. Grey -- from the

10   testimony we've heard today, his only involvement in this

11   case is that one January 6th meeting which he and

12   Kleckner were at.  Kleckner will testify about it, Mr.

13   Katz is -- it's duplicative at best.  If you want him to

14   come in and say the same thing about the same meeting so

15   be it.  But I would think counsel would say they'd go

16   with Kleckner's testimony.  They've deposed Kleckner

17   twice, they know what he's going to say about that

18   meeting.

19   UNIDENTIFIED SPEAKER:  Mr. Kleckner was not at

20   that portion of the meeting that Mr. Grey --

21   THE COURT:  That's my recollection.  Why don't

22   you get Mr. Grey here.  Mr. Tokayer had indicated his

23   testimony will be 15 minutes.  If we need to take him out

24   of turn, we'll take him out of turn.  Get him in and out

25   quickly.

Transcription Plus II, Inc.

174

Mr. Landeen - Redirect - Mr. Tokayer

1          MR. FIELD:  I'm certain -- I want to get all
2     the three people, but I don't want not to finish, these
3     guys have been sitting here since 8:30 this morning.
4          THE COURT:  All right.  Get him here.  I'm not
5     pleased with this lack of focus on this issue, but my
6     previous ruling dealt specifically with the scheduling
7     difficulties created by the fact that there was a soccer
8     match and I had said that if he is needed we would then
9     put it over until the second day of the hearing. When I
10    adjourned it I indicated to counsel that at this point
11    we're going to go as long as it takes today to get it
12    finished and Mr. Grey was not excused.  I'm sorry that
13    that wasn't communicated to you properly.
14          All right.  I'll see you at 2 o'clock.
15          (Luncheon recess)
16          MR. MEHLMAN:  Your Honor, before the next
17    witness takes the stand --
18          THE COURT:  Please be seated.
19          MR. MEHLMAN:  -- I'd like to put something on
20    the record.  I could just be seated as I go on the
21    record.
22          There was an issue during Mr. Landeen's
23    testimony regarding November 2, 2010 minutes pursuant to
24    an agenda of a meeting.  Initially I had not noticed that
25    there were not minutes attached to the November 2, 2010,

175

Mr. Landeen - Redirect - Mr. Tokayer

1    the actual minutes.  During the break I had Mr. Landeen

2    stay here, reach out to who he could reach out to clarify

3    the reason behind it.

4            This is the clarification and Mr. Landeen has

5    the e-mails to support it on his --

6            THE COURT:  This relates to the cross motion;

7    correct?

8            MR. MEHLMAN:  No, it doesn't relate to the

9    cross motion.  It relates to the fact that I don't want

10   Mr. Tokayer expressly kept the hearing open and Mr.

11   Landeen's testimony open arguing or --

12           THE COURT:  Well he purported to.

13           MR. MEHLMAN:  Right, purported to, November

14   2nd.  I just want to clarify for the record so it's

15   clear, and I kept Mr. Landeen here just so that there

16   were no open issues at all.

17           The November 2nd, 2010 agenda is referenced in

18   Exhibit 36 and it references kosher.  The October 12,

19   2010 minutes which are Exhibit 34 are actually the

20   November 2nd minutes.  They were e-mailed as the November

21   2nd e-mail -- as the November 2nd minutes and they were

22   e-mailed inappropriately labeled October 12, 2010.  We

23   then went back to find out if there were in fact minutes

24   for October 12, 2010 and there are minutes for October

25   12, 2010, they do not reference kosher at all.  The word

176

Mr. Landeen - Redirect - Mr. Tokayer

1  kosher is not in there at all and that's why they would

2  not have been picked up on the ESI.  The e-mails --

3          THE COURT:  I thought none of them were picked

4  up on the ESI.

5          MR. MEHLMAN:  None of them were picked up on

6  the ESI but that one for sure would have never been

7  picked up, we went back again a second time to try to

8  find even hard copies.  But the reference is, is the

9  October 12th minutes according to the e-mail ledger that

10 was sent were actually the minutes from November 2nd and

11 they referenced kosher and there is a, with reference to

12 some sort of kosher, and the October 2010, the mid-

13 October 2010 minutes we could produce as well, there's

14 nothing on kosher on it.  And the e-mails in which they

15 were sent evidencing this mistake in delineation on it,

16 are available by e-mail as well.

17         I had Mr. Landeen pull it up on his iPad and we

18 could forward it to the court and have them printed out.

19 The reason that I'm raising this is that Mr. Landeen's

20 here, I want any issues that Mr. Tokayer has referencing

21 this hearing I want to resolved so there's no argument

22 that any evidence or any documents referenced here,

23 referencing this hearing has not been produced been

24 produced prior to the hearing.

25         THE COURT:  Well you may well want to do that

Transcription Plus II, Inc.

177

Mr. Landeen - Redirect - Mr. Tokayer

1  but I have a different agenda and that is to do this
2  contempt hearing.  If you are right then there is nothing
3  further to question him about because there aren't any
4  other meetings referencing kosher.  I mean does he have
5  actual knowledge of this or?
6          MR. MEHLMAN:  He has knowledge via the e-mails
7  that he received.
8          THE COURT:  Have you provided Mr. Tokayer with
9  those e-mails?
10         MR. MEHLMAN:  I have them on his iPad.  I did
11  not, could not find a Kinko's where we could forward to
12  to print out.  I would ask that if the court's permission
13  if we could forward them to the clerk to be printed out.
14  The reason I kept Mr. Landeen here is so that if Mr.
15  Tokayer has any further questions he can question Mr.
16  Landeen so we could resolve that issue that I know he's
17  going to raise or he's appearing to raise during the
18  course of his direct examination.  That's why I told Mr.
19  Landeen not to go back to his office, but to stay here in
20  case he could be questioned again.
21         THE COURT:  Well if you want to forward those
22  e-mails to my law clerk, he can print them out, but I'd
23  like to proceed with the contempt hearing.
24         MR. MEHLMAN:  And I will keep Mr. Landeen here
25  in case Mr. Tokayer would like to recall him to question

178

                    Mr. Landeen - Redirect - Mr. Tokayer

1   him regarding those e-mails.  With regard to the contempt

2   hearing I want to make it clear that he has full, fair

3   opportunity to cross examine or examine Mr. Landeen

4   referencing any of the documents.

5           MR. TOKAYER:  Your Honor, I believe this just

6   exacerbates the problem because those e-mails were not

7   produced.  E-mails that purport to be the conveyance of

8   that minutes and agenda.

9           THE COURT:  All right.  You both made your

10  record now and this, as far as I'm concerned, goes to the

11  cross motions for alleged discovery violations.  I would

12  like to proceed with this hearing.

13          Where did Mr. Mehlman go?

14          UNIDENTIFIED SPEAKER:  He's directing the --

15          THE COURT:  I told him to give it to my law

16  clerk.  He could e-mail it to my law clerk.

17          UNIDENTIFIED SPEAKER:  He's bringing my e-mail

18  address to the --

19          MR. MEHLMAN:  Your Honor, Mr. Landeen's the one

20  who is going to forward them.

21          (Pause)

22          THE COURT:  All right.  Let's proceed with the

23  next witness.

24          MR. TOKAYER:  Kosher Sports calls Mr. Funk.

25          (Witness takes the stand)

                    Transcription Plus II, Inc.

179

Mr. Funk - Direct - Mr. Tokayer

1    THE CLERK:  Please state your full name and

2 Spell your last name for the record?

3    MR. FUNK:  Thomas Funk, F-u-n-k.

4    THE COURT:  Please be seated.  Mr. Tokayer you

5 may proceed.

6 T H O M A S   F U N K

7    having been first duly sworn, was examined and

8    testified as follows:

9 DIRECT EXAMINATION

10 BY MR. TOKAYER:

11 Q.   Good afternoon, Mr. Funk.

12 A.   Good afternoon.

13 Q.   Are you ready to proceed?

14 A.   Sure.

15 Q.   When did you start working for Aramark?

16 A.   July 2005.

17 Q.   And at that time where were you stationed?

18 A.   Lincoln Financial Field, Philadelphia.

19 Q.   And you eventually become the director of operations

20 there?

21 A.   Yes, I did.

22 Q.   Are you aware that Kosher Sports had a concession at

23 Lincoln Financial Field, Philadelphia, while you were

24 stationed there; correct?

25 A.   Correct.

180

Mr. Funk - Direct - Mr. Tokayer

1  Q.   In fact you signed the agreement between Kosher

2  Sports and Aramark, right?

3  A.   One of them at one point, yes.

4  Q.   Has Aramark asked Kosher Sports to operate at

5  Saturday events at Lincoln Financial Field?

6  A.   Yes.

7  Q.   When did you move to Citi Field?

8       THE COURT:  I'm sorry?  Who asked that?

9       MR. TOKAYER:  Aramark asked Kosher Sports.

10 Q.   Since -- I'm sorry.  When did you move to Citi Field?

11 A.   January 2009.

12 Q.   And you report directly to the resident district

13 manager at Citi Field?

14 A.   Correct.

15 Q.   And that was Rich Johns initially and then Scott

16 Kleckner; right?

17 A.   Correct.

18 Q.   When did Mr. Kleckner become the resident district

19 manager at Citi Field?

20 A.   I believe February 2010.

21 Q.   And you've heard some testimony but since you're the

22 Aramark representative, is it true that Mr. Kleckner

23 reports to Mr. Wiegert and that Mr. Wiegert reports to

24 Mr. Westboro?

25 A.   Correct.

Transcription Plus II, Inc.

181

Mr. Funk - Direct - Mr. Tokayer

1  Q.   As early as the spring of 2009, you Mr. Funk knew

2  that Kosher Sports intended to operate on Friday and

3  Saturdays; correct?

4  A.   Correct.

5  Q.   And at that time you also knew that the Mets were

6  against it; right?

7  A.   When was that?

8  Q.   Spring of 2009.

9  A.   At that time I don't know the Mets maybe, I know that

10 my bosses at the time were against it as well.

11 Q.   I asked you about the Mets though.

12 A.   Oh, yeah I think I recall that.

13 Q.   In January of 2010 Mr. Kestenbaum of Kosher Sports

14 made a request of Paul Asencio for Kosher Sports to

15 operate on Fridays and Saturdays.  Do you remember being

16 aware of that request?

17       MR. MEHLMAN:  Objection.  He's leading this

18 witness, your Honor.  It's also an improper question.

19       THE COURT:  All right.  Objection sustained.

20 Q.   Were you aware of a request by a David Kestenbaum of

21 Kosher Sports made of Kosher Sports to operate on Fridays

22 and Saturdays at Citi Field?

23 A.   Made to who?

24 Q.   Made to QBC?

25 A.   Not specifically.

Transcription Plus II, Inc.

182

Mr. Funk - Direct - Mr. Tokayer

1  Q.   I'd ask you to turn your attention to Exhibit 12,

2  it's an e-mail from Kestenbaum to Mr. Barrick and from

3  Barrick back to Mr. Kestenbaum.

4        Does that refresh your recollection of any

5  requests made that you were aware of?

6  A.   Yes.

7  Q.   What, if anything, did you do upon learning of Mr.

8  Kestenbaum's e-mail?

9        THE COURT:  I'm sorry.  But you're assuming a

10 fact not in evidence.

11        MR. TOKAYER:  I believe he just said that.

12        THE COURT:  No, you asked whether it refreshed

13 his recollection.  So why don't you lay a foundation.

14 Q.   Do you now recall that Mr. Kestenbaum asked QBC in

15 January of 2010 to operate on Friday and Saturdays at

16 Citi Field?

17        MR. MEHLMAN:  Objection.

18        THE COURT:  Sustained.

19 Q.   Is your recollection now refreshed that you were

20 aware of Mr. Kestenbaum's request made in Exhibit 12?

21        MR. MEHLMAN:  Objection.

22        THE COURT:  When did you first become aware of

23 the request in Exhibit 12, if you did?

24        THE WITNESS:   It was around that time,

25 February, March time period I think.

Transcription Plus II, Inc.

183

Mr. Funk - Direct - Mr. Tokayer

1  Q.   Do you remember at your deposition of being asked the

2  following question and getting the following response, on

3  Page 71, line 11 of Mr. Funk's deposition.

4         Mr. Tokayer -- I'm asking him if he was made

5  aware of the request of Mr. Kestenbaum of QBC in January

6  of 2010 to operate on Fridays and Saturdays?

7         "A   I mean I do recall whether it was

8             a conversation or e-mail, a request

9             was made.

10        "Q   Do you recall in January of 2010

11            being aware that Mr. Kestenbaum had

12            made a request of Paul Asencio to

13            operate on Fridays and Saturdays?

14        "A   I don't know if it was January,

15            it could have been thereafter, but

16            I'm sure. . yeah, yes.  What, if

17            anything do you recall doing upon

18            becoming a" --

19        THE COURT:  I'm sorry.  Is that part of a

20  question that's not even inconsistent with his testimony.

21        MR. TOKAYER:  I think it's -- he said that he

22  didn't remember, but now he's saying that it was around

23  January or thereafter.

24        THE COURT:  No, no.  He testified that he first

25  became aware of the request around February or March, and

Transcription Plus II, Inc.

184

Mr. Funk - Direct - Mr. Tokayer

1  there was nothing inconsistent in the testimony that you

2  read.  I'm not sure why you read that.

3            MR. TOKAYER:  Well he said --

4            THE COURT:  In his testimony he said he didn't

5  know whether it was January or sometime thereafter.

6  Please move on.

7            MR. TOKAYER:  Okay.

8  Q.   What, if anything, did you do upon hearing of Mr.

9  Kestenbaum's request?

10  A.   I don't remember.

11  Q.   Isn't it true that you did nothing in response to

12  that?

13  A.   Could be, yeah.

14  Q.   Now in May of 2010 you heard from an Aramark manager

15  named Anthony, something about Kosher Sports wanting to

16  operate on Fridays and Saturdays, do you remember that?

17  A.   Yeah, that sounds familiar.

18  Q.   Okay.  And at that time you e-mailed Mr. Katz about

19  what you had heard, right?

20  A.   I don't recall if I e-mailed him.

21  Q.   Let me show you Exhibit 18.  If you'd look at the

22  second page of Exhibit 18, there's an e-mail from you,

23  Mr. Funk.

24  A.   Right.

25  Q.   To Mr. Katz.  Does that refresh your recollection?

185

Mr. Funk - Direct - Mr. Tokayer

1   A.   It does.

2          MR. TOKAYER:   I'd move Exhibit 18 as evidence.

3   (Plaintiff's Exhibit 18 received in evidence)

4   Q.   And do you remember asking Mr. Katz who approved this

5   on the Mets side?

6   A.   Yes.

7   Q.   And do you recall getting Mr. Katz' response?

8   A.   I do now.

9   Q.   And within two minutes of receiving Mr. Katz'

10  response, did you forward that response on to Paul

11  Schwartz?

12  A.   I did.

13  Q.   And Exhibit 18 the e-mail that you wrote and received

14  and forwarded on May 18, 2010.  Is that the e-mail that

15  you wrote, received and forwarded on May 18, 2010?

16  A.   Yes.

17  Q.   And who is Paul Schwartz?

18  A.   Paul Schwartz is the senior director of Venue

19  Services for the Mets, New York Mets.

20  Q.   This action that we're here on today was commenced on

21  June 9, 2010 with the taking out of the summons.

22          MR. MEHLMAN:   Objection.

23          THE COURT:   Ask a question.

24  Q.   On June 11, 2010, did you become aware of this

25  lawsuit?

Transcription Plus II, Inc.

186

Mr. Funk - Direct - Mr. Tokayer

1   A.   I believe so, yes.

2   Q.   How did you become aware of this lawsuit at that

3   time?

4            MR. MEHLMAN:   Objection.

5            MR. TOKAYER:   Withdrawn.

6   Q.   Did you receive an e-mail on that date, June 11,

7   2010, informing you of the lawsuit?

8   A.   I don't recall if it was an e-mail or if I had read

9   something in the newspaper, I don't remember which one of

10  those, but one of those did occur.

11  Q.   I'm going to show you Exhibit 21.  E-mail is from a

12  Danielle Parillo, it's dated June 11, 2010 at 11:20 a.m.

13  and it's to -- I'm sorry.  The e-mail from Mr. Schwartz

14  dated June 11, 2010 at 11:26 a.m., do you see that?

15  A.   I do.

16  Q.   Okay.  Did you receive this e-mail from Mr. Schwartz

17  on that day?

18  A.   I did.

19  Q.   Okay.  And is Mr. Schwartz forwarding for your

20  information an e-mail that he received from Danielle

21  Parillo?

22  A.   Is he forwarding me the information?

23  Q.   Is he forwarding to you an e-mail from Danielle

24  Parillo on that same date?

25  A.   Yes.

Transcription Plus II, Inc.

187

Mr. Funk - Direct - Mr. Tokayer

1    MR. TOKAYER:  I'd like to move Exhibit 21 in

2  evidence, your Honor.

3    THE COURT:  Any objection?

4    MR. MEHLMAN:  No.

5    THE COURT:  Received.

6  (Plaintiff's Exhibit No. 21 received in evidence)

7  Q.   Now did you understand from this e-mail that the

8  lawsuit by Kosher Sports involved its claim that the Mets

9  were not letting Kosher Sports operate on Fridays and

10  Saturdays?

11    MR. MEHLMAN:  Objection.

12    THE COURT:  Overruled.

13    THE WITNESS:   I'm sorry can you ask it again.

14    MR. TOKAYER:  Sure.

15  Q.   Did you understand from this e-mail that was

16  forwarded to you by Mr. Schwartz that Kosher Sports had

17  filed a lawsuit involving its claim that the Mets were

18  not letting Kosher Sports operate on Fridays and

19  Saturdays at Citi Field?

20  A.   That was my understanding.

21  Q.   And you have spoken about the lawsuit with

22  representatives of the Mets; correct?

23  A.   Correct.

24  Q.   Paul Schwartz?

25  A.   Yeah, I believe so.

Transcription Plus II, Inc.

Mr. Funk - Direct - Mr. Tokayer

1  Q.   Mike Landeen?

2  A.   Yes.

3  Q.   Adam Barrick?

4  A.   Yes.

5  Q.   Pete Helfer?

6  A.   Never directly to Pete, no.

7  Q.   Paul Asencio?

8  A.   Possibly.

9  Q.   Do you remember your deposition telling me that you

10 probably did speak to Mr. Helfer about the lawsuit as

11 well?

12 A.   I don't remember that, but.

13 Q.   Let me just read you from your deposition, ask you if

14 you were asked the following questions and received the

15 following response.  On Page 91 at 2:  "Question:  By the

16 way before we leave it to the 120" - which is Exhibit 21

17 to this hearing - "this time did you have any

18 conversation with the Mets or any representatives thereof

19 about the lawsuit commenced by Kosher Sports?"

20     You have a number of people you identified and on

21 line 22 you say, "I would probably say Pete Helfer,

22 whoever was involved with working with Kosher Sports on

23 the corporate sales side.  Whether it was in passing

24 informally I'm sure there were conversations."

25     Do you remember being asked that question and giving

189

Mr. Funk ~ Direct - Mr. Tokayer

1  that response?

2  A.    I do.

3  Q.    Later on June 11th after you received Exhibit 21, did

4  you recall the Mets asking you and Scott Kleckner and

5  Scott Wiegert whether to let Kosher Sports continue to

6  operate at Citi Field on June 22nd because it started the

7  Mets' home stand?

8  A.    I don't remember the date but I do remember the

9  conversation.

10 Q.    Okay.  Invite your attention to Exhibit 22.  Does

11 that refresh your recollection as to the date that the

12 Mets made that request of you, Mr. Wiegert and Mr.

13 Kleckner?

14 A.    I do or it does.

15 Q.    So it was June 11th, it was later that day; correct?

16 A.    Yeah, yes.

17 Q.    And recall receiving this e-mail, Exhibit 22?

18 A.    I do.

19        MR. TOKAYER:  I'd like to move Exhibit 22 into

20 evidence, your Honor.

21        THE COURT:  Any objection?

22        MR. MEHLMAN:  Just the date once again, June

23 11, 2010.

24        THE COURT:  All right.  Overruled and received.

25 (Plaintiff's Exhibit No. 22 received in evidence)

Transcription Plus II, Inc.

190

Mr. Funk - Direct - Mr. Tokayer

1   Q.   And in that e-mail Mr. Funk the Mets also asked
2   Aramark what actions Aramark's legal department should be
3   taking, right?
4   A.   Yes.
5   Q.   Were you aware that the Mets also, at this time, were
6   seeking to coordinate with Aramark on a press release in
7   response to the lawsuit?
8   A.   I'm not sure about a press release.
9   Q.   Direct your attention to Exhibit 24 of your binder.
10  Do you know who David Freireich is?
11  A.   I do.
12  Q.   And who is Mr. Freireich?
13  A.   I believe he's the director of public relations or
14  marketing for Aramark.
15  Q.   And who is a Danielle Parillo, does she have the same
16  position at the Mets?
17  A.   Correct.
18  Q.   Okay.  And you recall receiving this information from
19  Mr. Freireich on or about June 17, 2010?
20          MR. MEHLMAN:  Objection.
21          THE COURT:  I'm sorry.  Receiving what
22  information?
23          MR. TOKAYER:  Information contained in Exhibit
24  24.
25          THE COURT:  This witness isn't cc'd in the e-

191

Mr. Funk - Direct - Mr. Tokayer

1   mail.

2          MR. TOKAYER:  Correct.  But he claims --

3          THE COURT:  Read it to yourself and then ask a

4   specific question.

5          (Pause)

6   Q.   Did you -- do you recall Mr. Freireich providing you

7   with the proposed press release contained in Exhibit 24?

8   A.   I remember reading it.  I don't know who -- Dave may

9   have sent it, but I do remember seeing it.

10         MR. TOKAYER:  I'd like to move Exhibit 24 into

11   evidence.

12         THE COURT:  Any objection.

13         MR. MEHLMAN:  Yes, your Honor.  I don't think

14   it's appropriate to move that into evidence.

15         THE COURT:  Sustained.

16   Q.   What information did you get from Mr. Freireich on,

17   with respect to this?

18   A.   This e-mail?

19   Q.   Yes.

20   A.   I don't remember specifically what it was.  It might

21   have been a forwarded note about this e-mail itself.  I

22   don't remember the exact form, I just remember seeing the

23   information that's here.

24   Q.   Right.

25         MR. TOKAYER:  Again, I'd move for Exhibit 24

Transcription Plus II, Inc.

192

Mr. Funk - Direct - Mr. Tokayer

1  into evidence as a document the even though he's not cc'd

2  on he was aware of.

3            THE COURT:  Well he said he was aware of a

4  press release.

5            MR. TOKAYER:  Proposed press release which is

6  what Mr. Parillo is providing to Aramark.

7            THE COURT:  Is there an objection?

8            MR. MEHLMAN:  Same objection, your Honor.

9            THE COURT:  Sustained.

10 Q.   You were aware in June of 2010 that the Mets were

11 providing a proposed press release to Aramark for their

12 review; correct?

13 A.   Correct.

14 Q.   Do you remember seeing a news article where the Mets

15 were quoted as saying that it was Aramark and not the

16 Mets who were not letting Kosher Sports operate on Friday

17 and Saturday?

18 A.   I do.

19 Q.   And did you agree with that article?

20 A.   I did not.

21 Q.   And which part of the article did you not agree with?

22 A.   I think it's something about Aramark providing carts,

23 if I -- I don't remember the exact term.  I think it said

24 that we wouldn't allow, Aramark wouldn't provide carts

25 which is what -- I don't remember the exact language on

Transcription Plus II, Inc.

193

Mr. Funk - Direct - Mr. Tokayer

1  it, but there was a piece of their statement that I

2  didn't agree with.

3  Q.    Let me see if I can refresh your recollection.

4  A.    Thank you.

5  Q.    If you'd look at Exhibit 29.  The bottom e-mail is

6  from you to Mr. Schwartz; correct?  Dated August 14, 2010

7  at 10:22 p.m.

8  A.    Correct.

9  Q.    And you're providing them with an article by a Janon

10  Fischer (ph)?

11  A.    Yes.

12  Q.    Okay.  Is that the article that you saw?

13  A.    Yes.

14  Q.    If you recall that you saw where the Mets were quoted

15  as saying that it was Aramark not the Mets who were not

16  letting Kosher Sports operate on Friday and Saturday;

17  correct?

18  A.    Correct.

19  Q.    Okay.  And you didn't agree with that part of the

20  article that said that Aramark had refused to allow

21  Kosher Sports to operate on Friday and Saturday; right?

22         MR. MEHLMAN:  Objection, leading the witness,

23  misstating the response to the question, your Honor.

24         THE COURT:  I don't think he did respond, but I

25  already said once that you're not to lead this witness.

194

Mr. Funk - Direct - Mr. Tokayer

1   Q.   Which part of that article did you not agree with?

2   Now that you have it front of you.

3   A.   The part where it says Aramark has refused to supply

4   the kosher vendor with carts for Fridays and Saturdays,

5   the Mets said.

6   Q.   Thank you. Which paragraph was this, on the second

7   page?

8   A.   Yes.

9   Q.   You thought that wasn't true; correct?

10   A.   I don't ever remember having dialogue around

11   supplying carts.

12   Q.   In fact when you first read this article you thought

13   that the Mets were throwing Aramark under the bus, do you

14   recall telling me that at your deposition?

