UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

KOSHER SPORTS, INC.,

                    Plaintiff,                            <u>MEMORANDUM AND ORDER</u>

           -against-                            10-CV-2618 (JBW)

QUEENS BALLPARK COMPANY, LLC,

                    Defendant.
-------------------------------------------------------------x

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

Currently pending before this Court are several motions for sanctions. Defendant Queens Ballpark Company, LLC ("QBC" or "defendant") has moved to sanction plaintiff Kosher Sports, Inc. ("KSI" or "plaintiff") and plaintiff's counsel, Ira Tokayer, for concealing and delaying production of two surreptitiously created recordings (the "2011 recordings") of conversations in 2011 between representatives of non-party Aramark Sports and Entertainment Services, LLC ("Aramark") and plaintiff's president, Jonathan Katz. <u>See</u> Letter to the Court from Avery Mehlman (June 2, 2011) ("Def. 6/2/11 Letter"), Electronic Case Filing Docket Entry ("D.E.") #64; Letter to the Court from Ira Tokayer (June 6, 2011) ("Pl. 6/6/11 Letter"), D.E. #65. Defendant likewise seeks sanctions for spoliation of evidence due to Mr. Katz's destruction of one or more recordings of conversations (the "pre-2011 recordings") of previous meetings with Aramark personnel. <u>See</u> Letter to the Court from Avery Mehlman (June 22, 2011) ("Def. 6/22/11 Letter"), D.E. #72. Finally, contending that defendant's motion for spoliation sanctions is frivolous, plaintiff cross-moves to sanction defendant's counsel. Letter to the Court from Ira Tokayer (June 24, 2011) ("Pl. 6/24/11 Letter"), D.E.

#74; Letter to the Court from Avery Mehlman (June 27, 2011) ("Def. 6/27/11 Letter"), D.E. #75.

Having heard oral argument and in-court testimony addressing these issues,[1] the Court grants defendant's motions to the following extent:  Plaintiff and plaintiff's counsel are ordered to pay a monetary sanction, in an amount to be determined, consisting of attorney's fees and other expenses, for their failure to timely produce the 2011 recordings.  With regard to the destruction of the pre-2011 recordings, the Court proposes that the District Court instruct the jurors at trial that they may infer that the lost evidence was unfavorable to plaintiff.[2]  Finally, as the defense motion for sanctions is meritorious, and not frivolous, the Court denies plaintiff's cross-motion for sanctions.

## FACTUAL BACKGROUND

The Court assumes familiarity with the prior proceedings in this case.  Briefly stated, plaintiff alleges that defendant, which operates Citi Field (the baseball stadium of the New York Mets since 2009), breached its contract with plaintiff, a vendor of kosher food products, and tortiously interfered with the contractual arrangement between plaintiff and Aramark,

---

[1]  See Minute Entry (June 3, 2011) ("6/3/11 Minute Entry"), D.E. #65; Minute Entry (June 7, 2011), D.E. #69 (oral argument on defendant's first sanction motion); Transcript of June 7, 2011 Oral Argument (docketed June 10, 2011) ("Argument Tr."), D.E. #71; Minute Entry (June 28, 2011), D.E. #76 (hearing and oral argument); Transcript of June 28, 2011 Hearing (docketed July 6, 2011) ("Hearing Tr."), D.E. #79.

[2]  Defendant's motions for discovery sanctions and plaintiff's cross-motion are "pretrial matter[s]" that this Court may "determine" pursuant to 28 U.S.C. § 636(b)(1)(A).  Nevertheless, because it is the District Court that will charge the jury, the Court fashions its ruling on the adverse-inference issue as a "proposal," but not as a "report and recommendation" (which implicates a de novo standard of review, see 28 U.S.C. § 636(b)(1)).

defendant's concessionaire.  <u>See</u> <u>generally</u> Supplemental Second Amended Complaint

("Complaint"), D.E. #56.  More specifically, plaintiff complains, among other things, that

defendant has improperly prevented plaintiff from distributing its kosher products at games

occurring at Citi Field during the Jewish Sabbath, i.e., on Friday evenings and Saturdays.  <u>See</u>

<u>id</u>. ¶ 11.

Defendant disputes these allegations, and contends that it is plaintiff's contract with

Aramark, and not plaintiff's "Advertising Agreement" with defendant, that "controls the time

and manner" in which plaintiff may operate at Citi Field.  Letter to Judge Weinstein from

Avery Mehlman (Apr. 19, 2011) at 1, D.E. #52.  According to defendant, it was Aramark's

decision "to deny [plaintiff's] request to operate on the Jewish Sabbath," <u>id</u>. at 2, and it is

plaintiff who has breached its contract with defendant, by failing to make the required

payments thereunder.  <u>See</u> Answer and Counterclaims (May 12, 2011) at 10, D.E. #58.

In August 25, 2010, following a hearing on plaintiff's motion for a preliminary

injunction, the Honorable Jack B. Weinstein, the District Court judge assigned to this case,

issued an order enjoining defendant and all those acting on its behalf "from taking any action,

directly or indirectly, with respect to, or affecting, the time or method of sale of [plaintiff's]

products at Citi Field."  Order (Aug. 25, 2010) at 1, D.E. # 21.  In doing so, Judge Weinstein

expressly found, by a preponderance of the evidence, that the contract between plaintiff and

defendant "does not control or address the days and hours when . . . [plaintiff] may sell its

products at Citi Field."  <u>Id</u>.

## I.     THE 2011 RECORDINGS

### A.     The January 2011 Recording and Defendant's First Discovery Demands

On January 6, 2011, Mr. Katz attended an operational meeting with Richard Grey,

Aramark's Division Manager of Concessions, to discuss the details of plaintiff's operations at

Citi Field during the 2011 baseball season.  Hearing Tr. at 257-58.  Mr. Katz secretly

recorded the meeting using a concealed digital recording device.  Deposition of Jonathan Katz

at 344-45 (May 9, 2011) ("Katz Dep. Tr.").[3]  While much of the meeting focused on logistical

details unrelated to the instant litigation, Mr. Katz raised the question of whether plaintiff

would be permitted to operate on Fridays and Saturdays during the upcoming season.

Transcript of Recording of January 6, 2011 Meeting ("Jan. 2011 Recording Tr.") at 2, DX C.

He claimed that the preliminary injunction issued by the District Court entitled plaintiff to

operate on Fridays and Saturdays, id., and he repeatedly suggested that defendant QBC, not

Aramark, was the actual decisionmaker on this issue.  Id. at 4-5.  Mr. Grey was not

particularly responsive to these suggestions.  Id. at 5-6.

Partway through the meeting, Messrs. Grey and Katz were joined by Scott Kleckner,

Grey's superior and Aramark's Resident District Manager at Citi Field, who stated that he and

his boss, Scott Wiegert, Aramark's Regional General Manager, both opposed permitting

plaintiff to operate on Fridays and Saturdays.  Jan. 2011 Recording Tr. at 9.  Mr. Kleckner

expressed his view that Friday-Saturday operations would damage plaintiff's credibility with

Sabbath-observant patrons of Citi Field; he also stated that Scott Wiegert felt that the terms of

---

[3]  The Katz deposition transcript was marked as Defendant's Exhibit ("DX") H at the June 28, 2011 evidentiary hearing on plaintiff's motion for contempt.

the governing KSI-Aramark agreement did not include Friday-Saturday operations and would need to be renegotiated were that to change. <u>Id</u>. at 9. Mr. Katz asked Mr. Kleckner whether defendant was seeking to push plaintiff out. <u>See id</u>. at 12 ("But you're telling me that at some point, despite [Judge Weinstein's] ruling, that they are not to interfere with me, . . . even afterwards . . . [they] told you they, uh, you know, let's try to find someone else[?]"). Mr. Kleckner responded: "They would defend this [by saying] that they want to know their other options in case something went south with you or whatever but, you know, [to] cut through the bullshit, yeah – . . . – they wanted to know [what] their other options were if they told you [to] pound sand or pay off . . . [,] they had something on the shelf." <u>Id</u>. at 12.

