UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KOSHER SPORTS, INC.,

                           **Plaintiff,**

            **-against-**

QUEENS BALLPARK COMPANY, LLC,

                         **Defendant.**
----------------------------------------------------------------x

                                                 **REPORT AND
RECOMMENDATION**

                                                 **10-CV-2618 (JBW)**

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      On April 15, 2011, plaintiff Kosher Sports, Inc. ("plaintiff," "Kosher Sports" or

"KSI") moved to hold defendant Queens Ballpark Company, LLC ("defendant" or "QBC")

and non-party Aramark Sports Entertainment Services, LLC ("Aramark") in contempt for

purported violations of a preliminary injunction entered by the Honorable Jack B. Weinstein on

August 25, 2010.  See Declaration of Jonathan Katz (Aug. 6, 2010) ("Katz 8/6/10 Decl."),

E.C.F. Docket Entry ("D.E.") #10; Order (Aug. 25, 2010) ("Prelim. Inj.") at 1, D.E. #21.

On April 18, Judge Weinstein referred plaintiff's motion to the undersigned magistrate judge

for a report and recommendation.  This Court held an evidentiary hearing on June 28, 2011

and entertained post-hearing submissions from the parties and from Aramark.  See Transcript

of June 28, 2011 Hearing (July 6, 2011) ("Hearing Tr."), D.E. #78; Plaintiff's Memorandum

in Support of Motion for Contempt (July 11, 2011) ("Pl. 7/11/11 Mem."), D.E. #80-1;

Defendant's Memorandum in Opposition to Motion for Contempt (July 11, 2011) ("Def.

7/11/11 Mem."), D.E. #83; Letter from Steven Hecht to the Court (July 11, 2011), D.E. #82.

      Based on the evidence adduced at the hearing, and for the reasons that follow, this

Court respectfully recommends that plaintiff's motion for contempt be denied in its entirety.

## BACKGROUND

### I.     THE RELATIONSHIPS BETWEEN KSI, QBC AND ARAMARK

Plaintiff is a vendor that sells kosher food products at "stadiums and entertainment venues throughout the country." Hearing Tr. at 30. Since 2006, plaintiff has had contracts with the organization of the New York Mets National Baseball Team (the "Mets"); plaintiff's most recent agreement is with defendant QBC, which manages Citi Field, the ballpark the Mets have occupied since 2009. Id. at 30-32. At Citi Field, plaintiff sells glatt kosher hot dogs and other products to the public. See Supplemental Second Amended Complaint (Apr. 24, 2011) ("Compl.") ¶ 5, D.E. #56. At Shea Stadium, the Mets' prior ballpark, plaintiff did not operate on Fridays and Saturdays: games played on those days generally fall within the Jewish Sabbath, which begins at sundown on Friday and ends at sundown on Saturday. The instant dispute largely concerns plaintiff's desire to operate on Fridays and Saturdays at Citi Field. Id. ¶ 12.

In an anticipation of the Mets' move to Citi Field, plaintiff and defendant QBC entered into an agreement, which was memorialized in a January 23, 2008 letter setting forth "certain advertising, ticket and product distribution rights . . . ." Letter from Paul Ascencio to Jonathan Katz (Jan. 23, 2008) ("KSI-QBC Agreement") at 1, Plaintiff's Exhibit ("PX") 4 at contempt hearing. Covering a term from April 1, 2009 through October 31, 2018, the agreement gives plaintiff the right to advertise KSI products at the ballpark. Id. at 1. It states, with regard to plaintiff's sales at the ballpark:

> QBC will permit Aramark Corporation, Ballpark concessionaire, to sell only [KSI]'s brand of the [enumerated] Kosher products in the Ballpark . . . , provided that Aramark enters into an

-2-

> agreement with [KSI] to sell each of such products.  In addition,
> QBC will not permit Aramark to sell competing brands of any
> such Kosher products . . . during events at the Ballpark as to
> which admission is made available to members of the general
> public, provided that [KSI] makes such products available to
> Aramark on customary terms and conditions for similarly situated
> facilities.

Id. at 1-2.  The KSI-QBC Agreement does not address any further details as to when, where

and how plaintiff's products will be sold.  Id. at 1-3.  It does provide that KSI must pay an

annual fee, scheduled to rise incrementally each year.  Id. at 2.  The initial fee in 2009

reflected a significant increase over plaintiff's obligations under its previous agreement with

the Mets, and plaintiff's President, Jonathan Katz ("Katz"), contends that he reached an oral

agreement with QBC's then employee, Greg Stangel, that KSI would be permitted "to sell at

every game," including Friday and Saturday games, "in order to afford [the] fee."  Hearing

Tr. at 42.

As contemplated in the KSI-QBC Agreement, id. at 1, plaintiff also executed an

agreement with Aramark.  See Concession License Agreement (Jan. 1, 2009) ("KSI-Aramark

Agreement") at 1, PX 7.  This agreement permits the sale of designated KSI products "from

locations at [Citi Field] to be designated at the sole discretion of ARAMARK," at events

"determined by ARAMARK in consultation with" KSI.  Id. at 1, 3.  The KSI-Aramark

Agreement requires that plaintiff pay Aramark a share of its gross receipts.  Id. at 3.  The term

of that agreement extends from January 1, 2009 through December 31, 2018, but provides for

early termination at either party's option on "30 days' advance written notice."  Id. at 5.

Plaintiff contends that the details of its agreement with Aramark were, in fact, negotiated with

QBC.  See Hearing Tr. at 34-35.

-3-

Aramark's role at the ballpark is that of concessionaire: Aramark manages food, beverage and merchandise sales at Citi Field, pursuant to a 30-year "Usage Agreement" with QBC.  See Amended and Restated Usage Agreement (July 12, 2010) ("QBC-Aramark Agreement"), PX 2.  Under that agreement, QBC and Aramark share the financial risks and rewards: "The Mets, instead of receiving a percentage of gross revenue from sales, . . . 'garner a portion of the net.'" *Mets, Aramark Agree To 30-Year Deal At Citi Field*, SportsBusiness Daily, June 4, 2007, PX 1.[1]  The agreement provides for joint decision-making in many regards through an "Operations Determination Process."  Defendant, however, reserved the right to circumvent the Operations Determination Process and to make certain decisions with regard to vendors of "designated Specialty Foods," including kosher products, so long as defendant acts "in its good faith discretion, following consultation with ARAMARK."  QBC-Aramark Agreement at 12-14.

## II.   KSI'S DISPUTE WITH QBC

The instant litigation follows what plaintiff claims was defendant's refusal to permit plaintiff to operate on Fridays and Saturdays.  Complaint (June 9, 2010) ("Compl.") ¶¶ 11-12, D.E. #1.[2]  That restriction, along with other disputes such as a disagreement over the suitability of one cart location offered to plaintiff, see id. ¶ 14, prompted plaintiff to stop

---

[1]  The substance of the QBC-Aramark Agreement remains covered by a confidentiality order. See Confidentiality Agreement and Order (Mar. 16, 2011), D.E. #36.

[2]  See Email from Adam Barrick to Jonathan Katz (Mar. 2, 2009), PX 9 ("After internal discussion, it's been decided that [defendant] cannot grant your request to run your carts during Friday and Saturday games at Citi Field," in light of public relations concerns and the fact that such sales would infringe upon another vendor's exclusive right to sell non-kosher hot dogs).

paying the fees set forth in its agreement with QBC.  See Katz 8/6/10 Decl. ¶¶ 11-13.  On

May 18, 2010, defendant demanded payment from plaintiff.  Letter from James Denniston to

Jonathan Katz (May 18, 2010), D.E. #10-6.  On June 9, 2010, plaintiff filed the instant

lawsuit, seeking, inter alia, injunctive relief requiring QBC "to permit KSI to sell and

distribute [its products] . . . during all events at the Ballpark at which admission is made

available to members of the general public, including Friday nights and Saturdays . . . ."

Compl. ¶ 24.  Plaintiff did not name Aramark in the lawsuit.  See generally id.  Citing

plaintiff's default in payment, QBC purported to terminate the KSI-QBC Agreement on July 1,

2010, though it stated that its actions "relate[d] only to the [KSI-QBC] Agreement and [would]

have no impact on any rights and obligations of KSI pursuant to" KSI's agreement with

Aramark.  Letter from James Denniston to Jonathan Katz (July 1, 2010), D.E. #10-9.

