

## ARTICLE XII.
## DESTRUCTION - FIRE OR OTHER CAUSE

Section 12.01 Restoration. If the Premises are damaged by fire or other casualty, ARAMARK shall give prompt notice to QBC, and the damage shall be repaired by QBC to substantially the condition of the Premises prior to the damage, subject to the provisions of the Stadium Lease, provided that (i) QBC shall have no obligation to repair or restore Subtenant's Property or any ARAMARK Alterations to the Premises, except to the extent that any such ARAMARK Alteration is property of QBC and (ii) QBC shall have no obligation to restore the Premises, except to the extent of proceeds available under applicable insurance policies and from the balance of the Fund. The funding for any repair or restoration work covered by this Section 12.01 shall first be sourced from all available insurance proceeds, with any deductible amounts associated with the payment of such proceeds being a Direct Cost. To the extent that additional funding shall be required for any such repair or restoration work, the Fund shall then be utilized. Except as otherwise provided in Section 4.12(c), the occurrence of any casualty event covered by this Section 12.01 shall not entitle ARAMARK to any compensation nor shall this Agreement or any of the obligations of ARAMARK be affected or reduced by reason of any such event.

Section 12.02 QBC's Termination Right. Notwithstanding anything to the contrary contained in Section 12.01, if (i) the Premises are totally damaged or are rendered wholly untenantable; (ii) the New Ballpark is so damaged that, in QBC's opinion, substantial alteration, demolition or reconstruction of the New Ballpark is required (whether or not the Premises are so damaged or rendered untenantable); or (iii) there are insufficient insurance and Fund proceeds to complete the required repairs to restore the Premises and, in any such case, if QBC elects not to rebuild, then QBC may deliver written notice to ARAMARK stating that QBC has elected not to proceed with the restoration of the Premises. If, as of one (1) year following the date of the damage, QBC has not delivered such notice, and has not commenced restoration, then ARAMARK may, at any time following such one (1) year anniversary but before commencement of restoration, deliver written notice to QBC stating that ARAMARK has elected to terminate the Sublease and this Agreement. If either of QBC or ARAMARK delivers the written notice covered by the two (2) preceding sentences, then (i) the Sublease and this Agreement shall terminate on the thirtieth (30th) day following the delivery of such notice; (ii) ARAMARK shall vacate the Premises and surrender the same to QBC no later than the effective date of such termination; (iii) QBC shall be entitled to collect all insurance proceeds of policies held by QBC providing coverage for ARAMARK Alterations and other improvements to the Premises; and (iv) QBC shall be entitled to receive and retain the proceeds from any ARAMARK Insurance maintained on ARAMARK Alterations to the extent that QBC performed or paid for such ARAMARK Alterations, whether by contribution, offset or otherwise.

Section 12.03 Waiver of Real Property Law Section 227. This Article XII constitutes an express agreement governing any case of damage or destruction of the Premises or the New Ballpark by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other law of like nature and purpose now or hereafter in force, shall have no application in any such case.

Section 12.04 QBC's Liability. Any employee of QBC to whom any property shall be entrusted by or on behalf of ARAMARK shall be deemed to be acting as ARAMARK's agent with respect to such property and neither QBC nor any of the QBC Indemnitees shall be liable



30



for any damage to such property, or for the loss of or damage to any property of ARAMARK by theft or otherwise. None of the QBC Indemnitees shall be liable for any injury or damage to persons or property or interruption of ARAMARK's business resulting from fire or other casualty, any damage caused by other subtenants or persons in the New Ballpark or by construction of any private, public or quasi-public work, or any latent defect in the Premises or in the New Ballpark (except that QBC shall be required to repair or restore the same to the extent provided in Article 7, Article 13 or Article 14, as applicable, of the Sublease). No penalty shall accrue for delays which may arise by reason of adjustment of fire insurance on the part of QBC or ARAMARK, or Unavoidable Delays, in connection with any repair or restoration of any portion of the Premises or of the New Ballpark. QBC shall use reasonable efforts to minimize interference with ARAMARK's use and occupancy of the Premises during the performance of any such repair or restoration; provided, however, QBC shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever. Nothing in this Section 12.04 shall affect any right of QBC to be indemnified by ARAMARK or of ARAMARK to be indemnified by QBC under Article XVIII for payments made to compensate for losses of third parties.

## ARTICLE XIII.
## QBC ALTERATIONS TO NEW BALLPARK

Section 13.01  Alterations to New Ballpark.  QBC shall have the right at any time to (i) change the name, number or designation by which the New Ballpark is commonly known or (ii) alter the New Ballpark to change the arrangement or location of entrances or passageways, doors and doorways, elevators, stairs, toilets, or other public parts of the New Ballpark without any such acts constituting an actual or constructive eviction and without incurring any liability to ARAMARK, so long as such changes do not deny ARAMARK access to the Portable Concession Areas.  QBC shall use reasonable efforts to minimize interference with ARAMARK's use of the Portable Concession Areas during the making of such changes or alterations, provided that QBC shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever.

## ARTICLE XIV.
## EVENTS OF DEFAULT; TERMINATION

Section 14.01  ARAMARK Events of Default.  The occurrence of any of the following events, after the giving of any required notice and expiration of any applicable cure period, shall constitute an "ARAMARK Event of Default" under this Agreement:

(i)      Payments.  ARAMARK shall fail to make a payment due to QBC under this Agreement and such failure continues for seven (7) Business Days after ARAMARK has received written notice of any such payment delinquency;

(ii)     Breach.  Except as otherwise provided in Section 10.02(c), ARAMARK breaches any of its representations and warranties or fails to fulfill any of the covenants or agreements of this Agreement on its part to be kept or performed and, to the extent that such breach or failure is capable of being cured, fails to fully cure or remedy such breach or failure within thirty (30) days after written notice from QBC to ARAMARK specifying the nature of such failure, breach or default and specifying the

31

QBC0021485



applicable Section(s) of this Agreement, <u>provided</u> that in the event that such breach is not capable of cure within such thirty (30)-day period, then, provided ARAMARK has promptly commenced to cure such default within that period and is diligently pursuing the cure, ARAMARK shall have an additional reasonable period of time (not to exceed an additional sixty (60) days) to cure such default;

(iii)  <u>Bankruptcy</u>.  ARAMARK files a voluntary petition in bankruptcy, or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, or shall seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of ARAMARK or of all or any substantial part of its properties (the term "acquiesce," as used herein, being deemed to include, but not be limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment within the time specified by law); or a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against ARAMARK seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, and ARAMARK shall consent to, or acquiesce in, the entry of such order, judgment or decree, or the same shall remain unvacated and unstayed for an aggregate of sixty (60) days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of ARAMARK, or of all or any substantial part of its properties, shall be appointed without the consent or acquiescence of ARAMARK and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days;

(iv)  <u>Improper Transfer</u>.  Except as expressly permitted under Section 21.14, ARAMARK's interest in this Agreement shall be transferred to any Person, whether by operation of law or otherwise;

(v)  <u>Discontinuance</u>.  Except for any immaterial, temporary cessation, ARAMARK shall discontinue providing Portable Concession Services at the New Ballpark;

(vi)  <u>Lien</u>.  Any lien shall be filed against the New Ballpark, any Concession Equipment or any portion thereof because of any act or omission of ARAMARK and such lien shall not be discharged within thirty (30) days, unless ARAMARK shall, within the aforesaid thirty (30) days, furnish to QBC a bond reasonably satisfactory to protect the interests of QBC; or

(vii)  <u>Control of ARAMARK by Mets Competitor</u>.  ARAMARK shall be directly or indirectly controlled by any Mets Competitor.

Section 14.02  <u>Termination by QBC</u>.  Without limiting any other termination rights of QBC hereunder, QBC shall have the right to terminate this Agreement (A) by delivery of written notice to ARAMARK, in the case of any ARAMARK Event of Default covered by clause (i), clause (iii), clause (iv) or clause (vii) of Section 14.01, or the occurrence of an ARAMARK Change of Control (subject to the provisions of Section 21.14(d)), and (B) by delivery of written notice to ARAMARK, in the case of an ARAMARK Event of Default covered by clause (ii),

32



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



clause (v) or clause (vi) of Section 14.01 that has resulted in a material adverse effect upon (I) the Mets, QBC or any of their respective Controlled Affiliates or (II) QBC's rights under this Agreement.

Section 14.03 .QBC Events of Default.  The occurrence of any of the following events, after the giving of any required notice and expiration of any applicable cure period, shall constitute a "QBC Event of Default" under this Agreement:

(i)   Breach.  QBC breaches any of its representations and warranties or fails to fulfill any of the covenants or agreements of this Agreement on its part to be kept or performed and, to the extent that such breach or failure is capable of being cured, fails to fully cure or remedy such breach or failure within thirty (30) days after written notice from ARAMARK to QBC specifying the nature of such failure, breach or default and specifying the applicable Section(s) of this Agreement, provided that in the event that such breach is not capable of cure within such thirty (30)-day period, then, provided QBC has promptly commenced to cure such default within that period and is diligently pursuing the cure, QBC shall have an additional reasonable period of time (not to exceed an additional sixty (60) days) to cure such default;

(ii)   Bankruptcy.  QBC files a voluntary petition in bankruptcy, or shall be adjudicated bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, or shall seek, consent to or acquiesce in the appointment of any trustee, receiver, conservator or liquidator of QBC or of all or any substantial part of its properties (the term "acquiesce," as used herein, being deemed to include, but not be limited to, the failure to file a petition or motion to vacate or discharge any order, judgment or decree providing for such appointment within the time specified by law); or a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against QBC seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute or law relating to bankruptcy, insolvency or other relief for debtors, whether federal or state, and QBC shall consent to, or acquiesce in, the entry of such order, judgment or decree, or the same shall remain unvacated and unstayed for an aggregate of sixty (60) days from the date of entry thereof, or any trustee, receiver, conservator or liquidator of QBC, or of all or any substantial part of its properties, shall be appointed without the consent or acquiescence of QBC and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days; or

(iii)   Improper Transfer.  Except as expressly permitted under Section 21.14, QBC's interest in this Agreement shall be transferred to any Person, whether by operation of law or otherwise.

