UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

KOSHER SPORTS, INC.,                 :      CV-10-2618 (JBW) (RLM)

                Plaintiff,    :

        - against -           :

QUEENS BALLPARK COMPANY, LLC,    :

             Defendant.   :
-----------------------------------------------------------------x

## PLAINTIFF'S OBJECTIONS
## <u>TO REPORT AND RECOMMENDATION</u>

IRA DANIEL TOKAYER, ESQ. (IT-4734)
Attorney for Plaintiff
405 Lexington Avenue, 7th Floor
New York, New York 10174
(212) 695-5250

**REDACTED**

TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

KSI'S OBJECTIONS TO THE REPORT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.     QBC's Actions Concerning the A-Z Guide
and the Guest Services Handbook
Violated The Court's Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.    QBC's Actions With Respect to Location K428
Violated the Court's Order.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.   QBC's Actions in Seeking To Have
Aramark Terminate and Replace KSI
Violated the Court's Order.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.   QBC and Aramark Are Liable For Preventing KSI
From Operating on Fridays and Saturdays.. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

       A.    QBC Influenced Aramark To Prevent KSI
From Operating on Fridays and Saturdays.. . . . . . . . . . . . . . . . . . . . . 16

       B.    QBC and Aramark, As Joint Venture Partners,
Are Jointly Liable For Preventing KSI
From Operating on Fridays and Saturdays.. . . . . . . . . . . . . . . . . . . . . 22

       C.    QBC Is Liable For Aramark's Conduct
In Banning KSI From Operating on Fridays and Saturdays
As a Matter of the Parties' Contractual Relationship. . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i

Plaintiff, Kosher Sports, Inc. ("KSI"),  by its attorney, Ira Daniel Tokayer, Esq.,

submits its Objections to the Report and Recommendation of Magistrate Roanne L. Mann, dated

August 26, 2011 (the "Report," ECF-90), which recommended that this District Court deny

KSI's motion, dated April 15, 2011, to hold defendant Queens Ballpark Company, LLC ("QBC")

and non-party Aramark Sports and Entertainment Services, LLC ("Aramark") in contempt of

court for violating the injunction of this Court, issued on August 13, 2010, and memorialized in

an order, dated August 25, 2010 (ECF-21, the "Order").

<u>Preliminary Statement</u>

On or about January 23, 2008, KSI and QBC entered into an agreement granting

KSI a 10-year exclusive right to distribute kosher food products at the Mets' new ballpark,

Citifield, starting in 2009, its inaugural season.  In exchange for a substantial increase in KSI's

sponsorship fee, QBC agreed that KSI would be allowed to operate "during all events at the

Ballpark as to which admission is made available to members of the general public," without any

limitation on the days of operation.  (Tr. Ex. 4; ECF-79, at 39-45.)[1]

This case, commenced on or about June 7, 2010, involves KSI's claim that QBC

breached the parties' agreement by preventing KSI from operating at the Ballpark on Fridays and

Saturdays.  (<u>See</u> Tr. Exs. 9, 12 and 19.)  On August 13, 2010, this District Court granted a

preliminary injunction in favor of KSI.  The ruling, memorialized in the Order, enjoined "QBC,

its officers, managers, attorneys, employees, successors, assigns, and all other persons acting on

its behalf" from "taking any action, directly or indirectly, with respect to, or affecting, the time or

method of sale of KSI's products at Citi Field."  (ECF-21.)

---

[1]  ECF-79 refers to the transcript of the evidentiary hearing conducted on June 28, 2011. "Tr. Ex." is a reference to the exhibits marked at the evidentiary hearing which are attached hereto.

Notwithstanding their undisputed knowledge of the Order, QBC and its concessions services partner, Aramark, deliberately disregarded the Order's express terms. Specifically, after the injunction was issued and despite its clear and unambiguous language:

- QBC revised the 2011 A-Z Guide (Tr. Ex. 45) and published the 2011 Guest Services Handbook (Tr. Ex. 46) to reflect that KSI would not be open on Fridays and Saturdays;

- QBC directed Aramark to decline KSI's request to close location K428 for the Pittsburgh series in September 2010;

- QBC sought to influence Aramark to terminate KSI and, together with Aramark, met with other kosher vendors for the purpose of replacing KSI; and

- QBC, through Aramark, has prevented and continues to prevent KSI from operating on Fridays and Saturdays at Citifield.

These actions "with respect to, or affecting the time and method" of KSI's operations at Citifield - separately and cumulatively - violated the express terms of this Court's Order.  On April 15, 2011, KSI moved to hold QBC and Aramark in contempt of court.  (ECF-80.)  On April 18, 2011, the matter was referred to the Magistrate for a report and recommendation.[2]

After an evidentiary hearing, the Magistrate issued the Report recommending that the District Court deny KSI's motion in its entirety.  This District Court should reject the

_____

[2]  Under Fed. R. Civ. P. 65(d), "a non-party with actual notice of an injunction may be held in contempt if he or she aids or abets a named party in a concerted violation of the injunction."  13 Moore's Federal Practice, § 65.80 (2011).  KSI notified Aramark of this Court's Order on August 27, 2010.  (Ex. 31.)  In addition, unbeknownst to KSI, immediately after the injunction was issued, QBC's Mike Landeen advised Aramark's Scott Wiegert and Clint Westbrook about the injunction and said that he was "not going to speak to Aramark about Kosher Sports anymore" (ECF-79, at 139-141), an undertaking that Landeen repeatedly violated, as demonstrated below.

