# EXHIBIT 1



SHEA STADIUM
123-21 ROOSEVELT AVE.
FLUSHING, NY 11368

January 23, 2008

Jonathan Katz
President/CEO
Kosher Sports Inc.
392 Broad Avenue
Englewood, NJ 07631

Dear Mr. Katz:

I am writing to confirm the agreement reached between Queens Ballpark Company. L.L.C. ("QBC"), operator of the new ballpark (the "Ballpark") being constructed for use by the New York Mets National League Baseball team (the "Mets"). and Kosher Sports. Inc.. ("Advertiser"), owner of the Kosher Sports brand of Glatt Kosher hot dogs and sausages and Kosher knishes, pretzels, peanuts, and hamburgers ("KSI Food Products"), for certain advertising, ticket and product distribution rights from April 1, 2009 through October 31, 2018 (the "Term").

Per the agreement, Advertiser will receive the following rights each year during the Term:

1. The right to advertise KSI Food Products in:

    • One message on the scoreboard at the Ballpark during each Mets regular season home game.

    • One full page, four-color, print advertisement in the annual New York Mets Yearbook.

2. Two tickets to each Mets regular season home games at the Ballpark (and the right to purchase the same seats for any Mets post season games at the Ballpark). Such rights shall be limited to the Term, and are not subject to renewal.

3. Two hundred and fifty (250) upper level Mets tickets will be donated to Jewish terminally ill children in the New York metropolitan area by the Mets and Advertiser each year during the Term.

4. QBC will permit Aramark Corporation, Ballpark concessionaire, to sell only Advertiser's brand of the following Kosher products in the Ballpark: (i) Glatt Kosher hot dogs and sausages, and (ii) Kosher knishes, pretzels, peanuts, and hamburgers, provided that Aramark enters into an agreement with Advertiser to sell each of such products. In addition, QBC will not permit Aramark to sell competing brands of any such Kosher products (i.e., branded products that are marketed as "Glatt Kosher" (in the case of hot dogs and sausages) or "Kosher" (in the case of knishes, pretzels, peanuts, and hamburgers) during events at the Ballpark as to which admission is made available to members of the general public, provided that Advertiser makes such products available to Aramark on customary terms and conditions for similarly situated



PLAINTIFF'S
EXHIBIT
6
5/12/11

facilities.

Except as expressly provided herein, none of the tickets provided to Advertiser hereunder may be used for any contest or promotion without the prior written approval of Sterling.

Advertiser will be responsible for the content of its advertisement, subject to the reasonable approval of QBC. Advertiser shall defend and indemnify QBC against any claims relating to the content of any advertising materials submitted by Advertiser.

For the foregoing goods and services, Advertiser will pay to QBC the following annual fee. (These are net figures and will not be reduced by any commissions or other amounts.) The annual fee shall be paid in six equal installments on or before April 1, May 1, June 1, July 1, August 1, and September 1 of each respective year.

2009: $50,000

2010: $55,000

2011: $60,000

2012: $65,000

2013: $70,000

2014: $75,000

2015: $80,000

2016: $85,000

2017: $90,000

2018: $95,000

In the event of a default by Advertiser in making any payment due pursuant to this Agreement, which default shall not have been remedied within three (3) working days after notice of default has been given in writing to Advertiser by QBC, then, in addition to any other remedies which may under the circumstances be available to QBC, which are expressly reserved, Advertiser shall be obligated to pay QBC, on demand, interest on all unpaid sums at a rate equal to the lesser of sixteen (16%) per annum, or the highest rate of interest allowed under New York law.

Notwithstanding any other provision of this Agreement, this Agreement and any rights or exclusivities granted by QBC hereunder shall in all respects be subordinate to each of the following, as may be amended from time to time (collectively, "MLB Documents"): (i) any present or future agreements entered into by, or on behalf of, any of the Major League Baseball ("MLB") entities or affiliates, or the member Clubs acting collectively ("MLB Entities"), including, without limitation, agreements entered into pursuant to the Major League Constitution, the American and National League Constitutions, the Professional Baseball Agreement, the Major League Rules, the Interactive Media Rights Agreement, and each agency agreement and operating guidelines among the Major League Baseball Clubs and an MLB Entity, or (ii) the present and future mandates, rules, regulations, policies, bulletins or directives issued or adopted by the Commissioner or the MLB Entities. The issuance, entering into, amendment, or

implementation of any of the MLB Documents shall be at no cost or liability to any MLB entity or affiliate or to any individual or entity related thereto. The territory within which Advertiser is granted rights is limited to, and nothing herein shall be construed as conferring on Advertiser rights in areas outside of, the Home Television Territory of the Mets, as established and amended from time to time. No rights, exclusivities or obligations involving the Internet or any interactive or on-line media (as defined by the MLB Entities) are conferred by this Agreement, except as are specifically approved in writing by the applicable MLB entity.

This Agreement is subject and subordinate to the lease agreement between the New York City Industrial Development Agency and QBC with respect to the Ballpark.

Please sign below to indicate your assent to the foregoing material terms and return the signed letter to my attention.

This letter shall be a binding and enforceable agreement and absent the execution of a more formal contract, a court may supply consistent additional terms as necessary to carry out the parties' intent.

Sincerely,

Paul E. Asencio
Vice President
Queens Ballpark Company, L.L.C.

Agreed to and Accepted by:

Kosher Sports, Inc.

By:
Title:

1/31/08
Date

# EXHIBIT 2

| | |
|---|---|
| **From:** | Greg Stangel [gstangel@nymets.com] |
| **Sent:** | Monday, September 10, 2007 7:10:11 PM |
| **To:** | mdn@focalsport.com |
| **Subject:** | FW: Kosher Sports Inc. and Citi Field Agreement |

**Importance:**     High

FYI

_____

**From:** Greg Stangel
**Sent:** Monday, September 10, 2007 7:09 PM
**To:** 'jkatz@koshersportsinc.com'
**Cc:** Tom Murphy; Paul Asencio; Mike Landeen; Steve Cohen
**Subject:** Kosher Sports Inc. and Citi Field Agreement
**Importance:** High

Jonathan,


We are delighted to have come to agreement with you and continue our partnership into our new home starting in 2009. A formal letter of agreement for both Citi Field and Keyspan Park will follow in the coming days.  To confirm, here are the deal points:

Term:  10 years

-    2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018 with an opt out after 2013 season by both parties

Marketing Fee:

-    $50,000 Net in 2009 (with comparable payment due dates as 2008/Shea Stadium agreement)
-    $55,000 Net in 2010
-    $60,000 Net in 2011
-    $65,000 Net in 2012
-    $70,000 Net in 2013
-    $75,000 Net in 2014
-    $80,000 Net in 2015
-    $85,000 Net in 2016
-    $90,000 Net in 2017
-    $95,000 Net in 2018

Benefits provided each year:

-    One (1) Full Page, 4/Color ad in the New York Mets Yearbook
-    Two (2) Half Season Tickets at Citi Field (every other game)
-    One (1) Scoreboard Message Each Game at Citi Field
-    Four (4) portable cart locations in mutually agreed upon areas of Citi Field
-    Mets and Aramark agree to following splits:  57.5% on food and 2% on beverages
-    Kosher Sports Inc. responsible for production costs of all portable cart equipment and adhering to defined specifications

Other:

-    Kosher Sports Inc. agrees to continue partnership with Brooklyn Cyclones at Keyspan Park during same term as



listed above

·    Each year, Kosher Sports Inc. will spend $7,000 Net in marketing dollars (exact benefits to be mutually agreed upon) at Keyspan Park and provide necessary equipment to conduct product sales

We look forward to a prosperous partnership for all parties!  Thanks Jonathan.


Best,


Greg

**greg e. stangel**

new york mets | director, corporate sales and services

shea stadium | flushing, NY  11368

work: 718.559.3126 | cell: 917.482.6316

fax: 718.507.6395 | aim: gestangel

gstangel@nymets.com | www.mets.com

QBC0003896

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

KOSHER SPORTS, INC.,                    :          CV-10-2618 (JBW) (RLM)

                        Plaintiff,       :

        - against -                    :          <u>AFFIDAVIT</u>

QUEENS BALLPARK COMPANY, LLC,  :

                   Defendant.    :
--------------------------------------------------------x

GREG STANGEL, being duly sworn, deposes and says:

      1.     In September 2007, as Director of Corporate Sales and Services for

Queens Ballpark Company, LLC ("QBC"), I negotiated the agreement memorialized in an email,

dated September 10, 2007, which I sent to Jonathan Katz and copied to Tom Murphy, Paul

Asencio, Mike Landeen and Steve Cohen.

      2.     I do not have a recollection of the discussions that led up to the agreement.

Therefore, I can neither confirm nor deny that the "marketing fee" and other deal points set forth

in the email were agreed to with the express understanding that Kosher Sports, Inc. ("KSI")

would have the right to sell products during all events at Citi Field as to which admission is made

available to the general public, including Fridays and Saturdays.

      3.     I believed the deal I negotiated was a favorable one for QBC and so

advised Tom Murphy, who concurred.

4.      I left QBC's employ on approximately July 25, 2008, and was not

consulted when I am advised that in March 2009 and thereafter QBC banned KSI from operating

at Citi Field on Fridays and Saturdays.

_____
GREG STANGEL

Sworn to be fore me this
25   day of May, 2011

_____
Notary Public

**JOSEPH AHN**
Notary Public, State of New York
No. 01AH6192843
Qualified in New York County
Commission Expires 9/2/12.

Stangel DEC.wpd

-2-

# EXHIBIT 4

PLAINTIFF'S
EXHIBIT
74A
M 5-26-11

PENGAD 800-631-6989

# CONCESSION LICENSE AGREEMENT

This Concession License Agreement ("Agreement") is entered into January 1, 2009, between ARAMARK Sports and Entertainment Services, LLC, a Delaware limited liability company, having its principal place of business at ARAMARK Tower, 1101 Market Street, Philadelphia, PA 19107 ("ARAMARK"), and Kosher Sports Inc., having an address of 392 Broad Avenue, Englewood, NJ 07631 ("Concessionaire").

## WITNESSETH:

WHEREAS, ARAMARK has been granted the exclusive right to operate and manage concessions and other services at the public event facility known as Citi Field and located at Flushing, New York (the "Facility");

WHEREAS, ARAMARK and Concessionaire desire that Concessionaire enter into this Concession License Agreement pursuant to which it shall act as a sublicensee of ARAMARK at the Facility in connection with the operation of certain services in accordance with the terms and conditions set forth below; and

WHEREAS, Concessionaire represents that it possesses the necessary qualifications to provide the services described herein;

NOW, THEREFORE, ARAMARK and Concessionaire agree as follows:

## ARTICLE 1 - Concessionaire's Privileges

A.     ARAMARK grants to Concessionaire a license to conduct the sale of Concessionaire's Kosher Food Products, together with certain other designated ARAMARK beverage products (ARAMARK designated beverage products shall hereinafter be referred to as "ARAMARK Beverage Products", and together with Concessionaire's Products, collectively referred to herein as the "Products"), all of which shall be sold at the prices set forth on Exhibit "A" attached hereto and made a part hereof. Products shall be sold from locations at the Facility to be designated at the sole discretion of ARAMARK (collectively, the "Concession Locations"). ARAMARK retains the right to modify or alter Concession Locations or relocate Concessionaire to alternative Concession Locations from time to time, and in no instance shall ARAMARK have any liability to Concessionaire resulting from such modification, alteration, or relocation. Concessionaire shall not offer for sale any food, beverage, or merchandise other than the Products, nor shall Concessionaire engage in any other commercial activity at or in respect of the Facility.}

B.     Concessionaire shall be permitted to use electric, gas, heat, water, and drainage utility services at no charge. Any additional utility lines, services, or connections required by Concessionaire must be preapproved by ARAMARK, in its sole discretion, and installed by Concessionaire at it sole expense. Notwithstanding anything in this Agreement to the contrary,

Concessionaire acknowledges that the Client (as hereinafter defined), as the owner/operator of the Facility, provides utility services to the Concession Location(s), and ARAMARK shall not be liable for any losses incurred by Concessionaire for failure in utility services regardless of cause.

C.     All signs and advertising used by Concessionaire at the Facility shall be subject to the prior approval of ARAMARK.

### ARTICLE 2 - Equipment; Maintenance and Repair; Compliance with Laws

A.     **Equipment; Maintenance and Repair.**  Concessionaire hereby accepts the Concession Location(s) in its (their) "AS IS, WHERE IS" condition.  Concessionaire, at its sole expense, shall provide all Products, equipment, serving pieces, utensils, storage containers, and all other supplies and equipment necessary for the sale of the Products in the Concession Location(s).  All such supplies and equipment shall be subject to ARAMARK's prior written approval.  Concessionaire shall be responsible for the maintenance and repair of all equipment, supplies, vehicles and improvements, if any, in the Concession Location(s) used by Concessionaire.  Under no circumstances shall ARAMARK have any liability to Concessionaire for any damage to Concessionaire's equipment, supplies, or inventory resulting from storage at the Concession Location(s).

B.     **Compliance with Laws.**  Concessionaire is in compliance with each, and is not in violation of any, Federal, state and local law (including, without limitation, those relating to safety, health, wages, recordkeeping and reporting requirements) with respect to its operations.  Concessionaire shall, at its sole expense, prior to the commencement of Concessionaire's operations, obtain all permits and licenses required for the conduct of its operations hereunder.