15          MR. MEHLMAN:  Objection.

16          THE COURT:  Overruled.  Did you say that at

17   your deposition?

18          THE WITNESS:   I did.

19   Q.   And you forwarded this article to the Mets; correct?

20   And to Paul Schwartz in particular with a copy to -- I'm

21   sorry -- to Paul Schwartz in particular; correct?

22   A.   Correct.

23   Q.   Did Clint Eastwood agree with your assessment --

24          THE COURT:  What's --

25   A.   I don't know what Clint Eastwood agreed to.

Transcription Plus II, Inc.

195

Mr. Funk - Direct - Mr. Tokayer

1  Q.   Did Clint Westbrook agree with your assessment that

2  the Mets had thrown Aramark under the bus?

3  A.   I believe he did.

4  Q.   Let me show you Exhibit 28.  It's an e-mail from

5  Westbrook to Mr. Wiegert dated August 14, 2010.  Do you

6  see that?

7  A.   I do.

8  Q.   Is it the ordinary course of Aramark's business to

9  send e-mails back and forth internally?

10          MR. MEHLMAN:  Objection.

11          THE COURT:  I'll allow it.

12          THE WITNESS:  I'm sorry?

13          MR. TOKAYER:  You may answer the question.

14          THE WITNESS:  So is Aramark allowed to send e-

15  mails to and from each other internally?

16          MR. TOKAYER:  Yes.

17          THE WITNESS:  Yes, we are.

18  Q.   And is that the ordinary course of Aramark's

19  business?

20          MR. MEHLMAN:  Objection.

21          MR. TOKAYER:  To send such e-mails.

22          THE COURT:  I'll allow the question.

23          THE WITNESS:  We do send e-mails back and

24  forth, yes.

25  Q.   And do the e-mails that are sent back and forth

Transcription Plus II, Inc.

196

Mr. Funk - Direct - Mr. Tokayer

1  ordinarily describe events contemporaneous with the e-

2  mails that are being sent?

3  A.   I'm not sure I understand the question.

4  Q.   Do you simply send an e-mail, is it about something

5  that happened at that time generally?

6           MR. MEHLMAN:  Objection.

7           THE COURT:  Are you suggesting that any time

8  two business people communicate by e-mail that, if it's

9  common to communicate by e-mail that that becomes a

10 business record and an exception to the hearsay rule?

11          MR. TOKAYER:  I believe that this e-mail is a

12 business record and I'm going to move into evidence.

13          MR. MEHLMAN:  Objection, your Honor.  There's a

14 much clearer foundation, a much more detailed foundation

15 that Mr. Tokayer hasn't laid, and I don't believe any

16 foundation could demonstrate that an e-mail is a business

17 record.

18          THE COURT:  Well I mean under certain --

19          MR. MEHLMAN:  Not this e-mail.  This e-mail is

20 a business record.  It's a communication between two

21 people at Aramark.  Would we then argue that all

22 communications between --

23          THE COURT:  Well that was my, that was my

24 question to Mr. TOKAYER.  I'll allow him to make his

25 record.  Finish making your record.

197

Mr. Funk - Direct - Mr. Tokayer

1    MR. TOKAYER:  I would move Exhibit 28 into

2  evidence.

3    THE COURT:  For the truth?

4    MR. TOKAYER:  For the fact that it was said.

5    THE COURT:  For the fact that what was said?

6    MR. TOKAYER:  That Mr. Westbrook and Mr.

7  Wiegert discussed their view that Aramark -- that QBC had

8  thrown Aramark under the bus?

9    MR. MEHLMAN:  Objection.

10    THE COURT:  Sustained.

11 Q.  If you could turn to Exhibit 31, did you see a copy

12 of this letter from me to Mr. Kleckner?

13    MR. MEHLMAN:  Objection.  What time period.

14    THE COURT:  Yes, ask a more specific question.

15 Q.  On or about August 27, 2010 did you get a copy of

16 this letter from me to Scott Kleckner enclosing Judge

17 Weinstein's order?

18 A.  Did I receive a copy?

19 Q.  Yes.

20 A.  I don't recall receiving a copy.  I did see it, but I

21 didn't receive a copy.

22 Q.  Okay.  And you discussed it with Mr. Kleckner?

23 A.  Yes.

24 Q.  At or about that date?

25 A.  Yeah, I don't know the date exactly.

Transcription Plus II, Inc.

198

Mr. Funk - Direct - Mr. Tokayer

1    MR. TOKAYER:  I'd like to move Exhibit 31 into

2  evidence.

3    UNIDENTIFIED SPEAKER:  It's already in

4  evidence.

5    THE COURT:  I'm told it's already in evidence.

6    MR. TOKAYER:  It's right here, thank you.

7  Q.   Did there come a time when the Queens Ballpark

8  Company sought to replace Kosher Sports with other kosher

9  vendors?

10 A.   Did there come a time?

11 Q.   Yes.

12 A.   Possibly.

13 Q.   Do you recall meeting with other kosher vendors at

14 QBC's request in order to replace Kosher Sports at Citi

15 Field?

16 A.   I do.

17 Q.   Okay.  And this occurred at the end of August 2010

18 and the beginning of September 2010?

19 A.   Somewhere, yeah, in there dates.

20 Q.   And QBC was present during many of those meetings?

21 A.   Yes, I believe they were.

22 Q.   Aramark has weekly meetings with QBC's vendor

23 services department; right?

24 A.   Correct.

25 Q.   And during the season as well during the off season;

199
Mr. Funk - Direct - Mr. Tokayer

1  correct?

2  A.    Correct.

3  Q.    Did the meetings stop after August 27, 2010, the date

4  of the letter from me to Mr. Kleckner, which is Exhibit

5  31?

6  A.    Did the meeting stop happening?

7  Q.    Yes.

8  A.    No.

9  Q.    Was Kosher Sports placed on the agenda of the weekly

10  meetings that Aramark with the vendor services department

11  during the off season between 2010 and 2011?

12  A.    They were on.

13  Q.    And was --

14         THE COURT:  I'm sorry.  I didn't hear that

15  answer.

16         THE WITNESS:   They were on the agenda.  Not

17  every week, but the topic came up, yes.

18  Q.    Kosher Sports was the topic of conversation at many

19  of those weekly meetings?

20  A.    Some, yes.

21  Q.    Okay.  And some of those conversations were reflected

22  in the minutes of those meetings; right?

23  A.    I believe they were, yes.

24  Q.    And you would get the minutes in the ordinary course

25  of your business?

Mr. Funk - Direct - Mr. Tokayer

1  A.   Yeah, I believe we were e-mailed them.

2  Q.   At some of the weekly meetings in November and

3  December of 2010, did Aramark and the Mets discuss

4  whether Kosher Sports was in breach of its agreement with

5  Aramark?

6  A.   In that time period?

7  Q.   Yes.

8  A.   Yes.

9  Q.   And that occurred at least at the November 2nd

10  meeting, November 11th meeting and the December 7th

11  meeting; right?

12          MR. MEHLMAN:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:   I don't remember the exact

15  dates, but I do know that, again, there were

16  conversations around the topic.

17  Q.   At one meeting or more than one meeting?

18  A.   It was a few sure.  It wasn't one.

19  Q.   Let me show you the minutes for December 7th, see if

20  you recall it being a topic of that meeting, and that's

21  Exhibit 39 in front of you.

22  A.   I remember.

23  Q.   Okay.  So it was a topic of the December 7th meeting;

24  correct?  Kosher Sports being -- whether Kosher Sports

25  was in breach of its agreement with Aramark; right?

Transcription Plus II, Inc.

201

Mr. Funk - Direct - Mr. Tokayer

1  A.   It says it's not in breach.

2  Q.   Right.

3  A.   Yes.

4  Q.   Whether or not it was in breach was discussed?

5  A.   Okay, yes.

6  Q.   Okay.

7  A.   Thank you.

8  Q.   And do you remember at your deposition testifying

9  that was also the topic of conversation at the November

10  2nd and the November 11th meeting?

11  A.   I believe, yes, that's what it said.

12  Q.   And was it your judgement that there was no grounds

13  for termination of Kosher Sports at that time?

14  A.   Correct.

15  Q.   And that's what you and Mr. Kleckner discussed

16  specifically?

17  A.   Yes.

18  Q.   Did Mr. Katz send you an e-mail on September 6th,

19  2010 asking if it was okay for Kosher Sports to be

20  permitted not to open its portable cart on the promenade

21  level for the Pittsburgh series?  Do you recall that?

22  A.   I think so, yes.

23  Q.   Let me show you Exhibit 33.  And refer you to the

24  second page, that's the e-mail from Mr. Katz to you on

25  September 6th on that topic.

202

Mr. Funk - Cross - Mr. Mehlman

1  A.   Okay.

2  Q.   Now you responded on September 7th at 1:54 p.m. that

3  it was not okay, do you remember that?

4  A.   I'm sorry what was it, what was the date?

5  Q.   On September 6th Mr. Katz asked you please let me

6  know if you are okay with this and then the next day on

7  September 7th of 2010 you told him, no.  Do you remember

8  that?

9  A.   I remember saying no, I don't remember the date

10 specifically.

11 Q.   Let me show you to refresh your recollection.  Okay.

12 Do you recall being asked this following question and

13 giving the following response in your deposition on May

14 26, 2010.  Page 150, line 25.

15         "Question:  Let's go back to section 428.  John

16 asked that it be closed for the Pittsburgh series and you

17 responded on the next day at 1:54 p.m.?

18         "Answer:  Yes.  That's what it says.

19         "Question:  Did you grant his request at that

20 time?

21         "Answer:  No."

22     Do you recall being asked that question and giving

23 that response?

24 A.   Yes.

25 Q.   Okay.  And between Mr. Katz asking you on September

203

Mr. Funk - Cross - Mr. Mehlman

1   6th whether it was okay and your responding to him on

2   September 7th at 1:54 p.m. it wasn't okay, you

3   communicated with the Mets, right?

4   A.   Yes, Paul Schwartz.

5   Q.   And you forwarded Mr. Katz' e-mail to Mr. Schwartz;

6   right?

7   A.   Correct.

8   Q.   And Mr. Schwartz responded that the Mets were not

9   okay with the request from their perspective; right?

10  A.   Correct.

11  Q.   And you relayed -- and that was the response that you

12  relayed to Mr. Katz without telling him that it was the

13  Mets who had said no; correct?

14  A.   Correct.

15        MR. TOKAYER:  No further questions.

16        THE COURT:  All right.  Cross examination?

17        MR. MEHLMAN:  Just briefly.

18  CROSS EXAMINATION

19  BY MR. MEHLMAN:

20  Q.   Mr. Funk, was Aramark asked by the Mets to meet with

21  other vendors that may want to sell their fare at Citi

22  Field?

23  A.   Yes.

24        THE COURT:  I'm sorry.  I didn't hear the

25  question.

Transcription Plus II, Inc.

204

Mr. Funk - Cross - Mr. Mehlman

1  Q.   Does Aramark -- was Aramark asked by the Mets to meet

2  with other vendors who want to sell their fare at Citi

3  Field?

4  A.   Yes.

5  Q.   Are those meetings constant and consistent throughout

6  a season, all season usually?

7           MR. TOKAYER:  Objection.

8           THE COURT:  I'll allow it.

9           THE WITNESS:  Yes.

10 Q.   And do you know the reason why QBC or the Mets asked

11 you to meet with other kosher vendors even though

12 Mr. Katz and KSI were still operating at Citi Field?

13 A.   I understood it that it was a contingent for a

14 sponsorship agreement that the Mets were trying to fill.

15 Q.   And Mr. Katz still operates in Citi Field; is that

16 correct?

17 A.   Correct.

18 Q.   And he hadn't stopped operating in Citi Field since

19 the beginning of this lawsuit; correct?

20 A.   Correct.

21 Q.   And did anyone from QBC, from the Mets, ever ask you,

22 as far as you know, to terminate Mr. Katz' Aramark

23 contract?

24 A.   No.

25 Q.   Did anybody from the Mets or QBC or anyone related to

205

              Mr. Funk - Cross - Mr. Mehlman

1   the Mets ever ask Aramark, as far as you know, to

2   terminate Aramark's contract with KSI?

3   A.   No.

4           MR. MEHLMAN:  Nothing further.

5           THE COURT:  All right. You may step down.

6           Mr. Tokayer, you can call your next witness.

7           MR. TOKAYER:  Mr. Grey, please.

8           THE COURT:  Is Mr. Grey here?

9           MR. FIELD:  Mr. Grey is coming at 4:00 o'clock.

10          THE COURT:  All right.

11          MR. FIELD:  I asked the question before about

12  how long you were going to be with them, the other two.

13  I have two of them have been here since 8:30.  And I

14  asked earlier if --

15          THE COURT:  You have two, we should only have

16  one more.

17          MR. FIELD:  Yes, now I have one.

18          THE COURT:  All right.  Mr. Kleckner is your

19  other remaining witness?

20          MR. TOKAYER:  Yes.

21          THE COURT:  All right.  Let's call Mr.

22  Kleckner.

23          MR. TOKAYER:  Can we just take a quick break.

24          THE COURT:  We've only be going for less than

25  an hour since the lunch break.

206

Mr. Kleckner - Direct - Mr. Tokayer

1           MR. TOKAYER:  It will just be a moment.

2           THE COURT:  You really need to use the

3  facilities now?  All right.  I'm going to stay on the

4  bench so make it fast.

5           MR. TOKAYER:  Okay.  Thank you, your Honor.

6           THE COURT:  You both have to go?

7           (Pause)

8           MR. TOKAYER:  Thank you, your Honor.

9           THE COURT:  Are we back on the record?

10          MR. CLERK:  We are.  Should I swear in the

11  witness?

12          THE COURT:  Yes.

13          (Witness takes the stand)

14          MR. CLERK:  If you could state your full name

15  and then spell your last name?

16          MR. KLECKNER:  Scott Eric Kleckner, K-l-e-c-k-

17  n-e-r.

18          THE COURT:  You may proceed.

19          MR. TOKAYER:  Thank you, your Honor.

20  S C O T T   K L E C K N E R

21      having been first duly sworn, was examined and

22      testified as follows:

23  DIRECT EXAMINATION

24  BY MR. TOKAYER:

25  Q.  Good afternoon, Mr. Kleckner.

207

Mr. Kleckner - Direct - Mr. Tokayer

1  A.    Hello.

2  Q.    When did you start working at Aramark?

3  A.    Less than five years ago.

4  Q.    And you started at which stadium?  Where were you

5  stationed?

6  A.    Lincoln Financial Field in Philadelphia.

7  Q.    How long were you at Lincoln Financial Field in

8  Philadelphia?

9  A.    About a year and half, about two seasons.

10 Q.    Was Mr. Funk there while you were there?

11 A.    Yes.

12 Q.    Now was Kosher Sports operating at Lincoln Financial

13 Field while you were there?

14 A.    Yes.

15 Q.    When did you begin the duties at Citi Field?

16 A.    It's been over a year now.  It was before last

17 season.

18 Q.    Sometime in the 2010?

19 A.    Yeah, approximately January.

20 Q.    And you are the resident district manager there;

21 correct?

22 A.    Correct.

23 Q.    And you have been since you, since January 2010?

24 A.    Correct.

25 Q.    Mr. Funk reports directly to you; correct?

208
Mr. Kleckner - Direct - Mr. Tokayer

1  A.   Correct.

2  Q.   And in the course of your duties, do you communicate

3  with Mr. Funk on a regular basis?

4  A.   Yes.

5  Q.   Would you say on a daily basis?

6  A.   Many times a day.

7  Q.   And in the course of your duties as the resident

8  district manager at Citi Field, you also communicate with

9  the venue services department of QBC; right?

10 A.   Correct.

11         MR. MEHLMAN:   Objection.   Is he going to be

12 leading this witness as well, your Honor?   It's not a QBC

13 witness.

14         THE COURT:   All right. Same ruling.

15 Q.   Do you communicate with the venue services department

16 at Citi Field?

17 A.   Yes.

18 Q.   How often would you say you communicate with the

19 venue services department?

20 A.   It depends, at the very least weekly.

21 Q.   Would you say daily?

22 A.   I would say at the very least weekly, sometimes not

23 daily.

24         THE COURT:   I'm sorry.   I didn't hear the end,

25 you said sometimes not daily or sometimes daily?

209

Mr. Kleckner - Direct - Mr. Tokayer

1   THE WITNESS:  At least weekly, but not every

2   day.  During the season more.

3   Q.   Remember taking a deposition in this case?

4   A.   Yes.

5   Q.   Do you remember the one that was taken in my office?

6   A.   Yes.

7   Q.   Do you remember being asked the following questions

8   and giving the following responses.

9         "Question:  Is the Mets venue service

10  department, the department of the Mets that you

11  communicate with most?

12        "Answer:  Correct."

13        THE COURT:  What page are we at?

14        MR. TOKAYER:  13, line 4 -- line 6.

15        THE WITNESS:  Is this something that's in front

16  of me or not?

17        MR. TOKAYER:  No, this isn't.

18        THE WITNESS:  Okay.

19        "Question:  Is my Mike Landeen the head of that

20  department?

21        "Answer:  Correct.

22        "Question:  Do you have weekly meetings with

23  that department?

24        "Answer:  Most weeks we meet.

25        "Question:  Do you communicate with the venue

Transcription Plus II, Inc.

210

Mr. Kleckner - Direct - Mr. Tokayer

1   service department other than at weekly meetings?

2           "Answer:  Yes.

3           "Question:  Would you say on a daily basis?

4           "Answer:  Most days."

5           MR. MEHLMAN:  Objection, your Honor.

6           THE COURT:  Overruled.

7           MR. MEHLMAN:  How is that inconsistent with the

8   witness's testimony?

9           THE COURT:  Overruled.

10  Q.   Do you remember being asked those questions and

11  giving those responses?

12  A.   I recall being in your office for about eight hours,

13  and I maintain that I meet with them at least on a weekly

14  basis was my answer and still is.

15  Q.   And in fact on most days you'd say -- you meet with

16  them on most days in fact?

17  A.   No, I do not say that.  You say that.  I say that I

18  meet with them at least weekly and most days especially

19  during the season I have some level of communication with

20  them.

21  Q.   And with whom at the venue services department do you

22  communicate most predominately?

23  A.   Most predominately Mike Landeen.

24  Q.   Do you interact with others as well?

25  A.   Correct.

Transcription Plus II, Inc.

211

Mr. Kleckner - Direct - Mr. Tokayer

1  Q.   When you started your duties at Citi Field, did

2  anyone from the Mets inform you of Kosher Sports' desire

3  to operate on Fridays and Saturdays at that venue?

4  A.   No.

5  Q.   Did anyone make you aware of an e-mail from David

6  Kestenbaum in January of 2010 requesting, on behalf of

7  Kosher Sports, to operate on Friday and Saturdays at Citi

8  Field?

9  A.   I don't recall hearing that name before.

10 Q.   Let me invite your attention to Exhibit 12 in the

11 binder in front of you.  This is documents in evidence,

12 there's an e-mail from Mr. Kestenbaum to Mr. Barrick and

13 Mr. Asencio dated February 19, 2010.  And there's a

14 response form Mr. Barrick to Mr. Kestenbaum and Mr.

15 Asencio dated February 22, 2010.  Do you see that?

16 A.   I see it.

17 Q.   Okay.  Were you consulted before Mr. Barrick's

18 response to Mr. Kestenbaum's e-mail?

19 A.   I don't have a specific recollection of this.

20 Q.   Did you become aware of Mr. Barrick's response after

21 it was sent?

22 A.   Again, I have no specific recollection of this chain

23 of events.

24 Q.   Now at some point you came to understand, did you

25 not, that the Mets did not want Kosher Sports to operate

212

Mr. Kleckner - Direct - Mr. Tokayer

1   on Fridays and Saturdays?

2   A.   Sorry what was the question?

3   Q.   At some point did you become aware that the Mets did

4   not want Kosher Sports to operate on Fridays and

5   Saturdays?

6   A.   From a newspaper article, yes.

7   Q.   What was the date of that newspaper article?

8   A.   Come on, Ira, I don't have it right in front of me.

9   I don't recall dates.  As I've told you before, this is a

10  such piece of my world, I'm not going to know the dates

11  of the newspaper articles.

12  Q.   So --

13  A.   Well, I can tell you the date that you know that

14  you're asking me about, it's a month after I started a

15  new job.  I can tell you the newspaper article, I presume

16  was after this.  But I would rather answer questions I

17  have direct knowledge of, than to speculate.

18          THE COURT:  However, there are attorneys here

19  who can make objections so just answer the question to

20  the best of your ability and rely on counsel to make

21  objections.

22          THE WITNESS:  Okay.  Understood.  After -- I

23  assume it was after this e-mail, so I imagine February,

24  March, I don't recall.

25  Q.   February/March of 2010?

213

Mr. Kleckner - Direct - Mr. Tokayer

1   A.   Again, I don't have a specific recollection, but I'll

2   say yes.

3   Q.   And on June 11th of 2010 -- do you recall becoming

4   aware of this lawsuit on June 11th, 2010?

5   A.   I don't recall June 11th specifically, if that's the

6   date of the newspaper article.

7   Q.   I mean, that's the date of a number of e-mails to you

8   on that date, so let me see if I can refresh your

9   recollection.  If you would turn to Exhibit 21.  Did you

10  get this e-mail on June 11th, 2010?

11  A.   It appears I did, yes.

12  Q.   And there's a reference to a New York Post inquiry,

13  do you see that?

14  A.   I do.

15  Q.   Okay.  And is this the article that you saw that made

16  you understand that Kosher Sports was complaining about

17  the Mets not letting them operate -- strike that.

18      Is this the article that from which you understood

19  that it was the Mets' position that they did not want

20  Kosher Sports to be operating at Citi Field on -- prior

21  to Saturday?

22  A.   No.  This is an e-mail from the PR department, I

23  presume before the article.

24  Q.   You even knew it before?

25  A.   Well, again, it's looking like they're looking for a

Transcription Plus II, Inc.

214

Mr. Kleckner - Direct - Mr. Tokayer

1  comment for an article deadline that was due that day.

2  So I assume the article was right after this.

3  Q.   And did you have a discussion with anyone from the

4  Mets on or about June 11, 2010 about the Mets not wanting

5  Kosher Sports to operate at Citi Field on Friday and

6  Saturday?

7  A.   The way the question's been asked, I don't believe

8  so.  The conversations around the article would've been

9  more about press coverage and less about the specifics, I

10  presume.

11  Q.   Do you remember being asked this question and giving

12  this response on page 45, line 17:

13       "Question:  Did you understand --"

14            THE COURT:  I'm sorry, what page?

15            MR. TOKAYER:  45.

16  Q.        "Question:  Did you understand --"

17            meaning you, Mr. Kleckner, "that the

18            Mets did not want Kosher Sports to

19            operate on Fridays and Saturdays on

20            June 11th, 2010?"

21       Your answer was:

22            "Answer:  I understood that's what

23            the New York Post was reporting.

24            "Question:  Did you have a discussion

25            with anyone at the Mets about that on

Transcription Plus II, Inc.

Mr. Kleckner - Direct - Mr. Tokayer

1          June 11th, 2010 or shortly

2          thereafter?

3          "Answer:  Within that time period,

4          yes."

5     Do you recall being asked that question and giving

6   that response?

7   A.   The answer seems consistent with what I just said.

8   Q.   Now, I bring your attention to Exhibit 31.  Just for

9   the record, did you get that fax from me on August 27th,

10  2010?

11  A.   Yes, I did.

12  Q.   Okay.  And did you provide it to your attorneys on

13  that day?

14  A.   Yes, I did.

15  Q.   And if you'd look at Exhibit 32, is that your

16  response to my letter?

17  A.   Yeah.  It appears it was the next day.

18  Q.   Okay.

19          MR. TOKAYER:  Is Exhibit 34 in evidence?

20          Yes, okay.

21  Q.   Now, Exhibit 41 is another letter from me to you, Mr.

22  Kleckner.

23          THE COURT:  I'm sorry, what's the exhibit

24  number now?

25          MR. TOKAYER:  41, it's an April 7th, 2011

216

Mr. Kleckner - Direct - Mr. Tokayer

1  letter.

2  Q.   Did you receive that letter from me on August 7th,

3  2011?

4         THE COURT:  April.

5  Q.   I'm sorry, April 7th, 2011.

6  A.   Honestly I can't tell the difference between this and

7  the other one, but it looks like I did, so I'll say yes.

8  Q.   Okay.  And is Exhibit 42 your response to my letter?

9  A.   No, it is not.  It's from my counsel.

10 Q.   Oh, I'm sorry.  Is Exhibit 40 your response?  Sorry

11 it's out of order.

12 A.   No.  That's an e-mail to Jonathan from me.

13 Q.   Okay.  And is it a response to my letter?  No?

14      What led you to write that?

15 A.   Let me read it.

16 Q.   Sure.

17         (Pause)

18 A.   No.  This is me reiterating conversations I'd had

19 with Jonathan and advising him not to have you contact

20 me, but to have you work through our attorneys.

21 Q.   All right.  Do you see my letter to you --

22         MR. TOKAYER:  I'd like to move Exhibit 40 and

23 Exhibit 41 and Exhibit 42 into evidence, Your Honor.

24         MR. MEHLMAN:  42 there's no foundation for,

25 Your Honor.

Transcription Plus II, Inc.