Mr. Katz apparently informed his attorney of the existence of this recording prior to the completion of plaintiff's responses to defendant's first set of interrogatories and document requests. Argument Tr. at 3-4. Those responses, verified by plaintiff's counsel and signed by Mr. Katz on January 14, 2011, include a series of "General Objections" to the interrogatories and document demands; among the boilerplate objections asserted therein, plaintiff generally objected to discovery demands "to the extent that [they] seek the disclosure of documents or information consisting of audio or videotapes prior to the time relevant depositions are complete." Plaintiff's Responses to Defendant's First Set of Interrogatories and Requests for Production of Documents (Jan. 14, 2010) ("Pl. First Resp.") at 2, 10, D.E. #64-3. Plaintiff's responses did not disclose the existence of the January 2011 recording, nor did plaintiff's specific responses to particular discovery demands incorporate by reference the aforementioned general objection or otherwise object to producing or disclosing any recordings. For example,

defendant demanded "all documents concerning or evidencing KSI's allegation that QBC determines the locations and hours of operation of KSI," or "that QBC inhibited and barred KSI's hours and locations of operation." Defendant's Interrogatories and Requests for Production of Documents (Dec. 15, 2010) ("Def. First") at 9, D.E. #64-1. Plaintiff responded without objecting and agreed to produce any non-privileged responsive documents. Pl. First Resp. at 11.

The parties subsequently litigated a number of discovery disputes. One of defendant's interrogatories sought a description of, *inter alia*, each "communication, meeting, [or] discussion . . . concerning KSI's request of Aramark Corporation, as [to] whether KSI can operate on Friday nights and Saturdays . . . ." Def. First at 5. Plaintiff responded, "None, except see Exhibit B," an August 27, 2010 letter from Mr. Tokayer to Mr. Kleckner. Pl. First Resp. at 4. Defendant complained to the Court that this response was not credible, Letter to the Court from Avery Mehlman (Mar. 17, 2011) ("Def. 3/17/11 Letter") at 6, D.E. #38, and sought further explanation at the Court's March 29, 2011 hearing on discovery issues. Mr. Tokayer clarified that he knew of no other communications concerning a request of Aramark. Transcript of March 29, 2011 Hearing (docketed Apr. 1, 2011) ("3/29/11 Hearing Tr.") at 57, D.E. #41. The Court then asked: "[A]re we slicing this very thin? Is it because it says [']request of Aramark as to whether it could operate[']? Were there discussions about whether KSI could operate?" Id. at 57. Notwithstanding his knowledge of the existence of the January 2011 recording, Mr. Tokayer told the Court: "I don't know that there have been discussions

since August 27th" of 2010.  Id. at 57-58.[4]

**B.    The April 2011 Recording and Defendant's Supplemental Discovery Demands**

The following week, on April 6, 2011, Mr. Katz called Mr. Kleckner on the phone and recorded their conversation without Mr. Kleckner's knowledge.  Hearing Tr. at 222-23; Katz Dep. Tr. at 339, 344-45.  Mr. Katz requested permission for plaintiff to operate during the season's opening home games, to be held at Citi Field on the following Friday and Saturday.  Transcript of Recording of April 6, 2011 Phone Call ("Apr. 2011 Recording Tr.") (DX D) at 2-3.  Mr. Katz indicated that he remembered the concerns Mr. Kleckner had previously raised regarding Friday-Saturday operations; Mr. Kleckner reiterated those same concerns.  Id. at 3-4.  After referencing plaintiff's lawsuit against QBC, and opining that "you guys don't get to make decisions on your own[,] . . . you have to kind of go to the Mets for approval," Mr. Katz asked Mr. Kleckner "to tell me where we stand here."  Id. at 5-6.  Mr. Kleckner responded that he was open to hearing more about plaintiff's efforts to rationalize how plaintiff could operate on Fridays and Saturdays "without hurting credibility," and he repeated that there might have to be "a change in financial terms for those days."  Id. at 6.  In any event, Mr. Kleckner said, logistical problems made it difficult to accommodate plaintiff's request as to the coming Friday and Saturday.  Id. at 6-7.  He then added, "off the record," that defendant "wanted me to shop" for a substitute kosher vendor and "to terminate and bring in somebody else . . . ."  Id. at 8.

---

[4]  After the belated disclosure of the 2011 recordings, Mr. Tokayer stated at oral argument on the instant sanction motion that his representation to the Court on March 29 was an honest response based on his memory at the time.  Argument Tr. at 27.

On April 15, 2011, plaintiff moved to hold defendant and Aramark in contempt of court for defying the District Court's preliminary injunction; plaintiff's application cited Mr. Katz's conversations on January 6, 2011 and April 6, 2011, though it did not disclose the existence of the recordings of those discussions. Declaration of Jonathan Katz (Apr. 15, 2011) ¶ 2, D.E. #44. An evidentiary hearing on the contempt motion, which remains *sub judice*, was originally scheduled for June 7, 2011, but, because of the belated surfacing of the 2011 recordings, was adjourned to and held on June 28, 2011. Order (June 6, 2011), D.E. #68; Minute Entry (June 28, 2011), D.E. #76.

Meanwhile, on April 14, 2011, defendant served supplemental interrogatories and document demands seeking, *inter alia*, particulars concerning "any communications [KSI] ha[s] had with Aramark concerning KSI's operations on Friday evenings and Saturdays at Citi Field since this lawsuit was commenced," and "all documents that constitute any [such] communications . . . ." Defendant's Supplemental Interrogatories and Requests for Production of Documents (Apr. 14, 2011) ("Def. Supp.") at 3-5, D.E. #64-2. Plaintiff's delayed response to the supplemental document demands, dated May 31, 2011, was not received by defense counsel until Monday, June 6, the day before the contempt hearing had been scheduled to commence and after the instant motion for sanctions was filed and first argued. See Plaintiff's Response and Objections to Defendant's Supplemental Request for Production of Documents (May 31, 2011) ("Pl. Supp. Doc. Resp."), D.E. #66-2; 6/3/11 Minute Entry; Def. 6/2/11 Letter at 1; Argument Tr. at 15-17. Plaintiff's objections to the supplemental document demands, while somewhat different from those in his earlier responses, were hardly a model of

clarity; again, plaintiff did not state that he was withholding any recordings.[5] Plaintiff's response to defendant's supplemental interrogatories was dated June 3, 2011, and was faxed to defense counsel's office at about 7:30 p.m. that evening, the day after the instant motion for sanctions was filed, and after the Court conducted a telephone conference addressing that motion. See Plaintiff's Response and Objections to Defendant's Supplemental Interrogatories (June 3, 2011) ("Pl. Supp. Interrog. Resp."), D.E. #85-1; Transmittal Cover Sheet and Transmission Verification Report (June 3, 2011), D.E. #84-2; 6/3/11 Minute Entry.

### C.     The Disclosure of the 2011 Recordings

In the interim, the parties had begun conducting, and had substantially completed, depositions, including those of Messrs. Katz and Kleckner and several representatives of defendant.  Plaintiff did not disclose the existence of the recordings or otherwise seek to supplement plaintiff's response to defendant's first set of document demands with regard to the discussions captured on the April 2011 recording.  At his initial deposition on May 9, 2011, Mr. Katz, when questioned about the meeting on January 6, 2011, failed to mention the recording and claimed that he did not remember the details of that discussion.  Katz Dep. Tr. at 243 (testifying that Mr. Kleckner "came in the room and stopped by and said hello . . . at some point during the meeting. . . .  I don't recall what we discussed at that time."). However, Mr. Katz later admitted that he had reviewed portions of both the January and April recordings several weeks prior to his deposition.  Hearing Tr. at 85-86.

According to defense counsel, it was not until the deposition of Mr. Kleckner on May

---

[5]  See infra pp. 24-25.