## III.   THE PRELIMINARY INJUNCTION

On August 6, 2010, plaintiff moved for a preliminary injunction to "restrain defendant

Queens Ballpark Company . . . from, inter alia, acting upon its unilateral termination of the

[KSI-QBC Agreement]" or otherwise "interfer[ing] with KSI's rights" under its agreements

with QBC and Aramark.  Katz 8/6/10 Decl. ¶ 2.  Plaintiff reiterated that it had no dispute with

Aramark.  Id. ¶ 10.  Plaintiff described the relief sought thus:

> By this motion, KSI seeks to enjoin QBC from acting upon its
> unilateral termination of the [KSI-QBC] Agreement and taking
> any action which would prevent KSI from distributing its
> products at Citifield on Sundays through Thursdays while the
> parties litigate, inter alia, QBC's other breaches of the
> Agreement, including QBC's failure to allow KSI to exercise its
> right to additionally distribute product on Friday nights and
> Saturdays . . . .

-5-

Plaintiff's Memorandum in Support of Motion for Preliminary Injunction (Aug. 6, 2010) ("Pl. 8/6/10 Mem.") at 1, D.E. #11.  Despite the stated purpose of the motion, the discussion at the August 13, 2010 hearing before Judge Weinstein focused on Friday and Saturday sales.  See, e.g., Transcript of August 13, 2010 Order to Show Cause Hearing (Aug. 13, 2010) ("8/13/10 Hearing Tr.") at 3-5, PX 26.  Judge Weinstein described the scope of the contemplated preliminary injunction: "The only injunction you are entitled to is that [QBC] may not order you not to sell or attempt to influence anybody else not to sell during the pendency of the injunction."  Id. at 5.  Defendant's counsel argued that Aramark held "sole authority" over when and how plaintiff's products were sold, id. at 6; Judge Weinstein noted that, in that case, defendant would not be "harmed in any way by the injunction . . . . [T]he injunction will be that you cannot stop them, your defendant, or attempt to influence anybody else to stop them." Id. at 8-9.  Judge Weinstein orally granted the motion and directed the parties to confer as to the form of the injunction.  Id. at 9.

As the parties were unable to agree on the form of the injunction, each party submitted a separate proposal.  Plaintiff's proposal sought to enjoin defendant from taking any action to

> prevent the sale and distribution of KSI Food Products . . . at events at Citifield . . . at which admission is made available to members of the general public, including but not limited to Friday nights and Saturdays, and/or from otherwise interfering with Kosher Sports' right to sell and distribute KSI Food Products and/or from influencing or attempting to influence any person, including but not limited to Aramark Sports Entertainment Services, LLC, from preventing the sale and distribution of KSI Food Products . . . .

Proposed Order (Aug. 20, 2010) ("Pl. Proposed Order") at 2-3, D.E. #17-2.  Defendant's proposal would have restrained defendant from "from taking any action interfering with any

determination made by Aramark" as to Friday-Saturday sales only.  Proposed Order (Aug. 20,

2010) ("Def. Proposed Order") at 1-2, D.E. #16.  Both proposals would have barred

defendant from seeking to influence Aramark to interfere with plaintiff's sales; neither

proposal otherwise named Aramark.  Pl. Proposed Order at 2-3; Def. Proposed Order at 1-2.

Finding that the KSI-QBC Agreement "does not control or address the days or hours

when, or locations where, KSI may sell its products at Citi Field," the District Court enjoined

defendant "QBC, its [officers], managers, attorneys, employees, successors, assigns, and all

other persons acting on its behalf . . . from taking any action, directly or indirectly, with

respect to, or affecting, the time or method of sale of KSI's products at Citi Field."[3]  Prelim.

Inj. at 1.

## IV.    THE PURPORTED VIOLATIONS OF THE INJUNCTION

On August 27, 2010, plaintiff's counsel wrote to Scott Kleckner ("Kleckner"),

Aramark's Resident District Manager at Citi Field, enclosing a copy of the Preliminary

Injunction and informing Mr. Kleckner that plaintiff would "commence taking all necessary

steps to arrange for the sale of products at Citi Field on Friday nights and Saturdays, times

heretofore prohibited by QBC."  Letter from Ira Tokayer to Scott Kleckner (Aug. 27, 2010),

PX 31.  Mr. Kleckner responded that he had forwarded the letter to Aramark's counsel for

review.  Email from Scott Kleckner to Ira Tokayer (Aug. 28, 2011), PX 32.  Aramark and KSI

apparently did not discuss Friday/Saturday sales again until a January 6, 2011 meeting

---

[3]  The District Court further ordered that "[n]o person is prohibited from expressing his, her, or its opinion in a personal capacity on what is permitted or appropriate with respect to such a sale under any religious law."  Prelim. Inj. at 2.

addressed below.

During the fall and winter of 2010, in the course of weekly meetings between Aramark and QBC staff, the subject of Kosher Sports came up for discussion on several occasions.[4]  At the hearing, the QBC and Aramark witnesses acknowledged discussing "contingency plans" for substitute kosher vendors should Katz leave the ballpark or be terminated by Aramark, but they insisted that defendant never asked Aramark to terminate plaintiff's contract.  Hearing Tr. at 152, 156-57, 204-05, 218, 244.  Kleckner and QBC's Mike Landeen both testified that they were concerned plaintiff might leave the ballpark of his own volition.  Id. at 150-51, 244.  Both cited a recent incident in which plaintiff abandoned MCU Park, a ballpark operated by the Mets' minor league affiliate, the Brooklyn Cyclones, leaving QBC "out to dry" without a kosher vendor.  Id. at 146, 232-33.

The subject of plaintiff's desire to operate on Fridays and Saturdays was raised during a January 6, 2011 pre-season operational meeting between Katz and Aramark's Richard Grey, during which Kleckner stopped in.  Unbeknownst to Kleckner and Grey, Katz was surreptitiously recording the meeting.[5]  Prior to Kleckner's arrival, Katz opined at length that

---

[4]  See, e.g., Meeting Notes (Nov. 2, 2010), PX 36 (listing agenda items: "Kosher Sports" and "Kosher"); Official Meeting Minutes (Nov. 2, 2010, erroneously labeled as Oct. 12, 2010), PX 34; Meeting Notes and Official Meeting Minutes (Nov. 11, 2010), PX 38; Official Meeting Minutes (Dec. 7, 2010), PX 39; see generally infra pp. 20-22.

[5]  See generally Memorandum and Order (Aug. 5, 2011) ("8/5/11 M&O"), D.E. #86 (imposing sanctions on plaintiff and plaintiff's counsel for their failure to disclose or produce the recordings of the January 6, 2011 meeting).

   The January 6th recording was introduced at the contempt hearing to impeach Katz; plaintiff's counsel, who previously agreed not to offer that recording as substantive evidence,
                                                                                    (continued…)

defendant, not Aramark, controlled whether he would be allowed to operate on Fridays and Saturdays. See Transcript of January 6, 2011 Recording (Jan. 6, 2011) ("Jan. 2011 Recording Tr.") at 2-5, Defendant's Exhibit ("DX") C at contempt hearing. Grey, who later testified that he had no real decision-making authority over the issue, Hearing Tr. at 261, was politely unresponsive to Katz's suggestions. See, e.g., Jan. 2011 Recording Tr. at 4. Kleckner joined the meeting and told Katz that he was reluctant to permit plaintiff to operate on Fridays and Saturdays. Id. at 9; Hearing Tr. at 231. Seeking to guide a friend and colleague away from conduct that might damage his business relationship with Aramark, id. at 219-220, 227, Kleckner expressed concern that such sales would offend Sabbath-observant customers, and noted that Scott Wiegert, his boss, felt that such sales were not contemplated in the KSI-Aramark agreement and would need to be on different financial terms. Id. at 231. Katz asked whether defendant had, after the injunction was issued, encouraged Aramark to terminate plaintiff's contract. Jan. 2011 Recording Tr. at 12. Kleckner replied:

> [T]hey would defend this that they want to know their other options in case something went south with you or whatever but, you know, [to] cut through [the] bullshit, yeah– . . . –they wanted to know [what] their other options were so if they told you [to] pound sand or pay off or . . . fuck off, they had something on the shelf. So Tom and I wouldn't give them that.

Id. at 12. According to Kleckner's testimony at the contempt hearing, after the preliminary injunction issued, defendant never asked him to terminate plaintiff's agreement, but did ask Aramark to look into possible substitute vendors for purposes of contingency planning.

---

[5](...continued)
Order (June 8, 2011) at 2 n.1, D.E. #70, offered statements from that recording to impeach Kleckner and Grey.

Hearing Tr. at 232.

The topic of Friday-Saturday sales was raised again during an April 6, 2011 phone conversation between Kleckner and Katz, which Katz likewise recorded without Kleckner's knowledge.[6]  Kleckner told Katz that Katz had given insufficient notice to allow for sales on the upcoming Friday and Saturday (the opening home games of the 2011 season), but that he was not yet refusing plaintiff's request to sell on other Fridays and Saturdays.  Hearing Tr. at 105.  Kleckner reiterated his reservations about such sales.  Id. at 231.  The day after this conversation, plaintiff's counsel sent Kleckner a letter objecting to Kleckner's refusal and reluctance to put his refusal in writing, and "demand[ing] that by 9:00 a.m., April 8, 2011, Aramark remove its carts from" KSI's usual locations "so that KSI [could] commence operations."  Letter from Ira Tokayer to Scott Kleckner (Apr. 7, 2011) at 1-2, PX 41.  Later that day, Kleckner emailed Katz, refusing to permit Friday-Saturday sales and noting that he was considering termination of the KSI-Aramark Agreement pursuant to its convenience termination clause.  Letter from Scott Kleckner to Jonathan Katz (Apr. 7, 2011), PX 40.