Section 14.04 Termination by ARAMARK.  Without limiting any other termination rights of ARAMARK, ARAMARK shall have the right to terminate this Agreement (A) by delivery of written notice to QBC, in the case of any QBC Event of Default covered by clause (iii) of Section 14.03 or the occurrence of a Mets Change of Control (subject to the provisions of Section 21.14(d)) and (B) by delivery of written notice to QBC, in the case of any QBC Event of

33

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021487



Default covered by clause (i) or clause (ii) of Section 14.03 that has resulted in a material adverse effect upon ARAMARK or ARAMARK's rights under this Agreement.

Section 14.05 <u>Automatic Termination</u>. If for any reason whatsoever, the Sublease shall terminate or expire, then this Agreement shall automatically terminate.

Section 14.06 <u>Effect of Termination</u>. Notwithstanding the termination or expiration of this Agreement, (i) the right of a party hereunder to receive a payment or obligation of either party hereunder to make a payment, in each case, which has accrued on or prior to the termination or expiration of this Agreement shall survive such termination or expiration; (ii) this Section 14.06 and Section 1.02, Section 4.19, Section 4.20, Article II, Article XV, Article XVI, Article XVII, Article XVIII, Article XX and Article XXI shall survive such termination or expiration of this Agreement; and (iii) such termination or expiration shall not relieve either party hereto from liability for any breach of this Agreement.

**ARTICLE XV.**
**REMEDIES AND DAMAGES**

Section 15.01 <u>QBC's Repossession Remedies</u>. At the expiration of the Term or upon its prior termination, (i) ARAMARK shall peaceably surrender to QBC the Concession Equipment, in good condition and repair, subject to ordinary wear and tear and damage by casualty excepted; (ii) besides other rights or remedies it may have, QBC shall have the immediate right to resume sole possession and control of the Concession Equipment by any lawful means, all without resort to legal process and without being deemed liable for trespass, or becoming liable for any loss or damage which may be occasioned thereby; (iii) at the direction of QBC, ARAMARK shall vacate the New Ballpark and shall have no right to further provide the Portable Concession Services; (iv) to the extent permitted by applicable law, ARAMARK shall surrender all alcoholic beverage licenses and other licenses and permits obtained by ARAMARK in connection with the provision of the Portable Concession Services to QBC or its designee; and (v) ARAMARK shall assign all catering sales contracts and catering deposits, for all Events that are scheduled to occur after the effective date of termination of this Agreement to QBC or its designee.

Section 15.02 <u>QBC's Other Remedies</u>.

(a)    Subject to Section 15.05, QBC may recover from ARAMARK all damages, costs and expenses that QBC may incur by reason of any breach of this Agreement by ARAMARK, including, without limitation, the cost of recovering the Concession Equipment, reasonable attorney's fees and court costs.

(b)    QBC's remedies hereunder are in addition to any remedy allowed by law.

Section 15.03 <u>ARAMARK's Remedies</u>.

(a)    Subject to Section 15.05, ARAMARK may recover from QBC all damages, costs and expenses that ARAMARK may incur by reason of any breach of this Agreement by QBC, including, without limitation, reasonable attorney's fees and court costs.

(b)    ARAMARK's remedies hereunder are in addition to any remedy allowed by law.

34

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Section 15.04 <u>Late Fees</u>. Any damages payable under this Agreement and not paid when due shall be subject to Late Fees until paid.

Section 15.05 <u>No Special, Consequential or Punitive Damages</u>. Notwithstanding any other provision contained herein, in no event under this Agreement shall either party hereto be liable for, and each party hereto, on behalf of itself and its affiliates, hereby waives any claim for, any indirect, special, consequential or punitive damages, including, without limitation, loss of profits or business opportunity, arising under or in connection with this Agreement.

## ARTICLE XVI.
## QBC'S RIGHT TO CURE; REIMBURSEMENT

Section 16.01 <u>Right to Cure</u>. If ARAMARK defaults in the performance of its obligations under this Agreement, QBC, without thereby waiving such default, may perform such obligation for the account and at the expense of ARAMARK: (i) immediately or at any time thereafter, and without notice, in the case of emergency or in case the default (A) materially interferes with the use by any other occupant of any space in the New Ballpark; (B) materially interferes with the efficient operation of the New Ballpark; (C) will result in a violation of any Requirements; (D) will result in a default under any Mortgage or Superior Lease; or (E) will result in a cancellation of any insurance policy maintained by QBC and (ii) in any other case if such default continues after the applicable cure period set forth in Section 14.01. All reasonable costs and expenses incurred by QBC in connection with any such performance by it for the account of ARAMARK and all reasonable costs and expenses, including reasonable counsel fees and disbursements, incurred by QBC in any action or proceeding (including any summary dispossess proceeding) brought by QBC to enforce any obligation of ARAMARK under this Agreement and/or right of QBC in or to the Portable Concession Areas or Concession Equipment shall be paid by ARAMARK to QBC on written demand, with Late Fees from the date incurred by QBC until paid. Except as expressly provided to the contrary in this Agreement, all costs and expenses which, pursuant to this Agreement are incurred by QBC and payable to QBC by ARAMARK, and all charges, amounts and sums payable to QBC by ARAMARK for any property, material, labor, utility or other services which, pursuant to this Agreement or at the request and for the account of ARAMARK, are provided, furnished or rendered by QBC, shall become due and payable by ARAMARK to QBC in accordance with the terms of the bills rendered by QBC to ARAMARK.

## ARTICLE XVII.
## COLLECTION RESPONSIBILITY; RECORD KEEPING; REPORTS; AUDIT RIGHTS AND BANK ACCOUNTS

Section 17.01 <u>Collection Responsibility</u>.

(a)     Except pursuant to Section 2.01(a)(i), ARAMARK shall have sole responsibility for the collection of all revenues and charges resulting from the Portable Concession Services including, without limitation, sales and/or use taxes attributable thereto, and for the payment of all such taxes to the appropriate Governmental Authorities. All collection methods and procedures shall be consistent with the prevailing industry standards for first-class Major League Baseball stadia, similarly situated, and subject to QBC's prior written approval. Neither ARAMARK nor any of its employees, contractors or other individuals subject to its control, shall actively solicit any gratuities from customers in the New Ballpark (e.g., through the

35



use of signage, tip cups or otherwise), or any other charges of any type, on account of the Portable Concession Services, other than those, if any, as shall be authorized through the Operations Determination Process.

(b)   As part of QBC's obligations under Article 5 of the Sublease, as of Opening Day, the parties hereto intend that state-of-the-art computerized cash registers and point-of-sale devices shall be located at all sales locations in the Portable Concession Areas as shall be necessary in order to accurately record the Gross Receipts. Throughout the Operational Term, the parties hereto shall periodically consult with each other about technology changes and the use of the Fund for technology-based upgrades and replacements to existing cash registers and point-of-sale devices for purposes of keeping the New Ballpark at the forefront technologically and enhancing the customer experience thereat. If, pursuant to the Operations Determination Process, the parties hereto agree to utilize software proprietary to ARAMARK in connection with the rendering of Concession Services, QBC shall execute such documents as shall be necessary to preserve ARAMARK's ownership interest and/or proprietary rights therein.

Section 17.02   Record Keeping.

(a)   Except as otherwise expressly provided in the definitions of the terms "Gross Receipts" and "Direct Costs," ARAMARK shall keep and maintain, consistent with generally accepted accounting principles, consistently applied, a set of full, true and complete books and records documenting, among other things, all Portable Concession Gross Receipts and Direct Costs relating to the Portable Concession Services and all Portable Concession F&NAB Payments and Additional Percentage Fee Payments, and all relevant supporting documents, calculations and other information used in determining the same. Each of the foregoing shall be kept and maintained (i) in a format reasonably acceptable to QBC and (ii) entirely separate and apart from books and records maintained by ARAMARK with respect to any other operations, other than those performed in respect of the Concession Services. All of the foregoing books, records, documents, calculations and other information shall be kept in a secure location within the Premises or such other location as QBC may approve, for at least three (3) years after the expiration of the calendar year to which they apply, and at ARAMARK's main office currently located at 1101 Market Street, Philadelphia, Pennsylvania 19107 for at least four (4) years thereafter.

(b)   At QBC's request, ARAMARK shall provide QBC with copies of, or access to, any and all sales and management reports generated by ARAMARK that relate to the New Ballpark.

Section 17.03   Reporting.

(a)   ARAMARK shall provide QBC, in a format determined and approved by QBC, with a written summary of each Event, within eighteen (18) hours after such Event, indicating (i) the Portable Concession Gross Receipts, separately indicating Portable Concession F&NAB Gross Receipts and Portable Concession Alcohol Gross Receipts; (ii) an itemized list of all Direct Costs incurred in connection with such Portable Concession Gross Receipts; (iii) cash sale and credit card sale components comprising the aggregate amount of such Portable Concession Gross Receipts; (iv) over/short report with respect to each sales location within the Portable Concession Areas; and (v) number of units sold, broken down by product category and item. ARAMARK shall attach the corresponding deposit ticket reports to all such summaries.

36

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021490



(b)   Within fifteen (15) days after the end of the month immediately succeeding the month that includes Opening Day and continuing for each month thereafter during the Operational Term, ARAMARK shall deliver a written final report which shall set forth, in reasonable detail, with respect to the most recently completed month, the (i) aggregate amount of the Portable Concession Gross Receipts, separately indicating Portable Concession F&NAB Gross Receipts and Portable Concession Alcohol Gross Receipts; (ii) amount of such Portable Concession Gross Receipts consisting of cash sales; (iii) amount of such Portable Concession Gross Receipts consisting of credit card sales; (iv) amount of such Portable Concession Gross Receipts attributable to each of the major categories of Concession Services (e.g., alcoholic beverages, soft drinks, non-catered food, retail merchandise, catering); (v) Portable Concession Gross Receipts by location within the New Ballpark; (vi) aggregate amount of Direct Costs associated with such Portable Concession Gross Receipts; (vii) amount of each major cost and expense category included within such Direct Costs (e.g., alcoholic beverages, soft drinks, non-catered food, retail merchandise, catered food, disposable cups, containers, plates, eating utensils, packaging and napkins, labor, sanitation expenses, maintenance expenses and utility charges); and (viii) extraordinary costs or items, if any, included within the amount of such Direct Costs.

(c)   Within one hundred ten (110) days after the end of the calendar year that includes Opening Day and within one hundred ten (110) days after the end of each calendar year thereafter during the Term, ARAMARK shall deliver to QBC audited financial statements reporting on the Concession Services provided during such calendar year prepared by an independent accounting firm acceptable to QBC.