Magistrate's Report for the following reasons:

- The Magistrate erred in recommending that QBC's revision of the 2011 A-Z Guide and its publication of the 2011 Guest Services Handbook, clearly actions "with respect to the time or method" of KSI's sales, did not warrant a finding of contempt (Report, at 28). (Objection I, infra.)

- The Magistrate erroneously concluded that QBC's actions in compelling KSI to operate location K428 during the Pittsburgh Series in September 2010, while falling within the clear and unambiguous language of the Order, fell outside its "contemplated scope" (Report, at 28-29). (Objection II, infra.)

- The Magistrate failed to properly consider the entirety of the evidence, including documentary evidence and irrefutable recordings of conversations, establishing that, even after the Court's injunction had issued, QBC continued to actively encourage Aramark to terminate KSI at Citifield and replace KSI with another vendor (Report, at 24). (Objection III, infra.)

- The Magistrate failed to properly consider the overwhelming evidence in recommending that the Court find that Aramark had "independently decided" to bar KSI from selling on Fridays and Saturdays at Citifield (Report, at 13) despite Aramark's policy of permitting KSI to operate on Fridays and Saturdays at venues not under QBC's control. (Objection IV(A), infra.)

- The Magistrate erred in rejecting KSI's argument that, as QBC's joint venture partner, Aramark's conduct in preventing KSI from operating on Fridays and Saturdays was attributable to QBC under agency principles. In addition,

3

**REDACTED**

(Objection IV(B)-C), <u>infra</u>.)

Failing to find any violation of the Court's Order, the Magistrate did not

determine the appropriate contempt sanction.  Accordingly, such determination necessarily falls

upon this Court.  <u>See</u> 13 Moore's Federal Practice, § 65.80 (2011).  "Since the plaintiff should be

made whole for the harm he has suffered, it is appropriate for the court also to award the

reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the

decree is found to have been willful."  <u>Vuitton et Fils S. A. v. Carousel Handbags</u>, 592 F.2d 126,

130 (2d Cir. 1979).  Thus, at a minimum, QBC and Aramark, jointly and severally, should be

ordered to compensate KSI for its losses as a result of the contempt, including reimbursement

for: (1) KSI's lost profits from lost Friday and Saturday sales for the 2011 season and through the

date of trial; (2) KSI's losses as a result of being forced to keep K428 open during the Pittsburgh

series in September 2010; and (3) KSI's costs of prosecuting the motion for contempt and filing

these Objections; among other sanctions.

In addition, it is respectfully requested that QBC and Aramark be given the

opportunity to purge themselves of contempt by permitting KSI to operate on Fridays and

Saturdays as per the terms of the contract between the parties, pending the resolution of this

action, so that KSI may obtain the full benefit of the injunction issued by this Court.

4

## KSI'S OBJECTIONS TO THE REPORT

Rule 72(a) governs the District Court's review of a Magistrate's recommendations to the extent the Magistrate's recommendations concern non-dispositive pre-trial matters.  The rule provides that the District Court "must consider timely objections and modify or set aside any part of the [Magistrate's] order that is clearly erroneous or is contrary to law."  A District Court is justified in finding a Magistrate's ruling to be "clearly erroneous" where "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  A determination is "contrary to law" if the magistrate "misinterpreted or misapplied applicable law."  14 Moore's Federal Practice, § 72.11[1][b] (2011).  See also S.E.C. v. Musella, 818 F. Supp. 600, 604 (S.D.N.Y. 1993) (applying de novo review to a magistrate's ruling on a contempt application).

It is respectfully submitted that the Report is "contrary to law" insofar as it recommends that the Order not apply to QBC's revision of the 2011 A-Z Guide, QBC's publication of the 2011 Guest Services Handbook and QBC's direction concerning the operation of location K428 for the Pittsburgh series in September 2010.  In addition, the Report is "clearly erroneous" in that the evidence established that QBC sought to influence Aramark to prevent KSI from operating on Fridays and Saturdays.  In fact, the evidence established that QBC encouraged Aramark to terminate KSI relationship to Citifield altogether and replace KSI with another vendor.  Further, the Magistrate erred as a matter of law in rejecting KSI's argument that Aramark's decision to prevent KSI from operating on Fridays and Saturdays - even if independently made - is attributable to QBC under agency and contract principles, as demonstrated below.

5

I.      QBC's Actions Concerning the A-Z Guide
        and the Guest Services Handbook
        <u>Violated The Court's Order</u>

It is undisputed that prior to the start of the 2011 season - well after the Court had issued its injunction - QBC revised the 2011 A-Z Guide which, contrary to the 2010 version, reflected that KSI would be closed on Fridays and Saturdays.  It is equally undisputed that QBC subsequently published the 2011 Guest Services Handbook, reiterating that KSI would not be allowed to open on those days.  (ECF-79, at 57-59; Tr. Exs. 45, 46.)  The revision of the Guide and the publication of the Handbook constitute actions "with respect to the time or method" of sale of KSI's products at Citifield, falling within the proscription of this Court's Order.

Nonetheless, the Magistrate recommended that QBC not be found in contempt because "the documents simply gave patrons . . . accurate information as to when kosher food was available" (Report, at 27).  The Magistrate, however, failed to consider that at the time of the publications Aramark had not acted to prevent KSI from operating on Fridays and Saturdays.  A proper interpretation of the Order would not "preclude QBC employees from saying anything at all to patrons concerning plaintiff's stands," as the Magistrate suggested (Report, at 27-28) - only from disseminating erroneous or baseless information.