### ARTICLE 3 - Cleaning Responsibilities; Standards of Operation

A.     Concessionaire shall be responsible for maintaining high standards of sanitation in the Concession Location(s) and surrounding areas and for routine cleaning in all such areas.  Concessionaire shall be responsible for trash and garbage removal to a designated point of central pickup.

B.     Concessionaire shall conduct its operations in a courteous and efficient manner.  If ARAMARK determines, in its sole judgment, that Concessionaire's operations are not being conducted in accordance with ARAMARK's standards, ARAMARK shall notify Concessionaire and Concessionaire shall immediately take all steps necessary to correct such deficient operations.

### ARTICLE 4 - Inventory

Concessionaire shall be responsible for maintaining sufficient inventory of the Products to meet anticipated demand for the Products.  Concessionaire shall be solely responsible for ordering and

transporting the Products to and from the Concession Location(s). All Products shall be first-quality and subject to ARAMARK's approval. Concessionaire shall not bring any Products to any Concession Locations after a pre-event inventory calculation has been conducted.

## ARTICLE 5 - Personnel; Independent Contractor

Concessionaire shall maintain a staff of its employees on duty at the Concession Location(s) at a level and in a manner consistent with the operating standards maintained and recommended by ARAMARK. Concessionaire's employees shall be required to participate in all necessary training as determined by ARAMARK, including Customer Focus Training. Such employees shall be employed by Concessionaire, which, for all purposes hereunder, shall be an independent contractor. Concessionaire shall be responsible for the payment of all wages, payroll taxes, and fringe benefits for its employees. Concessionaire shall indemnify ARAMARK against any and all liability which may be asserted against ARAMARK in connection with the foregoing.

## ARTICLE 6 - Events; Hours of Operation

The events at which the Products will be sold shall be determined by ARAMARK in consultation with Concessionaire. Concessionaire shall conduct its operations only during such hours as shall be specified by ARAMARK.

## ARTICLE 7 - Fiscal Arrangements

A. **Commissions.** Concessionaire shall pay to ARAMARK commissions ("Commissions") equal to forty five (45%) of Gross Receipts (as hereinafter defined) from the sale of Concessionaire's Products. Concessionaire will receive two percent (2%) of Gross Receipts from the sale of ARAMARK Beverage Products. "Gross Receipts" shall mean all receipts received by Concessionaire from sales of the Products at the Facility, less only retail sales taxes and other direct taxes imposed upon receipts collected from consumers. Gross Receipts shall be measured by the accounting and control procedures set forth in Section 7.C. below.

B. **Method of Payment.** All sums received by Concessionaire from sales of the Products shall be delivered to ARAMARK (in accordance with ARAMARK's cash control procedures) on the same day as received. ARAMARK shall retain from such receipts (i) all Commissions to which ARAMARK is entitled, (ii) an amount equal to all retail sales taxes and other direct taxes imposed upon receipts collected from consumers with respect to the sale of the Products (such amount ARAMARK shall pay to the appropriate taxing authority), (iii) the Utility Charge, and (iv) any amounts due and payable to ARAMARK pursuant to Article 8 below. After deducting the foregoing amounts from Gross Receipts, Concessionaire shall be entitled to the remainder of the Gross Receipts. ARAMARK shall be entitled to withhold from Concessionaire the amount of any cash or inventory shortages determined to have occurred in the course of Concessionaire's operations. If Gross Receipts are not sufficient to fund any such cash or inventory shortages, Concessionaire shall immediately pay to ARAMARK an amount equal to such deficiency. ARAMARK shall make the payments to Concessionaire required hereby within

twenty-eight (28) days following the close of each ARAMARK accounting period during the Term.

        C.    **Accounting and Control Procedures**. To ensure that all sums received by Concessionaire are delivered to ARAMARK as required under this Agreement, Concessionaire shall utilize in its operations at the Facility such cash and inventory controls as are required by ARAMARK's control procedures and by such other procedures established by ARAMARK from time to time. Concessionaire shall maintain accurate books and records in connection with its operations hereunder and shall maintain such records for a period of at least one (1) year, which books and records shall be available for ARAMARK's inspection during regular business hours.

## ARTICLE 8 - Reimbursement of Additional Sums

If ARAMARK has paid any sums or has incurred any expense for which Concessionaire agreed to pay or reimburse ARAMARK, or if ARAMARK is required to pay any sums or incurs any expense arising from this Agreement or arising from the failure or neglect of Concessionaire to perform or fulfill any of the terms or conditions of this Agreement, such amounts shall be deemed additional payments due hereunder; and Concessionaire shall reimburse ARAMARK for the amount(s) thereof within ten (10) days following such demand(s).

## ARTICLE 9 - Insurance and Indemnification

        A.    **Insurance:** Concessionaire shall provide to ARAMARK on or before the date on which it provides its services, a certificate evidencing (i) workers' compensation and employer's liability insurance, which coverages shall not be less than the amount required by applicable law, and (ii) comprehensive general liability with limits of liability in the amount of at least One Million Dollars ($1,000,000) per occurrence for bodily injury or property damage, including contractual liability (to cover the obligations contained in Section 9.B. below) and food products liability coverage (with respect to any defect in and/or the production or manufacturing of any of the Concessionaire's Products, or a food borne illness or other contaminant contained in any of the Concessionaire's Products) issued by a company or companies licensed to do business in the State where Facility is located and reasonably acceptable to ARAMARK. All policies of liability insurance shall include ARAMARK and the Client as additional insureds. Failure to carry the required insurance coverages shall not relieve Concessionaire of its responsibility for losses under this Agreement.

        B.    **Indemnification:** Concessionaire hereby agrees to indemnify, defend and hold ARAMARK and the Client harmless from any and all acts, claims, litigation, losses, and expenses (including reasonable attorneys' fees of litigation) and liabilities, arising by reason of Concessionaire's activities at the Facility, a defect in any of the Concessionaire's Products (including, without limitation, with respect to the production and/or manufacturing of any of the Concessionaire's Products, or a food borne illness or other contaminant contained in any of the Concessionaire's Products), or any condition in or upon or any occurrences in or upon any Concession Location(s), and for damage to any persons or property arising by reason of any of the foregoing.

C. **Waiver of Subrogation:** Concessionaire hereby releases ARAMARK and its employees, agents, officers, invitees and insurance companies from all liabilities, claims, losses and expenses sustained as a result of injury to employees of Concessionaire while such employees are providing services for ARAMARK. Concessionaire's workers' compensation and employers' liability insurance policies shall be endorsed to provide that Concessionaire's insurers shall not have any right of subrogation against ARAMARK, and its employees, agents, officers, invitees and insurance companies for any payments made or losses sustained as a result of injury to Concessionaire's employees.

## ARTICLE 10 - Applicability of Contract Documents with ARAMARK's Client

For the purpose of defining all obligations of the parties, that certain concession services agreement (the "Concession Agreement") between ARAMARK and Queens Ballpark Company, L.L.C. (the "Client"), except as expressly modified by the terms and conditions set forth in this Agreement, shall apply to the parties such that: (i) Concessionaire hereby agrees to comply with all terms and conditions required to be performed by ARAMARK in the operation and management of the Concession Location(s); (ii) Concessionaire shall have no rights against the Client nor shall it have any beneficial, creditor or other interest, direct or indirect, in the Concession Agreement, such document being incorporated herein solely for the purpose of establishing the respective obligations of Concessionaire and ARAMARK with respect to the operation and management of the Concession Location(s) licensed to Concessionaire hereunder; and (iii) in the event the Concession Agreement is terminated or expires, the Term shall similarly terminate or expire upon the effective date thereof, without any liability on the part of ARAMARK, even if any such termination was alleged to have been the result of ARAMARK's performance thereunder.

## ARTICLE 11 - Term

A. **Term:** The term of this Agreement (the "Term") shall commence on the date first written above and shall continue until December, 31, 2018.

B. **Early Termination:** Either party may terminate this Agreement prior to the expiration of the Term by giving 30 days' advance written notice to the other party of its intention to do so; provided, however, ARAMARK shall have the right to terminate this Agreement upon one (1) day notice in the event Concessionaire is in breach of any of its obligations hereunder.

## ARTICLE 12 - Assignment

This Agreement shall not be assigned by Concessionaire without the written consent of ARAMARK, which consent may be withheld in ARAMARK's sole discretion.

## ARTICLE 13 - Cancellation of Events

Concessionaire acknowledges that the business arrangement contemplated by this Agreement involves business risks and that its success will be solely dependent upon the ability of Concessionaire as an independent business operation. Concessionaire further acknowledges that ARAMARK has made no guarantees with respect to the potential volume, profits, or success of the Concessionaire's business operations contemplated by this Agreement, or with respect to the level of revenue or profitability of the events at which Concessionaire shall provide its services. In no instance shall ARAMARK have any liability to Concessionaire for the cancellation of any event at the Facility.

## ARTICLE 14 – Limitation of Damages; Non-Recourse

IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INCIDENTAL, INDIRECT, PUNITIVE OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, LOSS OF PROFIT, BUSINESS, OR GOODWILL, EVEN IF SUCH PARTY HAS BEEN ADVISED, KNEW, OR SHOULD HAVE KNOWN OF THE LIKELIHOOD OR POSSIBILITY OF SUCH DAMAGES OCCURRING. ACCORDINGLY, CONCESSIONAIRE SHALL NOT BE ENTITLED TO SEEK, CLAIM, OR COLLECT DAMAGES IN EXCESS OF THE ACTUAL AND DIRECT DAMAGES ACTUALLY INCURRED OR SUSTAINED UNDER THIS AGREEMENT.

In the enforcement of its rights and remedies under this Agreement, each of the parties hereto agrees that it shall not seek, enter or enforce any personal judgment against any stockholder, member, general or limited partner, director, officer, employee or principal, disclosed or undisclosed, of the other party or any of the other party's affiliates (or any of their respective successors and assigns) and shall look only to the assets of the other party and its successors and assigns.

## ARTICLE 15 - Notices

All notices, consents, waivers or other communications in connection with this Agreement shall be in writing and shall be deemed to have been duly given if mailed first class, postage prepaid, return receipt requested, or by reputable overnight delivery service, or courier service (providing return receipt), addressed as follows (or to such other addressee or address as shall be set forth in a notice to the parties):

To ARAMARK:    ARAMARK Sports and Entertainment Services, LLC
1101 Market Street
Philadelphia, PA 19107
Attn: President - Sports & Entertainment

Copy To:    ARAMARK Sports and Entertainment Services, LLC
1101 Market Street
Philadelphia, PA 19107

Attn: Associate General Counsel - Sports & Entertainment

To Concessionaire:        **Kosher Sports Inc**
**392 Broad Avenue**
**Englewood, NJ 07631**
**Attn: Lead Counsel**

Notice shall be deemed given conclusively when received as evidenced by the return receipt or tracking information.

## ARTICLE 16 – ARAMARK's Alcohol Policies

To the extent that ARAMARK, in the sole exercise of its discretion, permits Concessionaire to sell alcohol at the Concession Locations, then all of Concessionaire's employees who will be associated with the sale, service or provision of alcoholic beverages at the Facility shall undergo such alcohol training and certification as ARAMARK may from time to time require of its own employees involved in the sale, service or provision of alcoholic beverages at the Facility (including alcohol awareness training (TIPS) or any such other alcohol programs as ARAMARK may from time to time implement at the Facility). Concessionaire shall also ensure that all of Concessionaire's employees comply in all respects with all: (i) applicable laws pertaining to the sale, service and provision of alcoholic beverages (including, without limitation, service to minors, service to intoxicated individuals, and minimum age for volunteers and employees involved with the sale, service and provision of alcoholic beverages); and (ii) of ARAMARK's policies and procedures pertaining to the sale, service and provision of alcoholic beverages. Concessionaire's failure to comply with the terms and conditions contained in this Article 16 shall constitute an immediate grounds for termination without a corresponding right to cure. Without limiting the generality of the foregoing, if ARAMARK permits Concessionaire to sell alcohol hereunder, then nothing will prohibit ARAMARK from subsequently terminating Concessionaire's rights to sell alcohol hereunder (even in the absence of a default), and such termination shall not otherwise affect the rights of the parties hereto.

## ARTICLE 17 - Miscellaneous

This Agreement: (i) contains the entire understanding between the parties and the provisions in this Agreement supersede any and all prior and/or contemporaneous agreements or understandings relating to the same subject matter; (ii) may not be amended other than by a written instrument executed by both parties; (iii) shall be binding upon the parties hereto and their permitted successors and assigns; (iv) shall be governed by the laws of the State of where Facility is located; (v) may be executed in counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement; and (vi) may be signed via facsimile, which facsimile signature shall have the same force and effect as an original, non-facsimile signature by such party.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their duly authorized representatives the day and year first set forth above.

ARAMARK:

ARAMARK SPORTS AND
ENTERTAINMENT SERVICES, LLC

By: _Rich Johns_

Name: Rich Johns

Title: RDM

CONCESSIONAIRE:

KOSHER SPORTS, INC.

By: _signature_

Name: Jonathan Katz

Title: President /CEO

Rev 021809DS

# EXHIBIT 5

| | |
|---|---|
| **From:** | Peter Helfer [Phelf@nymets.com] |
| **Sent:** | Wednesday, February 18, 2009 11:12:28 AM |
| **To:** | Mike Landeen |
| **CC:** | Adam Barrick |
| **Subject:** | FW: 2nd Kosher Cart Rendering |
| **Importance:** | High |
| **Attachments:** | Grill Cart Renderings.pdf |

**From:** Jonathan Katz [mailto:jkatz@koshersportsinc.com]
**Sent:** Wednesday, February 18, 2009 10:01 AM
**To:** Peter Helfer
**Subject:** 2nd Kosher Cart Rendering
**Importance:** High

Pete,

Please see attached....

Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com

QBC0006294



Menuboard and Signage Per "Citi Field Concessions & Team
Store Signage" (2008 November 25)

— Stainless Steel Countertop

— All Supports RAL #7016

— PMS 484 with light grey "grout" lines

Black Vinyl Bumper



Grill Cart Rendering

A106

QBC0006295





Menuboard and Signage
Per "Citi Field
Concessions & Team
Store Signage" (2008
November 25)

All Supports RAL #7016

Stainless Steel Countertop

PMS 484 with light
grey "grout" lines

Black Vinyl Bumper

A107

QBC0006296

# EXHIBIT 6

| | |
|---|---|
| **From:** | Mike Landeen [mlandeen@nymets.com] |
| **Sent:** | Wednesday, February 18, 2009 7:26:02 PM |
| **To:** | Peter Helfer |
| **Subject:** | RE: Grill Carts |

You owe me once again.

---

Michael Landeen | Vice President, Venue Services
New York Mets
**Citi Field | Flushing NY 11368**
(P) 718.803.4039  (F) 718.429.1886

---

**From:** Peter Helfer
**Sent:** Wednesday, February 18, 2009 7:26 PM
**To:** Mike Landeen
**Subject:** RE: Grill Carts

That email must have hurt every finger as you pecked away....ha

Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

phelfer@nymets.com

---

**From:** Mike Landeen
**Sent:** Wednesday, February 18, 2009 7:23 PM
**To:** Peter Helfer
**Subject:** RE: Grill Carts

**PLAINTIFF'S EXHIBIT**
52
5/3/11

The materials that I received and these renderings are approved as presented.

QBC0007837

Michael Landeen | Vice President, Venue Services
New York Mets
Citi Field | Flushing NY 11368
(P) 718.803.4039  (F) 718.429.1886

**From:** Peter Helfer
**Sent:** Wednesday, February 18, 2009 11:12 AM
**To:** Mike Landeen
**Cc:** Adam Barrick
**Subject:** FW: Grill Carts
**Importance:** High

As I mentioned before, here's the request from Jonathan.  Is this easy enough to do once its been approved?

Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

phelfer@nymets.com

**From:** Jonathan Katz [mailto:jkatz@koshersportsinc.com]
**Sent:** Wednesday, February 18, 2009 9:59 AM
**To:** Peter Helfer
**Subject:** FW: Grill Carts
**Importance:** High

Pete,

Please see attached design for the kosher carts. There will be one more email to follow. I will drop off the samples provided by the manufacturer so that they can be reviewed and signed off on. I just need a generic letter stating that after reviewing the samples

QBC0007838

and renderings we approve the carts. The manufacturer is just looking for the okay to move forward and begin production.


Thanks


Jonathan


Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com


**From:** Matthew Mercier [mailto:matt@partnersbydesignllc.com]
**Sent:** Tuesday, January 27, 2009 3:36 PM
**To:** jkatz@koshersportsinc.com
**Subject:** RE: Grill Carts


Jonathan:


Attached is the updated rendering for your review.


I will provide a receptacle in the canopy for the "Bud Light" Signage.


Thanks!


**From:** Jonathan Katz [mailto:jkatz@koshersportsinc.com]
**Sent:** Tuesday, January 27, 2009 1:35 PM
**To:** matt@partnersbydesignllc.com
**Subject:** Re: Grill Carts

QBC0007839

Signing off on loan documents today

**From**: matt@partnersbydesignllc.com
**Date**: Tue, 27 Jan 2009 18:31:04 +0000
**To**: Jonathan Katz<jkatz@koshersportsinc.com>
**Subject**: Re: Grill Carts

Jonathan, I will correct the canopy design.

I do not traditionally have bud light market paraphernalia. Usually the distributor provides this.

Also the light is an outdoor grade fluorescent 24" x 24" sealed unit. Similar to Corsairs piece.

Thanks,

Matthew

Sent from my Verizon Wireless BlackBerry

**From**: "Jonathan Katz"
**Date**: Tue, 27 Jan 2009 11:58:01 -0500
**To**: 'Matthew Mercier'<matt@partnersbydesignllc.com>
**Subject**: FW: Grill Carts

Please see attached as well as text below

Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com

**From:** Walker, Mike [mailto:walker-mike@Aramark.com]
**Sent:** Tuesday, January 27, 2009 11:26 AM
**To:** jkatz@koshersportsinc.com

Cc: Mike Landeen
**Subject:** Grill Carts

Jonathan,

Here is the detail for the canopy on the type B1 grill cart, upper deck (no arch).

Check with Mike L regarding the Bud Light signage.

<<11-7-08_New Canopy_Grill_Upper Conc_Fairplex.pdf>> <<13197-F19.pdf>>

# EXHIBIT 7



February 19, 2009


Jonathan,

This letter serves as The New York Mets approval for the materials and renderings you submitted to me in person on Wednesday, February 18, 2009. This in no means is an approval for financing, but simply an acknowledgement that we were in receipt of the appropriate specs for your Kosher Sports vending locations.


Sincerely,

Pete Helfer
Director, Corporate Sales and Services



PLAINTIFF'S
EXHIBIT
51
5/13/11   DS

**New York Mets ✦ Citi Field ✦ Flushing, N.Y. 11368 ✦ 718.507.6387**

QBC0001840

# EXHIBIT 8

**From:**     Adam Barrick [abarr@nymets.com]
**Sent:**     Monday, March 02, 2009 1:39:55 PM
**To:**       jkatz@koshersportsinc.com
**CC:**       Peter Helfer
**Subject:**  Friday and Saturday Carts

Hi Jonathan,


After internal discussion, it's been decided that ~~we cannot grant your request~~ to run your carts during Friday and Saturday games at Citi Field.  Despite the fact that ~~you have approval from the Rabbis~~, there's still concern from a **PR perspective** of having Kosher products sold here on those days.  Also, by eliminating the Kosher branding and association on these days, there are concerns from a sponsorship perspective because you will now be infringing upon **Nathan's exclusive** non-kosher hot dog category.  We apologize for not being able to help you out with this request.  Please let me know if you have any questions.


AB



Adam Barrick

New York Mets- Corporate Sales and Partnerships

Citi Field

Flushing, NY 11368

Phone: 718-803-4009

Fax: 718-507-6395

abarr@nymets.com



PLAINTIFF'S EXHIBIT
14
5/12/11

QBC0009501

# EXHIBIT 9

**From:**       Peter Helfer [Phelf@nymets.com]
**Sent:**       Wednesday, March 04, 2009 9:43:46 AM
**To:**         jkatz@koshersportsinc.com
**CC:**          Adam Barrick
**Subject:**    RE: Friday and Saturday Carts

Jonathan –


Adam and I have gone to bat for you on every request you have put forth.  Contrary to what you believe, no partner of ours decides where their carts go, people don't have the right to just extend their categories, and people definitely don't have the unilateral decision making power to say that want to ~~extend hours of operation when it infringes~~ upon another sponsor (who pays incrementally for that right) a~~nd that creates a possible negative PR scenario.~~


Again, we have done nothing but fight for your every request, but not everyone sees it the same way as you.  Not our head of marketing/communications, not Mike's boss and definitely not the people from Nathans.


I am sorry this doesn't seem like its going your way, but you have yet to step foot in this building when fans are walking the concourses, so you have nothing to be negative about.  As I said a while back, we will continue to work for you and do our very best to accommodate if/when we can….that will not change.



Thanks

-Pete




Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

phelfer@nymets.com


--------------------

**From:** Jonathan Katz [mailto:jkatz@koshersportsinc.com]



QBC0009540

**Sent:** Wednesday, March 04, 2009 9:29 AM
**To:** Peter Helfer
**Subject:** Re: Friday and Saturday Carts

Let me talk to the powers that be!

_____

**From:** "Peter Helfer"
**Date:** Wed, 4 Mar 2009 09:17:49 -0500
**To:** <jkatz@koshersportsinc.com>
**Subject:** RE: Friday and Saturday Carts

Jonathan,

I have further discussed this with the powers that be, and although we truly appreciate and value your commitment to The New York Mets organization, we cannot approve this additional request.  When you signed on as a long term Mets partner, you agreed to a particular set of terms.  Given these tough times, we are doing our best to be accommodating, good partners because we want you to be encouraged to continue your relationship with our team.  Although we have gone back and forth with each other on a few items, I think you can agree that we've shown our willingness to do what we can for Kosher Sports (i.e. – allowing beer sales, lowering the investment level to address joint cart locations, allowing you to purchase separate POS terminals), but this incremental request touches on too many issues that the organization is not comfortable with.

We are expecting great things in this new ballpark and believe that Kosher Sports will certainly achieve growth out of this relationship.

Thanks

-Pete

Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

QBC0009541

phelfer@nymets.com

---------

**From:** Jonathan Katz [mailto:jkatz@koshersportsinc.com]
**Sent:** Monday, March 02, 2009 6:17 PM
**To:** Adam Barrick
**Cc:** Peter Helfer; Marc Katz; David Kestenbaum
**Subject:** RE: Friday and Saturday Carts
**Importance:** High


Adam,


I have had the privilege to have partnered with the Mets organization for the past three
years and look forward to a mutually rewarding and successful partnership for many years to
come.


Our mission is one and the same, to provide an excellent product and all around exceptional
game experience to the Mets fans while maximizing sales and profit.

It is our business to examine ways in which to achieve these goals.  As partners we need to
look for mutual opportunities to prosper.  During these extremely challenging economic
times there are things we cannot control therefore we must search for other ways to grow,
if not maintain, the level of sales we have achieved in years past.  My proposal to expand
the hours of service and provide Kosher food at EVERY game is mutually beneficial to all.
We are giving a substantial  amount of sponsorship dollars for a kosher vendor and I have
tried to be as flexible as possible with making it happen, including accepting a sub
standard location for one of my carts.


With regards to the PR perspective:  Myself and Aramark fielded numerous complaints last
year from non Sabbath observant Jews who attend Friday and Saturday games but do adhere to
eating kosher and were unable to eat at the games.  The OU is the most recognized kosher
supervision company in the entire world and has the respect of both corporate America and
the Jewish world so if they say it is okay there is no one who can argue with that.  It is
the equivalent of the Pope giving his approval.  I doubt "PR" would be worried about a
"Catholic" issue if the Pope gave it his blessing.  If anything you are discrediting them
by saying it is not good enough for you.


On the Nathan's exclusivity; Our product will be marketed as kosher on all days. The same
products will be used on Friday and Saturday that are being used on all other days. Another
concern I have is that I don't want my carts being moved. My carts at Shea suffered
extensive damages as a result of them being moved by Aramark each weekend. I am paying a
substantial sum of money for these carts. I am paying a substantial amount of money to sell

QBC0009542

```
my products from these locations. I should be entitled to maximize my sales from these
locations.


As a valued partner I would like to request a meeting with all parties involved so that we
may find a way for this to work for everyone in this partnership.


-Jonathan
```

Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com


**From:** Adam Barrick [mailto:abarr@nymets.com]
**Sent:** Monday, March 02, 2009 1:40 PM
**To:** jkatz@koshersportsinc.com
**Cc:** Peter Helfer
**Subject:** Friday and Saturday Carts


Hi Jonathan,


After internal discussion, it's been decided that we cannot grant your request to run your carts during Friday and Saturday games at Citi Field.  Despite the fact that you have approval from the Rabbis, there's still concern from a PR perspective of having Kosher products sold here on those days.  Also, by eliminating the Kosher branding and association on these days, there are concerns from a sponsorship perspective because you will now be infringing upon Nathan's exclusive non-kosher hot dog category.  We apologize for not being able to help you out with this request.  Please let me know if you have any questions.


AB

QBC0009543

Adam Barrick

New York Mets- Corporate Sales and Partnerships

Citi Field

Flushing, NY 11368

Phone: 718-803-4009

Fax: 718-507-6395

abarr@nymets.com

QBC0009544

# EXHIBIT 10

**From:**      Tom Murphy [Tmurp@nymets.com]
**Sent:**      Monday, March 16, 2009 12:34:35 PM
**To:**        Mike Landeen; Peter Helfer
**Subject:**   Re: Ices

Then it sounds like we have an issue.  Can we get together to discuss?

TM

----- Original Message -----
From: Mike Landeen
To: Tom Murphy; Peter Helfer
Sent: Mon Mar 16 12:32:51 2009
Subject: Re: Ices

There isn't a space available other than the spaces that he has his carts. I have carts that go into those spots on Friday and Sat when he is not open.

_____

Michael Landeen
Vice President|Venue Services
New York Mets|Citi Field
Flushing NY 11368
P) 718.803.4039  F) 718.429.1886

----- Original Message -----
From: Tom Murphy
To: Peter Helfer
Cc: Mike Landeen
Sent: Mon Mar 16 11:44:41 2009
Subject: RE: Ices

If the space is available for ices and it is not marketed as a kosher product then I would be open to him selling the ices on Friday and Saturday.  If it is viewed as a kosher product we can not suffer the bad PR from it.

Mike should weigh in too.

TM

Tom Murphy

Senior Vice President- Corporate Sales and Partnerships

New York Mets

Citi Field



PLAINTIFF'S
EXHIBIT
10†
5/24/11

QBC0007977

Flushing, NY 11368

718-559-3001

tmurphy@nymets.com

---

From: Peter Helfer
Sent: Monday, March 16, 2009 10:44 AM
To: Tom Murphy
Cc: Mike Landeen
Subject: FW: Ices
Importance: High

A follow up to my email on Friday. Let me know what you guys think.