217

Mr. Kleckner - Direct - Mr. Tokayer

1    THE COURT:  Sustained as to 42.  Any objections
2  to 40 and 41?
3    MR. MEHLMAN:  No.
4    THE COURT:  Received.
5  (Plaintiff's Exhibit Nos. 40 and 41 received.)
6  Q.   See the last sentence in Exhibit 40, you say, "In
7  addition, as you're also aware, Aramark has a legal
8  department and your attorney should direct all
9  communications to assistant general counsel Dave Kwombat
10  (ph) and not myself."
11    Does that refresh your recollection that you wrote
12  this -- well, did you write this letter after receiving
13  my letter?  So did you write Exhibit 40 after receiving
14  Exhibit 41?
15  A.   I'd have to look.
16  Q.   Sure.
17    (Pause)
18  A.   It appears so, yes.
19  Q.   And was Exhibit 40 in response to Exhibit 41?
20  A.   No, it was not.  It was an e-mail to Jonathan
21  explaining conversations that we had had and also
22  reiterating that I do not want to be contacted directly
23  by you, as I am not an attorney.
24  Q.   Okay.  And did you direct the counsel to send Exhibit
25  42?

Transcription Plus II, Inc.

218

Mr. Kleckner - Direct - Mr. Tokayer

1   A.   No.   What I do is I forward the matter to counsel.   I

2   don't direct counsel.

3

4   Q.   After the Judge Weinstein's order in August of 2010,

5   with the Mets seeking your help to line up another Kosher

6   vendor so that they could tell John Katz to pound sand?

7   A.   My answer to that would be you're paraphrasing a

8   conversation I had with Jonathan, the actual direction

9   from the Mets was to make sure we had a contingency in

10  light of not having a kosher operator, which we cannot

11  not have, and kosher operators serving our guests kosher

12  food, but that certainly was not the specific direction

13  of the Mets, no.

14  Q.   At one or more of the weekly meetings in the fall of

15  2010 specifically November and December, did you and QBC

16  discuss whether Kosher Sports was in breach of its

17  contract with Aramark?

18  A.   Yes.

19  Q.   And at those meetings, did Mr. Landeen or any other

20  representative of QBC ask you to terminate Kosher Sports'

21  relationship?

22  A.   They did not.

23  Q.   Was there any off season between 2010 and 2011

24  seasons, that you and Mr. Landeen discussed terminating

25  Kosher Sports?

219

Mr. Kleckner - Direct - Mr. Tokayer

1  A.   We've absolutely discussed what would happen if

2  either Kosher Sports terminated on their own or walked

3  out, or if we terminated the contract, and what we would

4  do at that point, yes.

5  Q.   Now, did you and Mr. Katz meet face-to-face in

6  January 2011?

7  A.   I don't recall if that was the date.  We definitely

8  did meet in the off season.

9  Q.   And it was a meeting between Mr. Gray and Mr. Katz

10  that you came into?

11  A.   Correct.

12  Q.   And did you say to Mr. Katz at that meeting in

13  January of 2011, that during the off season, despite the

14  Judge's ruling, the Mets had asked you to try to find a

15  vendor to replace Kosher Sports, so they could tell John

16  Katz to pound the sand?

17  A.   I don't think that's what I've said, but what I --

18  I'm sure I communicated to Jonathan that I did not agree

19  with the course he was taking.  I didn't see any good

20  outcome of suing my partner, the Mets, or going to the

21  press.  I advised him strongly against doing so.  I

22  advised him strongly against involving Aramark and I also

23  was very up front with him and told him that we had been

24  meeting with other kosher vendors, so that if it got to a

25  point where he wasn't there, either by, you know, the

220

Mr. Kleckner - Direct - Mr. Tokayer

1  combined efforts of the Mets and Aramark or by himself,

2  that we were starting to line up other vendors.

3  Q.    So let me play up a tape of that -- a portion of that

4  conversation.

5          (Pause)

6          MR. TOKAYER:  And for -- Your Honor, I can hand

7  out the transcripts of this particular track.

8          MR. MEHLMAN:  Your Honor, the Court made it

9  clear that if we were going to get a transcript of the

10 entire conversation, that that would be the transcript

11 that would be used in connection with the playing of the

12 tapes.  Mr. Tokayer refused to cooperate with QBC in

13 making the necessary preparations.

14         We on our own, went to Transperfect Legal

15 Solutions, we had it transcribed, conversations that are

16 transcribed in full.  We provided them to Mr. Tokayer,

17 and we ask that those transcripts be used in connection

18 with this matter, not the transcripts that Mr. Tokayer --

19         THE COURT:  I'll follow those transcripts.

20         MR. TOKAYER:  May I, Your Honor?

21         THE COURT:  One moment.  Let me get the QBC's

22 version.

23         MR. MEHLMAN:  I have a copy.

24         MR. UNIDENTIFIED:  Is this a January exhibit?

25         THE COURT:  This is a January one.

221
Mr. Kleckner - Direct - Mr. Tokayer

1          MR. MEHLMAN:  I believe that you have that one,
2    Judge.
3          MR. UNIDENTIFIED:  I couldn't see --
4          THE COURT:  No, isn't it in the box?
5          MR. UNIDENTIFIED:  I don't believe I gave you
6    the --
7          THE COURT:  Oh.  Okay.  Yes, I have it, I'm
8    sorry.
9          MR. MEHLMAN:  Exhibit C.
10         THE COURT:  Now which track are we --
11         MR. TOKAYER:  It'll be track four, Your Honor.
12         (Pause)
13         MR. MEHLMAN:  Which track are you playing?
14         THE COURT:  Track four he said.  Do you know
15   where that starts?  Do you have a cross-reference?
16         MR. MEHLMAN:  "Kleckner telling me at some
17   point," that's page 12, line 14.
18         THE COURT:  Yes.  Thank you.
19         MR. TOKAYER:  His -- everybody ready, Your
20   Honor?
21         THE COURT:  Yes.
22         MR. TOKAYER:  Yes.
23         (Taped conversation played)
24         THE WITNESS:  I can't hear it.
25         (Pause)

Mr. Kleckner - Direct - Mr. Tokayer

1       MR. TOKAYER:  Does that work?  Okay.

2           (Taped conversation played)

3   Q.   Is that your voice that's on that tape?

4   A.   A terrible recording, but at the end I heard myself

5   say expletive off, so that we could have something on the

6   shelf.  Other than that, because of the deceptive way in

7   which Jonathan was recording it, I could hear his voice

8   very clearly, but I could barely hear myself.

9   Q.   Okay.  Does that refresh your recollection that you

10  said to Mr. Katz at that meeting in January 2011, that

11  during the off season, despite the Judge's ruling, the

12  Mets had asked you to find a vendor to replace Kosher

13  Sports, so they could tell him to pound the sand?

14  A.   No, it does not --

15          MR. MEHLMAN:  Objection.  Objection.  It's not

16  accurate.  It's not an accurate reflection of the

17  transcript.

18          THE COURT:  The witness answered the question

19  and the tape is in evidence, and the two transcripts are

20  there for guidance for the Court.

21  Q.   Now, did you and Mr. Katz have a telephone

22  conversation in April of 2011?

23  A.   We've had phone conversations.  I presume you're

24  talking about the phone conversation which he recorded --

25  Q.   Yes, I am.

223

Mr. Kleckner - Direct - Mr. Tokayer

1  A.  -- so I'll say yes.

2  Q.  And did you say in that phone conversation that you

3  had been pretty open with Mr. Katz off the record about

4  the fact that you received -- wanted Aramark to terminate

5  Kosher Sports' relationship and bring in somebody else?

6  A.  That's not my recollection.  But what I do know is I

7  was very open with Jonathan Katz.  He was somebody I

8  considered a friend and somebody that I was trying to

9  guide for making a terrible business mistake, which is

10  what he did, and where we are now.

11  Q.  Okay.  Let me play the tape to you, it'll be track

12  six, see if you recognize your voice.

13          THE COURT:  I'm sorry.  I need -- I assume that

14  QBC wants me to also have their transcript available.  Is

15  that a separate document or part of the same document?

16          MR. MEHLMAN:  It's a separate document.  It's

17  the Exhibit D, Your Honor.  Do you want me to hand it up

18  to the Court?

19          THE COURT:  Yes, please.

20          MR. UNIDENTIFIED:  I'd like a copy to follow

21  along as well.

22          MR. MEHLMAN:  Thank you.  A moment, Your Honor.

23          (Pause)

24          MR. TOKAYER:  Are we ready?

25          THE COURT:  No.

Transcription Plus II, Inc.

224

Mr. Kleckner - Direct - Mr. Tokayer

1          MR. MEHLMAN:  No.

2          MR. TOKAYER:  Okay.

3          (Pause)

4          THE COURT:  Mr. Mehlman, track 6 begins where?

5          MR. MEHLMAN:  I'm looking, Your Honor, just

6     give me a second.

7          (Pause)

8          MR. MEHLMAN:  Yes, Your Honor, page 8, line 10.

9          THE COURT:  All right.

10          MR. MEHLMAN:  Just (indiscernible).

11          MR. TOKAYER:  Okay?

12          THE COURT:  All right.

13          (Taped conversation played)

14     Q.   Was that your voice, Mr. Kleckner?

15     A.   Very much out of context, but yes.

16     Q.   Okay.  Let's hear it back one more time.  I want to

17     ask you a question about --

18     A.   Okay.

19          MR. MEHLMAN:  Objection, Your Honor.  Is this

20     for impeachment purposes?

21          THE COURT:  It's being offered for impeachment

22     purposes only.

23          MR. TOKAYER:  Yes.

24     (Taped conversation played)

25     Q.   And, Mr. Kleckner, did you say to Mr. Katz in that

Transcription Plus II, Inc.

225

Mr. Kleckner - Direct - Mr. Tokayer

1  April 2011 conversation that you had been pretty open

2  with Mr. Katz off the record about QBC on Aramark to

3  terminate Kosher Sports' relationship and bring in

4  somebody else?

5  A.   Although I said that, unlike this conversation I

6  wasn't under oath, and I was trying to guide him from

7  going down the course he did.  So I --

8  Q.   When you said you had been pretty open off the record

9  with Mr. Katz, what were you referring to?

10  A.   Well, again, I'll start by saying I didn't --

11  Q.   What conversation were you referring to with that?

12  A.   Well, I would need to see the full conversation which

13  you have not afforded me the opportunity to do.  You've

14  taken a very small excerpt and you're asking me very

15  specific questions, and I'm not comfortable answering

16  unless I see the context of it.

17  Q.   Were you referring to the January 6th, 2011

18  operational meeting with Mr. Grey that you had walked in

19  on?

20  A.   I don't know.

21  Q.   Did you also say to Mr. Katz in that April phone

22  conversation that you operate with integrity and anything

23  you said you would repeat verbatim and that you certainly

24  wouldn't perjure yourself.

25  A.   I'll start by saying I would never perjure myself.  I

Transcription Plus II, Inc.

226

Mr. Kleckner - Direct - Mr. Tokayer

1  was trying to guide Jonathan from going down this course,

2  and I was trying to advise him to not go that direction.

3  Q.   My question to you was --

4  A.   The --

5  Q.   I'm sorry.

6  A.   The intricacies of our contract with the Mets which

7  Jonathan's not privy to, they cannot dictate that I

8  terminate a contractor.  They can make that decision, and

9  then if I am not on board with it, which I informed

10  Michael Landeen at that point KSI was not in breach with

11  Aramark and I was not going to terminate.

12      Then there's an arbitration process we would go

13  through.  So regardless of what I told Jonathan, the

14  bottom line is, the way our contract actually works, the

15  Mets cannot out right say terminate without me having the

16  right to do what I did do at that point in time, which is

17  defend Kosher Sports to stay from before there was the

18  sanctions up until his performance fell apart this year.

19  Q.   My question was very simple.  Did you in that April

20  conversation say to Mr. Katz that you operate with

21  integrity, is there anything you said you were being

22  verbatim and that you certainly wouldn't perjure

23  yourself, yes or no?

24  A.   Sounds like something I would say, yes.

25          MR. TOKAYER:  No further questions of this

Transcription Plus II, Inc.

227

Mr. Kleckner - Cross - Mr. Mehlman

1  witness.

2          THE COURT:  Cross-examination?

3          MR. MEHLMAN:  Yes.

4  CROSS EXAMINATION

5  BY MR. MEHLMAN:

6  Q.   Mr. Kleckner, could you describe your relationship

7  with Mr. Katz prior to getting involved in this lawsuit?

8  A.   He was somebody who would frequently represent

9  himself as a friend of mine.  He had somebody I had

10  favorable business dealings with, that I was a big

11  supporter of, because I felt he was doing a better job

12  than the other options, both in the Philadelphia market

13  and here, but that, of course, was the relationship then.

14  Q.   And at that time, did you consider Mr. Katz to be a

15  friend?

16          MR. TOKAYER:  Objection.

17          THE COURT:  Overruled.

18  A.   Yes.  Through work, I mean, we were not social

19  friends, but we were very friendly.

20  Q.   And did you care about Mr. Katz and his ability to

21  operate at Citi Field?

22  A.   Yes.

23  Q.   And did you try to advise Mr. Katz regarding his

24  filing of this lawsuit?

25  A.   Yeah.  I advised him aside from the consequences it

Transcription Plus II, Inc.

228

Mr. Kleckner - Cross - Mr. Mehlman

1  would have specific to Citi Field, that if he were to do
2  essentially what he's done now, they could have broader
3  consequences with his relationship with Aramark.
4  Q.   And when you discussed this issue whether it was in
5  April 2011 conversation or the January 2011 conversation,
6  were you trying to advise Mr. Katz?
7  A.   Very much so.  I was giving him -- I was actually
8  trying to guide him more so than advise him.  I was
9  trying to guide him away from the course he had been
10  through or been going down.  It seemed at that point his
11  goal was to try and embarrass the Mets through the media,
12  and then pursue litigation, and I thought it was a
13  terrible course to go down.
14  Q.   Now, did Mr. Katz ask you whether Aramark would
15  permit him to operate on Friday and Saturday?
16  A.   Yes.
17  Q.   Do you remember the first time he raised that with
18  you?
19  A.   I don't remember per se.  I do know I've been -- that
20  we had several different conversations about it.  The
21  first time we had the conversation would've been when
22  Scott Wiegert was still working, and I remember having a
23  conversation with Jonathan and then sharing the
24  conversation with Scott Wiegert and getting his opinion
25  on it.

229

Mr. Kleckner - Cross - Mr. Mehlman

1  Q.   So April 6th, 2011, two days before opening day, was

2  not the first time that Mr. Katz had raised or requested

3  that he operate on Friday night and Saturday night; is

4  that correct?

5         MR. TOKAYER:   Your Honor, objection.   This goes

6  beyond the scope of the direct.   I did not ask anything

7  about Friday and Saturday sales.   It was only asked

8  whether or not the Mets had sought to terminate his

9  relationship, Mr. Katz's relationship with Citi Field.

10         THE COURT:   Overruled.

11  Q.   You may answer the question.

12  A.   Yeah.   We had -- I had conversations with Jonathan

13  prior to that about Fridays and Saturdays towards the end

14  of the previous season.   And when I'd asked him at that

15  point, he told me he really didn't intend on opening on

16  Fridays and Saturdays.   So it was totally out of the blue

17  that right before opening day, he decided to bring the

18  issue up and try and enforce it.

19  Q.   So Mr. Katz told you that he never intended to open

20  up on Fridays and Saturdays?

21  A.   When --

22         MR. TOKAYER:   Objection.

23  A.   When we had spoke --

24         THE COURT:   You know, I will allow you to go

25  into this, but in the interest of expediting this so we

Transcription Plus II, Inc.

230

Mr. Kleckner - Cross - Mr. Mehlman

1  don't have to call the witness back, but I think you're

2  making him your own witness so you can cease all the

3  leading.

4  MR. MEHLMAN:  I will, Your Honor.

5  Q.  Mr. Katz indicated that -- you just indicated that

6  Mr. Katz told you that he wasn't really interested in

7  operating on Friday and Saturday; is that correct?

8  A.  Correct.

9  Q.  Did you ask him why he then brought the lawsuit

10  regarding that request?

11  A.  It would've been at the end of the previous season.

12  It was when I already was familiar with what was going on

13  from the papers, and from that point, I'm sure

14  conversation with Jonathan and the Mets and my folks, and

15  I asked him point blank, do you plan on opening Fridays

16  and Saturdays.  And at that point, it may have been

17  limited to the season, but it was a definite no.

18  Q.  Now --

19  THE COURT:  Which season are we -- the same

20  2010 season?

21  THE WITNESS:  Yeah, before the off season, it's

22  the last season.

23  MR. UNIDENTIFIED:  Which season, 2010?

24  Q.  Now, you indicated that you told Mr. Katz what

25  Aramark's position was with regard to him operating on

231

Mr. Kleckner - Cross - Mr. Mehlman

1   Friday and Saturday; is that correct?

2       A      Yeah.  I shared my personal opinion of a Jewish

3   background, and I did not feel that you could be Glatt

4   Kosher and operate on the Sabbath.  Also after, later up

5   in the conversation with Scott Wiegert and I shared with

6   him that Scott was of a different religious background,

7   and he felt that although there had been no real thought

8   or discussion of that evidence, it's not why we

9   contracted with him, if we were ever to extend operating

10  rights Friday and Saturday to him, then it would be under

11  very different financial terms.

12  Q.  And why would it be under very different financial

13  terms?

14            MR. TOKAYER:  Objection.

15            THE COURT:  Would you -- what -- I will limit

16  you to what he said to Mr. Katz.

17            THE WITNESS:  I did not specify the terms,

18  other than -- I guess that's the answer.

19  Q.  And what is Aramark's position with regard to

20  permitting Kosher Sports, Inc. to operate on Friday and

21  Saturday?

22  A.  As far as Citi Field's concerned, really Aramark, for

23  that venue, that's my decision.

24  Q.  And what is your decision?

25  A.  That it would compromise the integrity of our Glatt

232

Mr. Kleckner - Cross - Mr. Mehlman

1  Kosher offerings the other days of the week, which is the

2  whole reason that we have a Glatt Kosher operators to be

3  able to deliver that at the highest level, which I would

4  not want to compromise.

5  Q.   And is Aramark's position that position because it's

6  also the Mets' decision?

7  A.   It's my position, which again, our relationship with

8  the Mets, although we sometimes throw around words like

9  partnership, we really do -- you know, things aren't

10  forced down to me, so I can tell you that I really know

11  more about the Mets' position from things I've read in

12  the papers.  It's almost a moot point.  It's really my

13  position, and as Aramark, I dictate hours of operation,

14  days of operation, et cetera.

15  Q.   Did anybody from the Mets ever ask you to terminate

16  KSI?

17          MR. TOKAYER:  Objection.

18          THE COURT:  Overruled.

19          THE WITNESS:  I was never told to terminate, I

20  was never asked to take the steps to terminate.  We

21  certainly discussed if there was a termination what we

22  would do.  And I was definitely directed to make sure I

23  had a contingency.

24  Q.   And the reason for the contingency was?

25  A.   There's different incidents that have happened in the

233

                    Mr. Kleckner - Cross - Mr. Mehlman

1  past, both at our ballpark down in Brooklyn, our minor

2  league ballpark, and at Chase Stadium where there have

3  been periods of time where we have not had kosher food

4  available, and to many of our guests, that's something

5  that they need.

6           MR. MEHLMAN:  Thank you.  I have nothing

7  further.

8           THE COURT:  Any redirect?

9           MR. TOKAYER:  Yes, Your Honor.

10          (Pause)

11          THE COURT:  While Mr. Tokayer is going through

12  his notes, I have a question for Mr. Kleckner.  You said

13  it's your own view that Aramark would lose credibility if

14  you allowed your Glatt Kosher subcontractor to operate on

15  a Jewish Sabbath at Citi Field, and you specifically said

16  Citi Field.  There is evidence that there are other

17  Aramark venues where KSI has been permitted to operate on

18  the Jewish Sabbath.

19          So how do you square your testimony with the --

20  and including the venue where you were working at the

21  time, how do you square your own view and your claimed

22  loss of credibility with the fact that KSI was permitted

23  by Aramark to operate at other venues on the Jewish

24  Sabbath?

25          THE WITNESS:  Our businesses are run where --

                    Transcription Plus II, Inc.

234

Mr. Kleckner - Cross - Mr. Mehlman

1  in the instance of Citi Field, I'm really the business

2  leader.  So I have almost an entrepreneurial range of

3  responsibility where it's really, you know, quote/unquote

4  my account, it's something though to defend my personal

5  integrity.  I also know this market, unlike some of the

6  other markets that we work with across the country,

7  there's definitely heightened sensitivity, there's some

8  very, very observant Jews that, you know, me an example,

9  and you know, a neighbor of not too far from here, you

10 couldn't find a kosher business open on a Friday or

11 Saturday night.  And if they weren't open, they wouldn't

12 just lose credibility, people would no longer pay for

13 (indiscernible).

14        So especially in this area, it's something that

15 we have to be very sensitive to.  At the stadium, I sell

16 my kosher style products, I sell knishes or pretzels that

17 are --

18        THE COURT:  I'm sorry, which stadium are you

19 referring to now?

20        THE WITNESS:  At Citi Field.  I sell items that

21 are to some guests would meet the lowest level of needs,

22 they're prepared in a kosher style at the manufacturer.

23 But my focus is much like whether it's vegetarianism or

24 gluten free, is to do things of the highest standard, and

25 with kosher, that's -- the standpoint.  Because with

235

Mr. Kleckner - Cross - Mr. Mehlman

1  gluten free, for example, I have a whole separate cart so

2  that there's no chance of cross contamination of gluten

3  because that's the best way to ensure that there's not

4  cross contamination, is to have a totally separate area.

5         With kosher, it's not being open Fridays and

6  Saturdays.  It's just really doing it at the highest

7  level of integrity, which is what our goal is.

8         THE COURT:  And when you were associated with

9  the -- it's the Philadelphia venue?

10        THE WITNESS:  Yes.

11        THE COURT:  Were you involved in the decision

12  as to whether or not KSI would operate on Fridays and

13  Saturdays?

14        THE WITNESS:  Yes.

15        THE COURT:  So you were involved?

16        THE WITNESS:  Yes.

17        THE COURT:  And did you support that decision?

18        THE WITNESS:  I don't recall ever allowing them

19  to operate on a Friday or Saturday at Lincoln Financial

20  Field.

21        THE COURT:  You're saying they weren't allowed

22  to?

23        THE WITNESS:  I don't recall ever allowing them

24  to, no.

25        THE COURT:  All right.

Transcription Plus II, Inc.

236

Mr. Kleckner - Redirect - Mr. Tokayer

1          Mr. Tokayer, you may proceed.

2          MR. TOKAYER:  Thank you.  Okay.

3   REDIRECT EXAMINATION

4   BY MR. TOKAYER:

5   Q.   You said that Mr. Katz advised you that he didn't

6   intend to operate on Fridays and Saturdays.  Did he ever

7   convey that to you in writing?

8   A.   I don't recall if it was ever conveyed in writing.

9   Q.   Aramark'S been subpoenaed in this case.  Is there any

10  writing from Mr. Katz, anyone at Aramark, in which

11  Mr. Katz says that he doesn't intend to operate on

12  Fridays and Saturdays that you're aware of?

13  A.   If I'm understanding the question, no, that I'm aware

14  of.

15  Q.   Okay.  So your position with Mr. Katz was that you

16  wouldn't allow him to operate on Fridays and Saturdays at

17  Citi Field?  Did you ever convey that position to Mr.

18  Katz in writing?

19  A.   Well, I'll start by saying I --

20  Q.   Yes or no, did you convey it to him in writing?

21  A.   I mean I'm looking at the April 7th e-mail, so I'll

22  say yes.

23  Q.   Prior to April 7th?

24  A.   I can't give a yes or no, I don't recall.

25  Q.   Okay.  And which -- what are you looking at on the

Transcription Plus II, Inc.

237

Mr. Kleckner - Redirect - Mr. Tokayer

1  April 7th, which exhibit are you referring to?

2  A.   40.

3  Q.   And other than Exhibit 40, have you ever communicated

4  you, Mr. Kleckner, to Mr. Katz the position that you

5  didn't want Mr. -- Kosher Sports to operate on Friday and

6  Saturdays at Citi Field in writing?

7  A.   In my role, I had very little direct communication

8  with Jonathan Katz.  I was not trying to prepare

9  documentation for a lawsuit, so I will say it's a safe

10 bet no.

11 Q.   Okay.  And in response to our subpoena of Aramark in

12 this case, are you aware of any document in which anyone

13 from Aramark prior to April 7th, 2011 advised Mr. Katz

14 that it was Aramark's position that Kosher Sports would

15 not be permitted to operate on Fridays and Saturdays at

16 Citi Field?

17 A.   The question is beyond my understanding.  I know the

18 personal process that I went through in discovery, I

19 produced everything and --

20 Q.   Yes or no, do you know of any document like that?

21 A.   Well, I don't have knowledge of the area you're

22 covering.  You're asking me about stuff I haven't

23 reviewed.

24 Q.   I'm only asking you for your knowledge.

25 A.   Well then, no, I only participated in my own

Transcription Plus II, Inc.

238

Mr. Kleckner - Redirect - Mr. Tokayer

1  discovery process.