31, 2011 that Mr. Tokayer's questioning led him to suspect that counsel was relying on undisclosed recordings. Argument Tr. at 15-16. In a telephone call on June 2, defendant's counsel confronted Mr. Tokayer, asking if he had such recordings; Mr. Tokayer initially responded, "I'll call you back," then admitted that he had such recordings but refused to turn them over prior to the contempt hearing, which was then scheduled to commence on June 7, 2011. Argument Tr. at 5, 16. Defendant filed its initial motion for sanctions on June 2. Def. 6/2/11 Letter at 1. At the Court's direction, plaintiff produced the recordings as well as previously prepared partial transcripts the following day, Friday, June 3. 6/3/11 Minute Entry.

In its written response to the first sanction motion, plaintiff argued that defendant was on notice that the 2011 recordings existed by virtue of plaintiff's general objection to discovery demands to the extent they sought "the disclosure of documents or information consisting of audio or videotapes prior to the time relevant depositions are complete." Pl. 6/6/11 Letter at 2 (quoting Pl. First Resp. at 2). At a hearing on these issues on June 7, plaintiff's counsel repeatedly stated that he had not reviewed the recordings or his notes and was thus substantially unprepared to testify as to what he knew about the recordings or when he learned of them. Argument Tr. at 4, 7, 9-10, 24, 27. Accordingly, he refused to be sworn. Id. at 24.[6]

The Court adjourned the then imminent contempt hearing in order to allow defendant's counsel the opportunity to review the recordings and reopen the relevant depositions. 6/3/11

_____

[6] According to subsequent deposition testimony of Mr. Katz, his attorney did not have advance knowledge that Mr. Katz planned to record either discussion with Aramark. Katz Dep. Tr. at 339.

Minute Entry. Mr. Katz was questioned about the 2011 recordings at his reopened deposition and at the adjourned contempt hearing. He acknowledged that he had reviewed the relevant discovery responses for their accuracy before they were served on defense counsel. Hearing Tr. at 75-79.

## II. THE PRE-2011 RECORDINGS

At Mr. Katz's reopened deposition, it also emerged that he had covertly recorded other meetings with Aramark prior to 2011. Katz Dep. Tr. at 346-47, 386-87. He testified that he likely recorded the pre-season operational meetings with Aramark in 2010 and perhaps 2009, along with "operational meetings at other venues." Id. at 387-89. According to Mr. Katz's deposition testimony, the pre-2011 recordings had been "taped over" and "deleted," id. at 347, 389-90, but he did not remember when or whether they had been erased before or after the instant lawsuit commenced in 2010. Id. at 389-91. After Mr. Katz was asked whether he had informed counsel about the existence of the 2010 recording, id. at 391, plaintiff's attorneys took Mr. Katz out of the room for a private conversation over defense counsel's strenuous objections. Id. at 392. Upon their return, Mr. Tokayer announced that "Mr. Katz would like to clarify his answer" to a prior "confusing question." Id. at 394; see id. at 395. Mr. Katz then recalled that the 2010 recording had been deleted prior to the commencement of the lawsuit in June 2010. Id. at 396-98. Mr. Katz explained his stated rationale for recording his meetings with Aramark: "They're just operational conversations, normal business practice of going to a meeting and trying to remember a 50-minute conversation . . . . I tape meetings just for operational – to go back and refer for operational purposes." Id. at 347.

Following the reopened deposition of Mr. Katz, defendant moved to sanction plaintiff for destroying the pre-2011 recordings. Def. 6/22/11 Letter. Plaintiff cross-moved for sanctions, characterizing defendant's motion as frivolous. Pl. 6/24/11 Letter. In a sworn statement accompanying the cross-motion, Mr. Katz claimed that he regularly recorded his operational discussions "for later review" of the details contained therein and would then tape over old conversations. Declaration of Jonathan Katz (June 24, 2011) ("6/24/11 Katz Decl.") ¶¶ 2-3, D.E. #74-9. Mr. Katz now recalled that he discarded the micro-recorder in question shortly after the 2010 operational meeting in order to upgrade to a newer device. Id. ¶ 6. He also asserted that the 2010 operational meeting contained no discussion of his relationship with QBC, no discussion of Friday-Saturday operation, and nothing else relevant to the instant litigation. Id. ¶¶ 4-5. He further claimed that, at the time of the 2010 operational meeting, he was not contemplating litigation against QBC. Id. ¶ 4. He did not address why he recorded the meetings surreptitiously, as opposed to seeking permission of the other party or parties to those conversations.

## DISCUSSION

The Court addresses in turn defendant's sanction motions and plaintiff's cross-motion. Having concluded that both defense motions are meritorious, the Court grants them to the exent described herein and denies plaintiff's cross-motion.

## I. FAILURE TO PRODUCE THE 2011 RECORDINGS

Several provisions of the Federal Rules of Civil Procedure authorize sanctions for untimely, incomplete, or misleading responses during discovery. In particular, Rule 26(g)

requires that initial disclosures, discovery responses, and objections be signed by an attorney of record; "[b]y signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the response is consistent with the rules of discovery and is "not interposed for any improper purpose." Fed. R. Civ. P. 26(g)(1). Certifications made "without substantial justification" in violation of this rule are subject to "an appropriate sanction" on the certifying attorney, the client, or both. Fed. R. Civ. P. 26(g)(3); see also Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991) (imposition of sanctions is mandatory for a violation of Rule 26(g)). Rule 26(g) charges all attorneys with a special, "affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes" of liberal discovery. See Advisory Committee Note, Fed. R. Civ. P. 26 (1983). As officers of the court, all attorneys conducting discovery owe the court a heightened duty of candor. See generally United States v. Gotti, 322 F.Supp.2d 230, 236-38 (E.D.N.Y. 2004).

## A.    Defendant's First Set of Interrogatories and Document Demands

Based on the record adduced, the Court concludes that Messrs. Tokayer and Katz both sought to conceal the 2011 recordings and impede their production; they did so through a series of discovery responses and other statements calculated to mislead opposing counsel. Mr. Tokayer acknowledges that he knew of the January 2011 recording when, later that month, he prepared plaintiff's responses to defendant's First Set of Interrogatories and Requests for Production of Documents. Argument Tr. at 4. Accordingly, plaintiff's otherwise boilerplate General Objections included a general objection "to the extent the Interrogatories

[and Requests for Production of Documents] seek the disclosure of documents or information consisting of audio or videotapes prior to the time relevant depositions are complete." Pl. First Resp. at 2, 10. But plaintiff's specific responses did not incorporate this general objection; several of them denied the existence of documents, recordings,[7] or conversations responsive to demands clearly or arguably encompassing the January 2011 recording.

For example, defendant's fifth interrogatory asked plaintiff to detail each "communication, meeting, [or] discussion . . . concerning KSI's request of Aramark Corporation, as to whether KSI can operate on Friday nights and Saturdays during the Jewish Sabbath . . . ." Def. First at 5. Plaintiff responded: "None, except see Exhibit B," an August 2010 letter from Mr. Tokayer to Aramark's Mr. Kleckner. Pl. First Resp. at 5; 3/29/11 Hearing Tr. at 57. Similarly, defendant sought, in Document Requests Six and Seven, "all documents concerning or evidencing KSI's allegation that QBC determines the locations and hours of operation of KSI," or "that QBC inhibited and barred KSI's hours and locations of operation." Def. First at 9. Plaintiff responded to both demands, without objection, "Plaintiff will produce non-privileged documents at a mutually convenient time and place, if any." Pl. First Resp. at 11. In Document Request Fourteen, defendant demanded "all documents concerning any communication between KSI and Aramark Corporation concerning KSI's request as to whether KSI can operate on Friday nights and Saturdays during the Jewish Sabbath." Def. First at 10. Plaintiff responded: "Plaintiff objects on the ground that the item assumes a fact that does not exist, i.e., a request of Aramark. Subject to the aforementioned

---

[7] Defendant's First Set of Interrogatories and Requests for Production of Documents defined "document" to include "sound and/or video recordings." Def. First at 3-4.