At the hearing, plaintiff introduced excerpts retrieved from the Mets' website of the Mets' 2010 and 2011 A-to-Z Guides, which provide information about services available at the ballpark.  The 2010 A-to-Z Guide entry for "Kosher Food" merely lists KSI's locations and products.  See 2010 A-to-Z Guide (Mar. 15, 2011) at 1-2, PX 45.  The 2011 A-to-Z Guide entry added, "The Kosher stands operate Sunday-Thursday."  2011 A-to-Z Guide (Mar. 15,

---

[6]  See generally 8/5/11 M&O (sanctioning plaintiff and plaintiff's counsel for failure to disclose or produce the recording of that phone call).

Again, plaintiff's counsel offered portions of the recording for impeachment purposes, but not as substantive evidence.  Order (June 8, 2011) at 2 n.1.

2011) at 1, PX 45.  Similarly, the 2011 Citi Field Guest Service Handbook, which ballpark staff carry to facilitate responses to patrons' questions, lists KSI's days of operation as Sunday through Thursday.  Citi Field Guest Service Handbook (2011) at 2, PX 46; Hearing Tr. at 56-59.  On March 21, 2011, defendant agreed to withdraw the language referencing plaintiff's days of operation.  Def. 7/11/11 Mem. at 6 n.2.

On April 15, 2011, plaintiff filed the instant contempt motion.  This Court presided over the evidentiary hearing, which was held on June 28, 2011, and which included testimony from Jonathan Katz and several Aramark and QBC witnesses.  See generally Hearing Tr.

## DISCUSSION

Plaintiff advances several theories for holding both defendant and Aramark in contempt.  Plaintiff alleges that defendant violated the preliminary injunction by engaging in the following conduct: by encouraging Aramark to replace plaintiff during the fall and winter of 2010, Pl. 7/11/11 Mem. at 13; by asking Aramark to require that plaintiff operate a cart during a series at which plaintiff expected poor attendance, id. at 12; and by publishing the "A-to-Z Guide" listing days of operation indicating that plaintiff would be closed on Fridays and Saturdays, Pl. 7/11/11 Mem. at 11.  Plaintiff further contends that Aramark's decision to bar plaintiff's Friday-Saturday sales was made at defendant's behest, id. at 18, and/or that it is attributable to defendant by virtue of the relationship between Aramark and defendant, id. at 14, 16; plaintiff therefore argues that defendant and Aramark may both be held in contempt for the prohibition on Friday-Saturday sales.  The Court addresses these claims seriatim.

As the Second Circuit has noted,

-11-

a contempt order is a "potent weapon," <u>Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n</u>, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967), that is inappropriate if "there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," <u>Cal. Artificial Stone Paving Co. v. Molitor</u>, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885). "A contempt order is warranted only where the *moving party* establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict." <u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051, 1058 (2d Cir.1995) (emphasis added). Specifically, the "*movant* must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." <u>Id</u>. (emphasis added).

<u>Latino Officers Ass'n City of New York, Inc. v. City of New York</u>, 558 F.3d 159, 165 (2d Cir. 2009). "The party making the application for a civil contempt . . . has the overall burden of proof to establish, by clear and convincing evidence, that the court order . . . has been violated." <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243, 250 (2d Cir. 2002) (quoting <u>Yalkowsky v. Yalkowsky</u>, 461 N.Y.S.2d 54, 55 (2d Dep't. 1983)) (modification in original). "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." <u>Levin</u>, 277 F.3d at 250 (quoting <u>Callanan Indus., Inc. v. White</u>, 510 N.Y.S.2d 230, 231 (3d Dep't 1986)).

## I. WHETHER QBC AND ARAMARK ACTED IN CONCERT TO VIOLATE THE INJUNCTION

Plaintiff argues that defendant and Aramark should be held in contempt for Aramark's decision, allegedly at defendant's behest, to prevent plaintiff from operating on Fridays and Saturdays at Citi Field. The Court addresses later plaintiff's broader argument that Aramark, though not named in the lawsuit or in the preliminary injunction, is bound to abide by the latter

as a matter of law.  First, however, the Court addresses plaintiff's factual contention that QBC "dispatched," or sought to dispatch, "Aramark to do its 'dirty work'" of limiting plaintiff's days of operation or terminating plaintiff outright.  Letter from Ira Tokayer to the Court (Apr. 15, 2011) ("Pl. 4/15/11 Letter") at 2, D.E. #43.  This implicates two distinct but factually intertwined issues that the Court addresses together.  Plaintiff contends that a finding of contempt lies against defendant because defendant encouraged Aramark to terminate plaintiff, to prohibit plaintiff from operating on Fridays and Saturdays, or otherwise to affect plaintiff's operations.  Plaintiff further contends that a contempt finding lies against Aramark in that Aramark acted at defendant's behest to prohibit plaintiff from operating on Fridays and Saturdays.  While either allegation would, if proven, support a finding of contempt, plaintiff has not established either by clear and convincing evidence.  The record suggests that Aramark independently decided to prevent plaintiff from selling on Fridays and Saturdays; plaintiff has not sustained its burden of proving that defendant violated the preliminary injunction by encouraging Aramark to terminate plaintiff or limit plaintiff's operations.

It is undisputed that Judge Weinstein's order prohibits defendant from encouraging Aramark or any other entity to interfere with KSI's operations.  The preliminary injunction bars defendant QBC from "taking any action, directly *or indirectly*, with respect to, or affecting, the time or method" of KSI's sales.  Prelim. Inj. at 1 (emphasis supplied).  Aramark is, of course, not a party to this lawsuit and is not named in the order, though this alone is not dispositive of its liability for contempt.  Under the Federal Rules of Civil Procedure, an injunction "binds only . . . the parties; . . . [their] officers, agents, servants, employees, and

-13-

attorneys; and . . . other persons who are in active concert or participation with" them.  Fed.

R. Civ. P. 65(d).  As the Second Circuit observed, this

> codifies the well-established principle that, in exercising its
> equitable powers, a court "cannot lawfully enjoin the world at
> large."  Alemite Mfg. Corp. v. Staff, 42 F.2d 832, 832 (2d Cir.
> 1930).  In order for a court to hold a nonparty respondent in
> contempt of a court order, "the respondent must either abet the
> [party named in the order], or must be legally identified with
> him."  Id. at 833; see also Vuitton et Fils S.A. v. Carousel
> Handbags, 592 F.2d 126, 129-30 (2d Cir.1979).  The party
> seeking enforcement of an order bears the burden of
> demonstrating that the persons to be held in contempt are within
> the scope of the injunction.  See Vuitton et Fils, 592 F.2d at 129.

People v. Operation Rescue Nat'l, 80 F.3d 64, 70 (2d Cir. 1996) (modification in original).  A

party seeking to hold a non-party in civil contempt for aiding and abetting must prove, by clear

and convincing evidence, "(1) that the party subject to the court's mandate committed

contempt; and (2) that [the non-party] assisted the enjoined party."  Levin, 277 F.3d at 250

(citing Alemite, 42 F.2d at 833).

### A.    QBC and Aramark's Pre-Injunction Positions on KSI

Before addressing Aramark and QBC's alleged misconduct, the Court will briefly

review the evidence as to where they stood vis-à-vis KSI at the time the preliminary injunction

was issued.  As detailed below, the record shows that, at that time, QBC had already

terminated its contractual relationship with KSI and wanted KSI to be replaced; Aramark, in

contrast, wished to continue to work with KSI.  QBC opposed permitting KSI to sell on

Fridays and Saturdays; Aramark, in January 2011, expressed its own reservations about

Friday-Saturday sales that appear to predate the issuance of the injunction.