Section 17.04 Audit Rights.  Each of the parties hereto and its auditors shall have the right from time to time during regular business hours, upon reasonable advance notice, to inspect and audit all of the books and records of the other party hereto maintained in respect of the transactions contemplated by this Agreement if and to the extent that the audit is reasonably related to the rights and obligations of the party hereto engaging in such audit.  Each of the parties hereto shall, and shall cause its accountants to, reasonably cooperate with the other party and such party's auditors, and afford reasonable access to all information, records, invoices, data and working papers relevant to any audit.  The parties hereto shall take all necessary action (including, without limitation, the making of payments) to promptly correct any undisputed error discovered in any audit.  Subject to applicable law, all information made available in connection with any audit covered by this Section 17.04 shall be held in confidence by the party hereto conducting such audit and its auditors, except as may be necessary for the enforcement of such party's rights under this Agreement.  The audit right set forth in this Section 17.04 shall be in addition to the right afforded to the parties hereto under Section 2.01(e).

Section 17.05 Bank Accounts.  ARAMARK shall maintain one (1) or more separate commercial bank accounts at such bank(s) approved by QBC for all Concession Services-related deposits.

37

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021491



# ARTICLE XVIII.
# INDEMNITY

### Section 18.01 Indemnification by ARAMARK.

(a)    ARAMARK shall save and hold QBC, QBC's affiliates (including, without limitation, SMLP), each Mortgagee and Lessor, and each of their respective, direct or indirect, partners, members, affiliates, principals, directors, officers, stockholders, employees, contractors, licensees, invitees, servants, representatives and agents (collectively, the "QBC Indemnitees") harmless from and hereby indemnifies the QBC Indemnitees from and against any liability to, and claims and actions by, ARAMARK or any other Person (including, without limitation, any employees, agents, invitees, licensees and contractors of ARAMARK, and patrons, fans and others in the New Ballpark, and any other Persons served by ARAMARK), for or on account of any liabilities, claims, actions or expenses (including, but not limited to, reasonable attorney's fees and costs) where such liabilities, claims, actions or expenses are (i) caused or incurred, in whole or in part, by any alleged or actual negligence or other fault (including, without limitation, in respect of any (A) Hazardous Materials-related matter, (B) Requirements-related violation or other Requirements-related matter, (C) labor- or employment-related violation or other labor- or employment-related matter or (D) alcoholic beverage sales or service) on the part of ARAMARK or its employees, agents, invitees or other Persons within their control unless such conduct was either (I) specifically directed or authorized by QBC in writing or (II) determined through the Operations Determination Process and consistent with the standard of conduct set forth in Section 4.05(a); (ii) caused or incurred, in whole or in part, by any breach by ARAMARK of any representation, warranty, covenant or other provision of this Agreement; (iii) related in any way to alcoholic beverage sales or service for Events including, without limitation, any imposition of strict liability in connection therewith; or (iv) related in any way to any other imposition of strict liability occasioned by reason of any act or omission of ARAMARK or its employees, agents, invitees or other Persons within their control.

(b)    ARAMARK shall reimburse the QBC Indemnitees for any and all expense and loss resulting from the loss of, loss of the use of, or damage to property owned by or in which the QBC Indemnitees have any interest, which results, in whole or in part, from one or more of the foregoing causes. Nothing in this Section 18.01, however, shall be deemed to impose liability on ARAMARK to indemnify the QBC Indemnitees to the extent that the QBC Indemnitees' gross negligence or willful misconduct is the cause of the foregoing liabilities, claims, actions or expenses.

### Section 18.02 Indemnification by QBC.

(a)    QBC shall save and hold ARAMARK and its, direct or indirect, partners, members, affiliates, principals, directors, officers, stockholders, employees, contractors, licensees, invitees, servants, representatives and agents (collectively, the "ARAMARK Indemnitees") harmless from and hereby indemnifies the ARAMARK Indemnitees from and against any liability to, and claims and actions by, QBC or any other Person (including, without limitation, any employees, agents, invitees, licensees and contractors of QBC) for or on account of any liabilities, claims, actions or expenses (including, but not limited to, reasonable attorney's fees and costs) where such liabilities, claims, actions or expenses are (i) caused or incurred, in whole or in part, by any alleged or actual negligence or other fault (including, without limitation, in respect of any (A) Hazardous Materials-related matter, (B) Requirements-related violation or



38

QBC0021492



other Requirements-related matter or (C) alcoholic beverage sales or service, if any, provided under any alcoholic beverage license surrendered by ARAMARK to QBC under Section 15.01) on the part of QBC or its employees, agents or other Persons within its control <u>unless</u> such conduct was either (I) specifically directed or authorized by ARAMARK in writing or (II) determined through and undertaken in accordance with the Operations Determination Process; (ii) caused or incurred, in whole or in part, by any breach by QBC of any representation, warranty, covenant or other provision of this Agreement; or (iii) related in any way to any imposition of strict liability occasioned by reason of any act or omission of QBC or any of its employees, agents or other Persons within its control; <u>provided</u>, <u>however</u>, that QBC shall have no liability with respect to alcoholic beverages or the sales or service thereof for Events.

(b)     QBC shall reimburse the ARAMARK Indemnitees for any and all expense and loss resulting from the loss of, loss of the use of, or damage to property owned by or in which the ARAMARK Indemnitees have any interest, which results, in whole or in part, from one or more of the foregoing causes. Nothing in this Section 18.02, however, shall be deemed to impose liability on QBC to indemnify the ARAMARK Indemnitees to the extent that the ARAMARK Indemnitees' gross negligence or willful misconduct is the cause of the foregoing liabilities, claims, actions or expenses.

Section 18.03   <u>Indemnification Procedures</u>.

(a)     <u>Procedures Relating to Indemnification of Third Party Claims</u>. If any QBC Indemnitee or ARAMARK Indemnitee (the "<u>Indemnified Party</u>") receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under Section 18.01 or 18.02 (a "<u>Third Party Claim</u>"), and such Indemnified Party intends to seek indemnity pursuant to this Article XVIII, the Indemnified Party shall promptly provide the other party (the "<u>Indemnifying Party</u>") with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought. Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from liability on account of this indemnification, except and to the extent that the Indemnifying Party is actually and materially prejudiced thereby. The Indemnifying Party will have sixty (60) days from receipt of any such notice of a Third Party Claim to give notice to assume the defense thereof. If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume the defense of the Indemnified Party against the Third Party Claim with counsel of its choice. So long as the Indemnifying Party has assumed the defense of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim and (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party. The parties will use commercially reasonable efforts to minimize losses and other liabilities from Third Party Claims and will act in good faith in responding to, defending against, settling or otherwise dealing with such claims. The parties will also cooperate in any such defense and give each other reasonable access to all information relevant thereto. Whether or not the Indemnifying Party has assumed the defense, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's

39



prior written consent. The Indemnifying Party shall have the right, with the consent of the Indemnified Party, which consent shall not be unreasonably withheld, delayed or conditioned, to settle all indemnifiable matters related to Third Party Claims.

(b)     Procedures for Non-Third Party Claims.  The Indemnified Party will notify the Indemnifying Party in writing promptly of its discovery of any matter that does not involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party, giving rise to the claim of indemnity pursuant hereto. The failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party from liability on account of this indemnification, except and to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have sixty (60) days from receipt of any such notice to give notice of dispute of the claim to the Indemnified Party.  The Indemnified Party will reasonably cooperate and assist the Indemnifying Party in determining the validity of any claim for indemnity by the Indemnified Party and in otherwise resolving such matters. Such assistance and cooperation will include providing reasonable access to and copies of information, records and documents relating to such matters, furnishing access to employees to assist in the investigation, defense and resolution of such matters and providing legal and business assistance with respect to such matters.

Section 18.04 Survival.  The expiration or termination of this Agreement shall not affect the continuing obligations of ARAMARK or QBC as an indemnitor under this Article XVIII.

## ARTICLE XIX.
## REPRESENTATIONS AND WARRANTIES

Section 19.01 ARAMARK Representations and Warranties.  ARAMARK represents and warrants to QBC as follows:

(a)     ARAMARK is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and duly qualified and subsisting as a foreign limited liability company authorized to transact business in the State of New York to the extent required by the Requirements, with full power and authority, and with all licenses, permits, certifications, registrations, approvals, consents and franchises necessary to (i) conduct its business as currently conducted; (ii) enter into this Agreement; (iii) execute, deliver and perform this Agreement; and (iv) consummate the transactions contemplated hereby;

(b)     This Agreement is the valid and binding obligation of ARAMARK, enforceable against it in accordance with the terms and conditions hereof, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the rights of creditors generally and the discretion of courts in granting equitable remedies;

(c)     The execution, delivery and performance of this Agreement by ARAMARK does not and will not, with or without the giving of notice or the lapse of time, or both, (i) result in any violation of its constitutional documents; (ii) result in a breach of, or conflict with, any of the terms or provisions of, or constitute a default under, or result in the modification or termination of, or result in the creation or imposition of any lien or other encumbrance upon any of its properties or assets pursuant to any indenture, mortgage, note, contract, commitment or other agreement or instrument to which it is a party or by which it or its

40



properties or assets are or may be bound or affected; or (iii) violate any existing applicable law, rule, regulation, judgment, order or decree of any governmental agency or court, domestic or foreign, having jurisdiction over it or its assets;

(d)    ARAMARK is not in violation of, or in default under, any (i) term or provision of its constitutional documents; (ii) material term or provision, or any financial covenant of any indenture, mortgage, contract, commitment or other agreement or instrument to which it is a party, or by which it or any of its assets is or may be bound or affected; or (iii) existing applicable law, rule, regulation, judgment, order or decree of any government agency or court, domestic or foreign, having jurisdiction over it or any of its assets;

(e)    No approvals are required to be obtained by ARAMARK (other than those which have been obtained) in connection with its execution, delivery and performance of this Agreement. and

(f)    ARAMARK has not dealt with any broker in connection with this Agreement and that, to the best of its knowledge, no broker, finder or like entity procured or negotiated this Agreement or is entitled to any fee or commission in connection herewith.