QBC's "voluntary decision" to remove the offending language from the 2011 A-Z Guide (Report, at 27) was made only <u>after</u> QBC had been caught and KSI demanded that the language be deleted.  QBC, however, compounded its offense by subsequently publishing and disseminating the 2011 Guest Services Handbook containing the same language.  QBC offered no explanation for its conduct in publishing the Guide or its subsequent publication and dissemination of the Handbook.  Thus, because QBC's conduct in revising the Guide and

6

distributing the Handbook took place <u>after</u> this Court's Order and in violation thereof, the Magistrate's recommendation that QBC not be found in contempt is contrary to law.[3]

II.    QBC's Actions With Respect to Location K428
       <u>Violated the Court's Injunction</u>

On September 6, 2010, KSI requested that Aramark permit KSI to close location K428 for the upcoming Pittsburgh series due to poor attendance and anticipated low sales. (ECF-79, at 59-61.)  Unbeknownst to KSI, it was actually QBC which refused KSI's request - a fact only uncovered during discovery in this matter.[4]  As Tom Funk, Aramark's Director of Operation at Citifield, testified:

Q.    Did Mr. Katz send you an e-mail on September 6th, 2010 asking if it was okay for Kosher Sports to be permitted not to open its portable cart on the promenade level for the Pittsburgh series?  Do you recall that?

A.    I think so, yes.

*                    *                    *

Q.    On September 6th Mr. Katz asked you please let me know if you are okay with this and then the next day on September 7th of 2010 you told him, no.  Do you remember that?

A.    I remember saying no, I don't remember the date specifically.

---

[3]  To the extent QBC's publication of this information evidences QBC's knowledge that Aramark would eventually prevent KSI from operating on Fridays and Saturdays, such conduct demonstrates QBC's control over and/or complicity in Aramark's "decision," contrary to the Magistrate's recommendation.  <u>See</u> Objection IV(A), <u>infra</u>.

[4]  KSI did not raise the K428 issue in its original motion papers (Report, at 28) because it appears that document no. 8276 (Tr. Ex. 33) was produced by QBC some time after March 28, 2011, over two and one-half (2 ½) months after the document was required to be produced and in insufficient time to be reviewed and included.  The comment by Tom Funk of Aramark that KSI operating "saves us the labor dollars" (cited by the Magistrate in the Report, at 28) undermines any "financial motive" for Aramark - and QBC - wanting KSI closed on the weekends (cited in the Report, at 16-17; 25).

Q.     Let me show you to refresh your recollection.  Okay.  Do you recall being asked this following question and giving the following response in your deposition on May 26, 2010.  Page 150, line 25:

"Question:  Let's go back to section 428. John asked that it be closed for the Pittsburgh series and you responded on the next day at 1:54 p.m.?

"Answer:  Yes.  That's what it says.

"Question:  Did you grant his request at that time?

"Answer:  No."

Do you recall being asked that question and giving that response?

A.     Yes.

Q.     Okay.  And between Mr. Katz asking you on September 6th whether it was okay and your responding to him on September 7th at 1:54 p.m. it wasn't okay, you communicated with the Mets, right?

A.     Yes, Paul Schwartz.

                    *              *              *

Q.     And Mr. Schwartz responded that the Mets were not okay with the request from their perspective; right?

A.     Correct.

Q.     And you relayed -- and that was the response that you relayed to Mr. Katz without telling him that it was the Mets who had said no; correct?

A.     Correct.

(ECF-79, at 201-203.  See also ECF-79, at 144-145.)  QBC's conduct in requiring KSI to keep

location K428 open for the Pittsburgh series clearly constitutes an action "with respect to or

affecting" the "time or method" of KSI's operations at Citifield.  KSI's operating losses totaled

$1,700.  (See ECF-79, at 263.)[5]

The Magistrate acknowledged that QBC's direction that KSI remain open for the Pittsburgh series "arguably falls within the letter of the preliminary injunction" (Report, at 28). Nevertheless, the Magistrate recommended against a finding of contempt based upon an arbitrarily narrow and unjustified interpretation of the "contemplated scope" of the Order limiting "any actions" to actions which "prevent" KSI's from selling products at Citifield.  Such an interpretation contravenes the express terms of the Order and is unsubstantiated by the record. The Magistrate relied on a proposed Order submitted by KSI to justify confining the injunction solely to actions "preventing" KSI from distributing its products at Citifield (Report, at 29). However, KSI's proposed Order was broader than the Magistrate has suggested.  KSI not only asked the Court to enjoin QBC from taking any action to "prevent" the sale of KSI Food Products, but also from "otherwise interfering" with KSI's operations.  (See Report, at 6.)

In all events, the Court's injunction was clear, unambiguous and not limited to actions which "prevented" KSI from selling products at Citifield.  In response to QBC's repeated insistence at the hearing "that the responsibility and the individual sole corporation that authorizes whether [KSI] can sell the product [is] Aramark and not the New York Mets" (Tr. Ex. 26, at 4, 6 and 9), this Court stated: "then you are not harmed by the injunction" (Tr. Ex. 26, at 9).  Thus, the Court hoisted QBC by its own petard and issued a broad injunction directing that QBC not take "any action, directly or indirectly, with respect to, or affecting" KSI's operations. QBC failed to appeal or seek to modify the scope of the injunction once it became evident that its

---

[5]  QBC's conduct in secretly dictating Aramark's position mirrors the conduct that QBC performed with respect to KSI's Friday and Saturday sales, which was also secretly dictated by QBC.  See Objection III, infra.

efforts to mislead the Court by downplaying its control over KSI's operations had back-fired.[6]

QBC acted at its peril in disregarding the plain language of the Order.  Because QBC's conduct falls squarely within the proscription of the Order, the Court should find QBC in contempt of court.