Thanks

Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

phelfer@nymets.com

---

From: Jonathan Katz [mailto:jkatz@koshersportsinc.com]
Sent: Friday, March 13, 2009 5:41 PM
To: Peter Helfer
Subject: Ices
Importance: High

Pete,

QBC0007978

I want to follow up on our conversation regarding KJD and the Ices carts being open for all Mets home games.  As I explained to you the Ices are not kosher and are not being marketed as being kosher in any way  This was always a separate deal.  This is why we set up a separate corporation for the Ices business.  In fact if we were marketing them as kosher we could have just added ices to our kosher menu and sold them from our kosher stand as we did the past three years and not incur a separate sponsorship fee.

This was made very clear from the beginning and I find it very disturbing that we are now three weeks away from opening day and all of a sudden this is now being questioned.  I cannot be more serious when I say we cannot operate the Ices business if we are not open for all Mets home games.  It was what we agreed to and the whole basis of the business.  We have a similar arrangement with the US Open.  Our kosher stands were closed on Friday and Saturday last year while the Ices, popcorn and lemonade stands were open as they were separate entities.


I need to know that the deal I agreed to is in fact in place with the Ices being sold at all games.


Please get back to me.



Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com

# EXHIBIT 11

| | |
|---|---|
| **From:** | Mike Landeen [mlandeen@nymets.com] |
| **Sent:** | Tuesday, March 03, 2009 11:40:25 AM |
| **To:** | Peter Helfer |
| **Subject:** | Re: Friday and Saturday Carts |

You can fill in Dave if you want.

_____

Michael Landeen
Vice President|Venue Services
New York Mets|Citi Field
Flushing NY 11368
P) 718.803.4039  F) 718.429.1886


----- Original Message -----
From: Peter Helfer
To: Mike Landeen
Sent: Tue Mar 03 11:39:35 2009
Subject: Re: Friday and Saturday Carts

I know, but he is pushing and pushing for an answer to who made this decision and would definitely call dave or jeff....which is bad if they aren't in the loop. Do you want me to just fill dave in so you don't have to waste your time? Not bugging you to fix the prob...just don't want it getting to dave or jeff and told to them that it was their decision...ya know what I mean?


----- Original Message -----
From: Mike Landeen
To: Peter Helfer
Sent: Tue Mar 03 11:36:02 2009
Subject: Re: Friday and Saturday Carts

No time. It is what it is.

_____

Michael Landeen
Vice President|Venue Services
New York Mets|Citi Field
Flushing NY 11368
P) 718.803.4039  F) 718.429.1886


----- Original Message -----
From: Peter Helfer
To: Mike Landeen
Sent: Tue Mar 03 11:18:00 2009
Subject: FW: Friday and Saturday Carts

Let me know if/when you have a chance to discuss.



QBC0007921

Pete Helfer

Director, Corporate Sales and Services

Citi Field / New York Mets

Flushing, NY 11368

Office: 718-559-3126

Cell: 347-853-4573

phelfer@nymets.com

_____

From: Jonathan Katz [mailto:jkatz@koshersportsinc.com]
Sent: Monday, March 02, 2009 6:17 PM
To: Adam Barrick
Cc: Peter Helfer; Marc Katz; David Kestenbaum
Subject: RE: Friday and Saturday Carts
Importance: High


Adam,


I have had the privilege to have partnered with the Mets organization for the past three years and look forward to a mutually rewarding and successful partnership for many years to come.


Our mission is one and the same, to provide an excellent product and all around exceptional game experience to the Mets fans while maximizing sales and profit.

It is our business to examine ways in which to achieve these goals.  As partners we need to look for mutual opportunities to prosper.  During these extremely challenging economic times there are things we cannot control therefore we must search for other ways to grow, if not maintain, the level of sales we have achieved in years past.  My proposal to expand the hours of service and provide Kosher food at EVERY game is mutually beneficial to all.  We are giving a substantial amount of sponsorship dollars for a kosher vendor and I have tried to be as flexible as possible with making it happen, including accepting a sub standard location for one of my carts.


With regards to the PR perspective:  Myself and Aramark fielded numerous complaints last year from non Sabbath observant Jews who attend Friday and Saturday games but do adhere to eating kosher and were unable to eat at the games.  The OU is the most recognized kosher supervision company in the entire world and has the

respect of both corporate America and the Jewish world so if they say it is okay there is no one who can argue with that. It is the equivalent of the Pope giving his approval. I doubt "PR" would be worried about a "Catholic" issue if the Pope gave it his blessing. If anything you are discrediting them by saying it is not good enough for you.

On the Nathan's availability; Our product will be marketed as kosher on all days. The same products will be used on Friday and Saturday that are being used on all other days. Another concern I have is that I don't want my carts being moved. My carts at Shea suffered extensive damages as a result of them being moved by Aramark each weekend. I am paying a substantial sum of money for these carts. I am paying a substantial amount of money to sell my products from these locations. I should be entitled to maximize my sales from these locations.

As a valued partner I would like to request a meeting with all parties involved so that we may find a way for this to work for everyone in this partnership.

-Jonathan

Jonathan Katz

President and CEO

Kosher Sports Inc.

(201) 503-0161 (O)

(201) 658-1812 (C)

(201) 608-7161 (F)
jkatz@koshersportsinc.com

www.koshersportsinc.com

From: Adam Barrick [mailto:abarr@nymets.com]
Sent: Monday, March 02, 2009 1:40 PM
To: jkatz@koshersportsinc.com
Cc: Peter Helfer
Subject: Friday and Saturday Carts

Hi Jonathan,

After internal discussion, it's been decided that we cannot grant your request to run your carts during Friday and Saturday games at Citi Field.  Despite the fact that you have approval from the Rabbis, there's still concern from a PR perspective of having Kosher products sold here on those days.  Also, by eliminating the Kosher branding and association on these days, there are concerns from a sponsorship perspective because you will now be infringing upon Nathan's exclusive non-kosher hot dog category.  We apologize for not being able to help you out with this request.  Please let me know if you have any questions.

AB

Adam Barrick

New York Mets- Corporate Sales and Partnerships

Citi Field

Flushing, NY 11368

Phone: 718-803-4009

Fax: 718-507-6395

abarr@nymets.com <mailto:abarr@nymets.com>

# EXHIBIT 12

Jonathan Katz

| | |
|---|---|
| From: | Adam Barrick [abarrick@nymets.com] |
| Sent: | Friday, January 15, 2010 11:58 AM |
| To: | David Kestenbaum ; Paul Asencio |
| Cc: | Jon Katz |
| Subject: | RE: 2010 Kosher Sports |

**Completely** understand your concerns. We will get back to you once we deliberate with the necessary people on our end.

Adam Barrick
Manager, Corporate Sales and Partnerships
New York Mets
Citi Field
Flushing, NY 11368
Phone: 718-803-4009
Fax: 718-507-6395
abarrick@nymets.com

-----Original Message-----
From: David Kestenbaum [mailto:dkestenbaum@msn.com]
Sent: Friday, January 15, 2010 11:35 AM
To: Adam Barrick; Paul Asencio
Cc: Jon Katz
 ibject: Re: 2010 Kosher Sports

Thanks for getting back to me. Some of these issues were discussed and we agreed to wait until the end of the season. These are not unreasonable needs and I would hope that the powers that be understand that in this economy we need to be operating at full strength within our mutually agreed upon contract.
Sincerely,
David
-----Original Message-----
From: Adam Barrick <abarrick@nymets.com>
Date: Fri, 15 Jan 2010 16:27:40
To: <dkestenbaum@msn.com>; <pasencio@nymets.com>
Cc: <jkatz@koshersportsinc.com>
Subject: RE: 2010 Kosher Sports

Hi David,
Happy New Year to you as well. While we discussed some of these issues last year, let us huddle together with the appropriate people internally to figure out some potential resolution. We'll get back to you.
AB

Adam Barrick
Manager, Corporate Sales and Partnerships
New York Mets
Citi Field
   shing, NY 11368
 none: 718-803-4009
Fax: 718-507-6395



648

abarrick@nymets.com <mailto:abarrick@nymets.com> <mailto:abarr@nymets.com>

----------------

From: David Kestenbaum [mailto:dkestenbaum@msn.com]
Sent: Thursday, January 14, 2010 11:47 PM
To: Paul Asencio
Cc: Adam Barrick; Jon Katz
Subject: 2010 Kosher Sports

Dear Paul,

Happy New Year! All the best to you and yours for 2010.

Now that the holidays are over and a new season is on the horizon I think it is important we sit down and discuss how we can improve on 2009. There are some critical issues we would like to resolve including the following:

1) Our fourth "mutually agreed upon" location needs to moved to a more prime area. We expressed our concerns about this location immediately upon seeing where it was placed and that was prior to last season even began. The location couldn't even generate enough sales to pay the employees and rather than continuing to lose money we stopped utilizing it completely by the end of June. The location was not only a low traffic area, but also wasn't protected from the elements and if there was any kind of precipitation we had to close it. It is imperative this location be changed so that we can generate real sales out of it. We based our sponsorship amount with the idea that each of the four locations would be profitable. Sponsorship was increased 100% from 2008 to 2009 and will increase each year. We no longer have kitchen like we did at Shea and this fourth stand was going to allow us to make up the difference of the loss of sales from that kitchen.

2) Recently we were forwarded complaints regarding the lack of menu options offered by our stands. We have had complaints that our offerings are not as diverse as at Shea and one long time season ticket holder didn't renew his tickets and sighted this as being one of his reasons. Is there a way for us to offer French Fries and Chicken Nuggets?

3) As per our contract we are able to be open for all events held at Citi Field. We have written confirmation by the largest and most recognized kosher inspection companies in the world with their okay in us having our carts be open for all events including Saturday. We would just need to remove the Kosher Sports' signs otherwise nothing else would need to change. We designed the carts to have two grills and one will be locked on Saturday with only the rabbi having the key while the second grill would be utilized. In today's economy we very much need this revenue and if the leading rabbis don't have an issue with it no one else will.

Please let me know when we can meet to review all these issues and prepare to make 2010 the most successful season yet.

Sincerely,
David Kestenbaum

----------------

otmail: Powerful Free email with security by Microsoft. Get it now. <http://clk.atdmt.com/GBL/go/196390710/direct/01/>

# EXHIBIT 13

From:       Mike Landeen [mlandeen@nymets.com]
Sent:       Friday, January 15, 2010 2:33:51 PM
To:         Adam Barrick; Paul Schwartz - NY Mets
CC:         Paul Asencio
Subject:    RE: 2010 Kosher Sports

Attachments:    image001.jpg

**As I said this would happen, it is happening.  This deal is not worth all of our time and efforts put together   He is worse than Steiner, who at least was at one time close to seven figures.  I refuse to entertain any of these requests as they have been discussed at nauseam.  Every year and every month it is something with these guys.  They will never be happy.**

**Michael Landeen | Vice President, Venue Services**
New York Mets
**Citi Field | Flushing NY 11368**
(P) 718.803.4039  (F) 718.429.1886

http://www.metropolitanhospitality.com/

From: Adam Barrick
Sent: Friday, January 15, 2010 11:26 AM
To: Mike Landeen; Paul Schwartz - NY Mets
Cc: Paul Asencio
Subject: FW: 2010 Kosher Sports

Mike/Paul-

Paul and I received the below email from David Kestenbaum last evening.  Realizing that we discussed all of these issues last year, we wanted to get your thoughts...let me know when you have a little time to discuss.  Thanks.

AB

Adam Barrick

Manager, Corporate Sales and Partnerships

New York Mets

Citi Field

Flushing, NY 11368

Phone: 718-803-4009

Fax: 718-507-6395

abarrick@nymets.com



PLAINTIFF'S EXHIBIT
22
5 | 12 | 11

QBC0008030

From: David Kestenbaum [mailto:dkestenbaum@msn.com]
Sent: Thursday, January 14, 2010 11:47 PM
To: Paul Asencio
Cc: Adam Barrick; Jon Katz
Subject: 2010 Kosher Sports

Dear Paul,

Happy New Year! All the best to you and yours for 2010.

Now that the holidays are over and a new season is on the horizon I think it is important we sit down and discuss how we can improve on 2009. There are some critical issues we would like to resolve including the following:

1) Our fourth "mutually agreed upon" location needs to moved to a more prime area. We expressed our concerns about this location immediately upon seeing where it was placed and that was prior to last season even began. The location couldn't even generate enough sales to pay the employees and rather than continuing to lose money we stopped utilizing it completely by the end of June. The location was not only a low traffic area, but also wasn't protected from the elements and if there was any kind of precipitation we had to close it. It is imperative this location be changed so that we can generate real sales out of it. We based our sponsorship amount with the idea that each of the four locations would be profitable. Sponsorship was increased 100% from 2008 to 2009 and will increase each year. We no longer have a kitchen like we did at Shea and this fourth stand was going to allow us to make up the difference of the loss of sales from that kitchen.

2) Recently we were forwarded complaints regarding the lack of menu options offered by our stands. We have had complaints that our offerings are not as diverse as at Shea and one long time season ticket holder didn't renew his tickets and sighted this as being one of his reasons. Is there a way for us to offer French Fries and Chicken Nuggets?

3) As per our contract we are able to be open for all events held at Citi Field. We have written confirmation by the largest and most recognized kosher inspection companies in the world with their okay in us having our carts be open for all events including Saturday. We would just need to remove the Kosher Sports' signs otherwise nothing else would need to change. We designed the carts to have two grills and one will be locked on Saturday with only the rabbi having the key while the second grill would be utilized. In today's economy we very much need this revenue and if the leading rabbis don't have an issue with it no one else will.