2  Q.    And you say that Mr. Katz told you he didn't want to

3  operate on Fridays and Saturdays, but you did get my

4  letter, correct, from August 27th, 2010 where I told you

5  that he did intend to operate on Fridays and Saturdays,

6  right?  You got that?

7  A.    It was after that that I had the conversation with

8  him.

9  Q.    Did you take notes of that conversation?

10 A.    Not to my recollection, no.

11 Q.    Anyone else present?

12 A.    I don't even recall if it was a phone conversation or

13 a meeting, but I presume it was a phone conversation, so

14 no.

15 Q.    So as the resident district manager, it is your

16 decision, correct, whether to let Kosher Sports operate

17 on Fridays and Saturdays at Citi Field, right?

18 A.    Correct.

19 Q.    Even Mr. Wiegert, your boss, had not dictated the

20 decision to you, right?

21 A.    If it was something -- granted he's been out on

22 disability quite a while, it would not have been his

23 style to enforce an issue.  Technically, could he have

24 dictated it, I mean, yeah, we all have bosses, but it's

25 something he would have done.

239

Mr. Kleckner - Redirect - Mr. Tokayer

1  Q.   Okay.  And, in fact, you disagreed with Mr. Wiegert's

2  position as you've described it here; is that right?

3           MR. MEHLMAN:  Objection.

4           THE WITNESS:  I don't understand the question.

5  Q.   You testified about a position that Mr. Wiegert had

6  about that if John was allowed to operate on Friday and

7  Saturdays, it would have to be under a different

8  financial arrangement, and you, the resident district

9  manager, disagreed with that, correct?

10 A.   Not the way you phrased it.  I'll answer in a way I'm

11 comfortable with.  I said definitively I was not open to

12 him serving on Fridays and Saturdays, as you just said,

13 Scott said if we were to go in that direction.  If it

14 would be under very different financial terms.  That was

15 not a position as much somebody who was a boss and a

16 mentor giving me perspective.

17 Q.   Just to be clear, Mr. Wiegert could not have demanded

18 a decision of you, and anyway, you disagreed with his

19 position, correct?  Correct?

20 A.   No.  What is correct is, he was my boss, as is

21 understood in a relationship between a boss and employer,

22 if he felt very strongly about it, he could have

23 overruled me.  That is not how we worked together, as

24 I've explained to you in the past, Scott would not have.

25 But again, when you use absolutes could he have, yes, he

Transcription Plus II, Inc.

240

Mr. Kleckner - Redirect - Mr. Tokayer

1  was my boss, I have several bosses.

2  Q.   Okay.  So let me ask you if you were asked the

3  following question at your deposition and you gave the

4  following answer, page 139, line 10:

5           "Question:  Was Mr. Wiegert more

6           specific about those terms more

7           favorable to Aramark?

8           "Answer:  No.  And to be clear,

9           ultimately it's my call.  Scott was

10          in a position to influence my

11          decision but could not have demanded

12          a decision.  He was giving me a

13          different perspective one which I

14          disagreed."

15 Did you give --

16 A.   I absolutely --

17 Q.   -- that answer to that question yes or no?

18 A.   We're splitting hairs with couldn't or wouldn't, but

19 I'll say yes.

20 Q.   Okay.  Now, on Wednesday, April 6th, 2011, you

21 testified that you and Mr. Katz discussed whether Kosher

22 Sports could operate on opening day, Friday, April 8th

23 and Saturday, April 9th, do you recall that generally?

24 A.   I don't recall being repositioned in April, no.

25 Q.   Do you recall a discussion with Mr. Katz in April of

                Mr. Kleckner - Redirect - Mr. Tokayer
1  2007 whether he could operate his carts on opening day,
2  on Friday, April 8th and Saturday, April 9th?
3        MR. MEHLMAN:  Objection.  I think we're beyond
4  the scope of my cross-examination, Your Honor.  I think
5  we've gone back into direct examination.
6        MR. TOKAYER:  No.  This is directly relevant to
7  his claim that he told Mr. Katz.
8        THE COURT:  Well, I'm going to allow it anyway,
9  because if it doesn't come out now, then we'll be calling
10 Mr. Kleckner back on the defense case.  So I will allow
11 it.
12 Q.  Do you recall talking to Mr. Katz on April 6th about
13 April 8th and April 9th?
14 A.  I recall the e-mail that I sent him April 7th.
15 Q.  Do you recall the telephone conversation that you had
16 with him?
17 A.  Again, I don't recall if that was April 6th, but I'll
18 presume that was the conversation where he's asking me to
19 write him a letter telling he -- the conversation from my
20 collection was he called and asked me to write him a
21 letter stating my position.
22 Q.  And in that conversation, you said to Mr. Katz that
23 you would not be letting him operate during that first
24 weekend, Friday and Saturday of opening day, but that you
25 did not -- were not saying, though the future Friday and

                Transcription Plus II, Inc.

242

Mr. Kleckner - Redirect - Mr. Tokayer

1  Saturday events; isn't that true?

2  A.   I don't know if that is true.

3  Q.   What do you mean you have a tape, this is at track 5.

4  A.   Is this a new tape?

5  Q.   It's the tape of the April 6th conversation.

6        MR. TOKAYER:  Are we ready or do you want to --

7        MR. MEHLMAN:  Page 12, Your Honor, line 24,

8  "Frankly, honestly, I don't know their feelings, if that

9  would be authentic."

10        MR. TOKAYER:  Yes.

11        THE COURT:  All right.

12        (Tape conversation played)

13  Q.   Is that your voice?

14  A.   It appears it was my voice and Jonathan's voice.

15  Q.   And did you say that with respect to Fridays and

16  Saturdays in the future, that you were not saying no to

17  those future Fridays and Saturdays, that you were just

18  saying no to just this Friday and this Saturday in that

19  conversation?

20  A.   In that conversation Jonathan had said that first of

21  all --

22  Q.   First of all, did you say that?

23  A.   It's out of context, he never --

24  Q.   Okay.  But your attorney will have plenty of

25  opportunity to bring the context back.

243

Mr. Kleckner - Redirect - Mr. Tokayer

1  A.   Well --

2  Q.   I just asked you whether you said it.

3  A.   Right.  He also said --

4  Q.   Okay.  No question pending.

5      Referring to the contingency plan that you apparently

6  discussed with the Mets.  Do you remember that testimony

7  generally?

8          MR. MEHLMAN:  Objection.  I think we're going

9  beyond the scope, Your Honor, and I only have one

10  question on my direct case for Mr. Kleckner, and it

11  doesn't relate to any of this.  Mr. Tokayer had full and

12  fair opportunity to direct examine the witness.

13          THE COURT:  Let me hear the question.

14  Q.   Yeah.  On your examination by Mr. Mehlman, you said

15  that you were never told or asked to terminate Kosher

16  Sports, you discussed what you would do in a contingency

17  situation.  Do you recall that generally?

18          MR. MEHLMAN:  Objection.  That wasn't the

19  witness' testimony.

20          THE COURT:  Overruled.

21          MR. TOKAYER:  Could you just -- may I have the

22  question?

23          THE WITNESS:  If you were using the word told,

24  I was never told to terminate Kosher Sports, which is

25  deemed directed to do so.

Transcription Plus II, Inc.

244

Mr. Kleckner - Redirect - Mr. Tokayer

1  Q.   Were you asked to terminate?

2  A.   I was asked to have contingencies should there be a

3  termination.

4  Q.   Right.  And contingencies, you mean by that, in case

5  Mr. Katz decided to leave Citi Field on his own?

6  A.   Or if I were to terminate him, or if the Mets were to

7  terminate him, or if we were to mutually terminate him.

8  The bottom line is, none of those operators became our

9  contingency plan because I didn't qualify any of them

10  being able to operate in the stadium, and then we stopped

11  researching options.

12  Q.   Were you concerned that Mr. Katz was going to leave

13  Citi Field on his own volition?

14  A.   Yes.

15  Q.   And were the Mets concerned about that?

16          MR. MEHLMAN:  Objection.

17          THE WITNESS:  I don't know.

18          THE COURT:  Okay.

19  Q.   Now, isn't it true that in your conversation with Mr.

20  Katz in January, okay, you said to Mr. Katz that when

21  asked whether or not the Mets wanted to terminate --

22  strike that, I'll start again.

23      You told Mr. Katz that Kosher Sports came to you and

24  tried to get you to find somebody else, that the Mets

25  would actually defend what they were doing by saying that

Transcription Plus II, Inc.

245

              Mr. Kleckner - Redirect - Mr. Tokayer

1  it would -- it was really a contingency plan, but to cut

2  through the bull shit, they were asking to terminate Mr.

3  Katz.  Do you remember telling Mr. Katz that?

4           MR. MEHLMAN:  Objection.

5           THE WITNESS:  I don't even understand your

6  question.

7  Q.   Do you remember telling Mr. Katz --

8           THE COURT:  Well, I'd like to hear the

9  objection.

10           MR. MEHLMAN:  Yes, that's not in the

11  transcript.  The ending part is not in that series.

12  That's not what he said.  Which part are you referring

13  to, Mr. Tokayer?

14           MR. TOKAYER:  I asked the witness a question.

15           MR. MEHLMAN:  I asked you which track you're

16  referring to, Mr. Tokayer?

17           MR. TOKAYER:  I wasn't referring to any track,

18  I asked the witness a question.

19           MR. MEHLMAN:  Okay.  I believe he's asking him

20  a question based upon the transcript, and that's not --

21           THE COURT:  I think now we are going over areas

22  that -- let's wrap this up and get on with the next

23  witness.

24           MR. TOKAYER:  Yes.  Let me just play track 4

25  again.

246

Mr. Kleckner - Redirect - Mr. Tokayer

1      MR. MEHLMAN:  Is there a question or are we
2  just playing track 4, Your Honor?
3      THE COURT:  What is it that you --
4      MR. TOKAYER:  I asked him whether or not it
5  would be the Mets -- whether the Mets told him --
6      THE COURT:  If you're simply going to ask him
7  what he said then the tape and the transcript are in
8  evidence.  And I can listen to it, and I have, and I have
9  the transcripts in front of me.
10      MR. TOKAYER:  The tape and transcript aren't in
11  evidence then.
12      THE COURT:  Well, the transcript -- I'm sorry,
13  maybe I'm mistaken, the tape is in evidence.
14      MR. MEHLMAN:  The tape is in evidence for
15  impeachment purposes only, Your Honor.
16      MR. TOKAYER:  Then that would not be in
17  evidence.  Are you saying that the tape is in evidence?
18  Then I don't have any --
19      THE COURT:  The tape is in evidence not for the
20  truth.
21      MR. TOKAYER:  Okay.
22  Q.  Mr. Kleckner --
23      MR. MEHLMAN:  Objection, Your Honor.  And
24  the --
25      THE COURT:  Well, all he did was say his name.

Transcription Plus II, Inc.

247

Mr. Kleckner - Redirect - Mr. Tokayer

1   MR. MEHLMAN:  No, no, no.  I'm making it clear,
2   Your Honor, and you cannot use the tape for the truth
3   thereof.  That's pursuant to the Court's ruling.
4   THE COURT:  That's correct.
5   Q.   Did you tell Mr. Katz that the Mets would defend
6   their request of you to terminate Kosher Sports by saying
7   that they were just pursuing other options but to cut to
8   the bull shit, they were looking to terminate him.  Do
9   you remember telling Mr. Katz that?
10  A.   I don't recall if those were my exact words.  I can
11  say --
12  Q.   Okay.  So let me --
13  A.   I can say at this point, anybody would want to
14  terminate Kosher Sports, so if I use the word want as I
15  was advising Jonathan, it's very unpleasant to have
16  somebody going to the press and being very litigious and
17  costing us lots of money and time.
18  Q.   Okay.  Let me just play that track four again.
19  THE COURT:  For what purpose?  Let's not
20  belabor it.  It is in evidence for impeachment purposes
21  only.  You've had him explain his recollection of what he
22  said, and I can compare it to the tape.
23  MR. TOKAYER:  Okay.
24  THE COURT:  So let's move on.
25  MR. TOKAYER:  Yes, Your Honor.

Transcription Plus II, Inc.

248

Mr. Kleckner - Redirect - Mr. Tokayer

1      One moment.

2      (Pause)

3  Q.   You said that you understood that Mr. Katz went to

4  the press.  Do you have any evidence of Mr. Katz ever

5  calling the press or writing the press?

6          MR. MEHLMAN:  Objection.

7          THE COURT:  Overruled.

8          THE WITNESS:  I had a news --

9  Q.   Yes or no, do you have any evidence of that?

10 A.   There was a newspaper article.

11 Q.   That Mr. Katz initiated?

12 A.   I don't believe I ever accusing him of specifically

13 going to the press.  I don't know what you're asking.  I

14 do know that I did tell Jonathan it would not be smart to

15 try to embarrass the Mets in the press, and to -- and I

16 also was trying to defend the position of Aramark, and

17 telling him that it would be foolish to involve Aramark

18 in this.

19 Q.   With respect to the decision by Aramark not to let

20 Mr. Katz operate on Fridays and Saturdays, let me just

21 ask you to turn to Exhibit 44.  Is that the letter from

22 your attorneys to Judge Weinstein.  And if you look at

23 the second page, the end of the full paragraph, the last

24 two sentences, start with the words, "Based on."  Are you

25 with me?

249

Mr. Kleckner - Redirect - Mr. Tokayer

1   A.   I am not. Looking at Exhibit 44?

2   Q.   Yes.

3   A.   And where are you?

4   Q.   The first -- the full paragraph on page 2. Not the

5   last sentence but the next to last sentence. It begins

6   with the word "Based on".

7   A.   I see that.

8   Q.   "Based on the economics of the deal, and perceived

9   patron demand both for KSI's products and --"

10           THE COURT:  I'm sorry, this is 44?

11           MR. TOKAYER:  Yes.

12           THE COURT:  I see "Based upon the forgoing."

13   What are you looking at?

14           MR. MEHLMAN:  It's the second paragraph, your

15   Honor.

16           THE COURT:  On which page?

17           MR. MEHLMAN:  It's the second on page 2 that

18   starts with the word Second. If you count five lines up

19   from the bottom of that paragraph, towards the lefthand

20   side after see it, it says "Based upon".

21   Q.   And it says "Based on the --"

22           THE COURT:  Now don't -- this isn't in

23   evidence, is it?

24           MR. MEHLMAN:  No, it's not.

25           MR. TOKAYER:  This is a letter written to the

Transcription Plus II, Inc.

250
Mr. Kleckner - Redirect - Mr. Tokayer

1  Court.  I'd move it into evidence.  I don't think there's

2  any dispute that it was provided to the Court.

3          THE COURT:  It's in the record.

4          MR. TOKAYER:  Yes, may I move it into evidence

5  then?

6          THE COURT:  What does this witness have to do

7  with it?

8          MR. TOKAYER:  Well, I am going to ask this

9  question.  But this refers --

10          THE COURT:  Well why don't you ask him what his

11  involvement, if any, was to this letter.

12  Q.   Well did you have any involvement with this letter?

13  A.   No, this was my internal counsel directing outside

14  counsel.

15  Q.   Right.  There's a reference in that letter though to

16  an independent business decision made by Aramark.

17  A.   Right.

18  Q.   Do you see that?

19  A.   I would be more comfortable describing it in my

20  language than trying to interpret a legal document.

21  Q.   Well I want to ask you whether or not the decision

22  referred to in this document is memorialized in any

23  writing?

24  A.   As I explained in my deposition, I'll explain again,

25  it was never contemplated -- there was never a decision

Transcription Plus II, Inc.

Mr. Kleckner - Redirect - Mr. Tokayer

1  to not allow him to continue operating on Fridays and

2  Saturdays.  We had consistently never had Kosher

3  operating on Fridays and Saturdays.  So it was however

4  the lawyers worded things, I don't know.  I can tell you

5  internally, he had never operated Fridays and Saturdays.

6  There was never any discussion of it until the stuff

7  we've gone through.

8  Q.   So was the decision not to let him operate on Fridays

9  and Saturdays ever memorialized in any document?

10 A.   As I said, there is no --

11 Q.   Yes or no?

12 A.   There is not a decision because it was never

13 something contemplated.

14 Q.   So the answer's no.  The decision --

15 A.   The answer is --

16 Q.   You're not being --

17 A.   -- there was no decision, so I am not going to say

18 yes or no.  There was not a decision, so something that

19 didn't happen would not be memorialized in writing.

20 Q.   And the same answer would be if I asked you whether

21 -- where the reasons for the decision are, is it

22 memorialized in any documents, your answer would be the

23 same; right?

24 A.   My answer is there was no decision.  You're asking

25 for documentation of something that did not happen.

252

Mr. Kleckner - Redirect - Mr. Tokayer

1   Q.   And in a letter to Judge Weinstein, did your

2   attorneys refer to the reasons that you've given here as

3   to why you, Mr. Kleckner, don't want Kosher Sports to

4   operate on Fridays and Saturdays?

5   A.   As I've already said, I'm not comfortable

6   interpreting third-hand legal documents.  I -- as I

7   explained in writing to Jonathan and to yourself, when it

8   comes to legal mattes, I have in-house counsel who I

9   direct these things to.  They chose to retain outside

10  counsel and you're asking me to interpret this document

11  which I am not comfortable doing.

12  Q.   And in Mr. Bombach's letter to me of April 8, 2011,

13  which is Exhibit 42, does he refer to the reason that you

14  gave in this court for not allowing Mr. Katz and Kosher

15  Sports to operate on Fridays and Saturdays?

16          MR. MEHLMAN:  Objection.

17          THE COURT:  Sustained.

18          MR. TOKAYER:  Your Honor, I would move Exhibit

19  42 into evidence because it's a letter that I received

20  from Mr. Bombach.

21          MR. MEHLMAN:  Objection.

22          THE COURT:  Sustained.

23          MR. TOKAYER:  No further questions.

24          MR. MEHLMAN:  Your Honor, since Mr. Kleckner is

25  on our list as a witness, and I know there's some

Transcription Plus II, Inc.

253
Mr. Kleckner - Direct - Mr. Mehlman

1  scheduling issues, with the Court's permission if I could

2  take Mr. Bombach -- Mr. Kleckner --

3          THE COURT:  Kleckner?

4          MR. MEHLMAN:  -- I'm sorry, out of order on our

5  case and just ask him a few questions, so he doesn't have

6  to wait until after Mr. Grey testifies.

7          THE COURT:  I assume there's no objection to

8  that.

9          MR. TOKAYER:  I thought Mr. -- I thought he

10  asked the questions that he wanted to ask of

11  Mr. Kleckner --

12          MR. MEHLMAN:  You objected.

13          MR. TOKAYER:  -- on cross-examination.

14          MR. MEHLMAN:  You objected and you --

15          MR. TOKAYER:  And you went on and asked.

16          MR. MEHLMAN:  Well, I --

17          THE COURT:  If you have anything you want to

18  say please direct it to me.

19          MR. TOKAYER:  Yes.

20          THE COURT:  I did give you leeway to go into

21  questions that would be questions for direct.  If you're

22  saying you have a few more, I will allow them.

23          MR. MEHLMAN:  Thank you.

24          THE COURT:  Then the only question is whether

25  we do it now or whether we do it after Mr. Grey

254

Mr. Kleckner - Direct - Mr. Mehlman

1   testifies.  I don't see any reason why we shouldn't

2   finish up with this witness now.

3            MR. MEHLMAN:  Thank you.

4            THE COURT:  Let's keep it short, please.

5            MR. MEHLMAN:  Yes.

6            THE COURT:  And remember he's your witness.

7            MR. MEHLMAN:  Yes.

8   DIRECT EXAMINATION

9   BY MR. MEHLMAN:

10  Q.   Who operates the locations where Mr. Katz's carts are

11  on Fridays and Saturdays?

12  A.   They are Aramark proprietary carts.  So it's my staff

13  with my management.  It's not shared with a

14  subcontractor.

15  Q.   And do you make more money -- does Aramark make more

16  money operating its carts on Friday and Saturday as

17  opposed to if Mr. Katz would operate its carts on Friday

18  and Saturday?

19           MR. TOKAYER:  Objection.  Relevance.  He's

20  testified as to the reasons that he gave and when I asked

21  him at his deposition these kinds of questions, Aramark

22  objected and didn't permit me to inquire further into the

23  financial situation of Aramark and those carts.

24           MR. MEHLMAN:  That's absolutely inaccurate,

25  your Honor.  The questions were asked and Mr. Kleckner

255

Mr. Kleckner - Direct - Mr. Mehlman

1   was very, very clear in his answer regarding this issue.

2           THE COURT:  Well I am going to allow it but you

3   well be opening a door that you would rather not have

4   opened.

5           MR. MEHLMAN:  I would like to hear the answer.

6           THE COURT:  I'll allow it.

7   A.   As I stated in the deposition, we're significantly

8   more profitable on those Fridays and Saturdays, as we are

9   not sharing in a portion of our net sales with an outside

10  contractor.  We also sell items at a higher dollar amount

11  and based on their mass appeal, we sell more of them.

12          THE COURT:  Are you sharing your revenues with

13  QBC?

14          THE WITNESS:  Yes, in our --

15          THE COURT:  All right.

16          THE WITNESS:  -- in all sales.

17          THE COURT:  And QBC also has a financial

18  interest in having the Aramark proprietary carts operate

19  on Fridays and Saturdays; correct?

20          THE WITNESS:  Yes, they share in all net sales,

21  whether it's a subcontractor or a "Aramark" doing it

22  directly.

23          THE COURT:  All right.  I hope that's the end

24  of the questions on this.

25          MR. MEHLMAN:  Okay.  Nothing further.

256

Mr. Grey - Direct - Mr. Tokayer

1          MR. TOKAYER:  Nothing further, your Honor.

2          THE COURT:  All right.  Thank you very much.

3          THE WITNESS:  Thank you, your Honor.

4          THE COURT:  You may step down.

5          (Witness excused.)

6          THE COURT:  Mr. Tokayer, you can call your next

7  and hopefully last witness.  Is Mr. Grey your last

8  witness?

9          MR. TOKAYER:  Yes, your Honor.

10  R I C H A R D   G R E Y ,

11      called as a witness, having been first duly sworn,

12      was examined and testified as follows:

13          THE CLERK:  If you could just state your full

14  name and then spell your last name.

15          THE WITNESS:  Sure, it's Richard Arthur Grey.

16  Last name is G-r-e-y.

17          THE COURT:  All right.  Please be seated.  Mr.

18  Tokayer, you may proceed.

19          MR. TOKAYER:  Thank you, your Honor.

20  DIRECT EXAMINATION

21  BY MR. GREY:

22  Q.   Good afternoon, Mr. Grey.

23  A.   Good afternoon.

24  Q.   My name is Ira Tokayer.  I represent the Kosher

25  Sports.  We have not met before; have we?

257

Mr. Grey - Direct - Mr. Tokayer

1   A.   That's correct.

2   Q.   When did you start working for Aramark?

3   A.   It was April of 2010.

4   Q.   And what is your title?

5   A.   Right now I'm division manager of concessions.

6   Q.   And to whom do you report?

7   A.   I report to Tom Funk.

8   Q.   After the 2010 season, before the 2011 season,

9   specifically in January, was Aramark waiting on the Mets

10  to tell it what to do about Kosher Sports' request to

11  operate at Citi Field on Fridays and Saturdays?

12  A.   Not to my knowledge.

13  Q.   In January of 2011, as far as you knew, isn't it true

14  that Aramark had no position on Kosher Sports' request to

15  operate on Fridays and Saturdays?

16          MR. MEHLMAN:  Objection.

17          THE COURT:  May I have the question again?

18          MR. TOKAYER:  Yes.

19  Q.   Prior to January of 2011, as far as you Mr. Grey

20  knew, isn't it true that Aramark had no position on

21  Kosher Sports' request to operate on Fridays and

22  Saturdays?

23  A.   To my knowledge, they were going to continue to

24  operate everyday with the exception of Fridays and

25  Saturdays.

258

Mr. Grey - Direct - Mr. Tokayer

1  Q.   And was that because they were -- so they were not

2  going to operate on Fridays and Saturdays.  Is that

3  because the Mets didn't want them to or because Aramark

4  didn't want them to, as far as you knew at that time?

5  A.   As far as I knew, it was because they were -- it was

6  a Sabbath day and that's the way it was from when I got

7  there.

8  Q.   And did you tell Mr. Katz on January 6, 2011 that

9  with respect to Kosher Sports's Friday and Saturday

10  operations, it was important for the Mets to give Aramark

11  whatever decision they wanted Aramark to give to Kosher

12  Sports?

13  A.   On what --

14  Q.   On January 6, 2011.

15  A.   When we had an operations meeting --

16  Q.   Correct.

17  A.   That's the extent of my recollection of it.  I mean

18  it was just a regular operations meeting.

19  Q.   Okay.  So do you recall telling Mr. Katz at that

20  operations meeting that with respect to Kosher Sports'

21  Friday and Saturday operations, it was important for the

22  Mets to give Aramark whatever decision they wanted

23  Aramark to give Kosher Sports?

24  A.   I don't recall that; no.

25  Q.   Okay.  Let me play a tape -- a portion of that

Transcription Plus II, Inc.

259

Mr. Grey - Direct - Mr. Tokayer

1  meeting for you.

2  A.    Okay.

3  Q.    And see if you recognize your voice and if now you'll

4  recall telling Mr. Katz that.

5         (Taped Conversation played back.)