objections, and not by way of limitation, plaintiff will produce non-privileged documents at a mutually convenient time and place, if any." Pl. First Resp. at 12.[8]

Any attorney or party responding to these discovery demands in good faith would have disclosed the existence of the January 2011 recording and the general contents thereof, as the conversation between Mr. Katz and Messrs. Grey and Kleckner touched on all of these issues. See Jan. 2011 Recording Tr. at 4-5 (concerning Friday-Saturday operations, Mr. Katz asserts: "[I]t's not really an Aramark decision. It's a Mets decision, just like everything else is a Mets decision."); id. at 9 (responding to Mr. Kleckner's concerns, Mr. Katz inquires: "[I]s that because [the Mets are] telling you that we don't want it open Fridays and Saturdays or you guys are just against it?"); id. at 15 ("Everything that was negotiated was with the Mets including locations . . . ."). Instead, plaintiff opted for concealment, and likewise responded to several other document requests without producing or even disclosing the existence of the January 2011 recording or interposing a specific objection.[9]

---

[8]  In fact, that particular document demand was in no way limited to "a request of Aramark," but instead was broad enough to encompass communications with Aramark concerning plaintiff's request *of QBC* to operate on the Jewish Sabbath. Plaintiff's mischaracterization of defendant's document demand had no apparent purpose other than continued concealment of the January 2011 recording.

[9]  See, e.g., Def. First at 9 (Request Thirteen: "Any and all documents concerning who was responsible for determining the hours of operation and locations of KSI at Citi Field."); Pl. First Resp. at 12 (responding: "Plaintiff will produce non-privileged documents . . ."); see also Def. First at 9 (Request Ten: "all documents concerning or evidencing KSI's allegation that KSI is entitled to operate on Friday nights and Saturdays"); Pl. First Resp. at 12 (responding: "Plaintiff will produce non-privileged documents . . ."); Jan. 2011 Recording Tr. at 2:13-15 (discussing plaintiff's contention that the preliminary injunction entitled KSI to operate on Fridays and Saturdays).

Defendant also demanded, in Document Request Eleven, "[s]tatements concerning [the]
(continued...)

**B.      Excuses for Failing to Disclose the January 2011 Recording**

Plaintiff's counsel has provided several excuses for his failure to disclose the January 2011 recording in responding to defendant's First Set of Interrogatories and Requests for Production of Documents.  In opposing defendant's sanction motion, plaintiff noted that it had interposed general objections to disclosure of "audio or videotapes prior to the time relevant depositions are complete."[10]  Pl. 6/6/11 Letter at 2 (quoting Pl. First Resp. at 2, 10).  Plaintiff cites case law in which courts have authorized deferring production of surveillance recordings, intended for impeachment purposes, until after the completion of the relevant depositions.  Pl. 6/6/11 Letter at 2 (citing Perkins v. Memorial Sloan-Kettering Cancer Ctr., No. 02 Civ. 6493(AKH), 2003 WL 1831246 (S.D.N.Y. Apr. 4, 2003)).  Yet the Perkins case cited by plaintiff underscores "the general principle that 'any deferral of disclosure requires action by the Court; it cannot be accomplished unilaterally.'"  Travel Sentry, Inc. v. Tropp, 669 F.Supp.2d 279, 285 (E.D.N.Y. 2009) (quoting Willard v. Constellation Fishing Corp., 136 F.R.D. 28, 31 (D.Mass. 1991)).  In Perkins, the court, seeking to reduce the unfair advantage over the party lacking access to the tapes, required that the tapes be sequestered in a lockbox

---

[9](...continued)
action which were made or obtained by you . . . ," Def. First at 9, and plaintiff artfully responded by agreeing to provide statements "obtained *from the party* to the litigation."  Pl. First Resp. at 12 (emphasis added); see, e.g., Jan. Recording Tr. at 2, 3, 4, 12 (discussing the lawsuit).

[10]  Mr. Tokayer initially claimed that defendant's counsel had prior actual knowledge of the 2011 recordings, although, as of the June 7, 2011 hearing, Mr. Tokayer appeared to have abandoned that argument.  The Court has no reason to doubt defense counsel's credible account of how his suspicions were first aroused during the deposition of Mr. Kleckner, shortly prior to filing his first sanction motion.

until the close of the depositions.   2003 WL 1831246, at *2.  Other cases granting protective

orders authorizing deferred production have likewise made clear that "a party seeking to delay

discovery of a witness statement until after a deposition may seek a protective order from the

court, but that party may not independently withhold production without court authorization."

Costa v. AFGO Mech. Servs., Inc., 237 F.R.D. 21, 24 (E.D.N.Y. 2006).  A party that

desires to delay or avoid discovery through a protective order must "establish good cause . . .

in part because such an order deviates from the general principle of federal discovery 'that

parties be forthcoming with relevant information in their possession . . . .  Open discovery is

the norm. Gamesmanship with information is discouraged and surprises are abhorred.'"  Id. at

26 (quoting Rofail v. United States, 227 F.R.D. 53, 58 (E.D.N.Y. 2005)).

        In the face of these precepts, plaintiff's counsel now argues that his actions were

intended only to "put the burden of discovery where it belongs," on the party seeking

information.  Argument Tr. at 23.  But plaintiff did not overtly refuse to produce the January

2011 recording in a manner that might have alerted defendant to move to compel production;

rather, plaintiff's responses actively misled defendant as to the existence of that recording.  For

example, when asked to provide a complete set of documents "concerning or evidencing KSI's

allegation that QBC determines the locations and hours of operation of KSI," plaintiff agreed

to "produce non-privileged documents at a mutually convenient time and place" and did not

reiterate the general objection or otherwise indicate that any documents or other materials were

being withheld. Pl. First Resp. at 11.[11] As made clear by subsequent events, plaintiff did not have in mind a "mutually convenient time" for disclosure, but instead intended to conceal the materials until a unilaterally selected date after deposition discovery had ended. Plaintiff's response, in addition to the other responses discussed above, was objectively false and had the obvious and intended effect of misleading defendant's counsel. Argument Tr. at 13-14. While plaintiff's general objection might otherwise have alerted opposing counsel as to the existence of recorded meetings, plaintiff's specific responses, which generally suggested complete production, provided false reassurance and effectively hid the existence of the January recording and thus the basis for a timely motion to compel.[12]

Plaintiff's counsel has articulated another, equally unpersuasive reason for omitting mention of the January 2011 recording in relation to several of the interrogatories or document demands, viz., that the demands sought information regarding "KSI's *request of Aramark*" as to Friday and Saturday operations. Def. First at 5. Relying on plaintiff's theory that

_____

[11] Contrast this with plaintiff's treatment of privileged materials: in addition to his boilerplate general objection to disclosing privileged matter, see Pl. First Resp. at 1, plaintiff, in responding to certain demands, specifically interposed an objection on privilege grounds. See, e.g., id. at 12 ("Plaintiff objects to the Request as premature and to the extent the Request seeks information which is protected from disclosure by the work product doctrine or other applicable privileges. Subject to the aforementioned objections, and not by way of limitation, plaintiff will produce non-privileged documents at a mutually convenient time and place, if any."). Similarly, plaintiff's belatedly served response to defendant's supplemental document demands, which response was served after the depositions of Messrs. Katz and Kleckner had taken place, included specific objections, albeit obscurely worded ones. See infra pp. 24-25.