By the time the preliminary injunction issued, it was obvious to Aramark and plaintiff alike that defendant had lost patience with plaintiff.  An April 2010 internal QBC email exchange between Peter Helfer and Paul Ascensio memorializes defendant's discussion with Hain Celestials, an alternative kosher vendor.  Email from Peter Helfer to Paul Ascensio and Mike Landeen (Apr. 14, 2010) at 1-2, PX 17.  Mr. Helfer suggested that defendant "get rid of this punk and make it happen with" Hain Celestials.[7]  Id.  One month earlier, QBC's Mike Landeen suggested that Adam Barrick "[t]ell [Katz] to fuck off and throw him out!"  Email exchange between Adam Barrick and Mike Landeen (Mar. 18, 2010) at 1, PX 14.  In the months preceding the issuance of the preliminary injunction, defendant repeatedly demanded payment of past-due sums from plaintiff, and finally terminated plaintiff's Advertising Agreement with defendant, while noting that the termination "shall have no impact upon any rights and obligations of KSI pursuant to the Concession License Agreement between KSI and Aramark . . . ."  Letter from James Denniston to Jonathan Katz (July 1, 2010), D.E. #10-9.  Indeed, it was on the basis of this termination that plaintiff sought the preliminary injunction.  See Pl. 8/6/10 Mem. at 1.  Whether or not this conduct by QBC affected Aramark's view of plaintiff or of Aramark's relationship with plaintiff, none of it amounted to contempt, as it occurred before Judge Weinstein issued the injunction on August 13, 2010.

The evidence establishes that the relevant Aramark personnel viewed plaintiff and Jonathan Katz in a different light than did their counterparts at QBC.  Aramark's Scott Kleckner testified that prior to the lawsuit, he had largely "favorable business dealings" with Katz, that he had considered Katz a friend, and that he felt KSI "was doing a better job than

_____

[7]  See Hearing Tr. at 131 (QBC's Mike Landeen understood the term "punk" to refer to Katz).

the other options, both in the Philadelphia market," where Kleckner had helped manage the concessions at Lincoln Financial Field, and in New York.  Hearing Tr. at 227.  According to Kleckner, he had sought to persuade Katz that litigation against the Mets would ultimately damage Katz's business.  Id. at 227-28 ("I was trying to guide him away from the course he had . . . been going down."); see id. at 225-26.  While Kleckner was aware that defendant wanted to see plaintiff replaced at Citi Field, see id. at 247, he testified that he was disposed to "defend" KSI "until [Katz's] performance fell apart this year."  Id. at 226.

Nevertheless, the evidence also shows that Aramark was reluctant to allow plaintiff to operate at Citi Field on Fridays and Saturdays.  Plaintiff notes that Aramark's position was never embodied in a written decision.  See Hearing Tr. at 251 ("There [was] not a decision because it was never something contemplated.").  But Kleckner's subordinate, Thomas Funk, testified that, since the spring of 2009, he knew that plaintiff intended to operate on Fridays and Saturdays and he knew "that [his] bosses at the time were against it . . . ."  Id. at 181.  Kleckner, who was less involved in day-to-day interactions with KSI, see id. at 212 ("this is a [small] piece of my world"), stated that he first discussed the matter with Katz towards the end of the 2010 season.  Id. at 229-30 ("I asked [Katz] point blank, do you plan on opening Fridays and Saturdays.  And at that point, it may have been limited to the [2010] season, but it was a definite no.").  Kleckner "shared [with Katz his] personal opinion" that sales on the Jewish Sabbath would undermine KSI's glatt kosher offering; he added that Scott Wiegert, his superior, felt that Friday-Saturday sales were not contemplated in the KSI-Aramark agreement and that any such sales "would be under very different financial terms."  Id. at 231; see also id. at 254-55 (testimony that Aramark made more money on the days when it operated its own

carts in place of plaintiff's).  Kleckner understood the decision as his to make, id. at 231,

though he acknowledged that Wiegert could have overruled him.[8]

At the contempt hearing, in an effort to discredit Kleckner's stated rationales for

opposing Friday-Saturday sales, Katz testified as to KSI's experience at other stadiums where

Aramark managed the concession operations.  His testimony on this issue was incomplete and

contradicted by his prior sworn statements.  Plaintiff operates in conjunction with Aramark at

two football venues: the Philadelphia Eagles' Lincoln Financial Field and at the Baltimore

Ravens' M&T Bank Stadium.  Hearing Tr. at 54.  Scott Kleckner and Tom Funk both worked

for Aramark at Lincoln Financial Field before they obtained their present positions at Citi

Field.  Id. at 54.  Kleckner did not recall ever allowing KSI to operate on Saturdays at Lincoln

Financial Field.  Id. at 235.  At the hearing, Katz testified that Aramark had asked plaintiff to

sell kosher products at M&T Bank Stadium, id. at 54-55, and Lincoln Financial Field.  Id. at

53-54.  At his two depositions, however, Katz first denied operating on Friday nights or

Saturdays at Lincoln Financial Field, and then stated that KSI operated at "maybe two or three

events" at Lincoln Financial Field.  Deposition of Jonathan Katz (May 9, 2011) ("Katz Dep.

Tr.") at 51, 54, 435, DX H.

Whether KSI sold its products at "two or three" Lincoln Field events, Katz Dep. Tr. at

435, or none at all, id. at 54, the fact that Aramark allowed Friday-Saturday sales at a few

football venues does not cause the Court to doubt the reasons stated by Aramark personnel for

objecting to Friday-Saturday sales at Citi Field.  Kleckner testified credibly and in detail as to

his position that such sales would undercut the ballpark's glatt kosher offerings and would risk

---

[8]  See Hearing Tr. at 239 ("[I]f he felt very strongly about it, he could have overruled me.").

alienating Sabbath-observant Mets fans.  Hearing Tr. at 233-35.  He stated that Aramark gave

regional management considerable scope,  id. at 233-34, and that his decisions were informed

by the particular market he served: "I also know this market, unlike some of the other markets

that we work with across the country, there's definitely heightened sensitivity, there's some

very, very observant Jews."  Id. at 234.  Kleckner suggested that, in some heavily Orthodox

neighborhoods near the ballpark, kosher businesses would not open on the Sabbath for fear of

losing customers altogether.  Id. at 234.  The fact that another Aramark manager at a football

stadium in another city permitted Friday-Saturday sales at "select events" does not contradict

this rationale.[9]  Katz Dep. Tr. at 72.

       In sum, Aramark appears to have held longstanding, albeit unwritten, objections to

Friday-Saturday sales by KSI at Citi Field.  See Hearing Tr. at 250-51.  Aramark did not,

however, share QBC's desire to terminate KSI.  Id. at 226.  The subsequent section will

review the evidence as to QBC's post-injunction discussions with Aramark.  The fact remains,

however, that contrary to plaintiff's assertion that QBC influenced Aramark's decision-making

after the issuance of the preliminary injunction, Aramark ultimately acted in accordance with

its longstanding practice and stated views: Aramark did not terminate plaintiff, but continued

to prohibit Friday-Saturday sales at the ballpark.

       **B.      QBC's Post-Injunction Discussions With Aramark**

---

[9]  Indeed, at his deposition, Katz testified that, during the six years that plaintiff had a contract
with Aramark at Oriole Park, a Major League Baseball stadium in Baltimore, and in the time
plaintiff has been operating under Aramark's successor, plaintiff has never operated on Fridays
or Saturdays.  Katz Dep. Tr. at 95-97.

While plaintiff has introduced records reflecting several post-injunction communications between defendant and Aramark concerning plaintiff, plaintiff has not established by clear and convincing evidence that, after Judge Weinstein issued the injunction, defendant encouraged Aramark to interfere with plaintiff's operations.  Rather, employees of Aramark and defendant credibly testified that those conversations were innocuous and reflected defendant's legitimate desire to ensure that its guests would continue to have access to kosher products notwithstanding defendant's deteriorating relationship with plaintiff.

No witness testified that any QBC employee asked Aramark to terminate plaintiff or limit plaintiff's sales at any point after the issuance of the injunction.  See Hearing Tr. at 156-57 (QBC's Mike Landeen); id. at 204-205 (Aramark's Thomas Funk: "Did anybody from the Mets or QBC or anyone related to the Mets ever ask Aramark, as far as you know, to terminate Aramark's contract with KSI?"  "No."); id. at 218 (Aramark's Scott Kleckner: "at [the fall-winter 2010]  meetings [with QBC], did Mr. Landeen or any other representative of QBC ask you to terminate Kosher Sports' relationship?"  "They did not.").  The witnesses acknowledged that, after the issuance of the injunction, defendant and Aramark communicated about plaintiff on a number of occasions.  Plaintiff argues that "there is no conceivable reason for QBC to be discussing KSI with Aramark other than to 'influence' Aramark in violation of the Court's injunction."  Pl. 4/15/10 Letter at 3.  This Court disagrees.