Section 19.02 QBC Representations and Warranties.  QBC represents and warrants to ARAMARK as follows:

(a)    QBC is a limited liability company duly organized, validly existing and subsisting under the laws of the State of New York, with full power and authority, and with all licenses, permits, certifications, registrations, approvals, consents and franchises necessary to (i) conduct its business as currently conducted; (ii) enter into this Agreement; (iii) execute, deliver and perform this Agreement; and (iv) consummate the transactions contemplated hereby;

(b)    This Agreement is the valid and binding obligation of QBC, enforceable against it in accordance with the terms and conditions hereof, subject, as to enforcement of remedies, to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the rights of creditors generally and the discretion of courts in granting equitable remedies;

(c)    The execution, delivery and performance of this Agreement by QBC does not and will not, with or without the giving of notice or the lapse of time, or both, (i) result in any violation of its constitutional documents; (ii) result in a breach of, or conflict with, any of the terms or provisions of, or constitute a default under, or result in the modification or termination of, or result in the creation or imposition of any lien or other encumbrance upon any of its properties or assets pursuant to any indenture, mortgage, note, contract, commitment or other agreement or instrument to which it is a party or by which it or its properties or assets are or may be bound or affected; or (iii) violate any existing applicable law, rule, regulation, judgment, order or decree of any governmental agency or court, domestic or foreign, having jurisdiction over it or its assets;

(d)    QBC is not in violation of, or in default under, any (i) term or provision of its constitutional documents; (ii) material term or provision, or any financial covenant of any indenture, mortgage, contract, commitment or other agreement or instrument to which it is a party, or by which it or any of its assets is or may be bound or affected; or (iii) existing

41



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



applicable law, rule, regulation, judgment, order or decree of any government agency or court, domestic or foreign, having jurisdiction over it or any of its assets;

(e)     No approvals, other than the approval of the Office of the Commissioner of Baseball and such other approvals which have been obtained, are required to be obtained by QBC in connection with its execution, delivery and performance of this Agreement; and

(f)     QBC has not dealt with any broker in connection with this Agreement and that, to the best of its knowledge, no broker, finder or like entity procured or negotiated this Agreement or is entitled to any fee or commission in connection herewith.

## ARTICLE XX.
## DISPUTE RESOLUTION

Section 20.01  Deadlock.

(a)     In the event QBC and ARAMARK shall disagree (i) under Article VIII and the procedures set forth in this Article XX are invoked thereunder or (ii) over whether ARAMARK'S approval was unreasonably withheld in connection with any matter subject to the Operations Determination Process (each a "Deadlock"), each of QBC and ARAMARK shall have the right to provide the other with a written notice describing in reasonable detail the nature of the Deadlock and the desired outcome (each a "Deadlock Position Notice"). Following the delivery of the Deadlock Position Notices, each of QBC and ARAMARK shall negotiate in good faith to resolve the Deadlock. Such negotiations shall occur through in-person negotiations in which the representative of each of QBC and ARAMARK shall have decision-making authority and ability to bind QBC or ARAMARK, as the case may be, with respect to such Deadlock. If QBC and ARAMARK are unable to resolve the Deadlock within fifteen (15) days or a mutually-agreed upon longer or shorter period of time after delivery of the Deadlock Position Notices (the "Negotiation Period"), then QBC and ARAMARK shall follow the procedures set forth in Sections 20.01(b) through 20.01(d) to resolve the Deadlock.

(b)     In the event that QBC and ARAMARK are unable to timely resolve the Deadlock pursuant to Section 20.01(a), QBC and ARAMARK shall, within five (5) Business Days following the expiration of the Negotiation Period, resolve the Deadlock by submitting to binding arbitration pursuant to the Rules of the American Arbitration Association for Commercial Arbitration then in effect, except where those rules conflict with the terms and conditions of this Section 20.01(b), Section 20.01(c) or Section 20.01(d), in which case such Sections shall control. Concurrently with its submission to arbitration, each of the QBC and ARAMARK shall (i) select an arbitrator (each a "Designated Arbitrator") who is unaffiliated with such party and, to the extent possible, experienced in arbitrating baseball-related business (as opposed to labor) disputes and (ii) notify the other in writing of the identity of the arbitrator so selected. In the event that either QBC and ARAMARK shall fail to timely select its Designated Arbitrator, such Designated Arbitrator shall be selected by the office of the American Arbitration Association (or any successor thereto) located in the Borough of Manhattan in New York, New York. The Designated Arbitrators shall, within five (5) Business Days following their selection, select a third arbitrator (the "Third Arbitrator" and collectively with the Designated Arbitrators, the "Arbitrators"). If the Designated Arbitrators are unable to agree on the Third Arbitrator within such five (5) Business Day-period, then the Third Arbitrator shall be selected by the office of the American Arbitration Association (or any successor thereto) located



42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



in the Borough of Manhattan in New York, New York.  The fees and expenses of the Arbitrators and the American Arbitration Association shall be borne equally by QBC and ARAMARK.

(c)      The arbitration hearing shall be conducted in the Borough of Manhattan in New York, New York and conclude no later than thirty (30) days after the date on which the Third Arbitrator is selected pursuant to Section 20.01(b).  The Arbitrators shall set a date for the arbitration hearing; make determinations based solely on the documents and other evidence presented at the arbitration hearing; commit to the rendering of a decision regarding the Deadlock within ten (10) Business Days after the conclusion of the arbitration hearing (the date on which such arbitration hearing concludes being hereinafter referred to as the "Conclusion Date") and provide discovery according to the time limits specified herein, giving recognition to the understanding of QBC and ARAMARK that they contemplate reasonable discovery, including document demands and depositions, but that such discovery be limited so that the time limits specified herein may be met without undue difficulty.  In no event shall the Arbitrators allow either the QBC or ARAMARK to obtain more than a total of fifteen (15) hours of deposition testimony from all witnesses, including both fact and expert witnesses.  In the event multiple hearing days are required, they shall be scheduled consecutively to the greatest extent possible.

(d)      The Arbitrators shall, within ten (10) Business Days after the Conclusion Date, render a written opinion (the "Opinion") of their decision regarding the Deadlock to each of QBC and ARAMARK which shall set forth in reasonable detail the grounds upon which such decision is based.  The decision contained in the Opinion shall be final and binding on QBC and ARAMARK.  Neither the QBC nor ARAMARK may apply to any court to vacate, modify or appeal the Opinion, but may apply to an appropriate court solely for the purpose, if necessary, of enforcing the Opinion.  Notwithstanding the foregoing, each of QBC and ARAMARK may seek to vacate or modify the Opinion solely on the grounds of corruption, fraud or miscalculation of figures.

(e)      Until such time that a Dispute is resolved in accordance with this Article XX, QBC shall have the right to make any and all decisions and determinations relating to the subject matter of such Dispute, provided that if the Dispute is resolved in favor of ARAMARK, QBC shall be responsible for any demonstrable loss of Portable Concession Net Profits sustained by ARAMARK, to the extent such loss is the result of any such overturned decision or determination made by QBC without ARAMARK's approval.  ARAMARK shall comply with and cooperate in good faith with all decisions and determinations made by QBC pursuant to the immediately preceding sentence prior to the resolution of the Dispute at issue.

Section 20.02  MLB and Lease Changed Circumstances.

(a)      If after the date of this Agreement there is an amendment, modification or other revision ("Material Alteration") to (i) any of the MLB Documents, (ii) any Mortgage or (iii) the Stadium Lease or any other Superior Lease which materially diminishes the rights of ARAMARK or materially increases the obligations of ARAMARK under this Agreement, then QBC and ARAMARK shall follow the procedures set forth in Sections 20.01(a) through 20.01(d) to determine an equitable adjustment in the economic terms of this Agreement; provided, however, that if binding arbitration is invoked, the Arbitrators sole remedy shall be to impose an equitable adjustment in the economic terms of this Agreement, unless the Arbitrators determine that the result of the Material Alteration on ARAMARK's rights or obligations

43



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021497



hereunder is so fundamental and pervasive as to deprive ARAMARK of the essential benefits of this Agreement, such that it cannot reasonably be remedied through such equitable adjustment.

(b) In the event the Arbitrators determine under Section 20.02(a) that the rights of ARAMARK under this Agreement have been so fundamentally and pervasively altered so as to deprive ARAMARK of the essential benefits of this Agreement, such that it cannot be remedied through an equitable adjustment in the economic terms hereof, then QBC and ARAMARK shall promptly, following such determination, negotiate in good faith reach resolution regarding ARAMARK's rights hereunder. Such negotiations shall occur through in-person negotiations in which the representative of each of QBC and ARAMARK shall have decision-making authority and ability to bind QBC or ARAMARK, as the case may be, with respect to such resolution of ARAMARK's rights. If QBC and ARAMARK are unable to reach resolution within thirty (30) days (or a mutually-agreed upon longer or shorter period of time) following the commencement of such negotiations, then ARAMARK shall have the right to terminate this Agreement on not less than sixty (60) days' prior written notice to QBC, but in no event shall such date of termination occur at any time during any Baseball Season.

### ARTICLE XXI.
### MISCELLANEOUS

Section 21.01 Expenses. Each of the parties hereto shall be solely responsible for and shall bear all of its own expenses that it incurs in connection with the negotiation, execution and delivery of this Agreement.

Section 21.02 Notices. All notices, requests, claims, demands and other communications must be in writing and shall be duly given on the date of delivery, if transmitted by a nationally recognized courier service or by facsimile to the applicable facsimile number set forth on Schedule B annexed hereto (provided a copy of such facsimile is also sent at the time of such facsimile transmission to the recipient by any other means permitted hereunder), so as to be received during the hours of 8:00 AM to 5:00 PM, Monday through Friday, or on the date of receipt, if mailed to the Person to whom notice is to be given by certified or registered mail, postage prepaid, and properly addressed to the addresses set forth on Schedule B annexed hereto or such other address as may be set forth in written notice of change of address transmitted in the manner set forth in this Section 21.02.

Section 21.03 Conflicts. In the event of a conflict between the term and conditions of this Agreement and the Sublease, the Sublease shall govern and prevail in all respects.

Section 21.04 Specific Performance. Each of QBC and ARAMARK hereby acknowledges and confirms that its remedies at law for a breach or threatened breach of any of the provisions of this Agreement would be inadequate and, in recognition of that fact, hereby further acknowledges and confirms that, in the event of a breach or threatened breach by QBC or ARAMARK of the provisions of this Agreement, in addition to any remedies at law, the other party shall, without posting any bond or proof of actual damages, be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available.