III.   QBC's Actions in Seeking To Have
       Aramark Terminate and Replace KSI
       <u>Violated the Court's Order</u>

The Magistrate acknowledged that any efforts by QBC after the issuance of the injunction to encourage Aramark to terminate and replace KSI at Citifield would support a finding of contempt.  (Report, at 13.)  However, the Magistrate's recommendation that KSI had not established such efforts disregards the overwhelming evidence.

QBC's request that Aramark replace KSI was established by the uncontroverted testimony of Tom Funk:

Q.   Did there come a time when the Queens Ballpark Company sought to replace
     Kosher Sports with other kosher vendors?

A.   Did there come a time?

---

[6]   QBC's exercise of control over every aspect of KSI's relationship to Citifield was established by: (i) QBC's negotiation of Aramark's "deal points" (ECF-79, at 34; Tr. Exs. 3 and 5); (ii) the agendas, minutes and notes of the weekly meetings (Tr. Exs. 16, 23, 25, 34, 36, 38, 30; and Ex. 1 to the Post-Hearing Memorandum (ECF-81)); (iii)                **REDACTED**
                     ; (iv) the testimony of Rich Grey (<u>see</u> Objection III(A), <u>infra</u>); and (v) Ex. 2 to the Post-Hearing Memorandum (ECF-81), among other things.  The latter document in particular shows Aramark in December 2010, after the issuance of the Court's injunction, waiting for "direction" from QBC's "sponsorship" department concerning the "Kosher sub-contractor." The Magistrate noted that "plaintiff proffered no proof or theory of its likely date of origin" (Report, at 21, n. 10).  However, QBC precluded KSI from obtaining such proof by withholding the document until after the hearing.  Under the circumstances, the Magistrate should have drawn inferences in KSI's favor, not in QBC's.  In all events, inferences seem hardly necessary in light of the explicit date contained in the document for the relevant entry.

10

Q.      Yes.

A.      Possibly.

Q.      Do you recall meeting with other kosher vendors at QBC's request in order to replace Kosher Sports at Citi Field?

A.      I do.

Q.      Okay. And this occurred at the end of August 2010 and the beginning of September 2010?

A.      Somewhere, yeah, in there [sic] dates.

Q.      And QBC was present during many of those meetings?

A.      Yes, I believe they were.

                    *                *                *

Q.      Was Kosher Sports placed on the agenda of the weekly meetings that Aramark with the vendor services department during the off season between 2010 and 2011?

A.      They were on.

                    *                *                *

Q.      At some of the weekly meetings in November and December of 2010, did Aramark and the Mets discuss whether Kosher Sports was in breach of its agreement with Aramark?

A.      In that time period?

Q.      Yes.

A.      Yes.

Q.      And that occurred at least at the November 2nd meeting, November 11th meeting and the December 7th meeting; right?

                    *                *                *

11

THE WITNESS:  I don't remember the exact dates, but I do know that, again, there were conversations around the topic.

Q.    At one meeting or more than one meeting?

A.    It was a few sure.  It wasn't one.

(ECF-79, at 198-201.)  In addition to Funk's testimony, QBC's request that Aramark replace KSI was also established by documentary evidence.  (See agendas, minutes and notes of weekly meetings attached as Tr. Exs. 16, 23, 25, 34, 36, 38, 30; and Ex. 1 to the Post-Hearing Memorandum (ECF-81).)  QBC's perpetual "questioning" of Aramark in late 2010 as to whether KSI was in breach of its contract also evidences QBC's efforts to get Aramark to terminate KSI. The contention that these "questions" were not connected to QBC's efforts to terminate KSI is not credible, especially since, during the off-season, KSI was not operating and could not possibly have been in breach.[7]

Mike Landeen of QBC (see, e.g., ECF-79, at 129, 156-157) and Scott Kleckner of Aramark (ECF-79, at 219) attempted to downplay QBC's efforts to terminate KSI.  This was belied by the audio recordings of conversations between Kleckner and Katz:

MR. KATZ:  But -- but you're telling me that at some point,

_____

[7]  QBC's efforts to have Aramark terminate KSI was a continuation of its longstanding campaign to "get rid of" KSI.  Based on the irrefutable documentary evidence, the Magistrate acknowledged QBC's intent to terminate KSI.  Specifically, although KSI was not in default of any of its obligations under its QBC agreement: (i) on March 13, 2010, QBC was reviewing KSI's relationship with Citifield including KSI's agreement with Aramark (ECF-79, 126-127; Tr. Ex. 13); (ii) on March 18, 2010, Landeen directed Adam Barrick of the Mets to "tell [Katz] to fuck off" and "throw him out" of Citifield (Tr. Ex. 14); (iii) on March 26, 2010, QBC was contemplating legal action (ECF-79, 127-129; Tr. Ex. 15); (iv) on April 14, 2010, QBC sought to "get rid of this punk" (i.e., KSI) and commenced meetings with replacement vendors (Tr. Ex. 17; email from Pete Helfer of QBC to Mike Landeen, Adam Barrick, Paul Asencio and Paul Schwartz, all of QBC); and (v) on May 24, 2010, it was "clear" to QBC that the relationship with KSI "needs to end" (Tr. Ex. 20).  See also ECF-79, at 124-125.

despite the judge's ruling that they are not to interfere with me, they come to -- even afterwards, come to you and told you, hey, you know, let's try to find somebody else.