Please let me know when we can meet to review all these issues and prepare to make 2010 the most successful season yet.

Sincerely,
David Kestenbaum

Hotmail: Powerful Free email with security by Microsoft. Get it now.

# EXHIBIT 14

Jonathan Katz

**From:** David Kestenbaum [dkestenbaum@msn.com]
**Sent:** Monday, January 25, 2010 8:01 PM
**To:** Adam Barrick ; Paul Asencio
**Cc:** Jon Katz
**Subject:** Re: 2010 Kosher Sports

Great.
Thanks so much for keeping me posted.
David
-----Original Message-----
From: Adam Barrick <abarrick@nymets.com>
Date: Mon, 25 Jan 2010 23:48:49
To: <dkestenbaum@msn.com>; <pasencio@nymets.com>
Cc: <jkatz@koshersportsinc.com>
Subject: RE: 2010 Kosher Sports

Hi David,
Hope you had a nice weekend. **We are still internally discussing the points you laid out in your earlier email to** us. As
we try and get some resolution on these issues we will reach out to schedule a meeting with you and Jon. I'll be in
touch.
AB


Adam Barrick
Manager, Corporate Sales and Partnerships
New York Mets
Citi Field
Flushing, NY 11368
Phone: 718-803-4009
Fax: 718-507-6395
abarrick@nymets.com
-----Original Message-----
From: David Kestenbaum [mailto:dkestenbaum@msn.com <mailto:dkestenbaum@msn.com> ]
Sent: Sunday, January 24, 2010 11:06 AM
To: Adam Barrick; Paul Asencio
Cc: Jon Katz
Subject: Re: 2010 Kosher Sports

Hi,
Just wanted to follow up and see if we could set up a meeting to discuss 2010. Jon will be busy with gearing up our
stands at the Super Bowl, but we would really like to sit down immediately afterwards(the second week of February).
Thanks!
David
-----Original Message-----
From: Adam Barrick
To: dkestenbaum@msn.com
To: Paul Asencio
c: Jon Katz
Subject: RE: 2010 Kosher Sports
Sent: Jan 15, 2010 11:57 AM


PLAINTIFF'S
EXHIBIT
24
5/12/11

Completely understand your concerns.  We will get back to you once we deliberate with the necessary people on our end. Adam Barrick Manager, Corporate Sales and Partnerships      New York Mets Citi Field                          Flushing, NY 11368                          Phone: 718-803-4009 Fax: 718-507-6395 abarrick@nymets.com  -----Original Message----- From: David Kestenbaum [mailto:dkestenbaum@msn.com <mailto:dkestenbaum@msn.com> ] Sent: Friday, January 15, 2010 11:35 AM To: Adam Barrick; Paul Asencio Cc: Jon Katz Subject: Re: 2010 Kosher Sports Thanks for getting back to me.  Some of these issues were discussed and we agreed to wait until the end of the season.  These are not unreasonable needs and I would hope the powers that be understand that in this economy we need to be operating at full strength within our mutually agreed upon contract. Sincerely, David -----Original Message----- From: Adam Barrick <abarrick@nymets.com> Date: Fri, 15 Jan 2010 16:27:40 To: <dkestenbaum@msn.com>; <pasencio@nymets.com> Cc: <jkatz@koshersportsinc.com> Subject: RE: 2010 Kosher Sports Hi David, Happy New Year to you as well.  While we discussed some of these issues last year, let us huddle together with the appropriate people internally to figure out some potential resolution.  We'll get back to you. AB Adam Barrick Manager, Corporate Sales and Partnerships       New York Mets Citi Field Flushing, NY 11368                          Phone: 718-803-4009 Fax: 718-507-6395 abarrick@nymets.com <mailto:abarrick@nymets.com&gt;  <mailto:abarrick@nymets.com&gt; > <mailto:abarr@nymets.com <mailto:abarr@nymets.com> >  --------------- From: David Kestenbaum [mailto:dkestenbaum@msn.com <mailto:dkestenbaum@msn.com> ] Sent: Thursday, January 14, 2010 11:47 PM To: Paul Asencio  Cc: Adam Barrick; Jon Katz  Subject: 2010 Kosher Sports   Dear Paul,   Happy New Year! All the best to you and yours for 2010.   Now that the holidays are over and a new season is on the horizon I think it is important we sit dow

# EXHIBIT 15

Jonathan Katz

From:         David Kestenbaum  [dkestenbaum@msn.com]
Sent:         Monday, February 22, 2010 10:52 AM
To:           Jon Katz
Subject:      Fw: friday/saturday

-----Original Message-----
From: Adam Barrick <abarrick@nymets.com>
Date: Mon, 22 Feb 2010 15:49:40
To: <dkestenbaum@msn.com>; <pasencio@nymets.com>
Subject: RE: friday/saturday

Hi David,
Hope you had a nice weekend.  We certainly did not taking offense to any of your requests for enhancing the fan
experience, and we're sorry if you interpreted it that way.  We're in the business of entertainment so obviously fan
experience is one of our top priorities.

On the Friday/Saturday, we have taken your feedback, and taken it to literally the highest levels within the organization.
Unfortunately the answer remains the same and we will not allow you to operate your carts on Friday
evenings/Saturday.  We understand your frustration with this but there is no room for negotiation on this as the
decision has been made and is set in stone.  Regardless, we look forward to working with you as a valued partner in
2010. Take care and talk to you soon.


Adam Barrick
Manager, Corporate Sales and Partnerships
New York Mets
Citi Field
Flushing, NY 11368
Phone: 718-803-4009
Fax: 718-507-6395
abarrick@nymets.com <mailto:abarrick@nymets.com> <mailto:abarr@nymets.com>


---------------

From: David Kestenbaum [mailto:dkestenbaum@msn.com]
Sent: Friday, February 19, 2010 11:16 AM
To: Adam Barrick; Paul Asencio
Subject: friday/saturday

Good Morning,

Thanks for getting back to me yesterday.  I am not sure why you take offense to our requesting ways for us to enhance
the fans exprerience, not to mention generate more income for all of us .  I would assume those would be your
priorities.

That being said, I have looked into the kosher on Friday and Saturday issue and this is the story.  We are definitely
 ling a glatt kosher hot dog even on Friday and Saturday.  The supervision will not be there, but that doesn't change
the actual product.  They are two seperate things and anyone who eats a glatt kosher hot dog on a Friday and Saturday



would only eat this and not Nathan's.  We have had requests from fans to be open on Friday and Saturday and we would like to accomodate them.  **Our signage would not come down and it would still say "Kosher Grill".**

don't mean to sound presumptious, but if you want to tell your fans that you are more religious than them and that the hot dogs cannot be sold on Friday and Saturday that's your decision.  Even if you go down that slippery slope, our contract clearly states that the hamburgers, knishes, pretzels and peanuts are under a general kosher umbrella and therefore there can be no argument or possible excuse for us to not be allowed to sell these products on Friday and Saturday based on our contract.

I look forward to hearing your response.

Sincerely,
David

----------------

Hotmail: Free, trusted and rich email service. Get it now. <http://clk.atdmt.com/GBL/go/201469228/direct/01/>

----------------

Hotmail: Trusted email with Microsoft's powerful SPAM protection. Sign up now.
<http://clk.atdmt.com/GBL/go/201469226/direct/01/>

----------------

Hotmail: Free, trusted and rich email service. Get it now. <http://clk.atdmt.com/GBL/go/201469228/direct/01/>

# EXHIBIT 16

**From:**        James Denniston [JDenniston@nymets.com]
**Sent:**        Monday, April 26, 2010 5:21:50 PM
**To:**          Paul Asencio
**CC:**          Adam Barrick; Mike Landeen
**Subject:**     Kosher Sports

**Attachments:**     Kosher Sports Letter 4.26.10.pdf

See attached letter that I received today from Kosher Sports via hand delivery.

**James B. Denniston | New York Mets | Legal Counsel** | Citi Field | **T:** 718.803.4021| **F:** 718.507.6395 | **E:**
jdenniston@nymets.com



QBC0014087



James B. Denniston, Esq.
Queens Ballpark Company, LLC
CITI FIELD
Flushing, N.Y. 11368

April 22, 2010

Re: Kosher Sports Inc., (KSI)
w/ Queens Ballpark Co. LLC (QBC)

Dear Mr. Denniston:

I am the **General Counsel to Kosher Sports Inc.** and was in the process of drafting a letter to Paul Asencio regarding some impediments that have been placed on KSI, by QBC, whereby they are having difficulty fulfilling the terms of their Contract with you. At the same time I was just given your letter of April 21.

In your letter you state that QBC is in full compliance with its obligations. **We couldn't disagree more.** In particular, and the most serious issue, amongst others, is the direction by your organization of not allowing KSI to operate on Friday nights and Saturdays. This unilateral decision is unacceptable, and vio**lates the written agreement** exe**cuted by Mr. Asencio on behalf of QBC on January** 23, 2008.

As to KSI's obligations, KSI is very much aware that they have to pay their annual fees, and would like to tender their first payment immediately. Still the annual payments are only one part of a broader agreement, that must be viewed and complied with in its entirety. The **entire Agreement must be honored by both parties.** Clearly the paragraph marked number 4 in their agreement states "during events at the Ballpark as to which admission is made available to members of the general public…". These are the days when KSI is permitted to sell their products. There is no exclusion of weekend games in the QBC **Agreement or in the ARAMARK Concessionaire's Agree**ment. This unilateral breach **must be addressed.**

To show good faith, KSI is enclosing and tendering their first payment to you.  In light of the aforementioned it is being paid under protest and with reservation of all rights that

may exist pursuant to all prior Agreements etc.  Pending resolution of our outstanding claim regarding what we view as a critical breach on QBC's part. This breach not only diminishes KSI's revenue projections but impacts directly on their ability to pay the "Advertisers Fee" that would have been tendered sooner had anyone attempted to contact KSI, to address their prior communications regarding these issues.

We are anxious to resolve this matter amicably. Of course we are disappointed that numerous phone calls and e mails have gone unreturned by various people in the QBC or Mets Organization. I look forward to hearing from you immediately.

Very truly yours,

Leo N. Klein, Esq.

Encls. Check

# EXHIBIT 17



James B. Denniston
Legal Counsel
jdenniston@nymets.com

July 1, 2010

**<u>Via UPS Overnight</u>**
Jonathan Katz
Kosher Sports, Inc.
392 Broad Avenue
Englewood, NJ 07631

     Re: <u>Kosher Sports, Inc.</u>

Dear Mr. Katz:

    I write on behalf of Queens Ballpark Company, L.L.C. ("QBC") regarding the multi-year advertising agreement (the "Agreement") between QBC and Kosher Sports, Inc. ("KSI") dated January 23, 2008.

    On June 14, 2010 QBC provided written notice that KSI was in default of its payment obligations pursuant to the Agreement due to its failure to make payments due in the amount of $18,333.32. As of this date, QBC has not received KSI's payment of the outstanding balance. Due to this uncured payment default, QBC hereby terminates the Agreement.

    Please note that the actions we are taking relate only to the Agreement and shall have no impact upon any rights and obligations of KSI pursuant to the Concession License Agreement between KSI and Aramark Sports and Entertainment Services, LLC dated as of January 1, 2009.

    This letter is not intended to be a complete statement of the facts and circumstances relevant to this matter or of the rights of QBC, and shall not be construed as a waiver of any legal or equitable rights or remedies, including specifically, without limitation, the right to sue for the recovery of all payments due pursuant to the Agreement, and interest thereon, all of which are expressly reserved without prejudice.

                  Sincerely,

                  James B. Denniston

cc:    Ira Daniel Tokayer, Esq.
       405 Lexington Avenue
       Seventh Floor
       New York, New York 10174

# EXHIBIT 18

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Kosher Sports, Inc., Plaintiff

v.

Queens Ballpark Company, LLC, Defendants

**Case No.  CV-10-2618 (JBW)(ALC)**

# EXPERT REPORT OF
# THOMAS SCHOPFLOCHER, PH.D.

October 7, 2011

# Contents

Contents ............................................................................................................................... i

List of Exhibits ................................................................................................................... ii

I.      Qualifications ........................................................................................................1

II.     Introduction and Summary of Conclusions ..........................................................1
        A. Background ......................................................................................................1
        B. Allegations ......................................................................................................2
        C. Assignment and Summary of Opinions ...........................................................3

III.    The Market for Kosher Food .................................................................................4

IV.     Data and Historical Sales .....................................................................................5
        A. KSI sales for 2009 and 2010 ...........................................................................5
        B. Over a Third of Cart Revenues Derive from Friday and Saturday Sales.........7
        C. A Fourth Cart and the Importance of its Location ...........................................8

V.      Damages................................................................................................................9
        A. Lost Profits to Date Due to the Inability to Run the Operational Carts on Fridays and
           Saturdays .........................................................................................................9
        B. Lost Profits to Date Due to the Inability to Operate a Fourth Cart.................10
        C. Projected Annual Lost Profits over the Remaining Life of the Agreement......10
        D. Total Damages ...............................................................................................10

VI.     Damages under a Theory of Unjust Enrichment.................................................12

VII.    Miscellaneous ....................................................................................................13

## List of Exhibits

Exhibit 1.     Curriculum Vitae of Thomas Schopflocher ............................................................. 1

Exhibit 2.     Materials Relied Upon ...................................................................................... 4

Exhibit 3.     Prices for KSI Items for the 2009 and 2010 Seasons ................................................ 6

Exhibit 4.     Itemized KSI Expenses for the 2009 and 2010 Seasons ............................................ 6

Exhibit 5.     Percentage of Concession Sales by Day of Week for 2009 and 2010 Seasons ...... 7

Exhibit 6.     KSI Cart Locations .......................................................................................... 8

Exhibit 7.     Average Daily KSI Concession Revenue per Cart for the 2009 Season ............... 8

Exhibit 8.     KSI Itemized Lost Profits for the 2009 and 2010 Seasons .................................. 9

Exhibit 9.     Projected Lost Profits for KSI .......................................................................... 11

Exhibit 10.    Total Damages Suffered by KSI ....................................................................... 11

## I.      Qualifications

1.      I am a Senior Consultant at NERA Economic Consulting. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. It was established in 1961 and now employs more than 500 people in more than 20 offices worldwide. NERA's securities practice dates from the early 1970s and employs a research staff of more than 150 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

2.      My qualifications are summarized in my attached curriculum vitae, Exhibit 1.

*Exhibit 1.       Curriculum Vitae of Thomas Schopflocher*

3.      Prior to joining NERA, I worked for Deutsche Bank, Countrywide Securities, and Citigroup where I carried out research in the areas of fixed income strategy and modeling.