6  Q.    We're actually going to play the CD and we're going

7  to play it from a little before when your transcript

8  begins and that would be the January 6 transcript that

9  you've identified as Exhibit --

10         THE COURT:  So you don't have your own

11  transcript for this?

12         MR. TOKAYER:  Right.  The end of it,

13  your Honor, will be our track 4.  I'm sorry, track 1 but

14  it precedes the beginning.  It also precedes the

15  beginning of QBC's transcript.  It's Exhibit C.

16         (Recording played back.)

17  Q.    Is that your voice, Mr. Grey?

18  A.    It sounds like it; yes.

19  Q.    Thank you.  Okay.

20         (Recording played back.)

21         MR. TOKAYER:  Okay, thank you.

22  Q.    Now does that refresh your recollection that at that

23  meeting with Mr. Katz you said to him that it was

24  important for the Mets to give Aramark whatever decision

25  the Mets wanted you to give Kosher Sports very quickly.

Transcription Plus II, Inc.

260

Mr. Grey - Direct - Mr. Tokayer

1  A.   I took that more as me understanding what he was

2  saying.

3  Q.   And earlier do you recall saying "We do their

4  decision?  Do you recall saying that, referring to

5  Aramark doing the Mets' decisions?

6  A.   I --

7  Q.   Would you say that, as well?

8  A.   I didn't just hear that in there.  I mean there was a

9  lot of apparently wind blowing.  So I didn't hear that in

10  just that part; no.

11  Q.   And there was a part earlier, do you recall saying

12  that -- responding to Mr. Katz or in that meeting, did

13  you also agree with Mr. Katz's stated opinion that right

14  off the bat, he knew that the Mets were not going to let

15  this happen, meaning Friday and Saturday sales and you

16  agreed with that opinion?  Do you remember that?

17  A.   I remember him saying it but I don't remember seeing

18  me saying you're right.  I just remember us having the

19  conversation.

20  Q.   Okay.  Do you remember saying yes?

21  A.   If I just said it on there, then possibly.  Do I

22  remember saying it?  No.

23        MR. TOKAYER:  I have no further questions,

24  your Honor for Mr. Grey.  Thank you.

25        THE COURT:  Any cross?

Transcription Plus II, Inc.

261

                    Mr. Grey - Cross - Mr. Mehlman

1              MR. MEHLMAN:  Briefly.

2    CROSS-EXAMINATION

3    BY MR. MEHLMAN:

4    Q.   Mr. Grey, what's your title at Aramark?

5    A.   Division manager of concessions.

6    Q.   Do you work for Mr. Funk?

7    A.   Correct.

8    Q.   Who then works for Mr. Kleckner?

9    A.   Correct.

10   Q.   Who is the ultimate decision-maker at Citi Field for

11   Aramark?

12   A.   Scott Kleckner.

13   Q.   Not yourself?

14   A.   No.

15   Q.   Do you have any real decision making when it comes to

16   issues like operating on Fridays and Saturdays?

17   A.   I just make proposals and suggestions but the

18   decisions come from higher than me.

19   Q.   Thank you very much.  Nothing further.

20            THE COURT:  All right.  Thank you very much.

21   You may step down.

22            (Witness excused.)

23            THE COURT:  Does the plaintiff have any other

24   evidence to offer?

25            MR. TOKAYER:  Your Honor, before I rest, I

                    Transcription Plus II, Inc.

Mr. Grey - Cross - Mr. Mehlman

1  understand that I inadvertently failed to move the

2  following exhibits and evidence into evidence when they

3  were testified to.  It would be Exhibit 1, 3 --

4           MR. MEHLMAN:  3's in.

5           MR. TOKAYER:  3's in?  Okay.  29 and 37.  And I

6  would move those in at this time.

7           THE COURT:  What's the defendant's position?

8           MR. MEHLMAN:  No objection.

9           THE CLERK:  I'm sorry, 1, 39?

10          MR. TOKAYER:  1, 3, 29 and 37.

11          THE COURT:  No, 3 --

12          MR. TOKAYER:  3 was in already.

13          THE CLERK:  1, 29 and 37?

14  (Plaintiff's Exhibits 1, 29 and 37 marked in evidence.)

15          MR. TOKAYER:  Yes.  And with respect to 44,

16  which was a letter to the Judge, I don't think I

17  understood your Honor's ruling.  Is that in evidence or

18  is that just a part of the record?

19          THE COURT:  It's a lawyer's argument.  So what

20  is the evidentiary value of it?

21          MR. TOKAYER:  The evidentiary value is that

22  even at that late date, the reasons that are being

23  proffered in this court were not conveyed to the Court on

24  April 19, 2011.  We will argue that that tends to

25  establish that the reasons were after the fact and

263

Mr. Katz - Redirect - Mr. Tokayer

1  feigned.

2        THE COURT:  Well make that argument -- it's not

3  a hearing exhibit.  If you want to argue that the -- you

4  can make whatever argument you want from it as a legal

5  document that's part of the record.

6        Before I give the defense an opportunity to

7  present evidence, I do want the record to be complete.  I

8  sustained an objection to a line of questions that

9  plaintiff's counsel sought to put to Mr. Katz concerning

10  his alleged losses from not being permitted to not

11  operate during the -- on the promenade level at the

12  Pittsburgh series.  So if you want to make -- complete

13  your record, you can do that.

14        All right, Mr. Katz, if you would take the

15  stand.  And you're still under oath.

16        (Witness resumes the stand.)

17  REDIRECT EXAMINATION

18  BY TOKAYER:

19  Q.   Mr. Katz, did you lose money by being forced to keep

20  K-4-28 open for the Pittsburgh series in September of

21  2010?

22  A.   Yes.

23  Q.   Approximately how much?

24  A.   Approximately $1,700.

25        MR. TOKAYER:  That's it, your Honor.

264
Proceedings

1           THE COURT:  And do you have any documentation

2     to that effect?

3           THE WITNESS:  I have a spreadsheet that can

4     support that.

5           THE COURT:  It's not here in the courtroom?

6           MR. TOKAYER:  It is here in the courtroom,

7     your Honor.  I can show it to the witness.

8           MR. MEHLMAN:  Your Honor, it hasn't been turned

9     over.  It wasn't an exhibit.  It wasn't provided on

10    Friday, your Honor.

11          THE COURT:  All right.  I'll sustain the

12    objection.  Any cross-examination?

13          MR. MEHLMAN:  No, your Honor, but I would like

14    a brief recess before we put on our case, your Honor.

15          THE COURT:  All right.  What is your case going

16    to consist of, so I get a sense of how long we're going

17    to be?

18          MR. MEHLMAN:  A couple of questions for

19    Mr. Katz and potentially Mr. Landeen.

20          THE COURT:  We'll take a seven minute break.

21          MR. MEHLMAN:  Thank you, your Honor.

22          (Court recessed.)

23          THE CLERK:  We're back on the record.

24          THE COURT:  Please be seated.  Does the defense

25    have any evidence that it wishes to offer at this time?

Proceedings                                    265

1        MR. MEHLMAN:  No, your Honor.  I just wanted to

2   put on the record the fact that -- to clear up an issue

3   that we raised and we kept Mr. Landeen here in case the

4   plaintiff would like to recall Mr. Landeen.

5        Based upon the e-mails that I provided to

6   counsel, there were two -- minutes, I apologize, not e-

7   mails, minutes that I provided to counsel.  There were

8   two official meeting minutes, both dated October 12, 2010

9   in error.  The October 12, 2010 minutes that were turned

10  over to counsel were actually the minutes for the

11  November 2 meeting.

12       And I did turn over a few moments ago, an

13  additional set of Venue Services, weekly Aramark meeting

14  minutes, for October 12, 2010 and they were marked and

15  turned over referencing the October meeting.  And there

16  is no reference in those new minutes -- not new minutes,

17  the minutes that were actually from October 12, 2010,

18  referencing Kosher, Kosher Sports, Katz or anything of

19  the like.  But I did keep Mr. Landeen here in case the

20  plaintiff would want to call him for the limited purpose

21  of looking into any issues regarding the October 12, 2010

22  minutes which I turned over a few moments ago.

23

24       THE COURT:  All right.  Mr. Tokayer, do you

25  wish to question Mr. Landeen any further with regard to

266

                        Proceedings

1   these documents?

2           MR. TOKAYER:  I just got this a moment ago,

3   your Honor, so I need to look at it.

4           (Pause.)

5           MR. TOKAYER:  May I address Mr. Mehlman and ask

6   him a question about what he just turned over?

7           THE COURT:  Go ahead.

8           MR. TOKAYER:  Avery, the two page e-mail with

9   the October 13 date --

10          MR. MEHLMAN:  Correct.

11          MR. TOKAYER:  -- are you saying that that --

12  enclosed was the new October 12 minutes.

13          MR. MEHLMAN:  That's correct.

14          MR. TOKAYER:  And that's the one with (a)

15  through (h)?

16          MR. MEHLMAN:  Correct.

17          MR. TOKAYER:  And then the e-mail that's

18  November 3, 2010, the enclosure for that e-mail is the

19  October 12 minutes (a) through (l)?

20          MR. MEHLMAN:  That's correct.  And that's how

21  it was forwarded to the Court straight from the -- and

22  the client directly.

23          MR. TOKAYER:  Each of the e-mails it says, for

24  example, on the --

25          THE COURT:  I thought this was going to be done

267

Proceedings

1  before I took the bench.  My law clerk brought these

2  documents up around ten minutes ago.

3         MR. MEHLMAN:  I apologize.

4         THE COURT:  I mean if I -- if you want to

5  discuss it further, that's fine.  I'll go back to

6  chambers.

7         MR. TOKAYER:  I just got it now, your Honor, so

8  I apologize.

9         MR. MEHLMAN:  I apologize, your Honor.

10         THE COURT:  Were you in the courtroom when my

11  law clerk came up?

12         MR. TOKAYER:  Yes, I think he gave it to

13  Mr. Mehlman and --

14         MR. MEHLMAN:  And he put it on Mr. Tokayer's

15  desk.

16         MR. TOKAYER:  -- just now.  I think we'll just

17  take a moment, your Honor.

18         THE COURT:  All right.

19         MR. TOKAYER:  Maybe I could speak to him

20  privately.

21         (Counsel confer)

22         MR. MEHLMAN:  You have the November agenda

23  without the minutes.

24         MR. TOKAYER:  Based on what's been produced to

25  me, I don't have any further questions.

268

Proceedings

1        THE COURT:  All right.  Mr. Tokayer has no

2   questions for Mr. Landeen.  So, Mr. Landeen is free to

3   leave.  And I believe, Mr. Mehlman, you said you don't

4   have any witnesses to call or any evidence to offer.

5        MR. MEHLMAN:  Other than our application

6   regarding the deposition testimony of Mr. Kleckner and

7   Mr. Funk and Mr. Landeen.  I know that the Court asked us

8   to go through designations.  Mr. Tokayer indicated that

9   he would have certain designations that he would want.

10  To save the Court's time, if the Court can give us one or

11  two days to submit the designations because I know --

12  well I shouldn't say I know, it may be difficult at this

13  stage to agree on designations and to go through that

14  process, just knowing what I know about the case so far.

15        I still don't know why there's an objection to

16  having the entire deposition testimony moved into

17  evidence and then if the Court requests, post-hearing

18  memorandum, only if the Court requests those, we could

19  certainly designate the portions that we may or may not

20  be relying on during those papers.  But if the Court does

21  not want post-hearing memorandums, then certainly I

22  believe within a day we could agree on designations from

23  the other depositions.

24        THE COURT:  Well do both sides want the

25  opportunity to submit post-hearing briefs?

269

Proceedings

1          MR. TOKAYER:  That's not necessary, your Honor.

2          THE COURT:  I mean I think it could be useful

3     to me to have them, although I don't want -- I think we

4     should keep them relatively short and to the point.  And

5     when I had suggested that the parties designate portions,

6     it was so that if they wanted to follow-up with questions

7     of the witnesses on those points, that could be done

8     while they're here.  Since we're talking about

9     designating the portions after their testimony, I am not

10    sure that a designation makes much sense, as opposed to

11    -- I mean either they should come in or they shouldn't at

12    this point.  And maybe that's something you can both

13    address in your post-hearing papers why I should consider

14    the transcripts, apart from those portions that were

15    actually used during the witness' testimony and then the

16    plaintiff's opposition to that.

17         I would like the post-hearing submissions by

18    July 11.

19         MR. TOKAYER:  Will be -- could we make a

20    closing argument in all events -- this is in addition to

21    a closing argument?

22         THE COURT:  Is there any purpose that if you're

23    going to have an opportunity to brief it?

24         MR. TOKAYER:  Yes, I think so.  I think I will

25    be able to say things in the closing that may not come in

270

Proceedings

1   through a short brief.  I don't see the need for a post-

2   hearing memorandum.  The evidence is in, arguments will

3   be made.  It will be just --

4            THE COURT:  Well I've already --

5            MR. TOKAYER:  -- busy work.

6            THE COURT:  I've already ruled that I do want

7   post-hearing submission because I think it will be useful

8   to have citations.  I anticipate that there will be a

9   written opinion, since we're talking about a report and

10  recommendation.  I think it would be useful to have

11  submissions from the parties with citations to the

12  record.

13           MR. MEHLMAN:  Your Honor, if I may?  With the

14  post-trial briefing, is the Court also requesting that we

15  put in proposed designations at that time and that we're

16  allowed to --

17           THE COURT:  No, I just said that rather than

18  having designations, the purpose of designating portions

19  today was so that if the other side wanted to ask

20  questions of the witness when the witness was on the

21  stand concerning that portion, they'd have the

22  opportunity to do it.

23           Since it wasn't done prior to the testimony or

24  during the testimony, I would say that either I should

25  have them and they should be considered part of the

271
Proceedings

1  record in their entirety or they shouldn't be.  So no,

2  you do not have to designate portions.

3       MR. TOKAYER:  Your Honor, at the beginning of

4  the trial when I asked for an opening your Honor said

5  that we'd have an opportunity to close and that we would

6  do away with the opening.  I think a closing would be --

7       THE COURT:  All right.  But it's --

8       MR. TOKAYER:  -- an argument.

9       THE COURT:  It's not going to be lieu of a

10 post-hearing submission with citations to the record.

11      MR. TOKAYER:  And I would just ask for

12 additional time because I know we're going to have to get

13 the record and --

14      THE COURT:  You can order it on a daily basis.

15      MR. TOKAYER:  I was hoping this would be over

16 today.  I mean --

17      THE COURT:  All right.  Do you want to sum up?

18 I'll hear brief closing arguments.

19      MR. TOKAYER:  Can I go first, your Honor.

20      THE COURT:  Yes, it's your motion.

21      MR. TOKAYER: And I would like to discuss just

22 the timing, your Honor, of that post-trial brief we can

23 do it afterwards but Mr. Katz is going to be away

24 starting next week.  I have matters that I've put off for

25 this hearing.  If your Honor would permit --

272

Mr. Tokayer - Summation

1          THE COURT:  This is going to be a legal

2    document.  I don't expect Mr. Katz to be involved in its

3    preparation.

4          MR. TOKAYER:  I also like to have clients

5    involved but my schedule also just will not permit --

6    could we have until the end of July or the beginning of

7    August?

8          THE COURT:  You're not going to -- no, I can't

9    do that.  If you want to get a decision this summer, no.

10          MR. TOKAYER:  Okay.  May I sit or do you want

11    me to stand?

12          THE COURT:  Either way.  It's up to you.

13          MR. TOKAYER:  Thank you for your attention,

14    your Honor.  The evidence has shown that QBC has

15    certainly violated the order of Judge Weinstein.  In

16    March of 2011, QBC revised the A to Z Guide from what it

17    was in 2010 to reflect that henceforth Kosher Sports will

18    be banned from operating at Citi Field on Fridays and

19    Saturdays in disregard of Judge Weinstein's order that

20    QBC take no action directly or indirectly with respect to

21    the time or method of sale of Kosher Sports Products at

22    Citi Field.  The evidence is uncontroverted that that A

23    to Z Guide was revised in 2011.

24          Number two, in April of 2011, QBC circulated

25    the 2011 Guest Services Handbook reflecting that Kosher

273

Mr. Tokayer - Summation

1  Sports be banned from operating at Citi Field on Fridays

2  and Saturdays in disregard of Judge Weinstein's order,

3  that QBC take no action directly or indirectly with

4  respect to the time or method of sale of Kosher Sports

5  products at Citi Field.

6          Three, in September of 2009, after

7  Judge Weinstein's order, unbeknownst to Kosher Sports, it

8  was QBC who demanded that Kosher Sports operate its stand

9  on the promenade level for the Pittsburgh series to KSI's

10 detriment in disregard of Judge Weinstein's order that

11 QBC take no action directly or indirectly with respect to

12 or affecting the time or method of sale of Kosher Sports

13 products at Citi Field.

14         And four, despite Judge Weinstein's order, QBC

15 continued its efforts which began in March of 2010 to

16 replace Kosher Sports with other kosher vendors and

17 sought to enlist Aramark to terminate Kosher Sports at

18 Citi Field all together in direct violation of the

19 Court's order and it's clear directive on August 13, that

20 QBC not attempt to influence anybody to stop Kosher

21 Sports from operating at Citi Field.

22         Mr. Funk himself testified that in the fall of

23 2010, efforts were made to try to terminate Kosher

24 Sports.  Mr. Kleckner testified about the efforts made to

25 terminate Kosher Sports' relationship at Citi Field and

274

Mr. Tokayer - Summation

1   Mr. Landeen was not truthful on the stand when he said

2   that there were no discussions about terminating Kosher

3   Sports in the fall of 2010.  That is belied by the

4   testimony of both Mr. Kleckner and Mr. Funk.  And it's

5   belied by the minutes which he tried to explain away but

6   failed.

7            You heard from Mr. Landeen that all the efforts

8   to try to get rid of Kosher Sports were a contingency

9   plan.  Where's the evidence that John Katz and Kosher

10  Sports tried or wanted to leave Citi Field?  There's no

11  one document from Mr. Katz evidencing that.  There's not

12  one internal e-mail or document in the records of Aramark

13  or the records of QBC showing that Mr. Katz ever

14  threatened.

15           In fact, the evidence is that they, QBC, wanted

16  Mr. Katz out.  Is a contingency plan credible?  Mr.

17  Landeen said that he learned about Mr. Katz's desire to

18  leave from Peter Helfer.  Pete Helfer was the individual

19  who actually on May 10, 2010, said that he wanted to get

20  rid of Kosher Sports.  Is that an e-mail of somebody who

21  is afraid of Kosher Sports walking?  That's an e-mail of

22  someone who is trying to get Kosher Sports out.  And that

23  person is the person who Mr. Landeen claims he heard

24  about Mr. Katz's threat to leave, it came from

25  Mr. Helfer.

275

Mr. Tokayer - Summation

1        Now of course it's not believable that Kosher
2    Sports desired to leave Citi Field at any time.  Mr. Katz
3    filed this lawsuit in order to stay at Citi Field.  He
4    had been terminated unilaterally by the Mets in May and
5    he filed this lawsuit and argued that he had been
6    wrongfully terminated, that he wanted to stay.

7        And then in August, he filed for an injunction,
8    for the very purpose of staying and continuing to operate
9    at Citi Field.  There's no evidence that Mr. Katz ever
10   wanted to leave.  No evidence that there was ever a
11   contingency plan and, in fact, the discussions between
12   Aramark and QBC in the fall of 2010 were directed not at
13   trying to find an alternative to Mr. Katz, because of
14   Mr. Katz's threat to leave but because they wanted
15   Mr. Katz terminated and the evidence will show and our
16   post-trial briefs will show that that plan had been
17   hatched by Mr. Landeen as early as March of 2010 at a
18   time when Kosher Sports was not in breach of its
19   agreement with QBC, nor was it a breach of its agreement
20   with Aramark.

21       And the bottom line is that Mr. Katz never did
22   leave, so that the threat that somehow he wanted to leave
23   is just not credible.

24       In fact, as you heard from the tapes,
25   Mr. Kleckner himself said that the Mets had already

Transcription Plus II, Inc.

276

Mr. Tokayer - Summation

1  planned this defense from the beginning.  Well, Mr. --

2          THE COURT:  Again, that is not -- cannot be

3  offered for the truth.

4          MR. TOKAYER:  Yes.  I'll move on, your Honor.

5  In addition to the four ways that I just outlined in

6  which I believe that it's clear that QBC has violated

7  Judge Weinstein's order, on April 13, 2011 for the first

8  time, Aramark barred Kosher Sports from operating at Citi

9  Field on Fridays and Saturdays.  This also constitutes a

10 violation of Judge Weinstein's order.  Judge Weinstein

11 enjoined QBC, its officers, managers, employees,

12 successors, assigns and all persons acting on its behalf

13 from taking any action directly or indirectly with

14 respect to or affecting the time or method of sale of

15 Kosher Sports products at Citi Field.

16         Aramark acted on behalf of QBC when it banned

17 Kosher Sports from operating on Fridays and Saturdays at

18 Citi Field as a matter of law, as a matter of contract,

19 and as a matter of fact.  As a matter of law, QBC and

20 Aramark, your Honor, are in the words of Dave Howard,

21 Executive Vice President of QBC and an attorney, true

22 joint venture partners.  They operate the concessions at

23 the ballpoint jointly.  They share profits and losses.

24 They meet weekly and confer virtually daily.  They

25 negotiate the terms of each other's agreements.  They

Transcription Plus II, Inc.

277

Mr. Tokayer - Summation

1  coordinate strategy, they run press releases by each

2  other.

3          So when Aramark banned Kosher Sports from

4  operating at Citi Field, it acted on behalf of QBC as a

5  matter of law.

6          THE COURT:  So you're saying that even if QBC

7  had absolutely -- I know you've argued that they were

8  involved and that it was their decision, but you're

9  saying that as a matter of law, even if they had done

10 nothing, that Aramark's actions would be attributed to

11 QBC?

12         MR. TOKAYER:  As a matter of law, as a matter

13 of contract and as a matter of fact.  I'm now saying that

14 as a matter of law.

15         THE COURT:  Well if that's your position, then

16 you certainly have issues that need to be addressed in

17 your post-hearing brief.

18         MR. TOKAYER:  Yes, your Honor.  My next

19 argument from the contract refers to usage agreement, so

20 I would ask Mr. Katz to exit just for a moment.

21         THE COURT:  All right.

22

23

24

25

Transcription Plus II, Inc.

Mr. Tokayer - Summation

1    MR. TOKAYER:  And finally, your Honor, we

2   believe that the facts -- Aramark's conduct from barring

3   Kosher Sports from operating at Citi Field on Fridays and

4   Saturdays was, in fact, undertaken by Aramark on behalf

5   of the Mets.  The evidence shows that QBC had the motive

6   and opportunity to influence Aramark's conduct and did,

7   in fact, Aramark's conduct.

8        QBC's motive could not have been clearer.  Not

9   only did QBC want Kosher Sports not to sell on Fridays

10  and Saturdays as we saw from their e-mails dated March

11  '09, February 2010 and May of 2010, they wanted to get

12  rid of Kosher Sports and John Katz all together as you

13  see from the e-mails dated May 2010, April and May.

14        THE COURT:  Now under your theory, they have

15  the right -- that's a decision within their discretion.

16        MR. TOKAYER:  They had a ten year contract with

17  Kosher Sports, QBC, with no limitation as to events or

18  times or days of operation.  So QBC could not get rid of

19  Kosher Sports.  They needed Aramark to do their dirty

20  work.  And that's what Aramark did.  That's the motive.

21        THE COURT:  Well, KSI is still there.

22        MR. TOKAYER:  KSI is still there, yes, as of

23  today.  And thanks to Judge Weinstein's order.

24        QBC certainly had the opportunity to influence

25  Aramark through weekly, if not daily contacts with

Transcription Plus II, Inc.

Mr. Tokayer - Summation

1    Aramark as Mr. Funk and Mr. Landeen both testified.  QBC

2    actually influenced Aramark.  First we've established

3    that Aramark was aware of QBC's position on Friday and

4    Saturday sales.  I established that through Mr. Landeen's

5    testimony.  He said that he relayed to Aramark QBC's

6    position on Friday and Saturday sales.  And both Mr. Funk

7    and Mr. Kleckner admitted early on to knowing about QBC's

8    position with respect to Kosher Sports' operation on

9    Fridays and Saturdays.

10          And you heard Mr. Landeen say -- and there's an

11   e-mail in which it makes it clear that Aramark's -- that

12   it was Aramark's duty to take what QBC wanted into

13   account as they performed services at Citi Field.

14          And by the way, we've seen that there's

15   precedent for Aramark hiding the fact that the Mets

16   influenced their activities.  In September of 2010, when

17   Mr. Katz Aramark to allow him to close K-4-28 on the

18   promenade level, Mr. Funk the next day said no, without

19   telling Mr. Katz that it was really the Mets who dictated

20   that answer.

21          In that instance we learned that it was QBC,

22   only later through internal e-mails that the Mets and

23   Aramark at that time hid from Kosher Sports.  And we

24   submit that's what happened here, that it was QBC behind

25   the scenes was telling Aramark exactly what to do.