[12] As previously discussed, see supra p. 6, defendant did in fact complain, back in March 2011, that plaintiff had provided "evasive responses . . . ." Def. 3/17/11 Letter at 6. The Court addressed this issue at a lengthy hearing on March 29, 2011, directed both sides to supplement their discovery responses, and assumed that the parties' discovery disputes had been laid to rest. See Minute Entry (Mar. 29, 2011), D.E. #40.

defendant and not Aramark made the ultimate decision as to whether to permit Friday-Saturday operations, plaintiff's counsel denied that plaintiff made any such request, apart from an August 2010 letter from plaintiff's counsel to Aramark. Pl. 6/6/11 Letter at 3. Mr. Tokayer's hypertechnical distinction cannot excuse plaintiff's failure to mention the January 2011 recording in response to defendant's other relevant discovery demands, as discussed above. See, e.g., *supra* pp. 14-15 & notes 8-9. For example, plaintiff proffers no explanation as to how the January 2011 conversation was not a "document" (defined to include sound recordings, Def. First at 3-4) "concerning who was responsible for determining the hours of operation and locations of KSI at Citi Field." Def. First at 9.

In any event, the claimed distinction – that plaintiff made no "request" of Aramark, apart from an August 2010 letter – was sufficiently artful to draw skeptical inquiry from defense counsel and the Court alike, during the discovery hearing in March 2011. See 3/29/11 Hearing Tr. at 58. When the Court asked Mr. Tokayer whether the relevant responses were complete, Mr. Tokayer replied that his August 2010 letter was the only communication "[c]oncerning KSI's request of Aramark Corporation." Id. at 57. The Court then posed a follow-up question: "[A]re we slicing this very thin? Is it because it says [']request of Aramark as to whether it could operate[']? Were there discussions about whether KSI could operate?" Id. Mr. Tokayer responded: "I don't know that there have been discussions since August 27th." Id. at 57-58.

Months later, after defendant moved for sanctions, Mr. Tokayer unconvincingly sought to attribute his in-court false statement to a failure of recollection. Argument Tr. at 9-11. Whether his March 29, 2011 representation to the Court was an intentional falsehood or an

-19-

inadvertent omission, Mr. Tokayer prepared and signed off on unjustifiably misleading discovery responses in January 2011, just one week after the recorded meeting, when he admittedly knew of the January 2011 recording. While plaintiff could well have sought permission to defer disclosure of the January 2011 recording until after the relevant depositions, plaintiff and Mr. Tokayer cannot justify their decision to "independently withhold production without court authorization." Costa, 237 F.R.D. at 24.

This principle applies with particular force where, in contrast to the cases on which plaintiff relies, the January 2011 recording memorialized discussions between plaintiff and third parties, not with defendant. Had plaintiff moved for a protective order, judicial approval for withholding the recording from defendant's outside counsel was not a likely result, since plaintiff's concerns could be adequately addressed through lesser restrictions, such as an order prohibiting disclosure to Aramark, and perhaps certain QBC personnel.

In short, none of the cases cited by plaintiff excuses Mr. Tokayer's failure to mention the very existence of the January 2011 recording in plaintiff's first set of discovery responses. Given Mr. Tokayer's review of the 2011 recordings prior to depositions, Argument Tr. at 27, his failure to disclose that a responsive recording existed, or to promptly supplement plaintiff's earlier responses as required by Rule 26(e)(1)(A),[13] cannot be attributed to neglect. Rather, his omission reflects the sort of "gamesmanship" and trial-by-ambush condemned by the discovery rules. Rofail, 227 F.R.D. at 58. The Court finds that plaintiff's responses were intended to mislead defendant's counsel and conceal the existence of the January recording until, at the

---

[13]  See *infra* p. 23.

very least, the completion of deposition discovery.[14]

Pursuant to Rule 26(g), Mr. Tokayer's signature on plaintiff's discovery responses "certifi[ed] that to the best of [his] knowledge, information, and belief formed after a reasonable inquiry," the responses were, *inter alia*, consistent with the discovery rules, "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law," and "not interposed for any improper purpose, such as to . . . cause unnecessary delay . . . ." Fed. R. Civ. P. 26(g)(1). The certification in this case was improper and sanctionable. See Fed. R. Civ. P. 26(g)(3). Plaintiff's discovery responses were designed to (and did) "cause unnecessary delay" in the discovery process through unauthorized concealment of the January 2011 recording. Mr. Tokayer's attempt to unilaterally delay its production, without court authorization or even notice to opposing counsel, was not warranted by existing law or by any non-frivolous argument for changing existing law; his misleading responses to defendant's discovery demands contravened the bedrock principle underlying the discovery rules, to wit, "that parties be forthcoming with relevant information in their possession." Rofail, 227 F.R.D. at 58.

Under Rule 26(g), the Court may impose attorney's fees and/or other sanctions for an improper certification unless the violation was "substantially justified." Fed. R. Civ. P. 26(g)(3). "[T]he test for avoiding the imposition of attorney's fees [and other sanctions] for

---

[14] Although not relied upon by plaintiff as justification for delaying disclosure of the recordings, the record suggests an additional motive on plaintiff's part: the concern that revelation of Mr. Katz's covert taping would undermine plaintiff's "impeccable eight-year relationship" with Aramark. See generally 6/24/11 Katz Decl. ¶ 8. Such a rationale would not excuse plaintiff's unilateral decision to withhold discoverable evidence. See Travel Sentry, Inc. v. Tropp, No. 06-CV-6415 (ENV), 2008 WL 2097613, at *3 (E.D.N.Y. May 15, 2008).

resisting discovery in district court is whether the resistance was 'substantially justified' . . . .

[T]hat has never been described as meaning 'justified to a high degree,' but rather has been

said to be satisfied if there is a 'genuine dispute' . . . or 'if reasonable people could differ'"

regarding the appropriateness of the conduct at issue. <u>Pierce v. Underwood</u>, 487 U.S. 552,

565 (1988) (citations omitted). Here, plaintiff could and should have moved for a protective

order to delay release of the recordings. While reasonable persons might disagree about the

proper resolution of such a motion,[15] "no reasonable person, especially an attorney, could

dispute that the initial step in resolving any such conflict would be to seek the guidance of the

Court rather than pick a route of its own unilaterally" and without notice to opposing counsel.

<u>Travel Sentry</u>, 669 F.Supp.2d at 286. Plaintiff's discovery responses, reflecting Mr.

Tokayer's attempt to conceal the January 2011 recording, violated Rule 26(g) without

substantial justification. Accordingly, the Court will impose an appropriate sanction, as

discussed below.

### C. The April 2011 Recording

Plaintiff likewise failed to timely disclose and produce a copy of the April 2011

recording. That conversation focused almost exclusively on plaintiff's intent to operate on

Fridays and Saturdays; it was thus subject to production under several provisions of

defendant's first set of document demands. <u>See</u>, <u>e.g.</u>, Def. First at 9 ("all documents

concerning or evidencing KSI's allegation that KSI is entitled to operate on Friday nights and

Saturdays"); Apr. 2011 Recording Tr. at 14 ("[T]he judge has already told us we can open on

---

[15] <u>But</u> <u>see</u> *supra* p. 20 (expressing doubts that plaintiff could have justified blocking defense counsel's access to the recordings).

Friday and Saturday."). Under Rule 26(e) of the Federal Rules of Civil Procedure, plaintiff was required to supplement its response to defendant's earlier document request "in a timely manner" upon "learn[ing] that in some material respect the . . . response [had become] incomplete . . . ." Fed. R. Civ. P. 26(e). Plaintiff has offered no rationale, apart from the arguments discussed and rejected above, for failing to do so.[16] "A party's failure to supplement an earlier discovery response is sanctionable under Rule 37(c)." Robbins & Myers, Inc. v. J.M. Huber Corp., 274 F.R.D. 63, 74 (W.D.N.Y. 2011) (quoting James Wm. Moore et al., 6 Moore's Federal Practice—Civil § 26.132 (3d ed. 1997)). For the same reasons detailed earlier, plaintiff's failure to supplement was not substantially justified, nor was it harmless: it gave plaintiff's counsel an unfair advantage during the depositions of Aramark employees, and necessitated the reopening of the depositions of Messrs. Katz and Kleckner, with the additional costs attendant thereto. Accordingly, plaintiff's violation of Rule 26(e) is sanctionable under Rule 37(c).