Immediately after the injunction was issued, QBC's Mike Landeen contacted Aramark's Scott Wiegert and Clint Westbrook.  Hearing Tr. at 139.  Landeen told Westbrook that he was "not going to speak to Aramark about Kosher Sports anymore," since the injunction prohibited defendant from interfering with plaintiff's operations.  Id. at 141.  He added that plaintiff's

operations at Citi Field should remain "status quo," a term plaintiff's counsel seized upon to suggest that Landeen was telling Aramark to continue to bar Friday and Saturday sales. Id. at 141. There is no evidence either party to that conversation placed the same import on those words. See id. at 141 (per Landeen, it was "not the intent" of the statement to refer to Friday-Saturday sales). Indeed, according to Katz, plaintiff filed its motion for a preliminary injunction "merely . . . to maintain the status quo and continue to distribute its products at Citifield," after plaintiff stopped making installment payments set forth in its agreement with defendant and after defendant terminated that agreement. See Katz 8/6/10 Decl. ¶¶ 3, 12, 20; see also id. ¶ 23 ("By this motion, KSI merely seeks to maintain the status quo, not to obtain the ultimate relief requested in the complaint, i.e., the right to distribute products on Friday nights and Saturdays . . . ."). Plaintiff moved for an injunction "to maintain the status quo" during the lawsuit and to prevent defendant from acting on its repeated threats to terminate plaintiff. The motion was granted. Landeen informed Aramark that plaintiff was to remain "status quo" as far as he was concerned. Against this factual backdrop, the Court declines to assign sinister import to these words; they appear to reflect a good faith attempt to abide by the injunction.

The remainder of the communications cited by plaintiff occurred during the fall and winter of 2010, at "weekly Aramark meetings" hosted by defendant's Venue Services department. Plaintiff has introduced agendas and/or notes from three such meetings at which Kosher Sports was discussed. The agenda for the November 2, 2010 meeting lists two relevant items, "Kosher Sports" (under the heading "Tom Funk") and "Kosher" (under the heading "Mike Landeen"). Meeting Notes (Nov. 2, 2010), PX 36. The minutes from the

same meeting, erroneously marked as the October 12 notes, see Hearing Tr. at 175, state: "S[cott] Wiegert to set meeting with Kosher guy from MCU.  ARAMARK to figure out legal side with existing Kosher and to speak with Marketing re: new vendor, if there is one." Official Meeting Minutes (labeled as Oct. 12, 2010), PX 34.  The November 11, 2010 meeting agenda contains the item "Kosher Update"; the minutes state: "All outstanding issues have been cleared up with Katz.  S Wiegert will follow up with vendor from MCU."  Meeting Notes and Official Meeting Minutes (Nov. 11, 2010), PX 38.  Finally, the December 7, 2010 meeting minutes state: "M Landeen to relay message re: Kosher not in breach with ARAMARK."  Official Meeting Minutes (Dec. 7, 2010), PX 39.[10]

At the hearing, several witnesses testified that these conversations concerned discussions about possible substitute vendors who could have replaced plaintiff as a kosher vendor in the event plaintiff left Citi Field.  QBC's Mike Landeen was concerned that plaintiff might quit, in part because Katz had abandoned MCU Park, the ballpark operated by the Brooklyn Cyclones, the Mets' Minor League affiliate, leaving them "out to dry" without a kosher vendor.  Id. at 146-48.  Landeen denied discussing terminating Katz at the fall-winter 2010 meetings, id. at 152, though he acknowledged that they discussed the possibility of

---

[10]  Plaintiff has also introduced a partial photocopy of a belatedly produced document appearing to be a group work plan; one of the many entries is entitled "Kosher sub-contractor."  Untitled Document (July 11, 2011), D.E. #80-3.  That entry, assigned to a "Tom" (presumably Aramark's Tom Funk), lists a "completion goal" date of December 6, 2010.  Id.  (The other items bear "completion goal" dates ranging from January 2010 through December 2011.  Id.)  The item states: "Need direction from legal/sponsorship/Aramark on how to proceed."  Id.  The document is untitled, incomplete, and undated, and plaintiff has proffered no proof or theory of its likely date of origin, though the inclusion of "completion goals" as early as January 2010 for apparently uncompleted items suggests that the document may well predate the injunction.  Id.  Given the lack of any meaningful context, the document adds little to plaintiff's evidentiary showing.

replacing plaintiff on a contingency basis: "Again, we continued talking about, you know, contingency plans. We were very concerned that if Jonathan [Katz] decided to get up and leave that we needed to be ready to provide our guests with a Glatt Kosher product." Id. at 160-61. Landeen asked Aramark whether plaintiff was in breach of its agreement with Aramark, because "Aramark had various issues with operational instances with Kosher Sports during the season . . . [and] if Aramark terminated [the] agreement, I wanted to know what's our next steps." Id. at 161-62.

The testimony of the Aramark witnesses, particularly that of Scott Kleckner, confirms the substance of Landeen's testimony. Kleckner testified that "the Mets" directed him "to make sure we had a contingency [plan]" to ensure that the ballpark would not find itself without a kosher operator. Hearing Tr. at 218. He said, of his conversations with Landeen, "We've absolutely discussed what would happen if either Kosher Sports terminated on their own or walked out, or if we terminated the contract, and what we would do at that point . . . ." Id. at 218-19. Kleckner's testimony was credible and largely consistent with his prior statements surreptitiously recorded by Jonathan Katz. In his January 6, 2011 meeting with Kleckner, Katz repeatedly sought to lead Kleckner to make statements implicating defendant in post-injunction misconduct. Jan. 2011 Recording Tr. at 12 ("[Y]ou're telling me that at some point, despite the judge's ruling, that they are not to interfere with me . . . [QBC] even afterwards [came] to you and told you . . . let's try to find somebody else[?]"). Believing he was speaking off the record, Kleckner responded that defendant had asked Aramark to look

into other possible kosher vendors to "know what their other options were," in case defendant told plaintiff to "pound sand" or "in case something went south with" plaintiff.[11]

The substance of the January 2011 recording suggests that Katz and Kleckner viewed the conversation differently: Katz was trying to gather evidence for litigation purposes, while Kleckner "was trying to guide" Katz away from "making a terrible business mistake . . . ." Hearing Tr. at 223. Kleckner thought, at the time of the January and April 2011 conversations, that Katz's "goal was to try and embarrass the Mets through the media . . . and I thought it was a terrible course to go down," in terms of plaintiff's operation at Citi Field and Katz's broader relationship with Aramark. Id. at 228. The recorded statement by Kleckner, on which plaintiff relies, did not explicitly concern post-injunction conduct, see Jan. 2011 Recording Tr. at 12, and was by way of warning Katz that defendant had considered terminating plaintiff's operations and had sought a contingency plan in case their relationship with plaintiff "went south."[12] At the hearing, Kleckner elaborated: "I was never told to terminate, I was never asked to take the steps to terminate. We certainly discussed if there was a termination what we would do. And I was definitely directed to make sure I had a contingency." Hearing Tr. at 232. When asked why, Kleckner responded:

---

[11] See Jan. 2011 Recording at 12 ("[T]hey would defend this that they want to know their other options in case something went south with you or whatever but, you know, [to] cut through [the] bullshit, yeah– . . . –they wanted to know [what] their other options were so if they told you [to] pound sand or pay off or . . . fuck off, they had something on the shelf. So Tom and I wouldn't give them that.").

[12] See also Apr. 2011 Recording Tr. at 8 (in surreptitiously recorded telephone conversation on April 6, 2011, Kleckner stated that he had, "off the record[, been] pretty open with [Katz] about the fact that they wanted [Kleckner] to shop and they wanted me to terminate and bring in somebody else").

-23-

> There's different incidents that have happened in the past, both at our ballpark down in Brooklyn, our minor league ballpark [MCU], and at Chase Stadium where there have been periods of time where we have not had kosher food available, and to many of our guests, that's something that they need.

Id. at 232-33. The Court credits Kleckner's explanation, which, along with the testimony of Aramark's Thomas Funk,[13] supports the picture painted by Landeen's testimony and the documentary record, viz., that while defendant certainly would have preferred to have plaintiff out of Citi Field, defendant respected the injunction, see id. at 141 (testimony of Mike Landeen that he considered plaintiff's operations "status quo"), and did not encourage Aramark to terminate its agreement with KSI after the injunction. Id. at 247.

"In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred." Levin v. Tiber Holding Corp., 277 F.3d 243, 252 (2d Cir. 2002). Plaintiff has not established with any "reasonable certainty" that defendant encouraged Aramark, after the issuance of the injunction, to terminate plaintiff or otherwise interfere with plaintiff's operations. Rather, the QBC and Aramark witnesses testified credibly that the post-injunction conversations touched on defendant's legitimate desire to plan for the possibility that plaintiff would leave the ballpark, either out of frustration or if Aramark decided to terminate its agreement with plaintiff. The Court's conclusion in this regard is supported by the fact that plaintiff remains at Citi Field. Aramark has the right to terminate plaintiff on thirty days' notice for any reason or no reason

---

[13] See Hearing Tr. at 200-201, 204-05 (during the December 7, 2010 meeting, Aramark and defendant discussed whether plaintiff was in breach of its contract with Aramark, Aramark confirmed that plaintiff was not, and defendant never asked any Aramark personnel to terminate plaintiff).

at all.  KSI-Aramark Agreement at 5.  In spite of plaintiff's claim that defendant holds

fundamental control over Aramark's concession operations at Citi Field, Aramark has not

exercised the convenience clause.