Section 21.05 Jurisdiction. Except as otherwise provided in Article XX, each party hereto irrevocably agrees that any legal action, suit or proceeding against them arising out of or



44

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in Queens County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding, and waives any claim that such forum is inconvenient or any similar claim.

Section 21.06  <u>Service of Process</u>.  Each of the parties hereto hereby acknowledges and confirms that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth in Section 21.02 shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 21.05.

Section 21.07  <u>**Waiver of Jury Trial**</u>.  **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, OR RELATING TO, THIS AGREEMENT OR THE ACTIONS OF THE PARTIES TO THIS AGREEMENT IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 21.07.**

Section 21.08  <u>No Waiver</u>.  No provision of this Agreement shall be deemed to have been waived by either party unless such waiver is in writing and is signed by the party against whom such waiver is asserted, and any such waiver shall be effective only for the specific purpose and in the specific instance in which given.  The failure of either party to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Agreement, shall not be construed as a waiver or relinquishment for the future performance of such obligations of this Agreement or of the right to exercise such election but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

Section 21.09  <u>Relationship of the Parties</u>.  QBC and ARAMARK hereby acknowledge and confirm that they are independent contractors, and nothing contained in this Agreement, nor any act of the parties hereto, shall be deemed or construed to create the relationship of principal and agent, partnership or joint venture between QBC and ARAMARK.  Neither party hereto shall hold self out to be anything other than an independent contractor, and neither party hereto shall incur or purport to incur liability on behalf of the other.

Section 21.10  <u>Entire Agreement; Written Modification</u>.  This Agreement (together with the Schedules annexed hereto) and the Sublease (together with the Schedules and Exhibit annexed thereto) contain the entire agreement of the parties hereto, and there are no other terms, conditions, promises, understandings, statements or representations, express or implied, concerning this transaction.  None of the terms of this Agreement shall be amended, modified or



45

QBC0021499



otherwise supplemented in any respect, except by an agreement in writing signed by both parties hereto and specifically referring to this Agreement.

Section 21.11  Press Release; Confidentiality.  This Agreement constitutes and contains confidential and proprietary information of ARAMARK and QBC.  Promptly following the execution and delivery of this Agreement, QBC and ARAMARK shall cooperate jointly on developing a press release or other public announcement of the transactions contemplated by this Agreement.  Following the making of such press release or other public announcement, each of the parties hereto shall have the right to disclose that it is a party to this Agreement and is providing or receiving, as the case may be, the Portable Concession Services.  Except to the extent (i) permitted under the immediately preceding two (2) sentences; (ii) required by law (in which case the party hereto required by law shall give notice to the other party if permitted by law); or (iii) already or hereafter publicly known or known to the recipient of such disclosure (other than pursuant to a breach of this Section 21.11), from and after the execution of this Agreement neither party hereto shall disclose this Agreement to any other Person without the other party's prior written consent, provided that neither party hereto shall be prohibited or restricted from disclosing this Agreement to its affiliates (including, without limitation, in the case of QBC, SMLP) or to its or its affiliates' counsel, accountants, representatives, lenders, advisors or consultants, provided, in each case, that the foregoing shall be advised of the confidential nature of this Agreement and the party hereto providing this Agreement shall be responsible for compliance by such other Persons.  In addition, QBC and ARAMARK may disclose this Agreement to the Office of the Commissioner of Baseball, any governmental agency, lender, insurer, national statistical rating agency or other third party in connection with the development, construction or financing of the New Ballpark or for working capital purposes (including, without limitation, to the NYCIDA or Ambac Assurance Corporation as may be required pursuant to the Stadium Lease and other agreements entered into by QBC in connection with the development, construction or financing of the New Ballpark), provided the disclosing party uses reasonable efforts to cause such third parties to preserve the confidentiality of this Agreement (including, without limitation, reasonable efforts to obtain a confidentiality agreement), and gives the non-disclosing party reasonable advance notice of such disclosure and the opportunity to discuss methods of restricting disclosure.

Section 21.12  Unavoidable Delay.  Each party hereto shall be excused from performing any obligation or undertaking provided in this Agreement in the event and/or for so long as the performance of any such obligation is prevented or delayed, retarded or hindered due to Unavoidable Delay or any other cause, whether similar or dissimilar, not within the reasonable control of such party; provided, however, nothing in this Section 21.12 shall prohibit QBC from immediately exercising its right to perform concession operations as provided in Section 4.10(b).

Section 21.13  Severability.  If any term or provision of this Agreement or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to Persons or circumstances other than those held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

46

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021500



Section 21.14 <u>Assignment; Changes of Control; Initial Public Offering</u>.

(a)   <u>General</u>.   This Agreement shall be binding upon the parties hereto and their respective permitted legal representatives, successors and assigns.   Neither party hereto shall have the right to assign this Agreement, in whole or in part, without the prior written consent of the other party hereto, such consent not to be unreasonably withheld, conditioned or delayed.

(b)   <u>Exceptions to ARAMARK Consent</u>.   Notwithstanding Section 21.14(a), the prior written consent of ARAMARK shall not be required in connection with any (i) assignment pursuant to Article X or any other involuntary assignment by QBC, (ii) assignment by QBC to any Controlled Affiliate, <u>provided</u> that, under such circumstance, QBC (in addition to the assignee) shall remain responsible following such assignment for any payment obligation hereunder or (iii) assignment as part of the sale of all, or substantially all, of the assets of QBC; <u>provided</u>, <u>however</u>, that in each case such assignment is accompanied by a concurrent assignment of the Sublease (in accordance with the terms thereof) to the same assignee; and <u>provided</u>, <u>further</u> that in the case of an assignment covered by clause (ii) or clause (iii) of this Section 21.14(b), the assignee has sufficient resources to perform the obligations of QBC required hereunder as evidenced by financial statements or other documentation reasonably acceptable to ARAMARK and executes a document agreeing to be bound by this Agreement.

(c)   <u>Exceptions to QBC Consent</u>.   Notwithstanding <u>Section 27.16(a)</u>, the prior written consent of QBC shall not be required in connection with any assignment of this Agreement as part of the sale of all, or substantially all, of ARAMARK's assets.   This Section 21.14(c) shall have no effect upon provisions herein regarding "ARAMARK Change of Control" (<u>i.e.</u>, such an assignment may result in an ARAMARK Event of Default or termination right pursuant to such provisions).

(d)   <u>Changes of Control</u>.

(i)   *ARAMARK Change of Control*.   ARAMARK shall, not less than sixty (60) days prior to the date on which any impending transaction (the "<u>Subject Transaction</u>") involving an ARAMARK Change of Control is expected to be consummated, provide written notice (the "<u>Change of Control Notice</u>") to QBC of the Subject Transaction; <u>provided</u>, <u>however</u>, in the event of an ARAMARK Change of Control involving a Mets Competitor, this Section 21.14(d)(i) shall not apply, but Section 14.01(vii) and Section 14.02 shall apply.   The Change of Control Notice shall be accompanied by a general overview of the Subject Transaction, including: (i) the parties to the Subject Transaction and their respective control Person(s), (ii) the financial wherewithal of ARAMARK, after giving effect to the Subject Transaction, to perform all of its obligations under the Sublease and this Agreement, (iii) the anticipated timing for the closing of the Subject Transaction, (iv) the general transactional structure of the Subject Transaction, (v) the anticipated identity of senior management personnel of ARAMARK, after giving effect to the Subject Transaction, and (vi) such other information regarding the Subject Transaction as may reasonably be requested by QBC for the purpose of making an informed decision as to whether to exercise its right to terminate this Agreement under Section 14.02, provided QBC requests such information within fifteen (15) days of its receipt of the Change of Control Notice and required supporting documentation.   ARAMARK shall promptly supplement such information in

-47-



the event of material changes with respect to the information provided in the Change of Control Notice following delivery thereof. QBC shall, within thirty (30) days following its receipt of all information covered by the immediately two (2) preceding sentences, deliver written notice to ARAMARK indicating whether QBC intends to exercise its right to terminate this Agreement under Section 14.02. If QBC shall elect to terminate this Agreement by reason of a ARAMARK Change of Control, then QBC shall notify ARAMARK in writing of such election and shall specify the effective date of termination, which date shall be on or before the later of (y) the date of such notice and (z) the day immediately following the last day of the Baseball Season that occurs within the calendar year in which such election is made. If ARAMARK timely complies with its obligation to provide information under this Section 21.14(d)(i) and QBC fails to exercise its termination right by the deadline set forth herein, QBC shall be deemed to have waived such right with respect to the Subject Transaction at issue.

(ii)     *Mets Change of Control.*  QBC and SMLP, not less than sixty (60) days prior to the date on which any impending transaction (the "Mets Subject Transaction") involving a Mets Change of Control is expected to be consummated, provide written notice (the "Mets Change of Control Notice") to ARAMARK of the Mets Subject Transaction.   The Mets Change of Control Notice shall provide a general overview of the Mets Subject Transaction, including (i) the parties to the Mets Subject Transaction and their respective control Person(s), (ii) the anticipated timing for the closing of the Mets Subject Transaction, (iii) the general transactional structure of the Mets Subject Transaction, (iv) the anticipated identity of senior management personnel of QBC, after giving effect to the Mets Subject Transaction, and (v) such other information regarding the Mets Subject Transaction as may reasonably be requested by ARAMARK for the purpose of making an informed decision as to whether to exercise its right to terminate this Agreement under Section 14.04, provided ARAMARK requests such information within fifteen (15) days of its receipt of the Mets Change of Control Notice and required supporting documentation.   QBC shall promptly supplement such information in the event of material changes with respect to the information provided in the Mets Change of Control Notice following delivery thereof. ARAMARK shall, within thirty (30) days following its receipt of all information covered by the immediately two (2) preceding sentences, deliver written notice to QBC indicating whether ARAMARK intends to exercise its right to terminate this Agreement under Section 14.04.   If ARAMARK shall elect to terminate this Agreement by reason of a Mets Change of Control, then ARAMARK shall notify QBC in writing of such election and the effective date of termination shall be the day immediately following the last day of the Baseball Season that occurs within the calendar year in which the closing of the Mets Subject Transaction occurs. If QBC timely complies with its obligation to provide information under this Section 21.14(d)(ii) and ARAMARK fails to exercise its termination right by the deadline set forth herein, ARAMARK shall be deemed to have waived such right with respect to the Mets Subject Transaction at issue.