MR. KLECKNER:  They would defend this that they want to know their other options in case something went south with you, so you can see whatever.  But to cut through the bullshit.  Yeah.

MR. KATZ:  Yeah.

MR. KLECKNER:  They want to know what their other options were.  So they could tell you to pound sand or pay off or could ever, fuck off, and they had something on the shelf.

(Ex. 47, Recording of January 6, 2011 meeting; Ex. 48, Track 2-4.)  In a subsequent

conversation, Kleckner is heard confirming that he had been "pretty open" with KSI "about the

fact that [QBC] wanted me to shop it and they wanted me [to] terminate and bring in somebody

else."  (See Ex. 47, Recording of April 6, 2011 telephone conversation; Ex. 48, Track 6.)  There

could be no better proof of QBC's efforts to encourage Aramark to terminate KSI than the

spontaneous and unrehearsed statements of Kleckner, the highest on-site Aramark official at

Citifield.  Contrary to the Magistrate's suggestion (Report, at 23), the recorded statements clearly

concerned post-injunction conduct.  Kleckner states "what happened with the Mets in the off-

season [read, after the Order, dated August 25, 2010] is they obviously wanted me to bring in

other people."  He further responds affirmatively to the statement that "at some point, despite the

judge's ruling that [QBC is] not to interfere with [KSI], [QBC] come to -- even afterwards, come

to you and told you, hey, you know, let's try to find somebody else."  The Magistrate, however,

did not accord proper weight to these lawfully obtained statements.[8]

---

[8]  The Magistrate seems to have overlooked or misunderstood the import of Kleckner's reference to QBC's efforts to obtain another vendor "so they could tell [KSI] to pound sand or . . .

(continued...)

Landeen's "insistence" (Report, at 8) that QBC's efforts to replace KSI were merely a "contingency plan" was undermined by his admitted lack of personal knowledge that KSI ever considered "quitting" Citifield:

> Q.    Did Mr. Katz ever express in writing to you that he was
>        intent on leaving Citi Field?
>
> A.    Not to me.
>
> Q.    Did he ever say that in writing to anybody as far as you
>        know?
>
> A.    I couldn't tell you. I heard it verbally from others.

(ECF-79, at 151.)  Landeen testified that it was Pete Helfer of QBC and Tom Funk of Aramark who advised him that KSI "was not happy" (ECF-79, at 159).  However, Funk did <u>not</u> testify that he had any concern that KSI was going to "quit" Citifield and Helfer, to the contrary, was trying to "get rid of this punk [KSI] and make it happen with" Hain-Celestial, another kosher vendor (Tr. Ex. 17).  The Magistrate erroneously denied KSI's request to strike Landeen's testimony on this point.  (ECF-79, at 151.)

KSI never left QBC "out to dry" at MCU Park as Landeen claimed (Report, at 21).  Landeen's statement to that effect had no evidentiary value.  Indeed, as Landeen admitted, QBC (<u>i.e.</u>, the <u>Queens</u> Ballpark Company) manages Citifield only and has no relationship to MCU Park:

---

[8](...continued)
. fuck off" which clearly reflects QBC's intent to terminate and belies any purported "contingency" plan.  Kleckner's response to QBC that "Tom and I wouldn't give them that" further confirms that Kleckner was referring to QBC's efforts to have Aramark terminate KSI, which Aramark rebuffed.  By Memorandum and Order, dated August 5, 2011, the Magistrate found that KSI had belatedly produced the recordings but did not preclude KSI from using the evidence at the hearing.  (ECF-86.)

THE COURT:  You referred to Jonathan packing up and leaving.  I assumed you mean Mr. Katz?

THE WITNESS: Yes, correct.

THE COURT: Leaving where?

THE WITNESS: MCU.

THE COURT: What was the previous relationship with the Plaintiff at MCU?

THE WITNESS: He was the kosher provider there.  And again, I can't speak to it because I didn't deal with him down there . . .   It's a separate Aramark contract that has nothing to do with QBC.

(ECF-79, at 147-148.)  Neither do the citations to Scott Kleckner's testimony (Report, at 8) refer to KSI "quitting" MCU Park.  In fact, as the Magistrate separately and inconsistently acknowledged, Kleckner testified that "prior to the lawsuit, he had largely 'favorable business dealings' with Katz" (Report, at 15).  Indeed, Kleckner wanted KSI to continue at Citifield and so advised QBC, as the audio recordings make clear and the Magistrate acknowledged (Report, at 15-16) - hardly the sentiment of someone who had previously been left "out to dry" or had "operational issues" with KSI (Report, at 22).

Hand-written notations affixed upon a document entitled "New York Mets Baseball Club Weekly Aramark Meeting Notes" for April 13, 2010 (Ex. 1 to the Post-Hearing Memorandum, ECF-80) further negate Landeen's claim that QBC's attempt to replace KSI was a "contingency plan."  The notes of the meeting - attended by Landeen - unequivocally show QBC "explor[ing] alternatives, getting rid of Katz."  The record is replete with KSI's attempts to thwart QBC's efforts to "get rid of" KSI, including the negotiations in response to QBC's notices of default, the filing of this suit and the motion for a preliminary injunction to enjoin QBC from

15

terminating KSI.[9]

Because, as the Magistrate acknowledged, any efforts by QBC after the issuance of the injunction to encourage Aramark to terminate and replace KSI at Citifield would violate the Order and support a finding of contempt, this Court should find QBC in contempt of court.