4.      I have a Ph.D. and M.Sc. in Applied Mathematics from The University of Western Ontario and a B.Sc. in Mathematics from McGill University.

5.      NERA is being compensated for its time at standard billing rates and its out-of-pocket expenses at cost. My current hourly rate is $530. The rates charged for other NERA personnel range from $195 to $305 per hour. NERA's compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

## II.      Introduction and Summary of Conclusions

### A.  Background

6.      Plaintiff Kosher Sports, Inc. ("KSI") is a New Jersey based corporation that, at all relevant times, was in the business of selling and distributing kosher food products, including hot dogs, sausages, knishes, pretzels, peanuts, and hamburgers.[1]

---

[1] Supplemental Second Amended Complaint, Kosher Sports Inc., Plaintiff, against Queens Ballpark Company, LLC, Defendant, CV–10–2618 (JBW) (RLM), dated April 24, 2011, ¶ 5 ("Supplemental Second Amended Complaint").

7.      Defendant Queens Ballpark Company, LLC ("QBC") is a New York based company in the business of operating a ballpark used by the New York Mets National League Baseball Team, known as Citi Field (the "Ballpark").[2]

8.      In January 2008, KSI and QBC entered into a ten-year agreement (the "Agreement") whereby QBC granted KSI the exclusive right to sell and distribute glatt kosher hot dogs and sausages and kosher knishes, pretzels, peanuts, and hamburgers (defined in the Agreement as "KSI Food Products") at events at the Ballpark as to which admission is made available to members of the general public, without limitation as to the days of the week.[3]

9.      Prior to the commencement of the 2009 baseball season, QBC advised KSI that KSI would not be permitted to sell its products on Fridays and Saturdays.

10.      Also, at no time since the beginning of the Agreement has KSI been provided with a fourth portable cart location in a mutually agreed upon area of the Ballpark.

11.      Because the Agreement allowed KSI to operate during baseball games as well as other events (such as concerts), my analyses take into consideration all events for which concession stand revenue was documented. Nevertheless, because the majority of events at which KSI operated were Mets home games, I often refer to the 2009 and 2010 seasons. The baseball season typically runs from early April to early October.[4]

## B. Allegations

12.      It is alleged that Defendant QBC "breached the Agreement by denying KSI the right to have KSI Food Products sold and distributed on Fridays and Saturdays and actually prevented the sale of such products."[5]

13.      It is alleged that defendant QBC "breached the Agreement by failing to provide KSI with a fourth portable cart location in a mutually agreed upon area of the Ballpark …."[6]

---

[2] Supplemental Second Amended Complaint, ¶ 6.

[3] Supplemental Second Amended Complaint, ¶ 9.

[4] In the event that a team makes the playoffs, there is up to an additional month of play. However, this was not the case for the Mets in 2009 and 2010. Further, I conservatively assume that they will not make the playoffs for the duration of the Agreement.

[5] Supplemental Second Amended Complaint, ¶ 23.

14.     It is alleged that defendant QBC "breached the Agreement by improperly purporting to terminate the Agreement."[7]

15.     It is alleged that defendant QBC "has been operating portable food carts on Friday nights and Saturdays at locations where KSI Food Products would otherwise have been sold and distributed. Thus, QBC has been unjustly enriched at the expense of KSI...."[8]

## C. Assignment and Summary of Opinions

16.     I have been retained by counsel for Kosher Sports, Inc. ("KSI") to provide economic and financial analyses in connection with these claims. Assuming breach of contract, I have been asked by counsel for KSI to respond to the following questions:

a.  What are the lost profits to date due to KSI's inability to operate three carts on Fridays and Saturdays?

b.  What are KSI's lost profits to date due to its inability to operate a fourth cart at a mutually agreed upon location?

c.  What are KSI's expected annual lost profits for each year until the end of the Agreement?

d.  What are total damages suffered by KSI that result from QBC's breach of the Agreement?

17.     Based on my review and analysis of the materials listed in Exhibit 2, I have drawn the following principal conclusions:

a.  As a direct consequence of its not being allowed to operate three carts on Fridays and Saturdays, KSI has suffered lost profits of $52,400.74 in 2009 and $53,692.86 in 2010. As a direct consequence of its not being allowed to operate its suites on Fridays and Saturdays, KSI has suffered lost profits of $7,661.68 in 2009 and $4,538.83 in 2010. See Section V.A.

b.  As a direct consequence of its not being allowed to operate a fourth cart at a mutually agreed upon location, KSI has suffered a loss to date of $50,443.31 and $41,430.72 for the 2009 and 2010 seasons, respectively. See Section V.B.

---

[6] Supplemental Second Amended Complaint, ¶ 24.

[7] Supplemental Second Amended Complaint, ¶ 25.

[8] Supplemental Second Amended Complaint, ¶¶ 37–38.

c.   Assuming QBC does not allow KSI to operate from 2012 until the end of the Agreement, it is expected that KSI will suffer annual lost profits of $202,022.81 for each remaining year. See Section V.C.

d.   Applying a 9% simple interest rate on damages to date, and discounting future lost profits at the swap rate, KSI has suffered damages of $1,695,418.75 due to QBC's breach of the Agreement. See Section V.D.

*Exhibit 2.     Materials Relied Upon*

## III.   The Market for Kosher Food

18.      While Jewish dietary laws date back thousands of years and have traditionally been observed by only a subset of the (now mostly secular) Jewish population, the market for kosher foods has recently expanded beyond its traditional demographic of Orthodox and other religiously observant Jews.

19.      According to a recent *New York Times* article, "the market for kosher food among non-Jews is setting records."[9] In fact, only 14 percent of consumers of kosher food claim to buy kosher food for religious reasons. Instead, "[t]he majority of today's kosher consumers are classified within the following categories: 1) non-Jewish religiously-observant consumers such as Muslims and 7th Day Adventists; 2) Consumers with specific dietary restrictions and preferences, and; 3) Health and safety-conscious consumers, accounting for more than 75% of non-Jewish kosher-seeking consumers."[10]

20.      A 2009 Mintel press release claimed that sales of kosher foods (defined to be kosher-certified prepared foods and kosher meat, dairy and fish, and not "intrinsically kosher" products like unprocessed fruits and vegetables) were $12.5 billion in 2008. This represents a 64% increase since 2003. The Mintel survey also showed that 13 percent of adults say they intentionally purchase kosher foods.[11]

---

[9] Kim Severson, "For Some, 'Kosher' Equals Pure," *The New York Times*, January 13, 2010.

[10] Agriculture and Agri-Food Canada, "Agri-Food Trade Service: United States Kosher Food Market Brief," August 2010, available at http://www.ats.agr.gc.ca/amr/4975-eng.htm.

[11] Mintel Group Ltd. "3 in 5 kosher food buyers purchase food for quality, not religion," *Mintel Press Release*, February 2009, available at http://www.mintel.com/press-centre/press-releases/321/3-in-5-kosher-food-buyers-purchase-for-food-quality-not-religion.

21.     Kosher food is omnipresent with over 80,000 kosher products on the market as of 2003.[12] According to *The New York Times*, "[t]he kosher market already includes many mainstream foods that most people do not realize have kosher certifications. Frito-Lay's classic potato chips have been certified kosher since 1994; Coca-Cola has been since the early 1930's."[13] This suggests that most people buy kosher food products whether or not they care about the kosher certification.

22.     I have encountered no evidence that there are individuals who would avoid a food product solely because it is kosher. Thus, KSI appeals to a much wider audience than only those who follow Jewish dietary laws.

23.     KSI charges the exact same price for its hot dogs as all the other (non-kosher) concession stands. The prices for 2009 and 2010 were $4.75 and $5.00, respectively. (See Exhibit 3.) Thus, no economic reason exists for choosing non-kosher food over kosher food.

## IV.   Data and Historical Sales

### A. KSI sales for 2009 and 2010

24.     KSI's revenues at Citi Field were composed of two related businesses: the concession stands (the carts) and the suite sales. Concession stands are moveable carts that sell a variety of kosher items to all customers. In order to derive the profit margin for the carts, one needs to consider the costs of goods and labor as well as the 45 percent of post-sales tax revenue that is paid directly to Aramark/QBC.[14]

25.     In the case of suite sales, orders to KSI are made ahead of time. Prior to the start of the ballgame, KSI delivers directly to the suite. For this service, KSI gets paid directly from Aramark/QBC. Unlike in the arrangement for concession stands, Aramark/QBC does not take a cut of the revenues.

---

[12] Sherri Day, "You Don't Have to Be Jewish to Eat Kosher," *The New York Times*, June 28, 2003, available at http://www.nytimes.com/2003/06/28/business/28KOSH.html?pagewanted=print.

[13] Sherri Day, "You Don't Have to Be Jewish to Eat Kosher," *The New York Times*, June 28, 2003, available at http://www.nytimes.com/2003/06/28/business/28KOSH.html?pagewanted=print.

[14] In the case of beverages, 98% of all post-sales tax revenue is paid directly to Aramark/QBC.

**1. Cart Sales**

26.      KSI operated three carts for the majority of the 2009 season and all of the 2010 season. The menu was the same for all KSI carts. The KSI items and their prices are listed in Exhibit 3.

*Exhibit 3.      Prices for KSI Items for the 2009 and 2010 Seasons*

27.      Based on QBC/Aramark documents, I determined the annual KSI cart revenues for the 2009 and 2010 seasons.[15]

28.      The revenue derived from KSI concession stands in 2009 was $328,259.36 for food items and $136,224.14 for beverages.

29.      The revenue derived from KSI concession stands in 2010 was $285,224.52 for food items and $142,164.53 for beverages.

**2. Suite Sales**

30.      Based on the KSI invoices, I have determined the annual KSI suite revenues for the 2009 and 2010 seasons.

31.      The suite revenues for the 2009 and 2010 seasons were $65,327.52 and $36,128.60, respectively.

**3. Profit Margin**

32.      Profit is the difference between revenues and expenses. Profit margin is profit divided by revenue.

33.      The expenses for KSI can be broken down as (1) sales tax, (2) labor, (3) kosher supervision, (4) liability insurance, (5) cost of goods, (6) sponsorship fee, and (7) revenue to Aramark/QBC. Expenses for the 2009 and 2010 seasons are shown in Exhibit 4.

*Exhibit 4.      Itemized KSI Expenses for the 2009 and 2010 Seasons*

---

[15] For 2009 revenues, I based my analysis on a document called Citi Field Kosher Sports Subcontractor Settlement Component 6103. For 2010 revenues, I based my analysis on a document called Kosher Sports 2010 Revenue (Ref # 00929201006103).

34.     In total, the 2009 KSI expenses were $412,500.84. In 2010, the KSI expenses were $386,950.36.

35.     The KSI profit for 2009 was $117,310.18. In 2010, the KSI profit was $76,567.29. The 2009 and 2010 profit margins are 22.14% and 16.52%, respectively.

## B.  Over a Third of Cart Revenues Derive from Friday and Saturday Sales

36.     Because QBC disallowed KSI to carry out its business on Fridays and Saturdays, KSI was denied the revenue from two additional days. Also, Fridays and Saturdays are more likely to be game days than any other day of the week. Therefore, KSI was denied the revenue from the two days that generated over a third of the annual concession stand revenue.

37.     In 2009, 36 percent of sales from concession stands were generated on Fridays and Saturdays. In 2010, 41 percent of sales from concession stands were generated on Fridays and Saturdays. See Exhibit 5 for the 2009 and 2010 total concession stand sales broken down by day of the week. These results are derived from all concession stand sales for Citi Field events in 2009 and 2010.

*Exhibit 5.      Percentage of Concession Sales by Day of Week for 2009 and 2010 Seasons*

38.     In order to determine how KSI would have profited on Fridays and Saturdays, I first calculate the KSI market share by dividing the total KSI revenues by the total ballpark concession stand revenues for the days on which KSI operated. For 2009, the KSI market share was 3.27%; for 2010, the KSI market share was 4.07%.[16]

39.     Assuming that the KSI market share remains the same in the but-for scenario in which KSI was allowed to operate on Fridays and Saturdays, I am able to estimate the expected KSI sales revenues for 2009 and 2010. Also, I can use the KSI market share under the same assumptions to estimate lost profits for the remaining years of the Agreement. This is described in greater detail in Section V.