Mr. Tokayer - Summation

1   Aramark knew the Mets' position and when they implemented

2   it, there were being influenced and were only doing what

3   QBC wanted.

4           But here we also have further and direct

5   evidence of QBC's influence of Aramark's conduct.  On

6   August 13, 2010, just hours after the injunction by

7   Judge Weinstein issued, Mr. Landeen e-mailed, called and

8   left messages for Aramark.  And what he admitted at his

9   deposition was that he called Clint Westwood (sic), who

10  was the boss -- Clint Westbrook who was the boss, and

11  admitted telling him to keep the status quo with respect

12  to Kosher Sports.  Keep the status quo.

13          The status quo was no Friday and Saturday

14  operations.  Mr. Landeen's signal to Aramark could not

15  have been clearer an we submit that this alone shows

16  QBC's influence of Aramark's ultimate action in barring

17  Kosher Sports from Citi Field on Fridays and Saturdays.

18          And Rich Gray, in January 2011, also in an

19  unguarded moment testified that it was Aramark who was

20  waiting on the Mets for the decision with respect to

21  Friday and Saturday sales.  He was waiting for the

22  decision --

23          THE COURT:  I'm sorry.  Where is that

24  testimony?

25          MR. TOKAYER:  That testimony was from Mr. Grey

Mr. Tokayer - Summation

1  himself who remembered that that's what he said on

2  January 6, 2011 in the meeting with Mr. Katz.  Mr. Katz

3  testified as to what Mr. Grey said and Mr. Grey also

4  remembered.  What Mr. Grey and Mr. Katz testified to is

5  that they were waiting on the decision from the Mets and

6  that it was the Mets --

7          THE COURT:  I'm not sure -- I'll have to check

8  the transcript.

9          MR. TOKAYER:  Yes.  Now the other evidence of

10 QBC's influence, we submit, is just as strong.  If

11 Aramark was not acting at the Met's behalf -- behest, why

12 before the injunction was issued was it always QBC and

13 never Aramark who unilaterally acted to stop Kosher

14 Sports from operating on Fridays and Saturdays?  Kosher

15 Sports always communicated with the Mets about Friday and

16 Saturday sales.

17          And when Mr. Kleckner started at Citi Field,

18 the resident district manager, nobody at the Mets even

19 bothered to tell him about the issue, even though

20 Mr. Funk knew about it.  And, in fact, the events of May

21 2010 with Mr. Funk are particularly telling because once

22 he heard that Kosher Sports was interested in operating

23 on Fridays and Saturdays in May of 2010, his only

24 reaction was to inquire as to what the Mets wanted.  And

25 as Tom Funk said, he just didn't want to get involved

285

Mr. Tokayer - Summation

1   because it was the Mets' decision and not Aramark's.

2           If Aramark was not acting on the Mets' behalf,

3   why does Aramark let Kosher Sports operate on Fridays and

4   Saturdays at Lincoln Financial Field in Philadelphia and

5   M&T Bank in Baltimore?  The only difference between those

6   two venues and Citi Field is that at those venues, Kosher

7   Sports has no sponsorship agreement with the ball club.

8   It has only a contract with Aramark who lets it and asks

9   it to sell on Fridays and Saturdays.

10          At Citi Field, Aramark has a partner, the Mets.

11  So, of course, when Aramark bars Kosher Sports from

12  operating at Citi Field on Fridays and Saturdays, it's

13  the Mets' position that they are parroting.  It's not

14  Aramark that's behind that decision.  It's the Mets.  And

15  if it was not Aramark, then Aramark was not acting at the

16  Mets' behalf, your Honor, why did Aramark give

17  inconsistent reasons for its decisions in April of 2011?

18  I argued this before.

19          Mr. Kleckner says it was credibility and

20  integrity.  That reason is absent from his April 7 e-mail

21  to Mr. Katz, and it's absent from Lowenstein Sandler's

22  April 19 letter to Judge Weinstein.

23          We submit, your Honor that Aramark's so-called

24  decision which was made sometime after April 6, 2011

25  because on September -- on April 6, 2011, Mr. Kleckner

Transcription Plus II, Inc.

286

Mr. Tokayer - Summation

1  told Mr. Katz that he was not saying no to Friday and

2  Saturday sales.  That that was a decision and a reason

3  made up after the fact.  There's no scrap of evidence as

4  to that reason prior to this lawsuit.  There's no scrap

5  of evidence ever in which Aramark ever said to Mr. Katz

6  they had any problem with credibility or integrity or the

7  Friday and Saturday sales.  It was made up after April 6,

8  2011 to conform to what the Mets wanted.

9       THE COURT:  I'm sorry.  What was made up after

10 April 6?

11      MR. TOKAYER:  This reason that somehow

12 Mr. Kleckner had a problem with the credibility and

13 integrity of Kosher Sports' operations.  Yes.

14      THE COURT:  It was in the January --

15      MR. TOKAYER:  The January 11, he said that he

16 had a position.  He said Mr. Weigert had a position but

17 he did not say no on January 6, 2011.  And in fact, Mr.

18 Grey was saying that they were still waiting on a

19 decision from the Mets.  And that on April 6, 2011 when

20 Mr. Katz and Mr. Kleckner had that discussion, because

21 now the rubber hit the road and April 8 was upon them.

22 At that point, Mr. Kleckner said to Mr. Katz, I'm saying

23 no to April 8 because we should have had this

24 conversation two weeks ago.  But I'm not saying no to

25 future Friday and Saturday sales.  I'll speak to the

287

Mr. Tokayer - Summation

1  rabbi.  I'll speak to you.  I'm just saying no because on

2  April 6, he claimed he didn't have sufficient notice.

3         And by the way, the claim that he didn't have

4  sufficient notice, Mr. Kleckner was advised by me back on

5  August 27, 2010, in no uncertain terms that we intended

6  to operate on Fridays and Saturdays and he did not

7  respond.  He did not answer.  He did not object.  And

8  whatever he said to Mr. Katz on January 6, 2011 was just

9  talk because on April 6, 2011, he still wasn't saying no

10 to Mr. Katz with respect to Friday and Saturday sales.

11 And I submit that when his letters -- when his lawyers

12 write a letter to the Court, they don't even mention the

13 fact of credibility or integrity.  They come up with two

14 other reasons because these are all after the fact

15 reasons being made up to justify a decision that the Mets

16 had given and had insisted that they make.

17        And, in fact, of course the credibility,

18 integrity answer doesn't make any sense at all for

19 Aramark who permits Kosher Sports to operate at other

20 venues on Fridays and Saturdays.

21        Moreover, if it was really Aramark's decision

22 and not QBC's, why would Tom Funk and Clint Westbrook

23 have reacted the way they did after reading about the

24 Mets' position in this action?  You'll recall that they

25 saw the article on August 13 or August 14 about the

Transcription Plus II, Inc.

288

Mr. Tokayer - Summation

1  hearing in front of the judge and they both reacted the
2  same way.  Why are the Mets throwing us under the bus?
3  Throwing under the bus means to blame someone else for
4  something that you really did.

5         When QBC blamed Aramark for stopping Kosher
6  Sports from selling on Fridays and Saturdays, that's
7  because it was the Mets' decision and not Aramark's
8  decision.  And they want you to believe that now it's
9  Aramark's decision and not the Mets.  At that time, back
10 in August of 2011 and 2010, it was the Mets' decision and
11 Aramark knew it.  And in April of 2011, it was Mets'
12 decision and not Aramark's.

13        The only difference is that in April of 2007,
14 of course, your Honor, it took a while but the Mets
15 finally prevailed upon Scott Kleckner to take the fall
16 for them.  They wouldn't do it back in August of 2010.
17 They wouldn't do it in January 2011 when Mr. Katz spoke
18 to Mr. Kleckner and Mr. Grey.  They wouldn't even do it
19 in April of 2011.

20        But on August 13, 2011, as my letter to your
21 Honor says, that's the first time we ever heard that they
22 were going to stop us from all future Friday and Saturday
23 sales and it's at that point that Mr. Kleckner dug in his
24 heels and decided to take the fall for the Mets, which by
25 the way is not surprising given what Mr. Kleckner says

Transcription Plus II, Inc.

289

Mr. Tokayer - Summation

1    was the partnership between Aramark and the Mets.  Having

2    to choose in April of 2011 -- of course Aramark was going

3    to choose the Mets, their partner.

4              The Court should reject Mr. Kleckner's self-

5    serving testimony that this decision was his and

6    Aramark's.  In addition to being self-interested, his

7    testimony is not credible.  He says he always opposed

8    Kosher Sports operating on Friday and Saturday.  Yet,

9    there's not one scrap of written evidence supporting that

10   testimony.  And every time that Mr. Kleckner had an

11   opportunity to communicate that position to Mr. Katz, he

12   failed to.  You have that Kosher Sports advised Aramark

13   on August 27, 2010 of its intent to operate on

14   Friday and Saturdays, moving forward we would have

15   thought Mr. Kleckner would immediately respond with his

16   longstanding credibility, integrity objection.  He did

17   not respond that way.  He didn't object at all.

18             On April 6, 2011, when Mr. Katz and he

19   discussed opening day, you would have thought Mr.

20   Kleckner at that point would have come up with his

21   longstanding credibility, integrity objection.  He did

22   not.  In fact, he said he was not going to say no to

23   Kosher Sports for future Friday and Saturday sales.

24             And as I mentioned on April 19, in the letter

25   from Lowenstein Sandler to the Court, that reasoning is

290

Mr. Tokayer - Summation

1  also absent.  And, of course, Mr. Kleckner's credibility

2  and integrity objection itself lacks credibility and

3  integrity because was Mr. Kleckner himself was at Lincoln

4  Financial Field involved in the decision to ask Kosher

5  Sports to operate on Fridays and Saturdays.  Again, the

6  only difference being that at Lincoln Financial Field,

7  Mr. Kleckner did not have the Mets telling him what to

8  do.

9          And his answer to your Honor's questions I

10  submit are not believable.  He said that he didn't think

11  that they actually let Kosher Sports operate in Lincoln

12  Financial Field.  Well that testimony is belied by Mr.

13  Katz's testimony and Tom Funk's.  He understood that they

14  were operating at Lincoln Financial Field.  They didn't

15  only let him, they asked him.  And that's because the

16  Mets weren't involved.

17          In sum, the Court must find that Aramark and

18  QBC disregarded and violated Judge Weinstein's orders.

19  The Court should impose sanctions including costs

20  relating to this hearing and a fine to deter such

21  contumacious in the future.

22          In addition, QBC should be directed to purge

23  themselves of the contempt and Aramark, as well by

24  refraining from interfering with Kosher Sports' operation

25  on Fridays and Saturdays and during all events at Citi

291

Mr. Tokayer - Summation

1  Field as to which admission is made available to the
2  general public.

3          THE COURT:  Well what you're now asking is an
4  affirmative order directing Aramark to allow your client
5  to operate u=on Fridays and Saturdays.  Judge Weinstein
6  specifically declined to do that.

7          MR. TOKAYER:  He said that they were not to
8  interfere with our operations on Fridays and Saturdays.
9  And I'm saying that QBC did interfere and that Aramark
10  acting on their behalf interfering, they should both stop
11  interfering which yes, would result in Kosher Sports'
12  operating on
13  Fridays and Saturdays at Citi Field.

14          THE COURT:  Well I think another thing you
15  should address is the Court's authority to order a non-
16  party to do anything.  The -- in a situation where the
17  preliminary injunction that was sought, was sought
18  against the defendant and now you're asking for relief
19  against a non-party.

20          MR. TOKAYER:  Yes.

21          THE COURT:  And I don't know that there's any
22  case law to support that.

23          MR. TOKAYER:  I will look at that.  It's -- the
24  injunction was to QBC and anyone acting on its behalf.
25  Aramark --

Transcription Plus II, Inc.

292

Mr. Mehlman - Summation

1    THE COURT:  I certainly read that to mean

2  representatives of QBC and having read the transcript of

3  the proceeding before Judge Weinstein, I believe that

4  that is what he intended, as well.

5    MR. TOKAYER:  Your Honor, I would --

6    THE COURT:  Because at that time, Mr. Mehlman

7  said that -- he said it's not QBC's decision, it's

8  Aramark's to which the Judge said, "Then it has no affect

9  on your client."

10    MR. TOKAYER:  Right.  And I believe that that

11  representation by Mr. Mehlman to the Judge was a

12  misrepresentation because the evidence is now clear that

13  the Mets -- he said that the Mets never had anything to

14  do with the sale, to who to sell, to when to sell.

15    THE COURT:  Well I understand that.  And the

16  issue before me --

17    MR. TOKAYER:  And it turns out that that was

18  wrong.

19    THE COURT:  -- is whether the Mets violated

20  that order.  But now you're proposing something beyond

21  that.

22    MR. TOKAYER:  Yes.  And Aramark was made aware

23  of the order and I believe that there is law and I will

24  look into that, as to whether or not anyone who is aware

25  of the Court injunction also cannot participate in

Transcription Plus II, Inc.

293

Mr. Mehlman - Summation

1   violating it with the person to whom it was initially

2   directed.  Thank you.

3           THE COURT:  All right.

4           MR. MEHLMAN:  Your Honor, unaccustomed as I am

5   to saying that I'll rely upon our papers, I don't think

6   it's appropriate at this hour to make an argument.  As

7   the Court is well aware, I'm not usual not to move

8   forward with an argument but we'll reply upon

9   (indiscernible).

10          THE COURT:  Well I'd be interested in hearing

11   from you now.

12          MR. MEHLMAN:  Sure, your Honor.

13          THE COURT:  That way if I have any questions I

14   hopefully can get responses.

15          MR. MEHLMAN:  Not a problem, your Honor.  Your

16   Honor, it's been the defendant's position frm day one

17   that they did not in any way violate the restraining

18   order or the injunction of Judge Weinstein.  Judge

19   Weinstein asked during the course of the hearing to which

20   the injunction was issued for the Mets not to be involved

21   specifically in any way affecting the manner and the time

22   in which KSI operates.  The reasoning --

23          THE COURT:  By the way who drafted that, the

24   order?

25          MR. MEHLMAN:  The Judge.  The Judge drafted it.

Transcription Plus II, Inc.

Mr. Mehlman - Summation

1          THE COURT:  The Judge drafted it?

2          MR. MEHLMAN:  There was --

3          THE COURT:  Because at the end of the

4    proceeding he directed counsel to confer and come up with

5    proposed language.  Was that yet another instance in

6    which you couldn't agree on anything?

7          MR. MEHLMAN:  That's correct, your Honor.  But,

8    your Honor, the purpose of the motion that brought upon

9    the injunction was KSI's fear that QBC would not have --

10   would have KSI thrown out of the stadium, would not let

11   them operate any further in the stadium and that's what

12   brought on the injunction.

13

14          And the purpose of the injunction was for the

15   Judge to get involved and the Judge basically said, okay,

16   during the pendency of this trial and this litigation,

17   Mets, you can't throw them out.  He's going to stay it

18   out.  He's got his Aramark contract.  He has to remain.

19   That's the reason why the Judge issued the injunction.

20          The Judge did not see the issuing of the

21   injunction in any way as a penalty to QBC.  In fact, the

22   Judge basically said well if it's not up to you whether

23   he operates on Friday and Saturday or if you don't take

24   any issue with him operating on Friday and Saturday, then

25   what do you care about the injunction?  He's got his

295

Mr. Mehlman - Summation

1  Aramark (indiscernible).  Let him deal with Aramark.  And
2  that's why the Judge specifically said, "Are you
3  Aramark?" I said "No, I'm not Aramark.  I'm QBC.
4  Aramark's not named."
5         THE COURT:  And in fact the whole reasoning for
6  the injunction or the bringing of the injunction was
7  based upon communications by Mr. Tokayer in which
8  Mr. Tokayer was fearful that KSI will be thrown out of
9  the stadium.
10         Your Honor, it's clear --
11         THE COURT:  Well whether that was what
12  motivated the motion or not, the fact of the matter is
13  that the order is not so limited.
14         MR. MEHLMAN:  It's not so limited but the
15  purpose of the order was that the Mets should not affect
16  the hours of operation and the times of operations of
17  KSI.  Your Honor, there's no evidence that first of all,
18  the hours of operation, the days of operation, were
19  affected by the Mets after August 2011 -- 2010, when that
20  injunction was issued, your Honor.  Mr. Katz continues to
21  operate in the stadium.  Mr. Katz continues to operate in
22  the carts.
23         THE COURT:  Well you're not suggesting that it
24  was intended to -- that the only purpose of this was to
25  preserve the status quo.

Transcription Plus II, Inc.

296

Mr. Mehlman - Summation

1    MR. MEHLMAN:  I believe that it was Judge
2   Weinstein's position during the hearing.  Judge
3   Weinstein's position was basically hands off, let Aramark
4   make its decisions, whatever the decisions are and let
5   the Mets -- you do not get involved in its day to day
6   operations.  You do not get involved in his hours of
7   operations.  That's what Judge Weinstein said.  He said
8   leave it the way it is.  That's exactly what he said.
9   That was exactly the purpose.
10        He was fearful, based upon Mr. Tokayer's motion
11   that the Mets would throw him out and the Judge did not
12   want him thrown out during the pendency of the
13   litigation.  And he's not been thrown out. He continues
14   to operate.
15        The testimony is very, very clear, your Honor,
16   that at no time did the Mets ask Aramark to terminate
17   KSI.  In fact, Aramark did not terminate KSI.  In fact,
18   Aramark continues to allow KSI to operate.
19        THE COURT:  Well are you suggesting that if QBC
20   sought to influence the decision about whether or not KSI
21   would be permitted to operate on Fridays and Saturdays
22   that that would not be a violation of the order?
23        MR. MEHLMAN:  Perhaps that would be but they
24   did not do that, Judge.  There's no evidence to
25   suggest --

Transcription Plus II, Inc.

297

Mr. Mehlman - Summation

1        THE COURT:  Well that was all that I was

2   asking.

3        MR. MEHLMAN:  Yes, your Honor, perhaps it would

4   be.  But there is no evidence to suggest that QBC's

5   position regarding Fridays and Saturdays influenced

6   Aramark's position.  They may have known of QBC's

7   position and they understood that hey, the Mets don't

8   want him to operate on Friday and Saturday, but Mr.

9   Kleckner made it clear that they had their own

10  independent reasoning for not operating on Friday and

11  Saturday.  And it --

12       THE COURT:  Well the order is an injunction

13  against influencing or attempting to -- they're enjoined

14  from taking any action directly or indirectly with

15  respect to or affecting the time or method of sale of

16  KSI's products at Citi Field.

17       MR. MEHLMAN:  It --

18       THE COURT:  So --

19       MR. MEHLMAN:  And there's been no evidence

20  during the course of this hearing on the record that the

21  Mets directly or indirectly attempted to influence.  By

22  asking a company that runs the concession at Citi Field

23  whether they're going to terminate a specific

24  concessionaire, that is not inappropriate.  They need to

25  know that information.

298

Mr. Mehlman - Summation

1       QBC runs the ballfield.  QBC's in charge to
2  make sure that all the guests have what they need, that
3  all the guests are provided for.  And if a Kosher
4  provider is going to bail or if Aramark will decide that
5  they no longer want the Kosher provider there any longer,
6  then it's something that QBC needs to know.  Mr. Landeen
7  has an obligation to have meetings with Aramark on a
8  weekly basis.  There's nothing in the injunction that
9  bars Mr. Landeen to have those meetings with Aramark and
10 to question if there any issues with the Kosher provider,
11 just to insure they're --
12       THE COURT:  What about the --
13       MR. MEHLMAN:  -- maintaining the Kosher
14 concessions at the ballpark.
15       THE COURT:  What about the A to Z Guide and the
16 Guest Service Handbook?
17       MR. MEHLMAN:  Well, because he's not operating
18 on Friday and Saturday.  So if a guest is going to come
19 and they're going to look for the Kosher concession or
20 assume that the Kosher concession is operating at that
21 time, they're going to go to a stand that's not selling
22 Kosher food.  They're going to go to the stand that is
23 not -- that is being run by somebody else other than KSI
24 and not know the difference.
25       The purpose of those guides is to allow the

299

Mr. Mehlman - Summation

1  guests to know what's going on.  And they were operating

2  on Friday and Saturday at the time, when it was issued.

3  It's not influencing anybody.  They weren't operating.

4          And that was a decision that Aramark made

5  independently of the Mets.  If I'm a guest at Citi Field

6  and I'm looking for a concession, I should know where the

7  concessions are.  And KSI wasn't operating.

8          All those guides do is inform the public of the

9  fact and the fact is that on Fridays and Saturdays these

10  concessions run by Mr. Katz, Kosher Sports was not

11  operating.  I believe the fans are entitled to know that.

12  And that's all that was done.  Those guides are not

13  internal Aramark guides that Aramark in some fashion

14  relies upon in making decisions.  Those are fan guides.

15  Those are guides that are posted in the website or the

16  Mets --

17          THE COURT:  They're not Aramark documents.

18          MR. MEHLMAN:  They're not Aramark documents at

19  all.

20          THE COURT:  They're QBC documents.

21          MR. MEHLMAN:  They're not Aramark documents at

22  all.  They're a --

23          THE COURT:  QBC --

24          MR. MEHLMAN:  -- Guest Service Handbook.

25          THE COURT:  QBC or Mets --

300

Mr. Mehlman - Summation

1          MR. MEHLMAN:  That's correct.

2          THE COURT:  -- documents?

3          MR. MEHLMAN:  Yes.  They're Guest Service

4    Handbooks.

5          THE COURT:  What did they say in prior years?

6          MR. MEHLMAN:  I believe that there was

7    testimony that in 2010, at least in one of them, did not

8    say anything.  But, your Honor --

9          THE COURT:  It didn't say anything about kosher

10   food or didn't say anything about --

11         MR. MEHLMAN:  I believe the testimony --

12         THE COURT:   (Indiscernible).

13         MR. MEHLMAN:  -- I believe the testimony that

14   was elicited or attempted to be elicited, was that it did

15   not state the hours of operation.

16         But, your Honor, these Guest Services Guides

17   are also important fr when guests come to the stadium and

18   ask whether it's a Citi Field employee or an Aramark

19   employee, where is a kosher vendor?  That individual has

20   a right to give a frank response and a truthful response.

21   If it didn't state that in the -- then they say okay, go

22   up to, you know, a certain location, that's where the

23   kosher vendor's at.  If it's Friday and Saturday, it's

24   not accurate.  That's not appropriate.  They're giving

25   the wrong information to a guest.  That's the purpose of

301

Mr. Mehlman - Summation

1   this.

2           Because they wanted to insure that they were

3   giving the right information, that is not a violation of

4   the Judge's order.  Specifically, based upon the Judge's

5   discussions on the record, before issuing the order, I

6   would be surprised to learn that Judge Weinstein review

7   giving a guest the appropriate information about where

8   they can or cannot purchase certain kinds of food, would

9   in any way directly or indirectly affect the mannerism or

10  the hours of Kosher Sports' operations.

11          Mr. Kleckner specifically testified that the

12  Mets never asked him to terminate KSI.  In fact, if you

13  look in Mr. Kleckner's testimony, Mr. Kleckner explained

14  that not just in January of 2010 for the first time, but

15  dating back much earlier than that, Mr. Kleckner had

16  conversations with Mr. Katz about what Aramark's position

17  was regarding operating on Friday and Saturday.

18          And there were two reasons why Aramark did not

19  want KSI to operate on Friday and Saturday.  There was

20  Mr. Kleckner's reason that he was concerned that this

21  would affect the credibility of the products being served

22  during the rest of the week which is something that

23  Mr. Kleckner was greatly concerned about and then there

24  was the economic reason that Mr. Weigert was concerned

25  about.  And Mr. Weigert's reason was that if he wants two

302

                    Mr. Mehlman - Summation

1   extra days -- if he wants two extra days, they have to

2   readjust the terms.

3           And to say that because in Lincoln Field he's

4   operating, those are under different terms.  There's a

5   different amount of games.  That's comparing apples and

6   oranges.  Football games, there aren't eighty football

7   games, your Honor.  You heard the testimony from Mr.

8   Katz.  There are ten home games.  And the terms of those

9   agreements are different than the terms of the agreements

10  here.

11          And Mr. Katz operates under the Aramark

12  agreement.  And under the Aramark agreement, Aramark

13  decides the hours of operation.  And Aramark is free to

14  tell them when he can operate and when he can't operate.

15  And that's exactly what they did.  They told them based

16  upon the terms of your contract, you're not going to

17  operate on Friday and Saturday.  If you want to readjust

18  them, if you want to change it, perhaps that is something

19  that we may want to discuss; perhaps.  But not under the

20  current contract.

21          And you heard Mr. Kleckner, there's economic

22  issues --

23          THE COURT:  Well that goes to Mr. Weigert's --

24  is it Weigert or Weigert?

25          MR. MEHLMAN:  It's Weigert.

                  Transcription Plus II, Inc.

Mr. Mehlman - Summation

1    THE COURT:  -- Weigert's objection but

2  Mr. Kleckner said that his -- it was the integrity

3  argument, why is that any different at Citi Field than it

4  would be in Philadelphia or Baltimore, wherever the

5  other --

6    MR. MEHLMAN:  I think that Mr. Kleckner

7  answered that truthfully and based upon his knowledge of

8  the guests that are coming to Citi Field.  He believes

9  and I believe accurately, noting from what's been said

10  about the story on the web, that there are consumers,

11  many consumers, in the New York Metropolitan area who are

12  very, very observant and if they found out that this

13  stand was operating on Friday and Saturday, they would

14  not use the stand during the rest of the week.