Further, plaintiff failed to serve a timely response to defendant's supplemental interrogatories and document demands, dated April 14, 2011. See Def. Supp. at 5. Defendant sought, *inter alia*, "all documents that refer to, evidence, relate to, concern, represent or constitute any communication between [plaintiff] and Aramark regarding KSI's operations on Friday evenings and Saturdays at Citi Field since this lawsuit was commenced." Id. at 4. This document request clearly calls for both the January 2011 recording and the then-extant April

---

[16] Moreover, even plaintiff was constrained to concede that Mr. Katz's April 6 telephone conversation with Mr. Kleckner was a "request" of Aramark to operate on Fridays and Saturdays. See Hearing Tr. at 96, 99.

2011 recording.  See Apr. 2011 Recording Tr. at 2-3 (discussing Friday operations at Citi

Field).  Depending on the method of service of the supplemental demands, plaintiff's responses

were due no later than May 17, 2011, see Fed. R. Civ. P. 33(b)(2), 34(b)(2)(A), 6(d), before

most of the depositions had been conducted.  See Def. 6/2/11 Letter at 3.  By the time

defendant's counsel moved for sanctions on June 2, 2011, he still had not received any of

plaintiff's responses.  See id. at 3.

　　　Plaintiff's response to the supplemental document demands was reportedly mailed on

May 31, 2011, the date of the deposition of Scott Kleckner (a party to the April 2011

recording), see Affirmation of Service (May 31, 2011), D.E. #84-1, but was not received by

defendant's counsel until Monday, June 6.  Argument Tr. at 16-17.  Plaintiff interposed a

"General Objection" similar to the one asserted in responding to defendant's initial document

demands; however, now that deposition discovery was largely completed, plaintiff substituted

the word "testimony" for "depositions":  "Plaintiff objects to the extent the Request seeks the

disclosure of audio or video recordings prior to the time relevant *testimony* is complete."  Pl.

Supp. Doc. Resp. at 2 (emphasis added).  With the contempt hearing now only days away,

plaintiff this time crafted a specific, rather convoluted objection to defendant's demand for

documents evidencing "communications between [plaintiff] and Aramark regarding KSI's

operations on Friday evenings and Saturdays at Citi Field . . . ."  Def. Supp. at 4.

Specifically, "Plaintiff object[ed] to the extent the Request seeks the disclosure prior to the

time relevant testimony is complete of document other than written documents[17] or emails

---

[17]  Despite plaintiff's seeming agreement to produce "written documents," it is doubtful that,

(continued...)

and, subject to the aforementioned objections, will produce non-privileged documents, if any, at a mutually convenient time and place to the extent not previously produced." Pl. Supp. Doc. Resp. at 2.

Plaintiff delayed even longer in serving responses to the supplemental interrogatories: he faxed them to defense counsel's office at about 7:30 p.m. on Friday, June 3, one day after defendant moved for sanctions and hours after the conclusion of a telephone conference with the Court concerning that motion. See 6/3/11 Minute Entry; Transmittal Cover Sheet and Transmission Verification Report (June 3, 2011), D.E. #84-2. It thus appears that plaintiff's response to the supplemental interrogatories was hastily drafted after defendant filed the sanction motion.

In short, in addition to failing to supplement its responses to defendant's initial set of discovery demands, plaintiff served no timely response to defendant's supplemental interrogatories or document demands. Rule 37(d)(1)(A)(ii) of the Federal Rules of Civil Procedure authorizes sanctions, on motion, where "a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response." Fed. R. Civ. P. 37(d)(1)(A)(ii). Where, as here, a response is belatedly served following the filing of a motion for sanctions, the Court retains its authority under Rule 37(d) to sanction the delinquent party. See C. Wright, A. Miller & E. Cooper, 8A Federal Practice and Procedure: Civil § 2291 (3d ed. 2002) ("Although the court

---

[17](...continued)
but for the Court's Order of June 3, 2011, 6/3/11 Minute Entry, plaintiff would have disclosed its partial transcripts of the 2011 recordings in advance of the contempt hearing.

may consider the belated response in determining what sanction, if any, to impose, [Rule 37(d)] does not become inapplicable because a response is made in the interim between the filing of the motion for sanctions and the hearing on the motion."). Particularly in light of plaintiff's counsel's lack of candor regarding the 2011 recordings, this Court concludes that plaintiff's failure to serve a timely response is sanctionable under Rule 37(d)(1)(A)(ii), at least as to defendant's supplemental interrogatories.

### D. The Remedy for Failure to Produce the 2011 Recordings

Having concluded that the failure to produce the 2011 recordings, coupled with plaintiff's counsel's misleading discovery responses, is sanctionable under Rules 26(g), 37(c) and 37(d), the Court now turns to the question of what sanctions are appropriate. Defendant seeks preclusion of the two recordings as well as other sanctions. Plaintiff has acknowledged that it intends to use the 2011 recordings "solely for the purpose of impeaching a non-party witness." Pl. 6/6/11 Letter at 2 n.1. The Court previously opined that further preclusion was "not necessary in the instant case; alternative sanctions will be sufficient to address the misconduct in question and to ensure that defendant is not prejudiced by the delay in obtaining discoverable information." Order (June 8, 2011) at 2, D.E. #70; see id. at 2 n.1. The Court now explains the rationale for that ruling.

Under Rule 26(g), following an improper certification, the Court "must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g). Under Rule 37(c), a party that fails to supplement its discovery responses as required under Rule 26(e) "is not allowed to use that

information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to *or instead of* this sanction, the court, on motion and after giving an opportunity to be heard[,] . . . may order payment of the reasonable expenses, including attorney's fees, caused by the failure," or may impose "other appropriate sanctions," up to and including "striking the pleadings in whole or part" or "dismissing the action in whole or part." Fed. R. Civ. P. 37(c)(1), 37(b)(2)(A) (emphasis added).  Finally, under Rule 37(d), a party that "fails to serve its answers, objections, or written response" to interrogatories or a document request must be ordered to reimburse the aggrieved party for "reasonable expenses, including attorney's fees, caused by the failure," unless the violation was substantially justified or harmless.  Fed. R. Civ. P. 37(d)(3).  The Court may also preclude the introduction of evidence, strike the pleadings in whole or part, or dismiss the action in whole or part for violations of Rule 37(d).  <u>See</u> Fed. R. Civ. P. 37(d)(3), 37(b)(2)(A).

Generally speaking, in deciding whether to impose sanctions under Rule 37, the Court considers the following factors: "(1) the willfulness of the noncompliant party or the reasons for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the noncompliant party had been warned of the consequences of his noncompliance."  <u>Nieves v. City of New York</u>, 208 F.R.D. 531, 535 (S.D.N.Y. 2002) (citing <u>Bambu Sales, Inc. v. Ozak Trading Inc.</u>, 58 F.3d 849 (2d Cir. 1995)).  Courts in this Circuit typically consider preclusion a "harsh" remedy to be "imposed only in rare situations." <u>Update Art, Inc. v. Modiin Publ'g, Ltd.</u>, 843 F.2d 67, 71 (2d Cir. 1988).  Indeed, while Rule 37(c) identifies preclusion as the default remedy, courts treat it as discretionary and disfavored.

"Notwithstanding the seemingly mandatory language of [Rule 37(c)], even where the failure to disclose is neither 'justifi[ed]' nor 'harmless,' the Second Circuit has viewed the imposition of sanctions as discretionary and district courts have generally not ordered preclusion." Mahoney v. Keyspan Corp., No. CV 04–554, 2007 WL 1651853, at *1 (E.D.N.Y. June 6, 2007) (citing, inter alia, Design Strategy, Inc. v. Davis, 469 F.3d 284, 297–98 (2d Cir. 2006)).