For the foregoing reasons, the Court concludes that, given the demanding burden of

proof applicable in the contempt context, there is insufficient evidence to support a finding that

defendant violated the injunction by encouraging Aramark to terminate plaintiff.

### C.    Aramark's Decision as to Friday-Saturday Sales

As discussed above, Scott Kleckner, the relevant decision-maker at Aramark, testified

credibly as to Aramark's reluctance to permit plaintiff to operate on Fridays and Saturdays.

See, e.g., Hearing Tr. at 231.  While Kleckner began his work at Citi Field in early 2010, id.

at 207, and did not immediately learn of plaintiff's desire to operate on Fridays and Saturdays,

id. at 211, Funk, his subordinate, testified without contradiction that Aramark had opposed

Friday-Saturday sales since 2009.  Id. at 181.  Aramark has provided several different reasons

for that reluctance; these reasons are credible and not inconsistent with one another, and the

Court has no reason to question their legitimacy.  See, e.g., id. at 231 (Kleckner's concern that

such sales would affect plaintiff's credibility with Sabbath-observant patrons); id. at 231 (Scott

Wiegert's belief that such sales were not contemplated in the KSI-Aramark Agreement); id. at

254-55 (testimony that Aramark's profits are higher when it replaces plaintiff's carts on

Fridays and Saturdays).  While Katz claims that he first learned of Aramark's refusal to permit

Friday-Saturday sales on April 6, 2011, id. at 50, the recording of his January 6, 2011 meeting

with Aramark reflects that Kleckner voiced these concerns then, providing no indication that

defendant influenced Aramark's thinking on the subject.  Jan. 2011 Recording Tr. at 10.

Regardless of when Aramark memorialized or finalized its decision, the record contains no proof that it opted to bar Friday-Saturday sales as a result of influence by QBC.  Even if this Court were to credit plaintiff's argument that defendant implicitly or explicitly encouraged Aramark to terminate plaintiff during the fall and winter of 2010, no evidence has been adduced that any of the post-injunction conversations touched upon Friday-Saturday sales.[14] Plaintiff points to the A-to-Z Guide and Guest Service Handbook as evidence of "QBC's control with respect to the ultimate decision" on the issue.[15]  Pl. 7/11/11 Mem. at 12.  But the Aramark witnesses gave credible testimony, consistent with Kleckner's unrehearsed statements to Katz during the January 6, 2011 and April 6, 2011 conversations, showing that Aramark reached its own conclusion as to whether or not it was appropriate to permit Friday-Saturday sales.  There is no evidence that the A-to-Z Guide or the Guest Service Handbook influenced that decision, and no testimony suggesting that any QBC employee discussed the specific question of Friday-Saturday sales with any Aramark employee.  There thus is no basis on which to conclude that the challenged decision by Aramark, to bar plaintiff from selling on Fridays and Saturdays during the 2011 season, was the product of QBC's encouragement. Accordingly, the Court respectfully recommends that the District Court decline to hold

---

[14]  The Court's conclusion in this regard does not reach the merits of the action; the record contains evidence that, prior to the injunction, defendant indicated it would not allow plaintiff to operate on Fridays and Saturday, see, e.g., Email from Paul Schwartz to Jonathan Katz (May 20, 2010), PX 19, and that, on occasion, Aramark and defendant made joint decisions affecting plaintiff.  See, e.g., Email from Mike Landeen to Jonathan Katz (May 2, 2008), PX 5 (deferring to Aramark's Clete O'Connor in a decision as to whether plaintiff could close certain locations during poorly attended games).

[15]  The Court addresses below, see infra pp. 27-28, plaintiff's argument that the publication of these guides, without more, violated the injunction.  Pl. 7/11/11 Mem. at 11.

Aramark or defendant in contempt on the basis of Aramark's refusal to permit Friday-Saturday sales.

## II.   WHETHER QBC'S PUBLICATION OF KSI'S DAYS OF OPERATION VIOLATED THE INJUNCTION

Plaintiff contends that defendant violated the injunction by publishing the 2011 A-to-Z Guide and the 2011 Guest Service Handbook, both of which listed plaintiff's days of operation as Sunday through Thursday.  Pl. 7/11/11 Mem. at 11.  Following protests from plaintiff, defendant changed the former, a public document on the Mets' website, to remove the reference to plaintiff's days of operation.  Def. 7/11/11 Mem. at 6 n.2.  The latter document is given to ballpark staff so that they may answer patrons' questions.  Hearing Tr. at 58.

This Court concludes that the publication of the guides did not, without more, violate the preliminary injunction.  Neither document had any effect on plaintiff or on plaintiff's ability to sell its wares at Citi Field.  Nothing in the record suggests that the publication of either document played any role in Aramark's eventual independent decision to bar sales on Fridays and Saturdays.  The two documents simply gave patrons, directly or through ballpark staff, accurate information as to when kosher food was available.  There is no dispute that plaintiff has never operated on Fridays and Saturdays at Citi Field.  While the publication of accurate information may be considered an "action . . . with respect to . . . the time or method" of plaintiff's sales, Prelim. Inj. at 1, the same could be said of the inclusion of information as to plaintiff's locations, or even of defendant's voluntary decision to remove the disputed language from the A-to-Z Guide.  An overbroad interpretation of the preliminary injunction would preclude QBC employees from saying anything at all to patrons concerning

-27-

plaintiff's stands.  The Court does not believe such an interpretation is required or warranted.  See Stein Indus., Inc. v. Jarco Indus., Inc., 33 F.Supp.2d 163, 169-70 (E.D.N.Y. 1999) (denying contempt sanctions for a "de minimis" violation resulting in "no economic injury").  Accordingly, the Court respectfully recommends that defendant not be held in contempt for publishing the A-to-Z Guide or the Guest Service Handbook.

### III.   WHETHER QBC VIOLATED THE INJUNCTION WITH RESPECT TO K-428

At the contempt hearing, plaintiff for the first time argued that defendant violated the preliminary injunction by directing Aramark to deny plaintiff's request to close one of his locations, the cart at section K-428, during a series at which plaintiff expected poor attendance and low sales.  Hearing Tr. at 59-61.  Plaintiff had addressed his request to Aramark's Tom Funk, who forwarded it without comment to Paul Schwartz, QBC's Director of Venue Services.  Email exchange between Tom Funk and Paul Schwartz (Sept. 8, 2010) at 1-2, PX 33.  Schwartz responded:  "This is not ok from our perspective."  Id. Funk directed plaintiff to leave the cart open, adding, to Schwartz, "I want him to open all his locations as it saves us the labor dollars!"  Id.  Katz testified, without introducing any supporting evidence, that he incurred a loss of $1,700 from having to operate at K-428 during that series.  Id. at 263.

Defendant's conduct in this instance arguably fell within the letter of the preliminary injunction, which prohibited "any action, directly or indirectly, with respect to, or affecting, the time or method" of plaintiff's sales.  Prelim. Inj. at 1.  Nevertheless, the record reveals that the claimed misconduct was not within the contemplated scope of the order.  At the hearing on the motion for the preliminary injunction, Judge Weinstein described its scope thus:  "The only injunction you are entitled to is that [QBC] may not order you not to sell or attempt

-28-

to influence anybody else not to sell during the pendency of the injunction." 8/13/10 Hearing

Tr. at 5. Plaintiff sought the injunction to prevent defendant from "taking any action which

would *prevent* KSI from distributing its products at Citifield," Pl. 8/6/10 Mem. at 2 (emphasis

added), and plaintiff's proposed language for the preliminary injunction used similar terms.

See Pl. Proposed Order at 2 ("prevent the sale and distribution of KSI Food Products"). The

record reflects that Funk conveyed to plaintiff the same decision Aramark would have made of

its own accord. See Email from Tom Funk to Paul Schwartz (Sept. 8, 2010) at 1-2, PX 33 ("I

want him to open all his locations as it saves us the labor dollars!"). The claimed violation is

so technical and *de minimis*, and so far removed from the purpose for which plaintiff sought

the injunction, that the Court respectfully recommends denial of contempt sanctions with

regard to this conduct. See Stein Indus., 33 F.Supp.2d at 169-70 (denying contempt sanctions

for a "de minimis" violation not committed in bad faith and not within the "main thrust of the

. . . injunction"); see also California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609,

618 (1885) (contempt sanctions inappropriate "where there is a fair ground of doubt as to the

wrongfulness of the defendant's conduct").