(e)     Initial Public Offering.  Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall be deemed to prohibit, or require QBC consent for, an initial public offering of the stock of ARAMARK or of any entity that directly or indirectly controls ARAMARK, and any such transaction shall not constitute an ARAMARK Change of Control, unless (I) such initial public offering results in any Person or "group" (as such term is

48



used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, and Rule 13d-5 promulgated thereunder) having the power or ability to elect a majority of the board of directors of the issuer of the securities in such initial public offering or (II) if such issuer is ARAMARK, ARAMARK, immediately following such initial public offering, is not able to continue to perform all of the obligations of ARAMARK under the Sublease and this Agreement.

Section 21.15 <u>Governing Law</u>.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of law.

Section 21.16 <u>Non-Recourse</u>.  In the enforcement of its rights and remedies under this Agreement, each of the parties hereto shall not seek, enter or enforce any personal judgment against any stockholder, member, general or limited partner, director, officer, employee or principal, disclosed or undisclosed, of the other party or any of the other party's affiliates (or any of their respective successors and assigns) and shall look only to the assets of the other party and its successors and assigns.

Section 21.17 <u>Certain Rules of Interpretation</u>.  For purposes of this Agreement, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa.  This Agreement shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

Section 21.18 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original and both of which, when taken together, shall constitute one and the same agreement.

Section 21.19 <u>Captions</u>.  The captions in this Agreement are included for convenience only and shall not be taken into consideration in any construction or interpretation of this Agreement or any of its provisions.

Section 21.20 <u>Embargoed Person</u>.  Each party hereto represents and warrants that as of the date of this Agreement, and such party covenants that throughout the Term:  (i) such party is not, and shall not be, an Embargoed Person; (ii) no Embargoed Person shall have any interest of any nature whatsoever in such party, with the result that the investment in such party (whether directly or indirectly), is or would be prohibited by law or this Agreement is or would be in violation of law; and (iii) none of the funds of such party are or shall be derived from any unlawful activity with the result that the investment in such party (whether directly or indirectly) is or would be prohibited by law or this Agreement is or would be in violation of law. ARAMARK further represents and warrants that as of the date of this Agreement, and covenants that throughout the Term none of the funds or other assets of ARAMARK are or shall constitute property of, or are or shall be beneficially owned, directly or indirectly, by any Embargoed Person.

Section 21.21 <u>Article and Section References</u>.  Except where otherwise clear from the context of the reference: (i) with regard to references to an "Article," references with Roman numerals are references to Articles of this Agreement, while references to Articles with Arabic

49

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021503



numerals are references to Articles of the Sublease; and (ii) with regard to references to a "Section," if not specified as being a Section of the Sublease, such references are understood to be references to Sections of this Agreement.

[Remainder of page intentionally left blank.
Next page is signature page.]

50

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



IN WITNESS WHEREOF, QBC and ARAMARK have caused the execution and delivery of this Agreement as of the day and year first above written.

QUEENS BALLPARK, L.L.C.

By: _____
    Name: David P. Cohen
    Title:  EVP

ARAMARK   SPORTS   AND ENTERTAINMENT   SERVICES, LLC

By: _____
    Name: Mark R. Adams
    Title:  Vice President

51

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021505



## SCHEDULE A
## DEFINITIONS

"ARAMARK Change of Control" means (i) the sale of all or substantially all of ARAMARK's assets; (ii) the sale or transfer of a majority of the direct or indirect equity interests of ARAMARK; (iii) the merger or consolidation of ARAMARK or any entity which directly or indirectly controls ARAMARK with or into another entity, in each such case, either in one (1) transaction or a series of related transactions, unless, with respect to any transaction(s) covered by clause (i), (ii) or (iii), (A) any one (1) or more of the Person(s) listed on Schedule C annexed hereto directly or indirectly owns a majority in voting power and majority of the equity interests in ARAMARK or the surviving or resulting entity, as the case may be, immediately following such transaction(s) or (B) (I) the Person(s) who directly or indirectly owns a majority in voting power in ARAMARK immediately prior to such transaction(s) continues to directly or indirectly own a majority in voting power immediately following such transaction(s) and (II) such transaction(s) does not result in any Person or "group" (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, and Rule 13d-5 promulgated thereunder) owning a majority of the equity interests in ARAMARK or the surviving or resulting entity, as the case may be (except for the Person(s) who immediately prior to such transaction(s) owned a majority in voting power in ARAMARK) and (C) ARAMARK or the surviving or resulting entity, as the case may be, immediately following such transaction(s) has a net worth at least equal to ARAMARK's net worth immediately prior to such transaction(s) (each of the transaction(s) covered by clauses (i), (ii) and (iii) above that comports with clause (A) or clause (B) above and clause (C) above being a "Permitted Transaction"); (iv) the liquidation, dissolution, winding up or termination of ARAMARK; or (v) a change in at least a majority of the members of the board of directors of the entity which ultimately controls ARAMARK in connection with a transaction or series of related transactions, other than pursuant to a Permitted Transaction.

"Baseball Events" means all Major League Baseball Games and Major League Baseball All-Star Games that are played during the Operational Term at the New Ballpark.

"Baseball Season" means one (1) Major League Baseball season, such season starting with the date of the first (1st) game of a Major League Baseball Club during such season and ending on the date of the last Major League Baseball Game involving the Mets during such season (including, if applicable, any Post-Season Games).

"Business Day" means any day other than a Saturday, Sunday or a day when banks in New York City are authorized or required by law to be closed.

"City" means the City of New York, and, its various departments, agencies, bureaus and other subdivisions and the officials thereof.

"Concession Areas" has the meaning ascribed to such term in the Sublease.

"Concession Services" means the sale of the types of food, beverages and retail merchandise that are of a nature, kind and scope consistent with those customarily sold or typically provided to attendees at the Event or Function in question and the provision of services ancillary thereto (including specifically sales of products in the Media Commissary during Events); provided, however, that with respect to Non-Baseball Events, Concession Services shall

A-1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021506



not include the sale of retail merchandise which is specifically related to the Non-Baseball Event or the performers at such Non-Baseball Event (e.g., CDs, DVDs, concert t-shirts and other similar apparel), unless the promoter or performer has agreed to sales of such items by the venue operator on a consignment basis. Set forth below are certain examples that provide further clarification with respect to the nature, kind and scope of the Concession Services.

    (a)    By way of example, and not limitation, with respect to Baseball Events, the Concession Services would generally be expected to include the sale of food, alcoholic and non-alcoholic beverages, candy, snack foods, scorecards, programs, Major League Baseball-themed apparel and merchandise (including, without limitation, souvenirs, novelties and gifts) and the provision of restaurant- and catering-related general and premium services at restaurants, clubs and luxury suites located at the New Ballpark.

    (b)    By way of example, and not limitation, with respect to any Event, the Concession Services would not include the (i) sale of goods such as lottery tickets, film, newspapers and magazines of general circulation, tobacco products, phone cards and drug store-related sundries or (ii) provision of services such as credit or debit card, automatic teller machine or other payment systems, or Internet access or other technological- or communication-related services.

    "Controlled Affiliate" means, with respect to either party hereto, any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such party. For purposes of this definition, the term "control" as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management of that Person, whether through the ownership of voting securities or otherwise.

    "Direct Costs" means direct operating costs incurred in connection with the Concession Services provided at Events, including, but not limited to, the invoiced cost of all foodservice products, direct labor, and fringe benefit costs (which includes employee benefit plans and paid time off from work, in addition to other benefit and payroll costs including any agreed upon reimbursement for parking expenses incurred by managers and financial staff working at the New Ballpark) for ARAMARK's on-site manager and ARAMARK's other on-site employees, insurance costs or charges (expressly including general liability insurance premiums and workers' compensation insurance premiums, to the extent reasonably allocable to the Concession Services at Events, with such allocation calculated in a mutually agreed upon manner consistent with the methodology used by ARAMARK at similarly situated stadia), costs of licenses and permits, costs of accounting and financial statement and tax return preparation (expressly excluding, however, costs of income tax return preparation), costs of required employee uniforms, costs of utilities and all other costs of supplies and services, in all cases, to the extent directly related to the provision of such Concession Services, including, but not limited to, costs of alcohol awareness training (TIPS or TEAM), costs of training of staff and management, costs of compliance with any security protocols and procedures at the New Ballpark, any legally required annual health examinations of ARAMARK's employees, sales/use and any similar taxes, costs of using and maintaining cash and product computerized control systems, costs of any maintenance of equipment and smallwares, cleaning costs, waste removal, disposal of grease costs, vending operation costs, extermination costs, payroll costs, accounts payable processing costs, and bank charges. Notwithstanding the foregoing, any amount incurred by ARAMARK or QBC under Article XVIII of this Agreement or Article 24 of the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021507

Sublease and amounts incurred by ARAMARK under Section 5.01 of this Agreement or Section 7.2(a) of the Sublease shall not be, or be deemed to be, a Direct Cost.

"Embargoed Person" means a Person (i) identified on the Specially Designated Nationals and Blocked Persons List maintained by the United States Treasury Department Office of Foreign Assets Control and/or any similar list maintained pursuant to any authorizing statute, executive order or regulation and/or (ii) subject to trade restrictions under United States law, including, without limitation, the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated under any such laws, with the result that the investment in a party (whether directly or indirectly), is or would be prohibited by law or this Sublease is or would be in violation of law.

"Events" means all Baseball Events, Non-Baseball Events and Selected Functions.

"Expiration Date" means, subject to Section 4.12(c) of each of the Sublease and this Agreement, the date immediately following the date of the last Major League Baseball Game played during the calendar year (including Post-Season Games) in which the twenty-ninth (29th) anniversary of the first (1st) Regular Season Game of the Mets included within the first (1st) full Baseball Season participated in by the Mets at the New Ballpark occurs. By way of example, if the first (1st) full Baseball Season participated in by the Mets at the New Ballpark occurs in 2009, then, assuming the Term is not extended as provided in Section 4.12(c) of each of the Sublease and this Agreement, the Expiration Date shall fall within 2038.

"F&NAB Gross Receipts" means Gross Receipts derived from the Concession Services other than with respect to alcoholic beverage sales.

"Function" means any event or function at the New Ballpark during the Operational Term, other than Baseball Events and Non-Baseball Events. By way of example, and not limitation, Functions include, among other things, (i) Third Party Business Functions and (ii) Mets Group Functions.