IV.    QBC and Aramark Are Liable For Preventing KSI
       From Operating on Fridays and Saturdays

Aramark's conduct in April 2011 in preventing KSI from operating at Citifield on Fridays and Saturdays constitutes a violation of this Court's Order by Aramark and by QBC, as demonstrated below.

A.    QBC Influenced Aramark To Prevent KSI
      From Operating on Fridays and Saturdays

The Magistrate concluded that, in April 2011, Aramark "independently decided" to prevent KSI from operating on Fridays and Saturdays at Citifield despite the overwhelming evidence demonstrating that Aramark's conduct was anything but "independent." The Magistrate's recommendation that neither QBC nor Aramark be found in contempt neglects crucial and dispositive evidence and should be rejected as "clearly erroneous."

QBC alone controlled KSI's ability to operate on Fridays and Saturdays. (ECF-79, at 48-49.) There is no evidence of any communication concerning the Friday/Saturday issue with Aramark - to KSI or to QBC - when the decision to prevent KSI from operating on Fridays and Saturdays was made in March 2009 (Tr. Ex., 9). In February 2010, although aware that KSI had sought to re-visit the issue, Tom Funk of Aramark admitted that he "did nothing" in response

_____

[9] This was another document belatedly produced by QBC on July 7, 2011, almost six months after it was required to be produced and after the evidentiary hearing.

16

to KSI's request to operate on those days.  (ECF-79, at 184.)  In May 2010, upon hearing that

Friday and Saturday operations were again being discussed, Funk asked Katz "who approved this

on the Mets' side."  (Tr. Ex. 18; ECF-79, at 185.)  Indeed, because decisions with respect to

KSI's days of operations were solely the province of QBC, when Scott Kleckner became

Aramark's Resident District Manager for Citifield, he was not even told of KSI's interest in

operating at those times as he should have been had such matter genuinely been within his

company's bailiwick.  (ECF-79, at 211.)  In fact, under the KSI-Aramark contract, Aramark is

prohibited from unilaterally dictating to KSI the "events" at which KSI may operate.  (See Tr.

Ex. 7, Art. 6.)[10]

      QBC's control over Aramark's conduct in preventing KSI's Friday and Saturday

sales was also established by Aramark's Rich Grey.  At the January 6, 2011 "operational

meeting," he advised Katz that "it was important for the Mets to give Aramark their decision

[with respect to KSI's Friday and Saturday operations] and give it to them very quickly."  (Exs.

47 and 48, Track 1; ECF-79, at 50.)  Indeed, Grey anticipated that "the Mets were not going to let

[KSI's Friday and Saturday operations] happen."  (ECF-79, at 260.)  Documentary evidence also

shows that, at this time, Funk was waiting for "direction" from QBC concerning the KSI.  (See

Ex. 2 to the Post-Hearing Memorandum (ECF-80).)

      Aramark's request that KSI operate on Fridays and Saturdays at venues outside of

QBC's control, to wit, Lincoln Financial Field in Philadelphia ("LFF") and M&T Bank Stadium

in Baltimore ("MTB"), constitute additional compelling evidence that Aramark was acting at

---

[10]  Kleckner's testimony that "as Aramark" he could dictate "days of operation" (ECF-79,
at 232) is erroneous as a matter of law and evidences his complete misunderstanding of the
parties' contract and his proper role with respect to KSI's operations.

QBC's behest in banning KSI's weekend operations at Citifield (ECF-79, at 52-56.)  Tom Funk

of Aramark testified:

> Q.    When did you start working for Aramark?
>
> A.    July 2005.
>
> Q.    And at that time where were you stationed?
>
> A.    Lincoln Financial Field, Philadelphia.
>
> Q.    And you eventually become the director of operations there?
>
> A.    Yes, I did.
>
> Q.    Are you aware that Kosher Sports had a concession at Lincoln Financial Field, Philadelphia, while you were stationed there; correct?
>
> A.    Correct.
>
> Q.    In fact you signed the agreement between Kosher Sports and Aramark, right?
>
> A.    One of them at one point, yes.
>
> Q.    Has Aramark asked Kosher Sports to operate at Saturday events at Lincoln Financial Field?
>
> A.    Yes.

(ECF-79, at 179-180.)  Thus, the very same Aramark representatives who are now in charge of

Citifield allowed KSI to operate on the Jewish Sabbath at LFF where Aramark is not under

QBC's influence.  The Magistrate completely neglected to address Funk's testimony which was

confirmed by KSI's Katz (ECF 79, at 53).  The Magistrate also failed to give any weight to the

fact that, as recently as Memorial Day 2011, Aramark requested that KSI operate at MTB on the

Sabbath (Tr. Ex. 43).

> Ordinarily, circumstantial evidence is sufficient to prove concerted action which

by its very nature is secretive.  See U.S. v. Svoboda, 347 F.3d 471, 477 (2d Cir. 2003)

(conspiracies which are secretive by their very nature may be proved by circumstantial evidence),

cert. den., 541 U.S. 1044 (2004); U.S. v. RW Professional Leasing Services Corp., 452

F.Supp.2d 159, 175 (E.D.N.Y. 2006) (a conspiracy finding may be based on circumstantial

evidence alone).  Here, however, KSI provided direct evidence of QBC's control and influence

over Aramark's conduct.  Specifically, QBC's Landeen stated that he was "not comfortable

letting Aramark" permit KSI to operate on Fridays and Saturdays (ECF-79, at 138-139).