40.     Unlike the case for concession stand sales revenues, I do not have access to analogous Aramark aggregate sales data pertaining to suite sales. Therefore, in order to calculate

---

[16] In 2009, I do not include the cart K401 in my market share calculations.

the suite sale revenues in the but-for scenario in which KSI was allowed to operate on Fridays and Saturdays, I make the assumption that KSI's but-for increase in suite sales scales exactly with that of cart sales. That is, once I have calculated KSI's lost revenues for 2009 and 2010 as a fraction of overall KSI revenues, I use this same fraction to estimate the expected revenues in suite sales for these years. Further, I base my estimation of lost future profits on this method as well. This will be described in detail in Section V.

## C. A Fourth Cart and the Importance of its Location

41.     In 2009, KSI was assigned four cart locations, referred to as K115, K130, K401, and K428. These locations are depicted in Exhibit 6. The nomenclature refers to both physical cart location and vendor. The letter "K" is in effect while KSI operates the location, while a letter "G" is used otherwise. The number designates a specific area in the stands. In this case, the 100-series are situated at a lower level than the 400-series.

*Exhibit 6.      KSI Cart Locations*

42.     Cart locations K130, K115, and K428 (the "operational carts") were all situated in well-trafficked areas of the ballpark and their locations are not in contention. Location K401, however, was in a remote area of the ballpark, inconvenient to spectators, and totally exposed to the elements. Not only is this clear from the depiction in Exhibit 6, it is also evident from the substantially reduced sales numbers it produced while KSI operated a fourth cart during part of the 2009 baseball season.

43.     As further evidence that the location of cart K401 is inferior to the other three, even Aramark decided against using that particular location (under the label G401) for the 2010 season.

44.     In Exhibit 7, I show that the average revenue per cart is comparable for the operational carts, during days when all four carts were open. However, the average revenue for location K401 is significantly lower. Because the only feature that distinguishes this cart from the other three is its location, it stands to reason that it is the location effect alone that is responsible for the reduced revenues of K401.

*Exhibit 7.      Average Daily KSI Concession Revenue per Cart for the 2009 Season*

8

45.     In order to estimate how well the fourth cart should have done had it been placed at a mutually agreed upon location, which was equivalent in terms of accessibility and visibility, I use the average revenue for the other three carts for the 2009 and 2010 seasons in order to calculate damages in Section V.B.

## V.     Damages

### A. Lost Profits to Date Due to the Inability to Run the Operational Carts on Fridays and Saturdays

46.     To determine the lost revenues for Fridays and Saturdays for the 2009 and 2010 seasons, I multiplied the market share for each cart (for each year) by the total revenues for all concession stands (in the same year). Total Friday and Saturday concession stand revenues were $7,240,372.22 and $7,985,365.44 for 2009 and 2010, respectively.[17] Using these totals as well as the market shares determined in Section IV.B, I calculated the expected revenues for the operational carts that KSI would have generated had they been allowed to operate on Fridays and Saturdays, as $236,658.82 and $325,042.04 for years 2009 and 2010, respectively.

*Exhibit 8.        KSI Itemized Lost Profits for the 2009 and 2010 Seasons*

47.     In order to determine lost profits from the inability to operate on Fridays and Saturdays, I multiply these expected revenues by the KSI profit margins for the respective years. As such, the total 2009 lost profits for the operational carts was $52,400.74. For 2010, the lost profits for these carts were $53,692.86. See Exhibit 8.

48.     To determine the lost profits due to the inability to carry out suite sales on Friday and Saturday, I multiply the overall 2009 and 2010 suite sales revenues by the ratio of KSI's expected Friday and Saturday cart revenues to KSI's Sunday through Thursday cart revenues. This leads to lost suite sale profits of $7,661.68 and $4,538.83 in 2009 and 2010, respectively. See Exhibit 8.

---

[17] KSI only began operating in Citi Field on April 26, 2009. Therefore, this calculation only considers sales made on or after that date.

### B.  Lost Profits to Date Due to the Inability to Operate a Fourth Cart

49.     Assuming that QBC had allowed the operational carts to carry out business on Fridays and Saturdays, I determined that the average annual profit per cart would have been $50,443.31 and $41,430.72 for 2009 and 2010, respectively. See Exhibit 8.

50.     Therefore, had cart K401 had been able to operate on Fridays and Saturdays, and had it been situated in a location comparable to the operational carts, its total annual profits would have been approximately $50,443.31 and $41,430.72 for 2009 and 2010, respectively. See Exhibit 8.

### C.  Projected Annual Lost Profits over the Remaining Life of the Agreement

51.     KSI had actual profits of $117,310.18 and $76,567.29 in 2009 and 2010, respectively. Had QBC allowed it to operate on Fridays and Saturdays, and had assigned them a fourth cart at a location comparable to that of the operational carts, KSI would have been expected to enjoy additional profits of $110,505.72 and $99,662.42 in 2009 and 2010, respectively. This means that total profits for KSI should have been $227,815.90 and $176,229.71 in 2009 and 2010, respectively. The average of these numbers is $202,022.81. See Exhibit 8.

52.     Assuming that KSI would have performed comparably for each of the seven years in the remainder of the Agreement, and assuming that the KSI revenues will only rise as quickly as KSI expenses, I am able to calculate expected profits for each of those years. To calculate the future lost profits, assuming that KSI is not allowed to operate any day of the week at any location going forward, I estimate annual lost profits with the average expected annual profit from 2009 and 2010.

### D.  Total Damages

53.     The total lost profits for the 2009 season is broken down as the lost profits from the inability to run the operational carts on Fridays and Saturdays ($52,400.74), the inability to carry out suite sales on Friday and Saturday ($7,661.69), and the inability to operate a fourth cart at a mutually agreed upon location that would have been comparable to those of the operational

carts ($50,443.31). The sum of these numbers is $110,505.72. Applying a simple interest rate of 9% to date leads to damages of $130,396.75. See Exhibit 8.

54.    The total lost profits for the 2010 season is broken down as the lost profits from the inability to run the operational carts on Fridays and Saturdays ($53,692.86), the inability to carry out suite sales on Friday and Saturday ($4,538.83), and the inability to operate a fourth cart at a mutually agreed upon location that would have been comparable to those of the operational carts ($41,430.72). The sum of these numbers is $99,662.42. Applying a simple interest rate of 9% to date leads to damages of $108,632.04. See Exhibit 8.

55.    Therefore, QBC's not allowing KSI to operate on Fridays and Saturdays in 2009 and 2010, and not allowing KSI to operate a fourth cart at a mutually agreed upon location in 2009 and 2010 leads to damages to date of $239,028.79. See Exhibit 8.

56.    I understand that KSI has operated in 2011. However, Aramark has not provided the 2011 concession cart revenue data. Therefore, the damages for the 2011 season are taken to be the average damages from the 2009 and 2010 seasons: $105,084.07. See Exhibit 8.

57.    Discounting future expected annual profits of $202,022.81 for the 2012–2018 seasons at the current swap rate leads to future damages of $1,351,305.89. Adding in the lost profits for 2011 leads to expected damages of $1,456,389.96 for years 2011–2018. See Exhibit 9.

*Exhibit 9.    Projected Lost Profits for KSI*

58.    Finally, assuming that QBC has breached the Agreement and that KSI will not be allowed to operate from 2012 onward, KSI has incurred total damages of $1,695,418.75.[18] See Exhibit 10.

*Exhibit 10.    Total Damages Suffered by KSI*

---

[18] Under the theory that damages are calculated as of the point of contract breach in 2009, the damages number would be at least as large as those determined here. This is based on the fact that operating revenues for food and beverages (as described in the prospectus for the New York City Industrial Development Agency PILOT Bonds (Queens Baseball Stadium Project), Series 2006 Bonds) were projected to be higher than what was calculated here.

## VI.    Damages under a Theory of Unjust Enrichment

59.    Under a theory of unjust enrichment, the determination of damages would differ from a breach of contract claim. The idea is that any profits enjoyed by QBC should be provided to KSI.

60.    As described above, KSI's K-series carts were replaced by G-series carts on Fridays and Saturdays. Also, at times during the 2009 season, a fourth G-series cart operated in the place of the fourth K-series cart. I understand that under the theory of unjust enrichment, KSI would be entitled to all profits enjoyed by Aramark, which operated the G-series carts.

61.    Using Aramark's revenue data from 2009 and 2010, and assuming that Aramark's profit margin is the same as that of KSI, I estimated the profits derived from the G130, G115, and G428 carts when they were operated by Aramark on Fridays and Saturdays throughout the 2009 and 2010 seasons. Because I do not have access to Aramark's 2011 revenue data, I estimated the 2011 profits from operating these three carts on Fridays and Saturdays by averaging the respective results for the 2009 and 2010 profits.

62.    Aramark also operated the G401 cart for part of 2009. Again, I use Aramark's revenue data and the KSI profit margin to estimate the profits received by Aramark through the use of this location.

63.    I determined that KSI suffered lost profits of $168,279.00 because Aramark operated carts G130, G115, and G428 in place of KSI on Fridays and Saturdays from 2009–2011, and damages of $16,422.10 because Aramark operated cart G401 in place of KSI in 2009. Applying simple interest of 9% to date and adding these numbers together gives a total damage estimate of $204,684.06 under a theory of unjust enrichment.[19]

---

[19] Revenue was estimated by scaling up net sales figures by the appropriate tax rate.

## VII.  Miscellaneous

64.     My opinions are subject to revision based on new information that subsequently may be provided to, or obtained by me.

Thomas Schopflocher, Ph.D.
October 7, 2011

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

# ORIGINAL

Page 1

1      UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK

2  _____
                                )
3  KOSHER SPORTS, INC.,         )
                                )
4          Plaintiff,           )
                                )
5      -against-                )No.
                                )CV-10-2618(JBW)(RLM)
6  QUEENS BALLPARK              )
   COMPANY, LLC,                )
7                               )
           Defendant.           )
8  _____      )
9
10

11              HERRICK, FEINSTEIN LLP
                   2 PARK AVENUE
12           NEW YORK, NEW YORK  10016
                  MAY 9, 2011
13
14

15              ORAL DEPOSITION OF
                  JONATHAN KATZ
16
17
18
19
20
21
22  REPORTED BY:
23  DEBRA SAPIO LYONS, RDR, CRR, CCR, CPE
24
25

Page 132

1                    JONATHAN KATZ

2               MR. TOKAYER:  Objection as

3        to form.

4               THE WITNESS:  No, I did not

5        e-mail.

6    BY MR. MEHLMAN:

7          Q.   Did you ever have a

8    discussion with any representative of

9    QBC regarding operating on Friday night

10   and Saturday?

11         A.   Yes.

12         Q.   And who did you have that

13   discussion with?

14         A.   At two separate times I had

15   a conversation with Greg Stangel when I

16   negotiated the contract and I also had

17   it with Mike Landeen.

18         Q.   And that was prior to

19   executing the contract; is that

20   correct?

21         A.   Yes.

22         Q.   Okay.  Tell me your -- you

23   said two conversations.  Two separate

24   conversations?

25         A.   One's with Greg Stangel,

1                    JONATHAN KATZ

2    one's with Mike Landeen.

3         Q.   When was your conversation

4    with Greg Stangel?

5         A.   Approximately September of

6    2007.

7         Q.   That date you remember,

8    right, that time you remember,

9    September, 2007?

10        A.   Approximately September,

11   2007.

12        Q.   And what was your request?

13   Was it a via phone or was it in person?

14             MR. TOKAYER:   Objection as

15      to form.

16   BY MR. MEHLMAN:

17        Q.   I'm sorry.  Withdrawn.

18             Was it via phone or in

19   person?

20        A.   In person.

21        Q.   And whose offices were you

22   in?

23        A.   Greg Stangel's offices.

24        Q.   And what was the sum and

25   substance of the conversation?

Page 134

1                    JONATHAN KATZ

2          A.    It was negotiating the

3    QBC-KSI contract.

4          Q.    And what did you say to him?

5          A.    We discussed how he needed

6    me to pay more money in marketing

7    dollars which are outlined here.

8          Q.    You say more money, you mean

9    the money that's actually in the

10   agreement; is that correct?

11         A.    Yes, the money that's in the

12   agreement, that's correct.

13         Q.    Yes.  And what did you say?

14         A.    And I said to him that we

15   need to be open every day of the week.

16   You're taking my kitchen away and

17   you're giving me one other location and

18   we need to be open all days of the

19   week.

20         Q.    And what --

21         A.    And he said to me --

22         Q.    Yes.  And what did Craig

23   (sic) Stangel respond?

24         A.    His name is Greg.

25         Q.    Greg.

Page 135

JONATHAN KATZ

1

2      A.   And he said to me
3   absolutely.  It's a done deal.
4      Q.   He said to you that you
5   would be operating on Friday night and
6   Saturday; correct?
7      A.   Yes.
8      Q.   Okay.  Now, you said you had
9   a conversation -- it was one
10  conversation?  That was the only time
11  you had a conversation with him?
12     A.   That's the conversation that
13  we negotiated, yes.
14     Q.   Okay.  Did you have a
15  conversation -- you said you had a
16  conversation with Mike Landeen as well;
17  is that correct?
18     A.   Yes.
19     Q.   When would that conversation
20  take place?
21     A.   Prior to the conversation
22  with Greg Stangel.  We talked --
23     Q.   When would that have been,
24  September, August?
25     A.   I don't know.

Page 136

1                     JONATHAN KATZ

2          Q.    Sometime during the summer

3    of 2007?

4          A.    I -- I couldn't answer that

5    question.   I don't remember.