15    And that goes to the credibility issue of

16  what's the purpose of having a kosher stand catering to a

17  certain niche, to a certain community even though others

18  may purchase from them, because the lines or shorter or

19  for whatever reason, they think it's a better product or

20  a cleaner product or a safer product, those people who

21  are relying upon the kosher status of it will not use it

22  Monday through Thursday.  And that's a decision that

23  Aramark has a right to make.  And Aramark has a right to

24  make that decision independently based upon the

25  clientele, based upon the guests and based upon their

304

Mr. Mehlman - Summation

1    assessment of a particular group who are coming to the

2    ballpark.  And Mr. Kleckner made that decision.

3            And certainly it was also an economic issue.

4    Mr. Kleckner -- Aramark makes more money when they

5    operate on Friday night and Saturday and that's why the

6    revenue splits between Aramark and QBC would have to be,

7    as Mr. Weigert would say, would have to be, you know,

8    thought out again or rethought.

9            Your Honor --

10           THE COURT:  What's your response -- well I

11   guess we should have Mr. Katz step out again.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mr. Mehlman - Summation

1        THE COURT:  You can continue.

2        MR. MEHLMAN:  And as the testimony elicited by

3    both Mr. Kleckner, Mr. Landeen, Mr. Funk, as well as

4    Mr. Grey --  just for a moment if we could jump to

5    Mr. Grey for a minute, Mr. Grey did not say the things

6    that Mr. Tokayer educes Mr. Grey said.

7            If you listen to the conversation that was

8    being used for impeachment purposes, Mr. Katz says all of

9    that, that what Mr. Grey says is ah-hah, Mr. Grey clearly

10   was allowing Mr. Katz to say what he wanted to say

11   without any authority nor understanding about making any

12   decision at all.

13           Mr. Katz clearly went into that January 6

14   meeting with an agenda to try to gather evidence, gather

15   statements from Aramark that in some way would support

16   their claim before this court and this contempt

17   proceeding and perhaps in the cash in chief.  And what

18   they did was and what Mr. Katz did was specifically speak

19   for large intervals at a time giving his position,

20   including saying that under the Judge's contempt -- the

21   Judge's injunction, the Judge ruled that Aramark has to

22   let them open on Friday night and Saturdays.  No where

23   does that appear.

24           And to say that in some fashion that that

25   injunction says that he has a right to operate on Friday

308

Mr. Mehlman - Summation

1  and Saturday belies Judge Weinstein's decision, belies

2  Judge Weinstein's discussion on the record before issuing

3  the injunction.

4          MR. TOKAYER:  Objection, your Honor.

5          THE COURT:  What's the objection?

6          MR. TOKAYER:  He's referring to a tape that is

7  not in evidence and he's making arguments from it.

8          THE COURT:  The tape is in evidence.

9          MR. TOKAYER:  That's for impeachment purposes

10 and it was not used for impeachment purposes.

11         THE COURT:  I said that the plaintiff could,

12 because it wasn't turned over by the plaintiff and was

13 not listed as automatic -- it was not produced as part of

14 automatic disclosure, that the plaintiff could not use

15 it, except for impeachment purposes.

16         MR. MEHLMAN:  I'm not using it for anything

17 other than impeachment purposes.  He tried to impeach him

18 saying that's what he said but that's not what he said,

19 your Honor.

20         And then just finally, your Honor, this whole

21 idea that Aramark is being manipulated and Aramark is

22 manipulating reasons and QBC's manipulating reasons, look

23 it's clear QBC did not want him to operate on Friday and

24 Saturday.  What's also clear from the evidence is once

25 the Judge issued his injunction, all the Mets cared about

309

Mr. Mehlman - Summation

1   was was there going to be a kosher provider?  Was Mr.
2   Katz going to remain?  Was Aramark going to get rid of
3   Mr. Katz?  Did they need to put somebody in place?
4           That's their obligation.  That's all they cared
5   about.  And whether it was at meetings asking, are you
6   still good with Katz?  Is he still going to serve?  Is he
7   in breach?  No, fine.  Is he not?  Fine.  We have the
8   contingency plan.  Let's meet with some other people in
9   case he bails.  The evidence is clear that he bailed
10  before in 2009 from NCU park and other parks that the
11  Mets are partners in and they were concerned about that.
12  They didn't want to show up one day and find out there's
13  no kosher provider.
14          They did what they're obligated to do.  There's
15  no where in the injunction that bars QBC from having a
16  contingency plan and insuring that there is something in
17  place in case something should happen.
18          They didn't know what Aramark's position was.
19  They didn't know if Aramark was going to keep it going.
20  They asked.  They inquired. There's nothing wrong with
21  listing on a meeting minutes agenda, kosher update.  Are
22  you still happy with Mr. Katz?  Is Mr. Katz still
23  operating?  Yes, fine.  It's on the agenda.  Is he in
24  breach?  No, fine.  It's on the agenda.
25          That is in no way a violation at all.  It's

Transcription Plus II, Inc.

310

Mr. Mehlman - Summation

1   doing what the Mets are obligated to do; to insure

2   there's a provider of Glatt Kosher frankfurters at the

3   stadium.  And that's all they really cared about at this

4   stage.

5           They're not getting any money at all from this

6   relationship.  He's operating without paying one dime of

7   any of the sponsorship agreements.

8           THE COURT:  Well they --

9           MR. MEHLMAN:  And he's operating with impunity,

10  your Honor.  He does what he needs to do.  He sells his

11  frankfurters and there's no evidence at all, your Honor,

12  that the Mets in any way directly or indirectly affected

13  his hours of operation.

14          THE COURT:  Well what about the cart and the

15  promenade that he did not want to operate?

16          MR. MEHLMAN:  That's a guest relations issue.

17  And you saw the reason was not impede -- first of all,

18  your Honor, Judge Weinstein never envisioned that as part

19  of his injunction.  Judge Weinstein's injunction was

20  relating to the Friday night and Saturday issue.  That's

21  why it was raised.  That's what was discussed and that

22  was the issue.  Judge Weinstein never envisioned that if

23  Mr. Katz wanted to not operate a cart, not operate a

24  cart, and the Mets wanted him to operate because there

25  were fans that would be served by that cart, the Mets

Mr. Mehlman - Summation

1  couldn't chime in on their decision, your Honor.  That

2  was never envisioned by the injunction.

3         As the Court's well aware, that a motion to

4  contempt, the Court can take under its advisement the

5  purposes and the reasoning behind the issuing of the

6  injunction.  That was never raised to Judge Weinstein as

7  a point -- at the time that the injunction was issued and

8  certainly never contemplated by Judge Weinstein when he

9  issued the injunction.  That was a Friday night and

10  Saturday issue.  And that's why it was there.  And to

11  insure that Mr. Katz remained in the ballpark during the

12  pendency of the lawsuit.

13         THE COURT:  But you would agree that at least

14  the language of the order would seem to apply to that

15  situation.

16         MR. MEHLMAN:  I disagree.  I disagree that if

17  the language of the order is taken in a vacuum,

18  your Honor, not based upon the discussion on the record

19  with Judge Weinstein and Judge Weinstein's reasoning,

20  perhaps one may infer that but that's not the burden in a

21  contempt hearing.

22         The burden in a contempt hearing is that the

23  injunctive relief or the injunction must be interpreted

24  along the lines of the reasoning behind the judge issuing

25  the injunction.  And Judge Weinstein never envisioned

312

Mr. Mehlman - Summation

1 that injunction being used to allow Mr. Katz not to

2 operate a cart.

3         And the Mets had an obligation to provide the

4 service to those individuals that were up there.  You saw

5 the reasoning.  The reasoning wasn't to make Mr. Katz's

6 life miserable.  The reason was to make the guests' stay

7 at Citi Field enjoyable.  They didn't have to walk to the

8 other side of the park to get frankfurters.  Because as

9 you heard Mr. Landeen, he gets tons of complaints.  His

10 job is not to get complaints, to insure there aren't

11 complaints.

12        And if a cart's shut down and people are

13 looking for these kinds of products and are told I'm

14 sorry, for this evening, these carts are not operating,

15 you've got to go across court to get it, that the Mets

16 had an obligation to their fans to insure that that cart

17 was operating, your Honor.  And certainly nothing else

18 contemplated by Judge Weinstein.

19        And in fact, it wasn't even contemplated by Mr.

20 Tokayer because no where in his declaration nor his

21 motion for contempt does he even reference that specific

22 issue.  This was a "red herring" that he was slipping in

23 at this point, your Honor, to try to in some way come up

24 with a theory of why there may be contempt when there is

25 no other actions that fall into a -- that would in any

Transcription Plus II, Inc.

313
Proceedings

1 way violate the injunction.

2          THE COURT:  Well, I assume that his response

3 would be that the Mets are taking the position that they

4 don't in any event control the time or method of

5 operation KSI and yet here is an instance in which they

6 did, whatever the motive might have been.

7          MR. MEHLMAN:  Well, but they chimed in on their

8 reasoning why they would want it opened.  Ultimately, it

9 was Aramark's decision.  And that's based upon the

10 contract.

11          THE COURT:  Anything else?

12          MR. MEHLMAN:  No, your Honor.  Any further

13 questions?

14          THE COURT:  No, not for now.

15          MR. MEHLMAN:  Thank you, your Honor.

16          THE COURT:  Mr. Tokayer, did you want a brief,

17 a very brief rebuttal?

18          MR. TOKAYER:  No, I think I can address it in

19 my papers.

20          MR. FIELD:  Judge, may I speak about one

21 procedural issue?

22          THE COURT:  Yes.

23          MR. FIELD:  As you know I came here and my firm

24 has been involved in this case as a non-party.  My

25 client's been a non-party.  We've been asked to

314

Proceedings

1  facilitate the discovery, the brunt of which has fallen

2  on my client, put up some witnesses, et cetera, and we

3  did that.  And I thank you for letting us come here

4  today.

5          I was going to leave before you did the

6  summations but I am glad I stayed because I heard

7  something that is very troubling to me.  You picked up on

8  it.  That the plaintiff is now seeking relief against

9  Aramark.  There was no notice of any relief against the

10  non-parties.

11          THE COURT:  Well I am not sure that that is

12  what Mr. Tokayer is doing.  I think what he's trying to

13  do is attribute actions of your client to QBC.  Even

14  under my hypothetical, where assuming hypothetically that

15  there was no attempt to influence, he was saying as a

16  matter of law and as a matter of contract, that the

17  actions of Aramark should be attributed to QBC.

18          But if he's going beyond that, I think maybe we

19  should get clarification now and if so, you -- well, you

20  haven't participated in this.

21          MR. FIELD:  Judge, he went -- respectfully, he

22  did say exactly what you said but he went further because

23  he asked you to rewrite my client's contract with the

24  plaintiff which is not subject to this litigation, which

25  is not the subject of any claim.  And he asked you as

Transcription Plus II, Inc.

315

Proceedings

1  part of the relief he was seeking, in addition to all

2  these sanctions, et cetera, to enter an order that would

3  allow them to operate on Fridays and Saturdays.

4        That's not what the contract says.  It has

5  never said -- he's asking you to rewrite our contract.

6  Our contract's not before the Court.  The relief sought

7  in the complaint does not address our contract, nor could

8  it logically because we're not a party.

9        So I strongly want the Court to focus on the

10  relief sought by the plaintiff to make sure it rises and

11  falls with the contempt alleged against QBC.  But to

12  start to pull our contract in and say you should rewrite

13  it, I respectfully suggest that it's well outside of your

14  powers and authority in this matter as framed by the

15  plaintiff.

16        THE COURT:  Maybe I should have Mr. Tokayer

17  clarify what his position is in this regard.

18        MR. TOKAYER:  Yes, Aramark --

19        THE COURT:  You are not seeking contempt

20  sanctions against Aramark, I take it.

21        MR. TOKAYER:  Aramark cannot interfere with

22  Kosher Sports' operations on Fridays and Saturdays, if

23  they're doing it on behalf of the Mets.  And if they

24  have, then yes, they're in contempt of court.

25        THE COURT:  Well then we've had this proceeding

Transcription Plus II, Inc.

316

Proceedings

1  and although Aramark has provided witnesses as a non-

2  party, they have not participated as a party to this

3  contempt motion.

4          MR. TOKAYER:  That was their choice.

5          MR. FIELD:  Respectfully, I have no standing to

6  participate.  I'm not a named party.  This litigation has

7  been going on for a year and a half.  If somebody wants

8  to throw grenades at me at this late date, I deserved

9  notice a long time ago.

10          THE COURT:  Well it certainly wasn't clear to

11  me that this was -- that the motion was directed against

12  Aramark, as well as QBC.

13          MR. TOKAYER:  I think we need to go back to the

14  motion and the Court's order setting the hearing which I

15  will do.

16          THE COURT:  I've always treated Aramark as a

17  non-party in this regard, a non-party witness.  All

18  right.  Is there anything further with respect to the

19  contempt hearing?  Mr. Tokayer, did you want a few

20  minutes?

21          MR. TOKAYER:  No, your Honor.  I'll address it

22  in my papers.  Thank you.

23          THE COURT:  All right.  Mr. Field, you're free

24  to leave.  I don't know whether the counsel for the

25  parties want to address any of the other open issues.  I

317

Proceedings

1    will say one thing, Mr. Tokayer's cross-motion for

2    sanctions refers to a previous motion made by plaintiff

3    on I believe it was March 7 and indicates that that

4    motion for sanctions was still open.

5             I had no recollection that there was any open

6    motion for sanctions.  I went back and that matter was

7    resolved in the core proceeding at the end of March and

8    the docket entry, the minute entry specifically denies

9    that motion.  So there's no previous motion for sanctions

10   that is still open.

11            All right.  I have cross-motions now for

12   sanctions in connection with discovery issues.  Do

13   counsel want to be heard on that?

14            MR. MEHLMAN:  Does the Court want to set

15   another date or we can address it now?  It's up to the

16   Court.

17            THE COURT:  You're all here.  If you want to

18   address it --

19            MR. MEHLMAN:  Your Honor, since I think we made

20   the initial motion, if I could address the Court, from a

21   sitting position, if I may?

22            THE COURT:  That's fine.

23            MR. MEHLMAN:  It's been a long day.  While the

24   entire issue regarding these recordings of the

25   conversations that came out, there was a Friday call that

Transcription Plus II, Inc.

318
Proceedings

1  the Court had with -- there was a Friday call that the
2  Court had with all the parties.  And during that Friday
3  call, the Court specifically asked Mr. Tokayer whether
4  there were any other additional recordings.  And the
5  response from Mr. Tokayer was there were no additional
6  recordings.
7          THE COURT:  Which is technically true
8  apparently.
9          MR. MEHLMAN:  Technically true, that's correct,
10  but not the way we interpreted it, your Honor.  We
11  assumed that Mr. Tokayer was being frank when he said
12  there were no other recordings, that there were no other
13  conversations that were, in fact, recorded.
14          However, the Court granted portions of our
15  motion to reopen the depositions and we, in fact, did
16  reopen those depositions and just to make sure because
17  there's much to be made about how questions are asked and
18  how questions are answered during the course of this
19  litigation, I asked Mr. Katz whether he recorded any
20  other conversations.
21          And during the course of his testimony and in
22  -- as stated in his testimony on the record under oath,
23  as well as in his declaration before the Court in
24  Mr. Tokayer's response or opposition to our motion,
25  Mr. Katz has admitted that, in fact, there was an

319

Proceedings

1   operational meeting in 2010 between himself and Aramark
2   that he recorded.

3           And he claims that the recordings were
4   discarded.  I used the word destroyed.  I don't think it
5   makes a difference.  The recordings are no longer
6   available to review but it was during an operational
7   meeting similar to the operational meeting that took part
8   in 2011 where, in fact, this specific issue was not only
9   raised but was discussed in detail.

10          And as the Court is well aware from the
11  depositions that have been submitted to the Court, as
12  well as the exhibits that we submitted a long with our
13  motion, it had always -- this issue regarding whether the
14  Mets could -- whether KSI could operate on Friday night
15  and Saturday was raised as early as 2008 and as early as
16  2008, Mr. Katz was contemplating legal action.

17          In fact, in a detailed letter in March 23,
18  2009, Mr. Katz writes a letter on his letterhead to Peter
19  Helfer of QBC and he cc's that to the general counsel.

20          And in a follow-up letter, he specifically says
21  and that's dated April 14, 2009, "I will consult with my
22  legal counsel as to whether to bring legal action."

23          And additionally, in January 2010, arguably
24  almost the exact period of time where this conversation
25  may have been taking place or probably before this

Proceedings

1  conversation took place, once again Mr. Katz -- I'm

2  sorry, Mr. Kestenbaum of KSI, issues a very detailed

3  letter that would contemplate taking legal action.

4  Additionally --

5          THE COURT:  What's the -- which document is

6  that?

7          MR. MEHLMAN:  That's document exhibit number 5

8  and then Exhibit 6, March 18, 2010, perhaps right after

9  the conversation took place or about the same time,

10  Mr. Katz sends an e-mail which clearly contemplates legal

11  action whereby number three in his e-mail says,

12  "Additionally as the agreement lacks a merger/entire

13  agreement clause, the agreement is unintegrated."

14          That's as close as you're going to get to a

15  legal letter or  a lawyer's letter as you can get without

16  a lawyer actually signing off on it but with the client

17  sending it.

18          It is unconscionable that Mr. Tokayer would

19  argue that prior -- that during this operational meeting

20  in 2010, that litigation was not foreseeable.  Clearly

21  litigation was foreseeable at that point.  Litigation

22  arguably was foreseeable back in 2008, certainly in 2009

23  but certainly by 2010.

24          And as litigation was foreseeable, almost point

25  on point legal letters, threatening legal action, QBC --

321

Proceedings

1   I'm sorry, KSI -- a duty to preserve the conversations.

2   He preserved the 2011 one.  He preserved the January and

3   the April one.  He didn't tell anyone about it.  Provided

4   only snippets originally, not a full transcript.  It's

5   not -- under the law, it's not up to Mr. Katz to file a

6   self-serving declaration that says litigation was not

7   foreseeable and nothing was discussed on those tapes that

8   would reference this action. That's not the standard.

9           The standard is if litigation is foreseeable,

10  then there's an obligation to preserve.  Moreover, KSI is

11  the plaintiff and the courts have been clear, when it's

12  the plaintiff that fails to preserve evidence when

13  litigation's foreseeable, there's an extra burden because

14  they're the ones who dictate when they're filling a

15  lawsuit. This lawsuit wasn't filed a year afterwards.

16  This lawsuit was filed months.  And it was foreseeable

17  years beforehand.  And to say otherwise is in direct

18  contradiction to the e-mails, to the discussions, and to

19  the letters that were sent to Mr. Katz leading up to the

20  January or February or beginning of the season

21  operational meeting.

22          And to say it was just an operational meeting

23  and therefore, this wasn't discussed, is self-serving and

24  obviously not true because in 2011, was also an

25  operational meeting and guess what?  This wasn't

Transcription Plus II, Inc.

322

Proceedings

1  discussed.  And he had an obligation to preserve.

2          Additionally, your Honor, we're quite troubled

3  by the fact that during the deposition, counsel did not

4  allow us to get more detailed information regarding who

5  knew about these recordings, whether counsel knew about

6  these recordings, whether he was admonished by counsel

7  not to destroy these recordings, whether counsel failed

8  to admonish him not to destroy these recordings, whether

9  he did it on his own; certainly those are issues that

10 must be delved into regarding this issue because it is a

11 spoliation issue.

12          And I don't know what was on those tapes.  And

13 Mr. Katz's self-serving declaration does not serve in any

14 way to remove the violation and the impermissible action

15 of destroying or discarding these recordings, your Honor.

16          THE COURT:  All right.  Mr. Tokayer?

17          MR. TOKAYER:  Yes, we addressed this all in our

18 papers, your Honor.  The litigation in the early part of

19 2010 was not only foreseeable it was something that

20 Kosher Sports did not have in mind at all.  There's no

21 evidence that he consulted any attorneys at that time.

22 He had no issues with Aramark.  All his issues at that

23 time were with QBC.  And the conversation was with

24 Aramark, who is still not a party to this action and he

25 didn't have an issue with until sometime after April of

323

Proceedings

1    2011.

2            He preserved all the documents are the

3    litigation commenced.  And he didn't commence the

4    litigation until after Kosher Sports terminated his

5    contract and QBC terminated Kosher Sports contract

6    unilaterally in I believe it was either April or May of

7    2010.

8            We set forth the standard for spoliation

9    sanctions in our papers.  The burden is on the defendant

10   -- on the parties seeking sanctions to show that there

11   was a duty and that there was culpable action and that

12   the evidence would have been relevant to the aggrieved

13   parties case.  The conversation allegedly was with

14   Mr. Funk.  Mr. Funk was here.  Mr. Funk is available.

15   Mr. Funk testified that he didn't discuss Friday and

16   Saturday sales with Kosher Sports at that time.  And

17   we've submitted exhibits to that effect.

18            The rest of the argument is set forth in our

19   papers.  We don't believe there's any basis and that we

20   don't believe that QBC has even made a prima facie case

21   under the law for such sanctions.

22            MR. MEHLMAN:  Your Honor, just for the record,

23   the April 14, 2009 letter from Mr. Katz says I will

24   consult with my legal counsel as to whether to bring

25   legal action.  I'm not sure Mr. Tokayer can say that

Transcription Plus II, Inc.

324

Proceedings

1  legal action was not foreseeable or contemplated or that

2  he didn't even have a legal team or wasn't consulting

3  with a lawyer.

4        Additionally, the 2010 e-mail uses phrases that

5  are clearly very technical and very legal.  But moreover,

6  your Honor, I don't know who that conversation was with.

7  I don't know who was at that conversation in 2010.  I

8  don't know what was discussed.  There's an obligation

9  under the law to preserve evidence, to preserve evidence

10 when the litigation is foreseeable.  Litigation was

11 foreseeable and Mr. Katz destroyed the 2010 tape of the

12 operational meeting, similar to the operational meetings

13 in 2011.

14        And regardless of the fact that the meeting was

15 with Aramark, that in no way relieves Mr. Katz or casts

16 asides its obligation.  They've proffered a 2011

17 conversation with Aramark as evidence in this case.  And

18 Aramark is still not a party.  So that argument really

19 does not hold water at all, your Honor.

20        These conversations were recorded.  They were

21 recorded for a purpose and they were destroyed.

22        THE COURT:  And just remind me which years were

23 recorded?

24        MR. MEHLMAN:  He testified that he recorded many

25 conversations.  In fact, his testimony goes back to the

325

Proceedings

1  2009 operational meeting and conversations.

2          And then he went further and testified that he

3  recorded his 2010 conversation, operational conversation,

4  leading up to the season where this issue most probably

5  would be addressed.  And Mr. Kleckner testified today that

6  he had discussions with Mr. Katz prior to 2011 with regard

7  to Mr. Katz's intent to operate on Friday night and

8  Saturday.

9          MR. TOKAYER:  Your Honor, even the 2010 meeting

10 is not relevant to any issue in this case.  We did not

11 identify it in response to our Rule 26 motion.  And we

12 only used it to impeach witnesses from Aramark after it

13 became evidence that there was a breach of the --

14 Judge Weinstein's order which wasn't issued until August

15 of 2010.

16         MR. MEHLMAN:  Your Honor, just to make it clear,

17 the reason it was used only for impeachment is because the

18 Court levied a sanction against KSI and told KSI they

19 couldn't use it but for impeachment.  It was always the

20 intent of KSI to use that in their case in chief.  And

21 that's why they did not reveal it.  It was only after we

22 discovered the fact that it existed and the Court's

23 concern with he fact that it was not produced as it should

24 have been produced, did the Court levy a sanction against

25 Mr. -- sanction a ruling against KSI and order that it

Transcription Plus II, Inc.

326

                    Proceedings

1  only be used as impeachment.  So that argument is really

2  unfair, your Honor.  It's not really accurate.

3           MR. TOKAYER:  Your Honor, I stated that I was

4  only using it for impeachment purposes prior to the

5  Court's ruling.

6           MR. MEHLMAN:  And this conversation doesn't just

7  go to the contempt issue.  It goes to all claims in this

8  case.  I don't know what the discuss --

9           THE COURT:  If you can just find the portion of

10  the reopened deposition in which --

11          MR. MEHLMAN:  Sure.

12          THE COURT:  -- Mr. Katz testified that he

13  recorded other conversations.  I would like to look at

14  that portion.

15          MR. MEHLMAN:  Your Honor, I'm going to give that

16  to the Court right now. It's -- yes, your Honor, if you

17  look at page 346, line 19.  The question I ask Mr. Katz on

18  January 20, 2011 was as follows:

19          "Question:  Have you taped any of the

20  conversations between yourself and Aramark other than

21  these two conversations; the January 6, 2011 conversation,

22  the April 6, 2011 conversation?

23          "Answer:  I have taped conversations before;

24  yes.

25          "Question:  What dates were those conversations

                 Transcription Plus II, Inc.

327

Proceedings

1   from?

2          "Answer:  I have no idea.  They're over the

3   course of eight years.

4          "Question:  Were those taped conversations --

5   where are those taped conversations now?

6          "Answer:  Arrest -- erased.  I'm sorry.  They're

7   just operational conversations in normal business practice

8   of going to meetings and trying to remember a fifty minute

9   conversation."

10         Then further, on page 387, line 18 through 21:

11         "Question:  Prior to the 2010 season, your

12  operational meeting with Aramark that you taped without

13  their knowledge?"