The Court concludes that, given the efficacy of lesser sanctions, and the fact that the period of noncompliance ended within the discovery period, a sanction that would preclude plaintiff from using the 2011 recordings for impeachment purposes is not necessary in this instance. While plaintiff and plaintiff's counsel acted in a wholly inappropriate manner in concealing the existence of those recordings and in preparing misleading discovery responses, the Court granted a continuance and allowed defendant to reopen the relevant depositions to ensure that plaintiff would not enjoy an unfair advantage in preparing for the contempt hearing or for trial. This is not a case in which preclusion is the only effective remedy. See, e.g., Travel Sentry, 669 F.Supp.2d at 286 (magistrate judge's Rule 37(d) order, which reopened discovery and awarded attorney's fees but denied preclusion, "meted out a penalty . . . that fit the foul" and was thus affirmed by the district court). Defendant has been afforded the opportunity to cure the prejudice caused by the concealment of the recordings.

Nevertheless, the Court is mindful of the need to deter future discovery violations and to ensure that defendant is made whole for any loss resulting from plaintiff's discovery abuses. As a result of the delayed production of the tapes, the defense was constrained to reopen several depositions, likely at considerable expense. Accordingly, the Court will require plaintiff and plaintiffs' counsel to reimburse defendant for "the reasonable expenses, including

attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g). An award of attorney's fees is justified for violations of Rule 26(g), and it is "the mildest of the sanctions authorized by Rule 37." Miltope Corp. v. Hartford Cas. Ins. Co., 163 F.R.D. 191, 195 (S.D.N.Y. 1995) (internal quotations and citations omitted). In this case, the reimbursement should include the costs associated with litigating the instant sanction motion as well as the costs incurred in reopening depositions and preparing transcripts on an expedited basis in anticipation of the imminent contempt hearing.

Plaintiff and plaintiff's counsel will bear joint responsibility for defendant's reasonable expenses. Rule 26(g), which permits sanctions for an attorney's improper discovery responses, allows the Court to penalize "the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3); see also Fed. R. Civ. P. 37(d)(3) (authorizing courts to issue fee awards against "the party failing to" respond to discovery demands, "the attorney advising that party, or both"). Mr. Tokayer and plaintiff's president Jonathan Katz both signed off on the misleading responses to defendant's initial discovery demands, and Mr. Katz acknowledged that he reviewed those responses. Hearing Tr. at 76. In addition, on May 9, 2011, only a month after surreptitiously recording his April 6, 2011 conversation, and shortly after reviewing portions of both 2011 recordings, see Hearing Tr. at 88, Mr. Katz gave evasive deposition testimony concerning those conversations, plainly designed to perpetuate the concealment of that evidence. See, e.g., Katz Dep. Tr. at 244-45 (testifying that he did not remember much of the April 6 conversation); id.at 243 (claiming that he did not remember whether or not he raised the question of KSI's Friday-Saturday operations during the January 6, 2011 recorded meeting). Because Mr. Katz and plaintiff's counsel both participated in

misleading the defense as to the existence of the 2011 recordings, both will be jointly and severally liable for the reasonable expenses caused by the delayed disclosure of that evidence.

## II.    SPOLIATION OF THE PRE-2011 RECORDINGS

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Byrnie v. Town of Cromwell, 243 F.3d 93, 107 (2d Cir. 2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)). "In order to establish that sanctions for spoliation are warranted, the moving party must establish: (1) that the non-movant had an obligation to preserve the evidence; (2) that the non-movant acted culpably in destroying the evidence[;] and (3) that the evidence would have been relevant to the moving party's case, in that a reasonable fact finder could conclude that the evidence would have been favorable to the moving party." Mastercard Int'l, Inc. v. Moulton, No. 03 Civ. 3613, 2004 WL 1393992, at *3 (S.D.N.Y. June 22, 2004) (citing Residential Funding Corp. v. DeGeorge Funding Corp., 306 F.3d 99, 107 (2d Cir. 2002)).

A party is obligated to preserve evidence where that party "has notice that the evidence is relevant to litigation," or where "the party should have known that the evidence may be relevant to future litigation." Byrnie, 243 F.3d at 107-08 (quoting Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998)). The requirement of a culpable state of mind is satisfied where the non-moving party acted intentionally, knowingly, or, in appropriate circumstances, negligently:

> [The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the

destruction of evidence whether that act was done willfully or negligently. The
adverse inference provides the necessary mechanism for restoring the
evidentiary balance. The inference is adverse to the destroyer not because of any
finding of moral culpability, but because the risk that the evidence would have
been detrimental rather than favorable should fall on the party responsible for its
loss.

Residential Funding Corp., 306 F.3d at 108 (quoting Turner v. Hudson Transit Lines, Inc.,

142 F.R.D. 68, 75 (S.D.N.Y. 1991)) (alterations in original).

A.    Relevance of the Pre-2011 Recordings

Plaintiff's counsel argues that the pre-2011 recordings "had no bearing on this case."

Pl. 6/24/11 Letter at 2.  In his reopened deposition, Mr. Katz articulated the following

rationale for his surreptitious recording of meetings with Aramark: "They're just operational

conversations, normal business practice of going to a meeting and trying to remember a 50-

minute conversation . . . .  I tape meetings just for operational – to go back and refer for

operational purposes."  Katz Dep. Tr. at 347; but see id. at 413-14 (acknowledging, with

regard to the 2011 recordings, that he wanted to obtain statements that he could discuss with

his attorneys).  At the outset, Mr. Katz denied remembering the timing of any pre-2011

recorded conversations, stating that "[t]hey're over the course of eight years," id. at 347; he

subsequently clarified that he may have recorded one or two pre-season operational meetings

with Aramark, before the 2009 and 2010 seasons.  Id. at 389; Hearing Tr. at 62-63.  In

contrast, his declaration in connection with the cross-motions for sanctions appears to imply

that he recorded such meetings routinely: "Since the 2006 season, KSI has been working with

[Aramark] at Shea Stadium and then Citifield.  It was Aramark's practice to conduct annual

operational meetings with sub-contractors . . . .  Because of the duration of the meetings and

the high degree of detail involved, it was my practice to record these meetings for later

review."  6/24/11 Katz Decl. ¶ 2.

For the reasons that follow, and in view of the discussions memorialized in the 2011 recordings, Mr. Katz's explanation is not convincing.  The two recordings strongly suggest that Mr. Katz used secret taping as an ambush tactic and not as an *aide-mémoire*:  Mr. Katz spent considerable time during the January 6, 2011 and April 6, 2011 discussions attempting to bait Messrs. Kleckner and Grey into making statements contrary to defendant's litigation position.  See, e.g., Jan. 2011 Recording Tr. at 12.  Yet in his initial deposition testimony, before plaintiff had disclosed the 2011 recordings, Mr. Katz downplayed the significance of the January 6, 2011 meeting and gave vague, contradictory and misleading answers as to whether Friday-Saturday operations were even discussed.  Katz Dep. Tr. at 219-22, 231.[18]  Echoing Mr. Katz's discredited account of the January 2011 meeting, plaintiff now would have the Court believe that the pre-2011 tapes were part of Mr. Katz's operational routine, unrelated to the instant dispute.  Significantly, Mr. Katz has not explained why he resorted to covert taping to memorialize meetings with valued business associates, see 6/24/11 Katz Decl. ¶ 8, rather than relying on other, more conventional means, such as recording the discussions openly and with the permission of all present.  He presumably realized that the latter approach would likely produce a more intelligible recording than utilizing a device secreted in a pocket or otherwise on his person.  See generally Hearing Tr. at 222 (witness notes that "because of the

_____

[18]  When asked, "Did you discuss operating Friday night and Saturday at [the January 2011] meeting?," Mr. Katz replied, "I don't recall."  Katz Dep. Tr. at 221.  When asked about Mr. Kleckner's participation in that meeting, Mr. Katz stated that Mr. Kleckner "came in the room and stopped by and said hello . . . at some point during the meeting. . . . I don't recall what we discussed at that time."  Id. at 243; see also id. at 233 ("[Mr. Kleckner] came into the meeting at some point with Rich Grey."  "But you're not sure if you discussed" Friday-Saturday operation "at that meeting, correct?"  "I don't recall.").