## IV.  WHETHER QBC OR ARAMARK MAY BE HELD IN CONTEMPT FOR ARAMARK'S ACTIONS

Plaintiff contends that, under agency and partnership principles, defendant and Aramark

together operate a "joint venture" such that Aramark's actions are attributable to defendant as a

matter of law. Pl. Mem. at 14. Plaintiff further argues, in a theory not raised in the initial

contempt motion, see Pl. 4/15/11 Letter at 1-3, that Aramark's actions with respect to plaintiff

are attributable to defendant pursuant to the Usage Agreement between defendant and

Aramark, in which defendant reserved the right to make unilateral decisions concerning vendors of "Specialty Foods," such as kosher foods.  Pl. 7/11/11 Mem. at 16-17; QBC-Aramark Agreement at 12-14.  Because Aramark is not "legally identified" with defendant, the party named in the preliminary injunction, and because that order was drafted to exclude Aramark's independent actions, this Court respectfully recommends that neither Aramark nor defendant be held in contempt for Aramark's decision to preclude plaintiff's sales on Fridays and Saturdays.

A.    **The Injunction Does Not Apply to Aramark's Conduct Absent a Showing That Aramark Aided or Abetted a Violation by QBC**

While the Court addresses below plaintiff's arguments that Aramark's conduct is attributable to defendant as a matter of partnership, agency or contract law, plaintiff's claims with regard to Aramark's conduct may be dispensed with on a more straightforward ground: the terms of the preliminary injunction show that that order was not intended to apply to Aramark's conduct.  Those terms could not, in fairness, be applied to Aramark, as they would render meaningless Aramark's contract with plaintiff.  In seeking injunctive relief, plaintiff gave no indication that the order sought would apply to Aramark except insofar as Aramark acted under defendant's influence or direction.  Plaintiff may not use a contempt proceeding to broaden the injunction beyond the scope originally contemplated.

As discussed above, an injunction "binds only . . . the parties; . . . [their] officers, agents, servants, employees, and attorneys; and . . . other persons who are in active concert or participation with" them.  Fed. R. Civ. P. 65(d).  The Second Circuit stated more generally that injunctions may bind those "legally identified" with the party named in the order.

-30-

Operation Rescue Nat'l, 80 F.3d at 70 (quoting Alemite Mfg. Corp., 42 F.2d at 832).  A court

in this District has described the relevant analysis thus:

> The relevant question is whether the individual sought to be held
> liable is acting independently or remains "legally identifiable"
> with the corporation bound by the injunction.  Cablevision Sys.
> Corp. v. Muneyyirci, 1995 WL 362541, at *1 (E.D.N.Y. 1995).
> This is a case-specific inquiry that turns upon whether or not the
> individual is "so identified in interest with those named in the
> decree that it would be reasonable to conclude that [his] rights
> and interests have been represented and adjudicated in the
> original proceeding." Additive Controls & Measurement
> Systems, Inc. v. Flowdata, Inc., 154 F.3d 1345, 1352 (5th Cir.
> 1998) (citation omitted).

Matrix Essentials v. Quality King Distribs., Inc., 346 F.Supp.2d 384, 391-92 (E.D.N.Y.

2004) (last citation modified).

Aramark was not a party to the proceedings that resulted in the issuance of the

preliminary injunction and, throughout those proceedings, the parties apparently assumed that

the injunction would not directly bind Aramark.  During those proceedings, both parties

acknowledged that "Aramark's operational requirements" governed plaintiff's work at Citi

Field.  Katz 8/6/10 Decl. ¶ 10; Defendant's Memorandum in Opposition to the Motion for a

Preliminary Injunction (Aug. 11, 2010) at 10, D.E. #13.  At the hearing following which the

injunction issued, defense counsel twice argued that Aramark had the "sole authority" to

determine whether or not to permit plaintiff to sell on Fridays and Saturdays.  8/13/10 Hearing

Tr. at 8-9.  Judge Weinstein replied, in sum, "Then you are not harmed in any way by the

injunction."  Id.  Continuing to address defendant's counsel, the District Court then described

the scope of the injunction: "[Y]ou cannot stop them, your defendant, or attempt to influence

anybody else to stop them." Id. at 9.

Judge Weinstein directed the parties to confer as to the language of the preliminary injunction.  Id. at 9.  They nevertheless submitted separate proposals.  Plaintiff's language would have prohibited QBC and related persons or entities from preventing the sale of plaintiff's products "and/or from influencing or attempting to influence any person, including but not limited to Aramark," to interfere with plaintiff's right to sell.  Pl. Proposed Order at 2-3.  Defendant's proposed order included a factual finding that the KSI-QBC Agreement "did not address the days and hours when, or locations where, KSI may sell its products at Citi Field, which matters are addressed in" the KSI-Aramark Agreement.  Def. Proposed Order.  The defense proposal would have prohibited defendant "from taking any action interfering with any determination made by Aramark pursuant to" the KSI-Aramark Agreement with regard to plaintiff's Friday-Saturday sales.  Id.  The import of both of these proposals is clear: at the time that Judge Weinstein issued the injunction, which incorporated aspects of both proposals, both parties understood that it would not bind Aramark directly, but rather would prohibit defendant from "influencing," Pl. Proposed Order at 2, or "interfering with," Def. Proposed Order at 1, Aramark's own determinations.  Even leaving aside the fairness questions raised by Aramark's non-party status and lack of notice or opportunity to respond to the motion for a preliminary injunction, there is simply no possibility that Aramark could have had fair notice, at the time the injunction was argued and issued, that the injunction might restrict *its* ability to manage concessions at Citi Field.

The order crafted by Judge Weinstein, in contrast to plaintiff's, included a factual finding that the KSI-QBC Agreement "does not control or address the days and hours when, or locations where, KSI may sell its products at Citi Field."  Prelim. Inj. at 1.  The order restricts

QBC (and "all persons acting on its behalf") from "taking any action, directly or indirectly, with respect to, or affecting, the time or method of sale of KSI's products at Citi Field." Id. at 1. While the injunction does not explicitly exclude Aramark from its coverage, the prohibition ordered follows from the factual premise, discussed at the hearing, that defendant had no contractual right to restrict plaintiff's days of operation.[16] 8/13/10 Hearing Tr. at 8-9. In essence, viewed in light of the circumstances surrounding the preliminary injunction hearing, Judge Weinstein's order required defendant to leave to Aramark any decisions concerning the time or method of KSI's sales.

To extend this injunction to Aramark's conduct would render the order illogical since, in contrast to defendant, Aramark has explicit contractual rights over many aspects of plaintiff's day-to-day operations at Citi Field. Under the KSI-Aramark Agreement, plaintiff may sell only "from locations . . . to be designated at the sole discretion of ARAMARK . . . . ARAMARK retains the right to modify or alter Concession Locations or relocate Concessionaire to alternative Concession Locations from time to time." KSI-Aramark Agreement at 1. KSI may not sell any products not designated, id., nor post any signs or advertising not approved, by Aramark. Id. at 2. KSI "shall conduct its operations only during

---

[16] The Court need not now address whether this factual assumption was wholly accurate. Some of the documentary evidence suggests that, prior to the issuance of the preliminary injunction, defendant played a role in barring plaintiff's operations on Fridays and Saturdays. See, e.g., Email from Adam Barrick to Jonathan Katz (Mar. 2, 2009), PX 9. Other evidence in the record reveals that Aramark and QBC acted jointly with regard to some aspects of the day-to-day management of concession operations at Citi Field. See, e.g., Hearing Tr. at 226. As discussed below, however, it is undisputed that Aramark had considerable authority, under its agreement with plaintiff and in practice, over the time and method of plaintiff's sales. Viewed in light of this fact, the preliminary injunction cannot have been intended to apply to Aramark's independent conduct.

such hours as shall be specified by ARAMARK." Id. at 3.  Plaintiff has yet to explain how,

practically speaking, Aramark could conform its management of the Citi Field concessions to a

court order prohibiting it from "taking any action . . . affecting the time or method of sale of

KSI's products . . . ."  Prelim. Inj. at 1.

Extending the preliminary injunction to cover Aramark's independent conduct and

decision-making would render Aramark incapable of managing its contractual relationship with

plaintiff.  It would abrogate Aramark's rights under its concession agreement with plaintiff and

render that agreement meaningless.  Such an outcome would be manifestly unfair, given that

plaintiff gave Aramark no notice of the injunction proceeding and that Aramark had no

opportunity to weigh in on the language of the injunction.  "Contempt will not lie against one

who 'acts independently and whose rights have not been adjudicated.'"  Matrix Essentials, 346

F.Supp.2d at 392 (quoting Paramount Pictures Corp. v. Carol Publ'g Grp., Inc., 25 F.Supp.2d

372, 374 (S.D.N.Y. 1998)); accord Chase Nat'l Bank v. City of Norwalk, Ohio, 291 U.S.

431, 437 (1934); see also 11A C. Wright & A. Miller, Federal Practice & Procedure: Civil 2d

§ 2956 (2011) (opining that, to comport with due process, an injunction may reach a nonparty

"so identified in interest with those named in the decree that it would be reasonable to conclude

that their rights and interests have been represented and adjudicated in the original injunction

proceeding."); accord Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 874 n.1 (2d Cir.