"Give-Away Event" means any event at the New Ballpark during the Operational Term involving the distribution of one or more items that are not produced or manufactured by the promoter or sponsor of such event.

"Governmental Authority (Authorities)" means the United States of America, the City, County or State of New York or any political subdivision, agency, department, legislative body, commission, board, bureau or instrumentality of any of the foregoing, or any landmarks preservation agency (or other entity designated or accepted for such purpose by any landmarks preservation commission or art commission), now existing or hereafter created, having jurisdiction over the New Ballpark or any portion thereof, or any street, road, avenue, sidewalk or water immediately adjacent to the New Ballpark or any vault in or under the New Ballpark.

"Gross Receipts" means the total revenue received by (i) ARAMARK from its provision of the Concession Services; (ii) ARAMARK from any Provider pursuant to Third Party Agreements; and (iii) QBC constituting the proceeds from Concession Services at Events remitted to QBC by a Provider, in each case, less sales taxes and other direct taxes imposed upon



A-3

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



receipts collected from consumers, gratuities paid to employees, credit, debit, gift and other card transaction fees and charges, and amounts reserved for the Fund under the applicable provisions of this Agreement and the Sublease.  Notwithstanding the foregoing, any amount received by QBC in respect of admission privileges to any restaurant or club at the New Ballpark shall not be, or be deemed to be, Gross Receipts.

"Hazardous Materials" means any "hazardous waste" as defined under the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., or (ii) "hazardous substance" as defined under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq., or (iii) "hazardous materials" as defined under the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq., or (iv) "hazardous waste" as defined under New York Environmental Conservation Law Section 27-0901 et seq., or (v) "hazardous substance" as defined under the Clean Water Act, 33 U.S.C. Section 1321 et seq., or (vi) any substances, materials or wastes currently or in the future deemed or defined in any Requirements as "hazardous substances", "toxic substances", "contaminants", "pollutants" or words of similar import.

"Late Fees" means, collectively, the charge assessed with respect to any payments due from one party hereto to the other after the date specified in this Agreement for the payment. Late Fees shall accrue and compound daily based on an annual rate equal to the lesser of the (i) Prime Rate plus five percent (5%) and (ii) maximum rate permitted under applicable law.

"Lessor" means a lessor under a Superior Sublease, including but not limited to, NYCIDA.

"Major League Baseball" means the Office of the Commissioner of Baseball which office governs an unincorporated association with members consisting of Major League Baseball Clubs organized into the following two (2) leagues:  National League and American League.

"Major League Baseball Clubs" means professional baseball clubs that are member clubs of Major League Baseball (one of which is the Mets).

"Major League Baseball Games" means the professional baseball games played between two (2) Major League Baseball Clubs including exhibition, regular season and post-season games.

"MBE/WBE/DBE" means Minority Business Enterprises, Women Business Enterprises and Disadvantaged Business Enterprises.

"Media Commissary" means the cafeteria facility located at the New Ballpark available for use by members of the media providing coverage of the Mets.

"Mets Change of Control" means any transaction which results in both (i) a majority of voting interests in the Person that owns the Mets being ultimately controlled by Person(s) other than Fred Wilpon, Saul B. Katz and/or any of their respective spouses, children, siblings or lineal descendants of any such individuals (collectively, "Relatives") or to a trust solely for the benefit of any one or more Relatives and (ii) the designation of a Person, other than



A-4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021509



Fred Wilpon, Saul B. Katz, or any of their respective Relatives, as the "control person" for the Mets for Major League Baseball purposes.

"Mets Competitor" means any Person that (i) owns or controls any Major League Baseball Club (other than the Mets) or (ii) owns or controls any sports network, sports programming service or other non-print sports media business.

"Mets Group" means SMLP, QBC and their respective affiliates.

"Mets Group Functions" means the (i) holding of business meetings and holiday/special occasion parties (e.g., anniversary of employment service, retirement) of one (1) or more members of the Mets Group; (ii) operation of the Mets Group employee cafeteria/commissary; and (iii) conduct of any other function, gathering, party or event of, associated with or involving one (1) or more members of the Mets Group (including, without limitation, restaurant, suite and general Concession Services to designated Mets Group employees in a manner consistent with past practice at Shea Stadium), in each case, at a location at the New Ballpark during the Operational Term.

"Mets Marks" means all names, symbols, seals, emblems, logos, insignia, trademarks, trademark applications, trade names, service marks and trade styles (including, without limitation, all derivatives, associated designs and registrations thereof) of SMLP and the Mets.

"Mortgage" means any mortgage, trust indenture or other financing document which may now or hereafter affect the New Ballpark or the Premises and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

"Mortgagee" means any mortgagee, trustee or other holder of a Mortgage.

"Net Profits" means Gross Receipts less Direct Costs.

"Non-Baseball Events" means all events held during the Operational Term at the New Ballpark, other than Baseball Events, that (i) are open to those members of the general public that purchased tickets or otherwise paid an admission price to attend or (ii) are catered or other special private events of a personal (as opposed to business) nature (e.g. wedding, Bar Mitzvah, birthday).

"Office of the Commissioner of Baseball" means the Office of the Commissioner of Baseball which office governs an unincorporated association with members consisting of Major League Baseball clubs organized into the following two (2) leagues: National League and American League.

"Opening Day" means the date of the first (1st) Regular Season Game participated in by the Mets at the New Ballpark.

"Operational Term" means that portion of the Term commencing on the Substantial Completion Date and, subject to the earlier termination of the Term in accordance with the terms and conditions set forth herein, ending on the Expiration Date.

A-5

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021510



"Person" means an individual, partnership, firm, company, association, athletic conference, joint stock association, public or private corporation or other like organization, and any unit or branch of government or public department, agency or board.

"Portable Concession Areas" means, as to each Event, the areas within the New Ballpark in which Portable Concession Services are provided, as determined pursuant to Section 4.05(b).

"Portable Concession Alcohol Gross Receipts" means Portable Concession Gross Receipts with respect to alcoholic beverage sales.

"Portable Concession F&NAB Gross Receipts" means Portable Concession Gross Receipts other than Portable Concession Alcohol Gross Receipts.

"Portable Concession Gross Receipts" means Gross Receipts derived from the Portable Concession Services. All Gross Receipts that are not derived from Portable Concession Services are Premises Gross Receipts.

"Portable Concession F&NAB Net Profits" means all Portable Concession F&NAB Gross Receipts less the Direct Costs of providing the Portable Concession Services other than with respect to alcoholic beverage sales.

"Portable Concession Net Profits" means all Portable Concession Gross Receipts less the Direct Costs of providing the Portable Concession Services.

"Portable Concession Services" means the Concession Services rendered at the Portable Concession Areas; such services to be effected primarily by means of vendors (i) commonly known as "hawkers" walking up and down the aisle ways in the general seating areas at the New Ballpark; (ii) taking orders and making deliveries to customers located in certain premium seating areas at the New Ballpark; and (iii) utilizing pushcarts, temporary booths and kiosks, and other portable vending displays, and automatic vending machines located in the hallways, concourses and other common areas at the New Ballpark.

"Post-Season Games" means the annual Major League Games played following the conclusion of the last Regular Season Game in a playoff format culminating with the World Series of Major League Baseball.

"Premises" has the meaning the ascribed to such term in the Sublease.

"Premises Concession Services" means the Concession Services rendered at the Premises.

"Premises Gross Receipts" means Gross Receipts derived from the Premises Concession Services. All Gross Receipts that are not derived from Portable Concession Services are Premises Gross Receipts.

"Primary Site Ground Lease" means that certain Primary Site Ground Lease Agreement dated as of August 1, 2006 by and between the City, as landlord, and NYCIDA, as tenant, as the same may be amended.

A-6



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021511



"Prime Rate" means the fluctuating rate of interest equal to the "Prime Rate" appearing from time to time on the "Market Data: Rates & Bonds" screen page on www.Bloomberg.com, or if such rate is not available, then the fluctuating rate of interest equal to the "Prime Rate" as published from time to time in the "Money Rates" section of The Wall Street Journal (Eastern Edition). Any change in the Prime Rate shall take effect on the effective date as indicated on www.Bloomberg.com or in The Wall Street Journal (Eastern Edition), as applicable.

"Punchlist" has the meaning the ascribed to such term in the Sublease.

"Regular Season" means the period commencing on the date of the first scheduled Regular Season Game of a Baseball Season and ending on the date of the last scheduled Regular Season Game of a Baseball Season.

"Regular Season Games" means the annual Major League Baseball Games (including, if applicable, one or more "tie-breaker" games played for the purpose of determining eligibility for Post-Season Games) participated in during the Term by the Major League Baseball Clubs during the regular professional baseball season of Major League Baseball for determining the Major League Baseball Clubs that will participate in Post-Season Games.

"Rent" means the payments required to be made by ARAMARK under Sections 2.1, 2.2, 2.3 and 2.4 of the Sublease.

"Requirements" means all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes, executive orders, requirements, extraordinary and ordinary, applicable to the New Ballpark or any sidewalk comprising a part of or lying adjacent to the New Ballpark or any body of water below the New Ballpark or the maintenance, use or occupation thereof, of all Governmental Authorities and any applicable equivalent, and the laws, rules, regulations, orders, ordinances, statues, codes and requirements of any applicable fire rating bureau or other body exercising similar functions, all insurance bodies affecting the Premises, the New York State Liquor Authority and any Governmental Authority exercising similar functions, and Major League Baseball to the extent necessary to comply with the terms, covenants and conditions of the Primary Site Ground Lease and the Stadium Lease, including without limitation:

(i)     the Americans With Disabilities Act, 42 U.S.C. Section 12101 (et seq.), New York City Local Law 58 of 1987, and any law of like import, and all rules, regulations and government orders with respect thereto;

(ii)     the Zoning Resolution of The City of New York (as the same may be amended and/or replaced, or hereafter adopted);

(iii)     the Certificate(s) of Occupancy issued for the New Ballpark and the Premises as then in force;

(iv)     and of the foregoing and any guidelines, codes, permits, rules, administrative and judicial decisions, orders and ordinances and any other Requirements applicable to (A) the use, generation, manufacture, handling, processing, distribution, emission, discharge, release, storage, treatment, transportation, recycling and/or disposal

A-7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021512



of any Hazardous Materials, including without limitation any pollutant, contaminant or chemical, any toxic, explosive, corrosive, flammable, radioactive, caustic, or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including, without limitation, any substances now or hereafter defined as or included in the definition of "hazardous substance," "hazardous waste," "hazardous material," "hazardous chemical," "pollutant or contaminant," or "toxic substance" under any applicable Federal, State or local laws or regulations; (B) the clean up or other remediation of Hazardous Materials; (C) the effect of the environment or Hazardous Materials on human health or natural resources; or (D) public health and safety;

    (v)  the Act;

    (vi)  all provisions of the Labor Law of the State of New York applicable to any Construction Work (as defined in the Stadium Lease); and

    (vii)  The New York State Industrial Development Agency Act, being Title 1 of Article 18-A of the General Municipal Law, Chapter 24 of the Consolidated Laws of the State of New York, as amended, together with Chapter 1082 of the 1974 Laws of the State of New York, as amended.