Landeen also testified that, within hours of the August 13, 2010 hearing, he reached out to

Aramark and instructed its representatives to keep KSI's operations at Citifield "status quo"

which could only be understood as a direction for Aramark to carry-on QBC's policy of barring

KSI's Friday and Saturday sales.  (ECF-79, at 139-142.)  Instead of accepting these statements as

a rare window into the secret machinations between QBC and Aramark, the Magistrate ignored

the former statement and erroneously misconstrued the significance of the latter (Report, at 20).[11]

       This is not the first time that QBC has wrongfully sought to blame Aramark for

KSI's inability to operate on Fridays and Saturdays.  As Funk testified:

Q.    Do you remember seeing a news article where the Mets were quoted as saying that
it was Aramark and not the Mets who were not letting Kosher Sports operate on
Friday and Saturday?

A.    I do.

Q.    And did you agree with that article?

---

[11]  Landeen recognized that the very act of reaching out to Aramark and other discussions
concerning KSI, including discussions at the weekly meetings, ran afoul of the injunction.  On
August 13, 2010, Landeen told Clint Westbrook of Aramark that "as a result of the injunction [he
was] not going to speak to Aramark about Kosher Sports anymore" (Report, at 19).

19

A.   I did not.

*          *          *

Q.   In fact when you first read this article you thought that the Mets were <u>throwing Aramark under the bus</u>, do you recall telling me that at your deposition?

*          *          *

THE WITNESS:  I did.

*          *          *

Q.   Did Clint Westbrook [Regional Vice-President of Aramark to whom Scott Wiegert, Scott Kleckner's boss, reported] agree with your assessment that <u>the Mets had thrown Aramark under the bus</u>?

A.   I believe he did.

(ECF-79, at 192-195; e.s.)

While Kleckner conceded that he was aware that QBC was against KSI operating on Fridays and Saturdays (ECF-79, at 213-214), he nonetheless claimed that he acted alone in barring such operations.  Yet, he provided no testimony as to how, when and why he came to this "decision."  Not one scrap of internal communication or other evidence of any deliberations on the issue was produced.  Indeed, Kleckner's alleged "integrity" concern parroted the "PR concern" conveyed to KSI by QBC in March 2009 (Tr. Ex. 9).  The Magistrate's conclusion that Kleckner was acting in accordance with Aramark's "longstanding practice and stated views" (Report, at 18) is undercut by the lack of <u>any</u> written evidence of such "practice and views," including Aramark's failure to object - on "integrity" grounds or otherwise (ECF-79, at 231-232) - to KSI's notification on August 27, 2010 of KSI's intent to operate on Fridays and Saturdays (Tr. Exs. 31-32).  Contrary to the Magistrate's citations (Report, at 14-16), the record is devoid of any evidence of <u>any</u> pre-injunction "reservations" by Aramark.  Funk's statement that his "bosses

20

at the time were against it" (ECF-79, at 181) is vague, unsupported, uncorroborated, and, at best, inadmissible hearsay not responsive to the question posed. It is the slenderest of reeds upon which the Magistrate could find that Aramark acted "independently."[12]

In response to prodding by the Magistrate, Kleckner concocted an explanation for the discrepancy between Aramark's position at Citifield and other venues (ECF-79, at 233-235). The explanation was neither "credible" nor "detailed" (Report, at 17). Indeed, since Kleckner claimed "not to recall" letting KSI operate at LFF on Fridays and Saturdays at all (a position belied by the unequivocal testimony of Tom Funk and Jonathan Katz), his post hoc distinction between "very, very Observant Jews" in New York as opposed to that very same demographic in Philadelphia is entitled to no weight. Moreover, Kleckner failed to explain how such operations could possibly alienate Sabbath-observant Mets fans (Report, at 18) in light of the approval of nationally-recognized and highly-respected rabbinical organizations obtained by KSI. It is respectfully submitted that the Magistrate erred in rejecting the obvious explanation for the discrepancy between Aramark's position at Citifield and elsewhere, i.e., that at other venues the decision was Aramark's alone, whereas, at Citifield, Aramark was constrained to - and was in fact - executing QBC's bidding.

---

[12]  In response to KSI's April 6, 2011 advice, Kleckner stated that Aramark would not allow KSI to operate on the upcoming Friday and Saturday because of a purported lack of "notice." But, he also made clear that he "was not saying no" to Friday and Saturday operations in general. (See Exs. 47 and 48, Track 5; ECF-79, at 105.) The Magistrate (Report, at 10) mis-reads Kleckner's April 7, 2011 letter (Tr. Ex. 40). There, Kleckner refuses to permit KSI sales on "this Friday (tomorrow) and Saturday" only and is not threatening a season-wide ban. Tellingly, even Aramark's counsel's April 8, 2011 letter (Tr. Ex. 42) fails to object to Friday and Saturday in principle and their April 19, 2011 submission to this Court (Tr. Ex. 44) fails to reference any "integrity" concern.

B.     QBC and Aramark, As Joint Venture Partners,
       Are Jointly Liable For Preventing KSI
       <u>From Operating on Fridays and Saturdays</u>

Even if Aramark acted "independently" in banning KSI from operating at Citifield

on Fridays and Saturdays, its conduct is nonetheless attributable to QBC as a matter of law under

agency principles.  It has been stated that:

> A joint venture is a special combination of two or more persons
> where in some specific venture a profit is jointly sought.  It is in a
> sense a partnership for a limited purpose, and it has long been
> recognized that the legal consequences of a joint venture are
> equivalent to those of a partnership.