6          Q.    Okay.   And where were you?

7    Was it via phone or was it in person?

8          A.    It was in person at Shea

9    Stadium.

10         Q.    Was it in Mr. Landeen's

11   office?

12         A.    No.

13         Q.    Do you remember where it

14   was?

15         A.    On one of the levels of Shea

16   Stadium.

17         Q.    On one of the levels of Shea

18   Stadium.

19         A.    Yes.

20         Q.    Was it during a game?

21         A.    It was before a game.

22         Q.    Okay.   Okay.   And what was

23   the conversation?

24         A.    We discussed ways of being

25   open on Friday and Saturday, and he

# EXHIBIT 21

QBC0001882



KOSHER SPORTS and JAK ICES
2009 SPONSORSHIP ACTIVATION PLAN

PLAINTIFF'S
EXHIBIT
3
5/12/11

QBC0001883

# Table of Contents



Introduction...................................................1

Contact List..................................................2

Mets 2009 Spring Training Schedule.............3

Mets Regular Season Schedule....................4

Sponsorship Summary..............................5

Dear Sponsor,

Welcome to the 2009 New York Mets baseball season!

In order to make your 2009 partnership with us go as smoothly as possible we have carefully put together the following activation summary. Please take a moment to read through the following pages to ensure that you understand each element of your sponsorship. Feel free to circulate any appropriate deadlines, important dates and specs with the necessary people on your staff.

Our Partnerships team is dedicated to making sure that you get the most out of your sponsorship with the New York Mets in 2009 and beyond. We will work on our end to meet your needs and make sure the activation process is as simple as possible. If you have questions or needs throughout the season, please feel free to contact us and we'll do our best to make sure that your issue is resolved. We are proud to call you a partner of the New York Mets and look forward to working with you during the upcoming season.

Sincerely,



The New York Mets Corporate Sales and Partnerships Team

QBC0001884

QBC0001885

# The New York Mets Corporate Sales and Partnerships Team

## Main Contact: Adam Barrick
### abarr@nymets.com; 718-803-4009

**Tom Murphy- Senior Vice President**
tmurphy@nymets.com; 718-559-3001
**Paul Asencio- Vice President**
pasencio@nymets.com; 718-565-4382
**Pete Helfer- Director**
phelfer@nymets.com; 718-559-3126
**Matt Soloff- Director**
msoloff@nymets.com; 718-595-8022
**Brian Matthews- Assistant**
bmatthews@nymets.com; 718-565-4376
**Melissa Walters- Assistant**
mwalters@nymets.com; 718-803-4029
**Patrick Jones- Director, Suite Sales**
pjones@nymets.com; 718-565-4388
**Roberto Beltramini- Account Executive, Suite Sales**
rbeltramini@nymets.com; 718-803-4053



2





QBC0001886

# 2009 Spring Training Schedule

| Day | Date | Opponent | Location | Time |
|-----|------|----------|----------|------|
| Wednesday | 25-Feb | Baltimore Orioles | Ft. Lauderdale | 1:05pm |
| Thursday | 26-Feb | Florida Marlins | Port St. Lucie | TBA |
| Friday | 27-Feb | St. Louis Cardinals | Port St. Lucie | TBA |
| Saturday | 28-Feb | Detroit Tigers | Lakeland | TBA |
| Sunday | 1-Mar | Houston Astros | Port St. Lucie | 1:10pm |
| **Monday** | **2-Mar** | OFF DAY | | |
| Tuesday | 3-Mar | **St. Louis Cardinals** | **Port St. Lucie** | **TBA** |
| **Wednesday** | **4-Mar** | **Washington Nationals** | **Viera** | **TBA** |
| Thursday | 5-Mar | **WBC Team** | **Port St. Lucie** | TBA |
| Friday | 6-Mar | St. Louis Cardinals | Jupiter | TBA |
| Saturday | 7-Mar | Washington Nationals | Port St. Lucie | TBA |
| Sunday | 8-Mar | University of Michigan | Port St. Lucie | 1:10pm |
| | | Washington Nationals | Viera | TBA |
| Monday | 9-Mar | Baltimore Orioles | Port St. Lucie | 1:10pm |
| **Tuesday** | **10-Mar** | **Washington Nationals** | **Viera** | **TBA** |
| Wednesday | 11-Mar | OFF DAY | | |
| Thursday | 12-Mar | Florida Marlins | Port St. Lucie | TBA |
| Friday | 13-Mar | Detroit Tigers | Lakeland | TBA |
| Saturday | 14-Mar | Washington Nationals | Port St. Lucie | TBA |
| Sunday | 15-Mar | Florida Marlins | Jupiter | TBA |
| Monday | 16-Mar | Off Day | | |
| Tuesday | 17-Mar | Atlanta Braves | Disney | TBA |
| Wednesday | 18-Mar | Atlanta Braves | Port St. Lucie | TBA |
| Thursday | 19-Mar | Houston Astros | Port St. Lucie | TBA |
| Friday | 20-Mar | Baltimore Orioles | Ft. Lauderdale | 1:05pm |
| Saturday | 21-Mar | Atlanta Braves | Disney | TBA |
| Sunday | 22-Mar | Atlanta Braves | Port St. Lucie | 1:10pm |
| Monday | 23-Mar | Off Day | | |
| Tuesday | 24-Mar | Houston Astros | Kissimmee | TBA |
| Wednesday | 25-Mar | Detroit Tigers | Port St. Lucie | TBA |
| Thursday | 26-Mar | St. Louis Cardinals | Jupiter | TBA |
| Friday | 27-Mar | Washington Nationals | Port St. Lucie | TBA |
| **Saturday** | **28-Mar** | **Detroit Tigers** | **Port St. Lucie** | **TBA** |
| Sunday | 29-Mar | Baltimore Orioles | Ft. Lauderdale | 1:05pm |
| Monday | 30-Mar | Baltimore Orioles | Port St. Lucie | 1:10pm |
| Tuesday | 31-Mar | Florida Marlins | Jupiter | TBA |
| Wednesday | 1-Apr | St. Louis Cardinals | Jupiter | TBA |
| Thursday | 2-Apr | Baltimore Orioles | Port St. Lucie | 1:10pm |

3

QBC0001887

# 2009 Schedule

*Home games shaded

# 2009 Sponsorship Assets

## Kosher Sports

- **Right to Sell:** Opportunity to sell Kosher hot dogs, sausages, knishes, pretzels, peanuts and hamburgers at Citi Field.

- **Scoreboard Message:** One (1) scoreboard message at every Mets home game.  Please send desired logo to Adam asap.

- **Season Tickets:** Two half season tickets located at Baseline Box, Row 14, seats 23-24.  Tickets will be sent out within two weeks of Opening Day.

- **Yearbook Ad:** Right to advertise the Services in one advertisement in the 2009 Mets Yearbook. Specs and deadlines attached. Contact is Matt Fealey, 718-565-4324, mfealey@nymets.com.

## JAK Ices

- **Right to Sell:** Opportunity to sell Kosher flavored ices at Citi Field.

- **Yearbook Ad:** Right to advertise the Services in one advertisement in the 2009 Mets Yearbook. Specs and deadlines attached. Contact is Matt Fealey, 718-565-4324, mfealey@nymets.com.



5

QBC0001888

# EXHIBIT 22

From:          Mike Landeen [mlandeen@nymets.com]
Sent:          Thursday, January 28, 2010 12:59:17 PM
To:            Paul Asencio
Subject:       Re: Non Game Day Kosher Caterers

Patience is not one of my virtues.

---

Michael Landeen
Vice President|Venue Services
New York Mets|Citi Field
Flushing NY 11368
P) 718.803.4039  F) 718.429.1886


----- Original Message -----
From: Paul Asencio
To: Mike Landeen; Adam Barrick
Sent: Thu Jan 28 12:55:08 2010
Subject: RE: Non Game Day Kosher Caterers

Deep breaths...  I hate him too!

-----Original Message-----
From: Mike Landeen
Sent: Thursday, January 28, 2010 11:52 AM
To: Adam Barrick; Paul Asencio
Subject: FW: Non Game Day Kosher Caterers

This guy gets on my very last nerve.  FYI.

Michael Landeen
Vice President, Venue Services
New York Mets
Citi Field
P: 718.803.4039
F: 718.429.1886



-----Original Message-----
From: Heather Collamore
Sent: Thu 1/28/2010 11:51 AM
To: Mike Landeen
Subject: RE: Non Game Day Kosher Caterers

100% agree. Thank you.

---

Heather Collamore| Director, Metropolitan Hospitality
New York Mets | Citi Field | Flushing NY 11368
(P) 718.803.4032  (F) 718.429.1886  hcoll@nymets.com


-----Original Message-----



PLAINTIFF'S EXHIBIT
25
5|12|11

QBC0008041

From: Mike Landeen
Sent: Thursday, January 28, 2010 11:48 AM
To: Heather Collamore
Subject: RE: Non Game Day Kosher Caterers

Also I want to clarify that his sponsorship does not preclude him from paying a buyout.  He is just like everyone else. What he pays for in sponsorship if the right to serve kosher food during baseball and concert events.

Michael Landeen
Vice President, Venue Services
New York Mets
Citi Field
P: 718.803.4039
F: 718.429.1886

-----Original Message-----
From: Heather Collamore
Sent: Thu 1/28/2010 11:35 AM
To: Mike Landeen
Subject: FW: Non Game Day Kosher Caterers

Hey Mike:
Can you please read this trail and let me know what you think re: Jonathan Katz being on our list for Kosher Caterers. We were not pleased with using him. It was much more of a hassle, and he doesn't want to pay us any commissions, so it doesn't make sense for Aramark.

Heather Collamore| Director, Metropolitan Hospitality
New York Mets | Citi Field | Flushing NY 11368
(P) 718.803.4032  (F) 718.429.1886  hcoll@nymets.com

-----Original Message-----
From: Karyn Anastasio
Sent: Thursday, January 28, 2010 11:32 AM
To: Heather Collamore
Cc: Swartz, Derek J.
Subject: FW: Non Game Day Kosher Caterers

Is this true?  First of all, he is not a caterer; he's a game day vendor.  I was under the impression he is a middle man for other kosher caterers, which is partly my job :)

Karyn Anastasio
Catering Manager
Metropolitan Hospitality
NY Mets, Citi Field
718.803.4078 - phone
718.429.1886 - fax
kanastasio@nymets.com

QBC0008042

-----Original Message-----
From: Jonathan Katz [mailto:jkatz@koshersportsinc.com]
Sent: Thursday, January 28, 2010 11:22 AM
To: Karyn Anastasio
Subject: Re: Non Game Day Kosher Caterers

As per my agreement I should be on this vendor list and since I am paying a sponsorship I should be excluded from paying this buyout.

------Original Message------
From: Karyn Anastasio
To: jkatz@koshersportsinc.com
Subject: RE: Non Game Day Kosher Caterers
Sent: Jan 28, 2010 9:38 AM

Hi Jonathan, we have preferred contracts for Non-Game Day events, with the following 4 caterers:
Prestige
Mauzone, (Celebration)
Chef's Table
Foremost

I am happy to add one or two more, if you know of caterer's who want to join the list.  If the client chooses a caterer who is not on our list then we have to charge a buy-out fee to the client, to help cover costs that we lose when taking on a 3rd party caterer.

Karyn Anastasio
Catering Manager
Metropolitan Hospitality
NY Mets, Citi Field
718.803.4078 - phone
718.429.1886 - fax
kanastasio@nymets.com


-----Original Message-----
From: Jonathan Katz [mailto:jkatz@koshersportsinc.com]
Sent: Thursday, January 28, 2010 9:13 AM
To: Karyn Anastasio
Subject: Non Game Day Kosher Caterers

Karyn,

What is the story with kosher caterers on non event days? It has been brought to my attention that there are only 3 approved kosher vendors on these days.

Can you please confirm this and who they are.

Best,

Jonathan

QBC0008043

QBC0008044

# EXHIBIT 23



## METS AND KOSHER SPORTS INC.
## SIGN NEW MULTI-YEAR MARKETING AGREEMENT FOR CITI FIELD

**FLUSHING, N.Y., August 7, 2008** – The New York Mets and Kosher Sports Inc. today announced a multi-year agreement for the premier kosher concession company to continue as the exclusive Glatt Kosher concessionaire at Citi Field, the new Mets world-class home, opening in 2009.

Kosher Sports Inc. will be participating in various Mets publications and in game programming features.  "We're very excited to continue our relationship with the Mets," said Jonathan Katz, President and CEO, Kosher Sports.  "We take great pride in being a part of this historic event for the Mets and New York baseball."

"We are very pleased to continue our relationship with Kosher Sports Inc.," said Mike Landeen, Vice President, Venue Services, New York Mets.  "Kosher Sports Inc. is an integral member of our food services chain, enhancing our extensive and high quality menu options for all our great fans."

As part of the agreement, the Mets and Kosher Sports will donate 250 game tickets to Jewish Charities each year.

Kosher Sports Inc. has been the exclusive Glatt Kosher provider at Shea Stadium since 2006 and also services many other professional stadiums and arenas.  Their offerings feature Abeles and Heymann Provisions and Oceanside Knish Factory potato knishes.  For more information, visit  www.koshersportsinc.com.

# # #

**For more information contact:**

Jay Horwitz
Vice President, Media Relations
New York Mets
718-565-4330
jhorw@nymets.com



PLAINTIFF'S
EXHIBIT NO. 173
FOR IDENTIFICATION
DATE: 5/18/11   RPTR:

QBC0001177