14         THE COURT:  I'm sorry, what page are you on now?

15         MR. MEHLMAN:  Page 387, line 18.

16         "Question:  Prior to the 2010 season, your

17  operational meeting with Aramark that you taped without

18  their knowledge?

19         "Answer:  Yes."

20         And then page 389, line 10:

21         "Question:  Other than the January 6, 2011

22  operational meeting, you only taped one additional meeting

23  with Aramark referencing Citi Field?

24         "Answer:  I might have taped the one before the

25  2009 season but I don't recall.

328
Proceedings

1          "Question:  The operational meetings that you
2    taped prior to 2010 season, where is that?  Where are the
3    contents of that conversation today?

4          "Answer:  They don't exist anymore.  They were
5    deleted.

6          "Question:  When were they deleted?

7          "Answer:  I have no idea."

8          Now here, your Honor, I did not raise this but
9    this is also quite troubling.  I asked him page 4 -- I'm
10   sorry, page 391, line 13:

11         "Question:  Do you know if you destroyed the
12   contents of that conversation before or after you
13   commenced the 2010 lawsuit against QBC?

14         "Answer:  I have no idea."

15         And then I further questioned him about having
16   no idea and he was so committed to the fact that he had no
17   idea.  Then there's a break.  Mr. Tokayer and Mr. Klein
18   leave the deposition with their client.  He then comes
19   back in and clarifies his "I have no idea" which he
20   repeated at least three different times.  In fact, one of
21   the times when he repeated it he said, "You wouldn't
22   remember what happened two years ago, would you?  I have
23   no idea."

24         He goes out, consults with his lawyers in the
25   middle of a deposition, comes back and clarifies his "I

Transcription Plus II, Inc.

329
Proceedings

1   have no idea" to "It was before the commencement of the

2   litigation."

3           And I attempted to question Mr. Katz about what

4   refreshed his recollection or what refreshed his

5   recollection and allowed him to clarify this change in an

6   answer after he was so sure he had no idea.  And Mr.

7   Tokayer refused to allow Mr. Katz to answer those

8   questions.

9           And as the Court's well aware, in the middle of

10  a deposition, that he leaves the room and comes back and

11  clarifies -- he didn't clarify his answer your Honor.  He

12  changed his answer.  You don't say I have no idea four

13  different times, leave the courtroom with your lawyers,

14  come back and then change your answer if something didn't

15  go outside.  And I asked for that information and I

16  believe under the rules I am entitled to know what went on

17  outside.

18          I apologize for getting excited but I take these

19  things very seriously.

20          THE COURT:  Mr. Tokayer?

21          MR. TOKAYER:  Yes, we addressed all of this in

22  our papers.  There was no duty for him to preserve that

23  information at the time.  It was an operational meeting.

24  There was nothing relevant about it.

25          THE COURT:  Well that is what he says.

Transcription Plus II, Inc.

```
                                                         330
                        Proceedings
1            MR. TOKAYER:  Yes.
2            THE COURT:  But the transcript of his testimony
3   suggests that he began this operation, this recording, in
4   2009.
5            MR. TOKAYER:  No, I think he said he --
6            THE COURT:  Initially, he said that he can't
7   remember.  It's over the course of eight years but then
8   later in his testimony he says I recorded the prior year
9   and perhaps the year before that.  So we're talking about
10  2009 and 2010.  And certainly that fits within the time
11  line of the percolation of this dispute and communications
12  going back and forth about possible litigation.
13           It certainly suggests that he began to do this
14  at a time when he expected that they might prove useful to
15  him.
16           MR. TOKAYER:  Litigation with QBC was not even
17  foreseeable.  There was never an issue with Aramark.
18  Never had a problem with Aramark.  Never sued Aramark.
19  Never contemplated suing Aramark.  And even the
20  conversation in 2010 --
21           THE COURT:  But that doesn't mean that he --
22           MR. TOKAYER:  There's no --
23           THE COURT:  -- obtain evidence that would be
24  useful --
25           MR. TOKAYER:  How could --
```

Proceedings

1        THE COURT:  -- for him.

2        MR. TOKAYER:  How could any evidence with

3   Aramark -- any conversation with Aramark be useful in an

4   action with QBC?  QBC was the one who was stopping them

5   from operating on Fridays and Saturdays and he had no

6   issue with Aramark.

7        THE COURT:  You spent a lot of time using those

8   tapes in cross-examining the witnesses in this hearing.

9   So how can you sit there and say how can they be relevant?

10        MR. TOKAYER:  Of Aramark and only with respect

11   to what Aramark did in April of 2011.

12        MR. MEHLMAN:  There's a --

13        MR. TOKAYER:  Aramark never -- there's no

14   evidence that Aramark ever stopped or tried to stop

15   Mr. Katz from operating on Fridays and Saturdays.  The one

16   communication he had with Aramark about Fridays and

17   Saturdays, was never responded to by Aramark.  And

18   instead, it was the Mets who unilaterally issued all of

19   these e-mails and stopped them from operating.  The Mets

20   controlled the ballpark.  The Mets controlled Friday and

21   Saturday sales and it was the Mets with whom Mr. Katz was

22   having a dispute.

23        There's still no evidence that he ever consulted

24   a lawyer, no matter what saber-rattling he may have done

25   and there's there's no evidence that he had any intent

332

Proceedings

1    other than to act in the ordinary course of his business.

2    He taped some meetings and he taped over some meetings.

3    And he discarded the recorder because it was aged and

4    because it no longer served its purpose.

5              THE COURT:  So --

6              MR. TOKAYER:  Ad it was months before the

7    litigation was even commenced, certainly months before he

8    ever consulted with an attorney with respect to this.

9              THE COURT:  Well I don't know that there's any

10   evidence one way or the other about that but what there is

11   in evidence is a letter that he wrote on April 14 in 2009

12   when he says I discussed with my lawyer whether to bring

13   an action.

14             MR. TOKAYER:  He said -- wait.  Are you

15   referring to the April 18, 2009 letter?

16             THE COURT:  I thought it was April 14.  I may

17   have written down the date wrong.

18             MR. MEHLMAN:  It's April 14.  You're correct,

19   your Honor.

20             MR. TOKAYER:  He said, "I will consult with my

21   legal counsel."

22             MR. MEHLMAN:  This is --

23             MR. TOKAYER:  First of all, it doesn't say that

24   he did consult with him or that he even had legal counsel.

25   That's the kind of letter clients write when they are

Transcription Plus II, Inc.

333

Proceedings

1  saber-rattling.  This is a year before --

2          THE COURT:  But doesn't that discuss that

3  litigation is foreseeable because he is rattling the saber

4  of litigation?

5          MR. TOKAYER:  With QBC and -- no, it's --

6  there's no evidence that he ever consulted with an

7  attorney at that time.  And in fact, this --

8          THE COURT:  Well do we want to have a hearing on

9  when he first consulted with counsel?  I will tell you, I

10  am very troubled by this because based on the evidence

11  before me, he starts taping these operational meetings in

12  perhaps as early as 2009, certainly in 2010.  2009 is when

13  he's already rattling the saber of litigation.

14          And while you say that he had no issue with

15  Aramark, at least from the tapes that have been preserved,

16  it is clear that he was using those meetings as a way of

17  extracting statements from Aramark that he thought would

18  support his claims or potential claims against QBC.

19          MR. TOKAYER:  Your Honor, with respect to --

20  that is not the testimony and the fact that the --

21          THE COURT:  That's the tape.

22          MR. TOKAYER:  No, but the tape in context does

23  not support that.

24          MR. MEHLMAN:  Your Honor, there's also a

25  tortious interference claim in which KSI alleges that QBC

Transcription Plus II, Inc.

334

Proceedings

1  tortiously interfered with their contract with Aramark.

2  Our conversations with Aramark --

3          MR. TOKAYER:  That claim was brought after April

4  of 2011.  That's exactly my point.

5          THE COURT:  Well I think this is an other

6  example of splitting hairs because I -- on the part of the

7  plaintiff.  I think there's sufficient information in the

8  record from which to conclude that litigation was

9  certainly reasonably foreseeable at the time that he was

10  taping these conversations.  And that these conversations

11  could be useful in connection with the litigation.  I'll

12  reserve decision on that.

13          Let's -- do you want to argue your cross-motion?

14          MR. TOKAYER:  Yes.  Again it's in our papers.

15  And by the way, you heard evidence that today that not

16  only were the minutes not produced in this case, but the

17  minutes were circulated  by e-mail, so that the e-mails

18  and the minutes should have been found through the

19  electronic search that they had performed back earlier

20  this year.

21          And it took us all kinds of -- we had to go and

22  conduct non-party subpoenas and discovery of Aramark, only

23  to find snippets by the way of these minutes.  Apparently

24  Aramark themselves do not hold all of their e-mails.  But

25  the few e-mails that we were able to find led us to these

Transcription Plus II, Inc.

335

Proceedings

1  minutes, minutes that should have been produced by QBC and

2  should have been found in the electronic search because as

3  Mr. Landeen testified, both at his deposition and today,

4  those minutes of those meetings were circulated by e-mail

5  and they clearly referred to Kosher, Kosher Sports, John

6  Katz, and other search terms that QBC supposedly used in

7  making their production.

8           THE COURT:  But they were circulated as an

9  attachment.

10          MR. TOKAYER:  Yes, it included attachments.

11          THE COURT:  Well no one has presented to me what

12 the parties agreed upon a search protocol was.

13          MR. TOKAYER:  Yes, I have, your Honor.

14          THE COURT:  No, what you've provided to me is

15 the proposal for the particular terms but I don't have the

16 complete search protocol and I know from previous

17 experience with a dispute over electronic searches and, in

18 fact, in a case that you cited in your submission to me,

19 that there are -- that searches can be performed and

20 depending on the format of the attachment, a word search

21 will not -- may not pick up an attachment.

22          MR. TOKAYER:  The search terms were agreed upon.

23 Magistrate Carter demanded that we agree upon these terms,

24 report it back to the Court that these are the terms that

25 we agreed upon and I believe that it was -- the

Transcription Plus II, Inc.

336

Proceedings

1  extraction, we say here should include attachments and the

2  entire e-mail prior and responsive e-mails which do not

3  contain -- which do not contain the key words  It would

4  include attachments and, in fact, the entire e-mail

5  string.  And this is what we agreed upon.  This is what we

6  reported to Judge Carter that we had agreed upon.  These

7  documents should have been found in their electronic

8  search.

9            THE COURT:  Well --

10           MR. MEHLMAN:  Which means that he wants the

11  document as identified but the extract produced should

12  have included the entire e-mail string.  So it doesn't

13  mean that the search was necessarily --

14           THE COURT:  Well, my law clerk just pointed out

15  which was my experience in the Nycomed case that you cited

16  and that is that the -- if the document contains a term

17  that is within the agreed upon search term and the

18  document is located, then the entire document including

19  attachments has to be produced, doesn't necessarily mean

20  that the attachment -- that a search is going to pick up

21  words that appear in the attachment but not in the

22  document itself.

23           MR. TOKAYER:  I don't know because they haven't

24  explained that.  And I will say also that these documents

25  were supposed to be produced, irrespective of any

337

Proceedings

1  electronic document search.  We were entitled to these

2  documents.  They were called for and they were belatedly

3  produced.

4           THE COURT:  They were belatedly produced --

5           MR. TOKAYER:  After we found their existence --

6           THE COURT:  Although --

7           MR. TOKAYER:  -- through on-party discovery.

8           THE COURT:  And you found them in the middle of

9  May and you did examine the witnesses at deposition on

10  those documents, other than I guess there was one that was

11  produced today.

12           MR. TOKAYER:  Yes, and I believe that -- we only

13  got a few of those documents heavily redacted from

14  Aramark.  We did not get many of the documents that we

15  used today, in fact, at the hearing.

16           THE COURT:  Well what was redacted though?  Were

17  those items on the agenda or in the minutes that had

18  nothing to do with Kosher Sports or the issues in this

19  case?

20           MR. TOKAYER:  That may be true.  I don't know

21  but --

22           MR. MEHLMAN:  We --

23           THE COURT:  Well, I saw an example --

24           MR. TOKAYER:  We got them --

25           THE COURT:  -- of a redacted --

338

Proceedings

1           MR. TOKAYER:  But they were definitely --

2           THE COURT:  -- rather than the full document.

3           MR. TOKAYER:  There were definitely documents

4   that were not produced by Aramark that were produced

5   belatedly by Kosher Sports which we use and relied upon

6   today that were not found by Aramark -- were not produced

7   by Aramark.

8           THE COURT:  In your motion you cited two basis

9   for why these documents were responsive.  One was that

10  they should have been produced as part of the electronic

11  search.  The other was that they were responsive to a

12  specific request.  That specific request was served in

13  early June and the response that you received was bout two

14  weeks later.  So were there other requests earlier that

15  these would have been responsive to?

16          MR. TOKAYER:  That's my understanding.  That's

17  what I will have to look -- I would look for.

18          THE COURT:  Well --

19          MR. TOKAYER:  I could look for it now.

20          (Pause.)

21          THE COURT:  Mr. Mehlman?

22          MR. MEHLMAN:  Just briefly, your Honor.  They

23  weren't specifically requested until June 17, your Honor.

24  When we became of these, we did everything that we --

25          THE COURT:  No, I think they were turned over on

Transcription Plus II, Inc.

339

Proceedings

1    June 17.

2            MR. MEHLMAN:  Oh, I'm sorry.  They were turned

3    over June 17.  I'm sorry.  They weren't due until July 6

4    based upon Mr. Tokayer's third discovery demand.  And they

5    were turned over as laid out in our papers, eleven days

6    after the request and certainly before the due date of

7    July6.

8            And the reason they were turned over, your

9    Honor, is once we found we were able to find them and some

10   of them might have been a hard copy, some of them were as

11   attachments to e-mails.  We turned them over to

12   Mr. Tokayer prior to the deposition or the reopening of

13   the deposition of Mr. Kleckner.

14           And Mr. Tokayer had an opportunity to question

15   him or at least we, QBC, did not in any way inhibit

16   Mr. Tokayer from asking those questions.

17           What I'm troubled about is, is that Mr. Tokayer

18   sent us an e-mail the Monday -- I'm sorry, the Tuesday

19   after the Friday of when it was turned over.  It was

20   turned over on Friday.  On Monday, during the deposition

21   of Mr. Katz, the reopening of the deposition of Mr. Katz,

22   he said "You never turned over the minute meetings."

23           We said "We did.  We turned them over on Friday.

24   We e-mailed them to you on Friday."

25           He said "Well I don't remember seeing them."

Transcription Plus II, Inc.

340

Proceedings

1        We got an e-mail then on Tuesday.  I received

2   the agenda and minutes, why were they not previously

3   produced and we detailed in an e-mail why they weren't

4   previously produced.  We also said that if you want to,

5   you can call Mr. Kleckner.  We don't control Mr. Kleckner

6   but we did not oppose you questioning Mr. Kleckner.  And

7   we didn't oppose you calling Mr. Landeen.  And we will

8   provide Mr. Landeen for you if you wanted to reopen it, so

9   that he would not be prejudiced.  And we also put in the

10  end of the e-mail that should he make a motion, that he

11  should apprise the Court of what opposition was. And that

12  was not done.

13       And I know when motions are made and positions

14  are laid out, it's appropriate to layout a position,

15  especially in this type of motion when it comes to

16  sanctions motion.

17       We found the minutes.  We turned them over.  We

18  turned them over in a fashion that was almost within a few

19  days of when we received them.

20       THE COURT:  Why weren't they found earlier?

21       MR. MEHLMAN:  I think the reason they weren't

22  found earlier was because they were attachments and the

23  attachment did not reference the e-mail, the cover e-mail

24  doesn't say Kosher, okay, or Katz or any of those things.

25       THE COURT:  That wasn't what you said in your

Transcription Plus II, Inc.

341

Proceedings

1   submission to the Court.  You said they were maintained

2   only in hard copy.

3          MR. MEHLMAN:  I'm going to let Mr. Adler address

4   this.  He is our guru when it comes to these things.

5   So --

6          MR. TOKAYER:  And your Honor, there were other

7   exhibits that we marked today and used in court that are

8   e-mails themselves that contain those search words that

9   weren't produced, such as Exhibit 22.

10         MR. ADLER:  Yes, your Honor.  The first time

11  around my understanding of why these weren't picked up by

12  the ESI terms which just for the record, those were the

13  terms disclosed by the plaintiff and just run based on

14  their suggestion that were run.  They weren't -- they

15  didn't show up initially because of the limitation the

16  Court just noticed where there's a cover e-mail and a

17  responsive term is not in that cover e-mail, then

18  something in the attachment wouldn't get picked up.  And

19  so, in the course --

20         THE COURT:  But that isn't what the Court was

21  told.

22         MR. ADLER:  Well, no, no.  As I am -- what I was

23  about to say, your Honor, is that once it became -- it

24  came to our attention that these meeting minutes existed,

25  which came out during the subsequent deposition, we had

Transcription Plus II, Inc.

342

Proceedings

1  our client go back and specifically look for them.  And at

2  that point, they were located only in hard copy form.

3          And so, you know, we've been trying to follow-up

4  on this.  As soon as something's been brought to our

5  attention, we've been going and following up and trying to

6  figure out why they weren't picked up initially by the big

7  ESI search.  And I think the reason for that is now

8  apparent.

9          And so we produced as we indicated in our

10 letter, what was located initially in hard copy form and

11 then today, where it became apparent that there was still

12 one set of meeting minutes missing, we went back and tried

13 to retrace what was going on there and that's when we

14 discovered that there were, you know, two meeting minutes

15 with the same dates.

16         MR. MEHLMAN:  And that they were e-mailed as

17 attachments.

18         MR. ADLER:  Right.

19         MR. MEHLMAN:  And that then came to the

20 reasoning why they most probably were not picked up.  But

21 your Honor, they were not destroyed.  They were not thrown

22 out or discarded.  They have been produced.  We've

23 maintained from day one that we can't produce

24 Mr. Kleckner.  We asked Mr. Kleckner to stay and allow

25 Mr. Tokayer to be questioned.  In fact, on the record at

343

Proceedings

1  the end of Mr. Kleckner's deposition I specifically said,

2  "Will Mr. Kleckner stay on and be questioned about these

3  minutes, knowing that there may be a motion."

4          Mr. Kleckner's attorney independently made a

5  decision that they didn't think that it was appropriate

6  for him to stay  because they were only ordered back for

7  the deposition for a limited reason.

8          We also made Mr. Landeen available and

9  Mr. Tokayer never asked to have Mr. Landeen brought

10 forward to reopen the deposition.  We don't see any

11 prejudice that there should be any reason for any

12 sanctions.

13         They have been turned over and if they want to

14 reopen Mr. Landeen's -- for that limited purpose, we'd be

15 more than happy.  We offered it right away.

16         THE COURT:  All right.

17         MR. TOKAYER:  I don't understand, your Honor,

18 why they're only in hard copy form because they were

19 created by Mr. Landeen's secretary electronically

20 obviously.

21         THE COURT:  Right.  But they were --

22         MR. TOKAYER:  And with respect to --

23

24         MR. MEHLMAN:  They were attached to -- I'm

25 trying to explain, they're attachments.  So if the e-mail

Transcription Plus II, Inc.

Proceedings

1   that -- they were picked up only because we asked

2   Mr. Landeen's secretary to go back and do a search not for

3   Kosher or Kosher Sports but go do a search for any

4   minutes, any meeting minutes and their attachments.

5           That's why they were picked up this time.  It's

6   not -- it's not the cover e-mail that's the issue.  It's

7   the attachment to the cover e-mail.  And also frankly,

8   your Honor, we could have met and conferred on this motion

9   prior which is an obligation.  We would have explained to

10  Mr. Tokayer as we did in our e-mail which we e-mailed him

11  prior to the making of the motion, what happened and give

12  him an opportunity -- even I was willing to call

13  Mr. Brennan and ask Mr. Kleckner to come back on my dime

14  and be allowed to be --  and I don't know that a motion

15  was necessary.

16          I believe the motion was just a knee-jerk

17  reaction to QBC's motion on the spoliation issue and

18  you're really comparing apples and oranges.  You're

19  talking about destroyed documents and destroyed recordings

20  as opposed to documents that were turned over and were

21  produced and there is no prejudice involved at all.

22          MR. TOKAYER:  That doesn't explain, your Honor,

23  why Exhibit 22 which is a document we got from Aramark

24  which came from the Mets wasn't produced.

25          MR. MEHLMAN:  I don't believe that's part of his

345

Proceedings

1  motion, your Honor.  I don't know if he's amending his
2  motion now or if he's filing a new motion or making a new
3  motion.
4          MR. TOKAYER:  Well what I am saying is that the
5  story about the attachments doesn't carry through to
6  matters such as Exhibit 22 which is an e-mail itself.
7          THE COURT:  Well if you have another application
8  to make, this is the first time I'm hearing that.  And I
9  think I have enough on my plate already.  If you want to
10 meet and confer about why you didn't get that, you can do
11 that.
12         MR. MEHLMAN:  But then also, your Honor --
13         MR. TOKAYER:  In response to your Honor's
14 question, in our very first document request, items 24
15 seeks correspondence between defendant and Aramark
16 concerning plaintiff and/or KSI Food Products.  25 asks
17 for documents and correspondence between defendant and any
18 person concerning plaintiff and/or KSI Food Products.
19 Document 26, documents constituting correspondence
20 concerning plaintiff and/or KSI Food Products.  27 os
21 documents concerning plaintiff and/or KSI Food Products.
22 These documents are responsive to those items.
23         THE COURT:  and what was the parties'
24 understanding about what documents would be searched for
25 responsive items?

Transcription Plus II, Inc.

346

Proceedings

1        MR. TOKAYER:  The electronic search was not in
2   lieu of a hard copy search for other documents.  That was
3   not my understanding.

4        MR. MEHLMAN:  Your Honor, we did --

5        THE COURT:  I don't know what the understanding
6   was.  I'm asking --

7        MR. MEHLMAN:  I don't know that that was
8   discussed in detail.  And I think that Mr. Tokayer saying
9   that that was discussed in detail, I don't know how he
10  could remember.  I don't think that was discussed in
11  detail.

12        He gave us search items.  We accepted his search
13  items.  And we did the search and we have turned over in
14  excess of thousands and thousands of documents, your
15  Honor.  He asked specifically his third interrogatory for
16  these minutes.  We turned them over within eleven days
17  prior to Mr. Kleckner's testimony.  I don't believe
18  there's been any prejudice at all.  Mr. Tokayer wants to
19  have Mr. Landeen come back for a deposition, limited to
20  those documents, I'd be more than happy to make those
21  arrangements.

22        MR. TOKAYER:  Yes.

23        MR. MEHLMAN:  He has not asked for that and he
24  did not ask for that prior to his motion.

25        MR. TOKAYER:  Your Honor, I did seek to ask

Transcription Plus II, Inc.

347

Proceedings

1   Mr. Kleckner about these documents at his deposition and I

2   was prevented from doing so by Aramark's attorney.  l

3   Not by QBC, your Honor.

4           THE COURT:  But he was questioned about it at

5   the hearing today.

6           MR. MEHLMAN:  That's --

7           MR. TOKAYER:  We did use these documents at the

8   hearing.

9           THE COURT:  All right.  Court is adjourned.

10  I'll take all these matters under advisement.

11               (Matter concluded)

12                   -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcription Plus II, Inc.

348

1                      I N D E X

2

3 **David Howard**:

4 Direct Examination by Mr. Tokayer. . . . . . . . . . .  18

5 Cross-Examination by Mr. Mehlman. . . . . . . . . . . .  28

6

7 **Jonathan Katz**:

8 Direct Examination by Mr. Tokayer. . . . . . . .  29, 263

9 Cross-Examination by Mr. Mehlman. . . . . . . . . . . .  61

10 Redirect Examination by Mr. Tokayer. . . . . . . . . . 104

11 Recross-Examination by Mr. Mehlman. . . . . . . . . . 106

12

13 **Michael Landeen**:

14 Direct Examination by Mr. Tokayer. . . . . . . . . . . 107

15 Cross-Examination by Mr. Mehlman. . . . . . . . . . . 157

16 Redirect Examination by Mr. Tokayer. . . . . . . . . . 166

17

18 **Thomas Funk**:

19 Direct Examination by Mr. Tokayer. . . . . . . . . . . 179

20 Cross-Examination by Mr. Mehlman. . . . . . . . . . . 203

21

22

23

24

25

349

1

2                          **I  N  D  E  X**

3                          (Continued)

4   **Scott Kleckner**:

5   Direct Examination by Mr. Tokayer. . . . . . . . . . . 206

6   Cross-Examination by Mr. Mehlman. . . . . . . . . . . 227

7   Redirect Examination by Mr. Tokayer. . . . . . . . . . 236

8   Direct Examination by Mr. Mehlman. . . . . . . . . . . 254

9

10  **Richard Grey**:

11  Direct Examination by Mr. Tokayer. . . . . . . . . . . 256

12  Cross-Examination by Mr. Mehlman. . . . . . . . . . . 261

13

14  Closing Argument:

15  by Mr. Tokayer. . . . . . . . . . . . . . . . . . . . . 272

16  by Mr. Mehlman. . . . . . . . . . . . . . . . . . . . . 293

17

18

19

20

21

22

23

24

25