-32-

deceptive way in which Jonathan was recording [the conversation], I could hear his voice very clearly [on the recording], but I could barely hear myself.").

In addition, the timing of Mr. Katz's taping activity is particularly telling: the Complaint alleges that, in advance of the 2009 season, plaintiff went to considerable expense, including refitting its carts and obtaining rabbinical certification, in order to allow for Friday-Saturday sales. Complaint ¶ 10. The evidence shows that as early as December 2008, Mr. Katz was communicating with representatives of QBC and Aramark in an unsuccessful quest to obtain permission for plaintiff to operate on Fridays and Saturdays.[19] Mr. Katz's use of surreptitious recordings during the pendency of this litigation, his evasiveness regarding the 2011 recordings and his conversations with Aramark, and his acknowledgment that he recorded at least one of the pre-season meetings during 2009 and 2010, all tend to suggest that he was, in fact, recording those meetings to gather evidence to use in his disputes with defendant or Aramark. To be sure, defendant bears the burden to show that spoliation sanctions are warranted; nevertheless, the Court will not assess plaintiff's explanations in a vacuum or ignore the fact that Mr. Katz participated in the discovery process in a manner notable for its lack of candor.

The standard for relevance in the spoliation context is whether "a reasonable fact finder could conclude that the evidence would have been favorable to the moving party." Mastercard Int'l, 2004 WL 1393992, at *3. A reasonable jury could conclude that notwithstanding Mr.

---

[19] See Hearing Tr. at 43-46; Email from Adam Barrick to Jonathan Katz (Jan. 28, 2009), Plaintiff's Exhibit ("PX") 8 at contempt hearing; Email from Adam Barrick to Jonathan Katz (Mar. 2, 2009), PX 10; Email from David Kestenbaum to Jonathan Katz (Feb. 22, 2010), PX 12; see also Complaint ¶ 12.

Katz's memory-enhancement rationale, he recorded the meetings in question to obtain statements valuable to plaintiff in its developing dispute with QBC, and that he deliberately destroyed the recordings because, as it turned out, they were not helpful to plaintiff; for example, one possible and reasonable inference is that the recordings contained statements by Aramark representatives that Aramark independently objected to plaintiff's aim to operate on Fridays and Saturdays, contrary to plaintiff's litigation position.[20]

The Court is mindful that it cannot "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." Kronisch, 150 F.3d at 128; accord Byrnie, 243 F.3d at 110. On balance, and in light of plaintiff's questionable explanation for his surreptitious recording activity, the Court concludes that a reasonable fact finder could infer that the pre-2011 recordings would have been favorable to defendant.

B.      Obligation to Preserve the Pre-2011 Recordings

As to the first element for a spoliation sanction, i.e., whether plaintiff had an obligation to preserve the pre-2011 recordings, the Court is wholly unimpressed by plaintiff's argument that at the time of their destruction, Mr. Katz had no reason to foresee litigation. Hearing Tr. at 331-32. As previously noted, see supra p. 33, the dispute over Friday-Saturday operations

---

[20]   That Mr. Katz may also have recorded meetings concerning other venues does not undercut this analysis, Katz Dep. Tr. at 388, since Mr. Katz may well have been seeking to elicit statements from Aramark concerning plaintiff's Friday-Saturday operations at those other venues. See Hearing Tr. at 285 (arguing that plaintiff's authorization to operate on the Jewish Sabbath at Lincoln Financial Field in Philadelphia and M&T Bank Stadium in Baltimore proves that the decision to prevent plaintiff from doing so at Citi Field was made by defendant, not by Aramark).

had been percolating since 2008. Indeed, as early as April 14, 2009, Mr. Katz threatened to

"consult legal counsel as to whether to bring legal action" against defendant. Letter from

Jonathan Katz (Apr. 14, 2009), D.E. #72-6; see also Hearing Tr. at 181 (by the spring of

2009, Aramark representative Tom Funk knew of Mr. Katz's desire to operate on Fridays and

Saturdays, and knew that his "bosses" opposed such a move). Although Mr. Katz claimed to

"have no idea" when he deleted the conversations, see Katz Dep. Tr. at 389-90, he was able to

recall, after apparent mid-deposition coaching by his attorneys, that the recordings were

destroyed before he filed this lawsuit. The Court is unpersuaded by this belated recollection,

given that Mr. Katz's testimony has been otherwise fraught with memory problems. See, e.g.,

id. at 243 (denying recollection as to whether Friday-Saturday operations were discussed at the

January 6, 2011 meeting with Aramark).[21] Whether the recordings were destroyed before the

litigation commenced or after, the Court concludes that it is likely that, by the time the

recordings were destroyed in 2009 or 2010, Mr. Katz should reasonably have foreseen that his

developing dispute over Friday-Saturday operations might result in litigation, and plaintiff was

under an obligation to preserve the pre-2011 recordings.

### C.    Culpable State of Mind

As previously outlined, it is reasonable to infer that Mr. Katz made the pre-2011

recordings with an eye towards gathering evidence relating to his disputes with defendant, in

---

[21] Plaintiff unconvincingly argues that there was no reason to foresee litigation against
*Aramark*, opposed to QBC. Hearing Tr. at 333. However, the contents of the 2011
recordings plainly show that plaintiff's dispute with defendant thoroughly implicated the details
of his operational relationship with Aramark.

which case his destruction of the recordings would reflect, at a minimum, negligent disregard for the possibility that they might be useful in litigation. Even if the Court were to take at face value Mr. Katz's dubious claim that he prepared the recordings only for operational purposes, he was at least aware that those disputes might develop into litigation. Either possibility supports a finding of negligence. On balance, the Court is satisfied that defendant has established that the recordings were destroyed with a sufficiently culpable state of mind to warrant remedial action by the Court.

### D.    Remedies

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, . . . and is assessed on a case-by-case basis." Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 246 (2d Cir. 2001). Under the circumstances of this case, it is the view of this Court that the jury is entitled to hear evidence as to the production and destruction of the pre-2011 recordings and to draw appropriate conclusions about their relevance. See Residential Funding, 306 F.3d at 109 n.4 ("Although the issue of whether evidence was destroyed with a 'culpable state of mind' is one for a court to decide in determining whether the imposition of sanctions is warranted, whether the materials were in fact unfavorable to the culpable party is an issue of fact to be determined by the jury.") (citing Byrnie, 243 F.3d at 109-10). The Court declines to order or recommend more drastic remedies, such as dismissal of the case, given that the pre-2011 recordings are not central to the case.

Plaintiff's cross-motion for sanctions is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion to sanction plaintiff and plaintiff's counsel for failure to timely produce the 2011 recordings is granted in part and denied in part. The Court declines to preclude plaintiff's use of those recordings for impeachment purposes, but directs plaintiff and plaintiff's counsel to reimburse defendant's reasonable attorney's fees and expenses incurred in litigating that sanction motion, in reopening depositions, and in preparing transcripts of the recordings and reopened depositions on an expedited basis. Counsel for both parties are directed to confer on the calculation of attorney's fees and expenses to which defendant is entitled pursuant to this ruling, and to notify the Court, via ECF, whether they have reached agreement on this issue; the deadline for such notification is August 29, 2011, unless in the interim an objection to any of the rulings contained herein has been filed with Judge Weinstein, in which event the deadline for such notification will be five business days after Judge Weinstein rules on the objection.

Defendant's motion to sanction plaintiff for the destruction of the pre-2011 recordings is granted in part and denied in part, insofar as the Court concludes that an appropriate remedy is an instruction to the jurors that they may find that the destroyed recordings were adverse to plaintiff's claims. Plaintiff's cross-motion for sanctions is denied.

Any objection to the rulings contained herein must be filed with Judge Weinstein by August 22, 2011, or will be deemed waived.

      **SO ORDERED.**

**Dated:**     **Brooklyn, New York**
             **August 5, 2011**

                                  **ROANNE L. MANN**
                                  **UNITED STATES MAGISTRATE JUDGE**