1988).

The District Court obviated these concerns by drafting a limited injunction that

controlled defendant's conduct but not Aramark's.  It did so without objection from plaintiff's

counsel, who, in fact, proposed language that excluded Aramark from its coverage and

recognized its status as a non-party to the injunction proceeding.  Pl. Proposed Order at 1-2

(prohibiting QBC and related persons or entities from preventing the sale of plaintiff's products

"and/or from influencing or attempting to influence any person, including but not limited to

Aramark," to interfere with plaintiff's operations).  Plaintiff's arguments concerning

Aramark's relationship to QBC--their argument, in essence, that Aramark should be bound by

the injunction--could have been litigated, with proper notice and an opportunity to respond,

when plaintiff sought the preliminary injunction.  Plaintiff could thereafter have sought to

modify the order to include Aramark.  The injunction was not understood to reach Aramark's

independent conduct, and plaintiff may not now seek to refashion it to do so through a

contempt proceeding.

> ### B.    Aramark's Conduct Did Not Violate the Injunction as a Matter of Agency or "Joint Venture" Law

Latching on to one QBC's executive's comments to the press,[17] plaintiff contends that

the Citi Field concession operations reflect a "partnership" or "joint venture" between

Aramark and QBC, allowing the Court to impose liability on one for the acts of the other.  The

evidence does not support a finding that defendant and Aramark operated the Citi Field

concessions as a joint venture, and the preliminary injunction cannot be extended to Aramark's

conduct on the basis of such a theory.

The Second Circuit has articulated the elements of joint venture liability as follows:

> In order to form a joint venture, (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property,

---

[17]  See *infra* note 18.

> financing, skill, knowledge, or effort; (4) each must have some
> degree of joint control over the venture; and (5) there must be a
> provision for the sharing of both profits and losses. See, e.g.,
> Flammia v. Mite Corp., 401 F.Supp. 1121, 1127
> (E.D.N.Y.1975), *aff'd without opinion*, 553 F.2d 93 (2d
> Cir.1977). All of these elements must be present before joint
> venture liability may be imposed.

Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd., 909 F.2d 698, 701 (2d Cir. 1990).

"A joint venture represents more than a simple contractual relationship. Thus, it is insufficient

for a [p]laintiff to allege mere joint ownership, a community of interest, or a joint interest in

profitability." Zeising v. Kelly, 152 F.Supp.2d 335, 347 (S.D.N.Y. 2001) (internal citation

omitted).

> In formulating an agreement to be joint venturers, "the parties
> must be clear that they intend to form a joint venture, which is a
> fiduciary relationship, and not a simple contract." Precision
> Testing Laboratories v. Kenyon Corp., 644 F.Supp. 1327, 1349
> (S.D.N.Y.1986). Indeed, with respect to a determination as to the
> parties' intent, "[t]he ultimate inquiry . . . is whether the parties
> have so joined their property, interests, skills, and risks [that]
> their contributions have become one and their commingled
> properties and interests have been made subject to each of the
> others' actions, on the trust and inducement that each would act
> for their joint benefit." Zeising, 152 F.Supp.2d at 348 (citations
> omitted).

Kidz Cloz, Inc. v. Officially For Kids, Inc., 320 F.Supp.2d 164, 171 (S.D.N.Y. 2004) (Chin,

J.) (alterations in original). As discussed above, a "party seeking enforcement of an order

bears the burden of demonstrating that the persons to be held in contempt are within the scope

of the injunction." Operation Rescue Nat'l, 80 F.3d at 70.

Several of the elements of a joint venture are clearly present here. Aramark and

defendant entered into a specific agreement to manage the Citi Field concessions for a profit,

jointly contributing various resources to the endeavor.  Aramark and defendant exercised joint control, both under the terms of their agreement and in practice.  Both shared in the profits and losses.  But with regard to the intent requirement, plaintiff offers only the statements to the press of Dave Howard, defendant's Vice President, announcing the QBC-Aramark agreement.  Pl. 7/11/11 Mem. at 16.  Howard described that arrangement as "along the lines of a joint venture . . . .  We're true partners going forward.  We're sharing all the upside and all the risk."[18]

Contrary to the premise of plaintiff's argument, "calling [a relationship] a partnership does not make it one."  Kosower v. Gutowitz, 00 Civ. 9011(JGK), 2001 WL 1488440, at *6 (S.D.N.Y. Nov. 21, 2001) (internal quotation omitted).  Nor does the fact that Howard is an attorney, Hearing Tr. at 18, convert every remark he makes into a statement of the law.  Laypeople and attorneys alike use terms having technical meaning in non-technical contexts.  For example, a person may call her spouse or companion a "partner" without assuming liability for that person's torts.  As Howard credibly testified, he used those terms to speak of a valued business relationship.  Hearing Tr. at 28; see also id. at 232 (testimony of Aramark's Scott Kleckner).  They were a rhetorical flourish, not a legal characterization.

It speaks volumes that plaintiff's counsel hinged his two-sentence argument regarding the intent element on Howard's offhand comments, without any reference to the terms of the QBC-Aramark Agreement.  One need not delve too deeply into that contract to conclude that it

---

[18] See *Mets, Aramark Agree To 30-Year Deal At Citi Field*, SportsBusiness Daily, June 4, 2007, PX 1 ("The Mets, instead of receiving a percentage of gross revenue from sales, will 'garner a portion of the net.'  Mets Exec VP/Business Operations Dave Howard said the deal is 'along the lines of a joint venture.'  Howard: 'We're true partners going forward.  We're sharing all the upside and all the risk.'").

amounts to a rights agreement reflecting a careful delineation of the rights and duties of each party.  The Court does not find intent to create a joint venture in an agreement explicitly disavowing any such intent: "[N]othing contained in this Agreement, nor any act of the parties hereto, shall be deemed or construed to create the relationship of principal and agent, partnership or joint venture."  QBC-Aramark Agreement at 45.

In any event, allegations of joint venture liability go to whether defendant could be held liable for Aramark's misconduct, if proven.  The misconduct alleged here is the violation of an order never intended to reach Aramark's own conduct.  Absent a finding that Aramark acted at defendant's direction and thereby aided or abetted defendant's indirect violation, there is no basis to hold Aramark to the terms of the injunction and thus no underlying misconduct at all.  See Alemite Mfg., 42 F.2d at 833 ("[T]he only occasion when a person not a party may be punished is when he has helped to bring about, not merely what the decree has forbidden, . . . but what it has the power to forbid, an act of a party.").  As shown above, the evidence before the Court is insufficient to warrant a finding of aiding and abetting.

### C.    QBC-Aramark Agreement

Certain provisions of the QBC-Aramark agreement purport to give QBC unilateral control over the operations of "speciality food" vendors, defined expressly to include kosher food vendors.  See QBC-Aramark Agreement at 12-14.  Plaintiff contends that this provision allows the Court to impute, as a matter of law, Aramark's conduct to defendant.  Pl. 7/11/11 Mem. at 16-18.  Under such a theory, even if Aramark made its own business decision, pursuant to its contractual rights, to limit plaintiff's Friday-Saturday sales, that decision should be deemed taken on defendant's behalf whether or not Aramark consulted with defendant.

Plaintiff advances no legal support for this theory, id. at 16-18, and the Court discerns no basis on which it could assign defendant the responsibility for the independent actions of a non-party. With regard to the challenged limitation on plaintiff's Friday and Saturday sales, the relevant inquiry is not which entity had the theoretical legal right to fix plaintiff's hours of operation; rather, the Court must determine which entity actually made the decision to do so. Plaintiff may well be correct that defendant had the contractual option, pursuant to its agreement with Aramark, to disregard Aramark's desires and decisions in managing plaintiff's sales at Citi Field. There is no evidence that defendant did so. In the wake of a judicial directive that defendant stay clear of the operational details surrounding plaintiff's sales, see Prelim. Inj. at 1, it would be inequitable and illogical to hold defendant accountable for a non-party's independent decisions in managing those same matters.

Having found no factual or legal basis on which to attribute to defendant Aramark's decision to bar plaintiff from operating on Fridays and Saturdays, the Court respectfully recommends that neither Aramark nor defendant be held in contempt on that basis.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends that plaintiff's motion to hold defendant Queens Ballpark Company, LLC and non-party Aramark Sports and Entertainment Services, LLC in civil contempt be denied in its entirety.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Jack B. Weinstein on or before **September 12, 2011**. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See

-39-

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a)(1), 72(b)(2); <u>Small v. Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to enter this Report and Recommendation into the ECF system.

**SO ORDERED.**

**Dated:**      **Brooklyn, New York**
            **August 26, 2011**


                        **ROANNE L. MANN**
                        **UNITED STATES MAGISTRATE JUDGE**