  "Selected Functions" means those Functions as to which QBC or SMLP has, upon reasonable advance written notice to ARAMARK, required ARAMARK to provide all or a portion of the Concession Services required for such Function.

  "SMLP" means Sterling Mets, L.P., a Delaware limited partnership.

  "Stadium Systems" means the mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the New Ballpark up to (but not including) the point of localized distribution to the Premises (excluding any systems or facilities exclusively serving the Premises).

  "Substantial Completion" means that the New Ballpark (including, without limitation, the Premises) is substantially complete such that it can be used for its intended purpose (as such term is customarily used in the construction industry) with only Punchlist items remaining to be completed and that all licenses, permits and approvals necessary for the use and operation of the New Ballpark, including, without limitation, a temporary or permanent certificate of occupancy has been issued and QBC's architect has issued a certificate of Substantial Completion.

  "Substantial Completion Date" means the date, as evidenced by QBC's written notice delivered to ARAMARK under Section 1.2(b) of the Sublease, on which Substantial Completion occurs, but not earlier than the date QBC has the right to sublease the Premises in accordance with the Stadium Lease.

  "Subtenant Party" has the meaning ascribed to such term in the Sublease.

  "Subtenant's Property" has the meaning ascribed to such term in the Sublease.

A-8





HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



"Superior Lease" has the meaning ascribed to such term in the Sublease.

"Third Party Business Functions" means business meetings, seminars and other corporate functions at the New Ballpark held or sponsored during the Operational Term by a Person, other than QBC or any other member of the Mets Group.

"Unavoidable Delay" has the meaning ascribed to such term in the Sublease.

"Work Stoppage" has the meaning ascribed to such term in the Sublease.

Each of the following capitalized terms shall have the meaning ascribed thereto in the Section or other location in this Agreement set forth across from such term:

| | |
|---|---|
| 126th Street Retail Space | Section 3.01 |
| Act | Section 4.11(a) |
| Activities Thresholds | Section 4.03(a) |
| Additional Percentage Fee Payments | Section 2.02 |
| Agreement | Preamble |
| ARAMARK | Preamble |
| ARAMARK Alterations | Section 6.01 |
| ARAMARK Event of Default | Section 14.01 |
| ARAMARK Indemnitees | Section 18.02(a) |
| ARAMARK Insurance | Section 11.02(c) |
| Arbitrators | Section 20.01(b) |
| Branded Goods | Section 4.03(a) |
| Change of Control Notice | Section 21.14(d)(i) |
| Concession Equipment | Section 1.02(a) |
| Conclusion Date | Section 20.01(c) |
| Deadlock | Section 20.01(a) |
| Deadlock Position Notice | Section 20.01(a) |

A-9



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021514



| | |
|---|---|
| Designated Arbitrator | Section 20.01(b) |
| Determination | Section 2.01(e)(i) |
| Disregarded Year | Section 2.01(b) |
| Disruption Extension Period | Section 4.12(c)(i) |
| Disruption Period | Section 4.12(c)(i) |
| Equipment Schedule | Section 1.02(a) |
| Extension Threshold | Section 4.12(c)(iii) |
| Fund Accounting Period | Section 5.01(a) |
| Indemnified Party | Section 18.03(a) |
| Indemnifying Party | Section 18.03(a) |
| Independent Accounting Firm | Section 2.01(e)(i) |
| Initial Concession Equipment | Section 1.02(a) |
| Initial Period | Section 5.01(a) |
| Local Rebates | Section 2.01(d)(iv) |
| Material Alteration | Section 20.02(a) |
| Mets | 1st WHEREAS clause |
| Mets Change of Control Notice | Section 21.14(d)(ii) |
| Mets Subject Transaction | Section 21.14(d)(ii) |
| MLB Documents | Section 10.02(a) |
| MLB Entities | Section 10.02(a) |
| MLBAM | Section 10.02(a) |
| Negotiation Period | Section 20.01(a) |
| New Ballpark | 1st WHEREAS clause |
| NYCIDA | 1st WHEREAS clause |
| Operations Determination Process | Section 4.05(b) |

A-10

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



QBC0021515



| | |
|---|---|
| Opinion | Section 20.01(d) |
| Original Usage Agreement | 3rd WHEREAS clause |
| Percentage Payments | Section 2.01(a) |
| Portable Concession F&NAB Payments | Section 2.01(d) |
| Portable Maintenance Program | Section 4.16(a) |
| Prior Year Percentage | Section 2.01(b) |
| Promotional Event | Section 4.03(b) |
| Providers | Section 4.03(a) |
| QBC | Preamble |
| QBC Event of Default | Section 14.03 |
| QBC Indemnitees | Section 18.01(a) |
| Service Interruption | Section 4.12(b) |
| Single Season Extension Period | Section 4.12(c)(ii) |
| Slotting Fees | Section 2.01(d)(iv) |
| Specialty Foods | Section 4.03(a) |
| Stadium Lease | 1st WHEREAS clause |
| Subject Transaction | Section 21.14(d)(i) |
| Sublease | 2nd WHEREAS clause |
| Sublease Notice | Section 3.01 |
| Successor | Section 10.01(b) |
| Term | Section 1.01 |
| Third Arbitrator | Section 20.01(b) |
| Third Party Agreements | Section 4.03(a) |
| Third Party Claim | Section 18.03(a) |
| Third Party Goods | Section 4.03(a) |

A-11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021516



| | |
|---|---|
| Third Party Goods Activities | Section 4.03(a) |
| Transition Date | Section 10.01(b)(i) |
| Utility Services | Section 8.01 |
| Work Stoppage Extension Period | Section 4.12(c)(iii) |
| Year End Report | Section 2.01(c) |



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

QBC0021517



## SCHEDULE B
## NOTICES

To ARAMARK:

ARAMARK Sports and Entertainment Services, LLC
c/o ARAMARK
ARAMARK Tower
1101 Market Street, 21st Floor
Philadelphia, PA 19107
<u>Attn</u>:  Elizabeth B. Cartmell, President
Telecopier No.: (215) 413.8830

with a required copy to:

ARAMARK Sports and Entertainment Services, LLC
c/o ARAMARK
ARAMARK Tower
1101 Market Street, 29th Floor
Philadelphia, PA 19107
<u>Attn</u>:  Daniel W. Simcox, Esq., Vice President and Associate General Counsel
Telecopier No.: (215) 238.3282

To QBC:

Queens Ballpark Company, L.L.C.
Shea Stadium
Flushing, New York  11368
<u>Attn</u>:  Jeffrey S. Wilpon, Chief Operating Officer
Telecopier No.: (718) 565.5357

with required copies to:

Queens Ballpark Company, L.L.C.
Shea Stadium
Flushing, New York  11368
<u>Attn</u>:  General Counsel
Telecopier No.: (718) 335.8066

and

Queens Ballpark Company, L.L.C.
Shea Stadium
Flushing, New York  11368
<u>Attn</u>:  Executive Vice President
Telecopier No.: (718) 446.1225

B-1



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



**SCHEDULE C**

**EQUITY HOLDERS OF ULTIMATE PARENT OF ARAMARK**

1. Joseph Neubauer, any of his Relatives or a trust fund for the benefit of his Relatives.

2. GS Capital Partners V Funds, LP, GS Capital Partners V Offshore Fund, LP, GS Capital Partners V Institutional, LP and GS Capital Partners V GmbH & Co KG or any similar investment fund that is directly or indirectly managed by, or has as its primary investment advisor, GS Capital Partners (Goldman Sachs) or any of its controlled affiliates or successors.

3. JP Morgan Partners (BHCA) , LP, JP Morgan Partners Global Investors, LP, JP Morgan Partners Global Investors A, LP, JP Morgan Partners Global Investors (Cayman), LP, JP Morgan Partners Global Investors (Cayman) II, LP, JP Morgan Partners Global Investors (Selldown), LP, and JP Morgan Partners Global Investors (Selldown) II, LP or any similar investment fund that is directly or indirectly managed by, or has as its primary investment advisor, J.P. Morgan Partners or any of its controlled affiliates or successors.

4. CCMP Capital Investors II, LP, CCMP Capital Investors (Cayman) II, LP, or any similar investment fund that is directly or indirectly managed by, or has as its primary investment advisor, CCMP Capital Advisors or any of its controlled affiliates or successors.

5. THL Fund VI Bridge Corp, Thomas H Lee Equity Fund VI, LP, Thomas H Lee Parallel Fund VI LP, Thomas H Lee Parallel (DT) Fund VI, LP, Putnam Investment Holdings, LLC, Putnam Investment Employees Securities Company III, LLC and THL Coinvestment Partners, LP, or any similar investment fund that is directly or indirectly managed by, or has as its primary investment advisor, Thomas H. Lee Partners or any of its controlled affiliates or successors.

6. Warburg Pincus Private Equity IX, LP, or any similar investment fund that is directly or indirectly managed by, or has as its primary investment advisor, Warburg Pincus, LLC or any of its controlled affiliates or successors.

7. Any current equity owners who are currently directors or senior executive officers of ARAMARK.

For purposes of this Schedule C the phrase "similar investment fund" shall mean a private equity investment fund that is similar to one of the listed funds, taking into account, for example, market capitalization, organizational structure, distribution and concentration of equity ownership, general business objectives, and availability to limited partners or passive investors through a fund managed by a manager or advisor. For the avoidance of doubt, the intention of this phrase is to include similar investment funds without excluding one simply because it has a different market capitalization or structure, for example, than any of those funds listed.

C-1

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

QBC0021519