<u>Gramercy Equities Corp. v. Dumont</u>, 72 N.Y.2d 560, 565, 534 N.Y.S.2d 908 (1988).  <u>See also</u>

15A N.Y.Jur 2d, <u>Business Relationships</u> § 1537 (2009).  The court has held that:

> Under New York law, a joint venture is formed when (a) two or
> more persons enter into an agreement to carry on a venture for
> profit; (b) the agreement evinces their intent to be joint venturers;
> (c) each contributes property, financing, skill, knowledge, or effort;
> (d) each has some degree of joint control over the venture; and (e)
> provision is made for the sharing of both profits and losses.

<u>SCS Communications, Inc. v. Herrick Co.</u>, 360 F.3d 329, 341 (2d Cir. 2004).  The very nature of

a partnership and/or a joint venture is based on the law of principal and agent.  "Just as a

principal is liable for the acts of its agents, each partner is personally responsible for the acts of

other partners in the ordinary course of the partnership's business."  <u>Ederer v. Gursky</u>, 9 N.Y.3d

514, 522, 851 N.Y.S.2d 108 (2007).  <u>See also</u> <u>Polycast Technology Corp. v. Uniroyal Inc.</u>, 728 F.

Supp. 926, 935 (S.D.N.Y. 1989) ("partnership liability is rooted in agency principles; it requires

no actual participation in or knowledge of the acts performed by the partners to impose liability);

15A N.Y.Jur 2d, <u>Business Relationships</u> § 1662 (2009), citing N.Y. Partn. L., § 4(3).

The relationship between QBC and Aramark satisfies not only "several of the elements" (Report, at 36), but each and every element of a joint venture. QBC and Aramark jointly carry-on the concessions services business at Citifield. They control and manage the business using their combined property, skill and knowledge. QBC even negotiated the terms of Aramark's agreement with KSI (Tr. Exs., 3, 11; ECF-79, at 112). The parties hold regularly-scheduled weekly meetings and communicate daily. They share profits and losses. QBC and Aramark coordinate legal strategy, cooperate on press releases and collaborated on whether to permit KSI to continue to operate at Citifield. (Tr. Exs. 21, 22. See also ECF-79, at 186-192.) Dave Howard ("Howard"), Executive Vice-President of Business Operations for QBC and an attorney, stated that the relationship between QBC and Aramark was "along the lines of a joint venture" and described the parties as "true partners." (Tr. Ex. 1.)

REDACTED                         The Magistrate failed to properly credit the contemporaneous public statements of the parties as evidence of their joint venture partnership.[13]

Attributing Aramark's ban on KSI's Friday and Saturday sales to QBC would not render Aramark's contract with KSI "meaningless" (Report, at 30). Certainly, the Order could be construed to permit Aramark to exercise any contractual rights possessed by Aramark such as those identified in the Report (at 33). However, Aramark does not have the contractual right to determine whether KSI may operate on Fridays and Saturdays. In fact, Aramark is expressly prohibited from unilaterally determining the "events" at which KSI may operate (Tr. Ex. 7, Art.

---

[13] Just as "calling [a relationship] a partnership does not make it one," (Report, at 37), neither is contract language disavowing a partnership dispositive when a partnership in fact exists.

6).[14]

In light of the joint venture relationship between QBC and Aramark, the Order applied to the conduct of Aramark as well as QBC.  If, in light of their relationship, QBC and Aramark - who both had actual notice of the Order - felt aggrieved by the Order's breadth, they could have appealed or sought to modify the Order, which they did not.  Thus, QBC and Aramark should be held jointly and severally liable for preventing KSI from operating on Fridays and Saturdays at Citifield.

C.      QBC Is Liable For Aramark's Conduct
        In Banning KSI From Operating on Fridays and Saturdays
        As a Matter of the Parties' Contractual Relationship

**REDACTED**

_____

[14]  To the contary, KSI's right to operate at all events was bargained for and granted to KSI by QBC.  The agreement between KSI and Aramark was a mere formality in all events. QBC announced KSI's "new multi-year marketing agreement for Citifield" as a fait accompli in August 2008 (Tr. Ex. 6), prior to the agreement between KSI and Aramark which was not executed until January 2009.  QBC directed Aramark to enter into an agreement with KSI (ECF-79, at 111-112),

**REDACTED**

                                QBC even negotiated Aramark's "deal points" (ECF-79, at 31-35).  (See also Tr. Exs. 10-11 and ECF-79, at 111-112, demonstrating that a QBC agreement is a pre-requisite for an agreement with Aramark.  Thus, James Denniston, Esq.'s letter claiming that a termination of the QBC-KSI contract would have "no impact" on KSI's agreement with Aramark (cited in the Report, at 5) is belied by the evidence.)

**REDACTED**

<u>Conclusion</u>

WHEREFORE, plaintiff respectfully requests that, based on the forgoing, the

Objection be granted, the Report and Recommendation be rejected in its entirety and the District

Court grant such other and further relief as to the Court may seem just and proper.

Dated: New York, New York
September 19, 2011


_____/s/_____
IRA DANIEL TOKAYER, ESQ. (IT-4734)
Attorney for Plaintiff
405 Lexington Avenue, 7th Floor
New York, New York 10174
(212) 695-5250


OBJECTIONS to Magistrate 02CR.wpd

26