**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

KOSHER SPORTS, INC.,

                    Plaintiff,                  **CASE NO. 10-CV-2618 (JBW)(RLM)**

       v.

QUEENS BALLPARK COMPANY, LLC,

                Defendant.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Dated: Armonk, New York
       February 13, 2012

                              BOIES, SCHILLER & FLEXNER LLP
                              Edward Normand
                              Jason Cyrulnik
                              Nathan Holcomb
                              333 Main Street
                              Armonk, New York 10504
                              (914) 749-8200

                              *Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ..................................................................................... 4

LEGAL STANDARDS ......................................................................................... 4

ARGUMENT ........................................................................................................ 5

I.     QBC DOES NOT REMOTELY SATISFY THE STANDARDS FOR
SUMMARY JUDGMENT IN ITS FAVOR ON KSI'S CLAIM
FOR BREACH OF CONTRACT .......................................................... 5

     A.    The QBC-KSI Product Distribution Agreement Gives KSI
The Right to Sell Its Kosher Products at the Ballpark. ............................ 6

          1.    The Plain Terms and Only Reasonable Interpretation of
The QBC-KSI Product Distribution Agreement .................... 6

          2.    QBC's Attempt to Construe the Agreement Differently
As a Matter of Law Is Meritless ........................................... 8

          3.    QBC's Reliance on a Truncated Excerpt from the
Preliminary Injunction Is Unavailing ................................... 11

     B.    The Extrinsic Evidence Does Not Remotely Support
Summary Judgment in QBC's Favor. ...................................................... 13

          1.    The Parties' Negotiations and Earlier Agreements on
Contract Terms Demonstrate KSI's Right to Distribute
on Fridays and Saturdays ...................................................... 13

          2.    QBC's Attempt to Shift Blame to Aramark Is Belied by
QBC's Own Contract with Aramark ...................................... 16

     C.    In Addition to Its Other Undisputed Breach,
QBC Breached Its Obligation to Provide KSI with
Four Carts in Locations That Were Mutually Agreed-Upon. ................... 17

II.    QBC MISTAKENLY CONTENDS THAT KSI CANNOT
RECOVER LOST  PROFITS ON ITS CLAIM FOR BREACH
OF CONTRACT .................................................................................. 20

III.   KSI IS PERMITTED TO PURSUE ITS ALTERNATIVE
CLAIM FOR UNJUST ENRICHMENT ............................................. 22

IV.    QBC IS NOT ENTITLED TO SUMMARY JUDGMENT
       ON ITS COUNTERCLAIM. ................................................................................. 24

CONCLUSION ....................................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

447 Clinton Ave. LLC v. Clinton Rising, LLC,
 22 Misc. 3d 1104(A) (Table) (Sup. Ct. Kings Cnty. Jan. 6, 2009)........................................... 10

Andy Warhol Found. for Visual Arts v. Fed. Ins. Co.,
 189 F.3d 208 (2d Cir. 1999) ...................................................................................................... 9

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,
 70 N.Y.2d 382 (1987) .............................................................................................................. 23

Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,
 650 F. Supp. 2d 314 (S.D.N.Y. 2009) ....................................................................................... 9

Dimario v. Coppola,
 10 F. Supp. 2d 213 (E.D.N.Y. 1998) ....................................................................................... 19

Guidance Endodontics, LLC v. Dentsply Int'l, Inc.,
 No. Civ. 08-1101, 2010 WL 4054115 (D.N.M. Aug. 26, 2010) ............................................. 22

In re Northwest Airlines Corp.,
 393 B.R. 337, 348 (Bankr. S.D.N.Y. 2008) ............................................................................ 18

JA Apparel Corp. v. Abboud,
 682 F. Supp. 2d 294 (S.D.N.Y. 2010) ..................................................................................... 14

Jobim v. Songs of Universal, Inc.,
 732 F. Supp. 2d 407 (S.D.N.Y. 2010) ..................................................................................... 14

Kramer v. Remley,
 No. 01 Civ. 0303, 2002 WL 31323823 (S.D.N.Y. Oct. 16, 2008) ........................................... 14

Laskey v. Rubel Corp.,
 303 N.Y. 69 (1951) .................................................................................................................. 10

Leo v. Stevens,
 307 A.D.2d 453 (3d Dep't 2003) ............................................................................................. 10

Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,
 500 F.3d 171 (2d Cir. 2007) .............................................................................................. 20, 24

NetJets Aviation, Inc. v. LHC Commc'ns, LLC,
 537 F.3d 168 (2d Cir. 2008) ..................................................................................................... 4

Oscar Prods., Inc. v. Zacharius,
 893 F. Supp. 250 (S.D.N.Y.1995) ........................................................................................... 14

R.B. Ventures, Ltd. v. Shane,
  112 F.3d 54 (2d Cir. 1997) ................................................................................ 14

Rule v. Brine,
  85 F.3d 1002 (2d Cir. 1996) .............................................................................. 14

S.D. Hicks & Son Co. v. J.T. Baker Chem. Co.,
  307 F.2d 750 (2d Cir. 1962) .............................................................................. 21

Spirit Locker v. EVO Direct, LLC,
  696 F. Supp. 2d 296 (E.D.N.Y. 2010) ................................................................ 23

Starter Corp. v. Converse, Inc.,
  170 F.3d 286 (2d Cir. 1999) .............................................................................. 18

TVT Records v. Island Def Jam Music Grp.,
  412 F.3d 82 (2d Cir. 2005) ................................................................................ 18

U S W. Fin. Servs., Inc. v. Tollman,
  786 F. Supp. 333 (S.D.N.Y. 1992) ..................................................................... 10

Univ. of Texas v. Camenisch,
  451 U.S. 390 (1981) ........................................................................................... 12

**Other Authorities**

Fed. R. Civ. P. 56(a) .................................................................................................. 4

Fed. R. Civ. P. 56(c)(1)(A) .................................................................................. 4, 13

Restatement (Second) of Contracts § 243(4) (1981) .............................................. 20

Plaintiff, Kosher Sports, Inc. ("KSI"), respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## PRELIMINARY STATEMENT

QBC's motion is a model of one-sided and unreasonable contractual interpretation, of selective reliance on mischaracterized bits of evidence, and of convenient avoidance of the record that already exists in this case.  KSI shows in its concurrent motion that it is entitled to partial summary judgment on the question of QBC's liability for breach of contract, and none of the arguments in QBC's motion warrants a contrary result.

First, QBC proposes an unreasonable interpretation of the Product Distribution Agreement – and improperly seeks to buttress that reading by citation to an out-of-context citation to a prior decision of this Court.  QBC's motion reduces to the implausible contention that it did not agree to provide KSI the right to distribute its Kosher products at any events at Citi Field from April 1, 2009, through October 31, 2018.  QBC did agree to provide such rights – for all events open to the general public.  The parties' September 2007 agreement memorandum says so.  The January 2008 Product Distribution Agreement also says so.  And if extrinsic evidence were necessary, it shows that both written agreements reflected QBC's verbal agreement to provide KSI the foregoing rights.

In the face of such language and evidence, QBC principally contends that in granting KSI a preliminary injunction, this Court has already decided that the Product Distribution Agreement does not give KSI the right to distribute its products at Citi Field.  The main defect in this argument is that the Court took care to say that it was referencing the Agreement solely for purposes of that motion – not to any greater extent.  Indeed, on its face QBC's interpretation of the Court's order makes no sense:  QBC would have the Court finding KSI likely to succeed on

the merits of claims that, according to QBC's re-interpretation of the order, now fail as a matter of law on the basis of the Court's prior finding.  The argument is non-sensical.

QBC thus resorts to <u>changing</u> the facts, including by (i) <u>rewriting</u> the text of the Product Distribution Agreement to provide that QBC was providing KSI only with "exclusivity for" product distribution rights (whatever that means) – instead of "product distribution rights" as stated in the Agreement; (ii) <u>renaming</u> the Agreement an "Advertising Agreement" – as if the phrase QBC chooses to use in its brief somehow alters the parties' rights under the Agreement; and (iii) pretending that, in <u>granting KSI's motion</u> for a preliminary injunction, the Court actually meant to decide the core issue in this case <u>in QBC's favor</u>.

<u>Second</u>, QBC improperly seeks to restrict the scope of the agreement between the parties, with respect to both its source and scope.  The Product Distribution Agreement, memorializing the parties' verbal agreement, imposes no restrictions whatsoever on the days of the week on which KSI could exercise its bargained-for right to sell its products at Citi Field during the ten seasons of the Agreement's Term, nor does the Agreement give QBC the right to impose any such restrictions.  To the contrary, the Agreement defines its "Term" as April 1, 2009, through October 31, 2018, without limitation, and identifies KSI's rights as extending to "each regular season game" and "events where general admission is made available to the public."  QBC's contrary and absurd interpretation reduces to the proposition that KSI was paying $725,000 for de minimis rights to advertise – and to fans to whom KSI did not even have the right to sell.

QBC nevertheless says that the Agreement cross-references the prospect of a forthcoming agreement with Aramark and that such agreement – notwithstanding KSI's agreement to pay QBC $725,000 over ten years – gives Aramark the right to determine whether QBC was entitled to sell at <u>any</u> events at Citi Field.  In addition to its facial absurdity, this argument fails because it

2

was QBC, not Aramark, who decided to preclude KSI from selling its products on Friday nights and Saturdays for the 2009 and 2010 seasons – the breaches at issue in this case. QBC itself emphasized at the time that its decision came from the "highest levels within the organization." QBC's undisputed conduct was not only a critical basis on which the Court granted KSI's motion for preliminary injunction, and not only is direct, contemporaneous evidence that QBC viewed its Agreement with QBC as addressing the question of sales on Friday nights and Saturdays – it is also part of the evidence that QBC made virtually every substantive decision concerning operations at the Ballpark. QBC's effort to pass the buck now is a litigation confection.

Third, allowing for the possible relevance of extrinsic evidence, QBC ignores the overwhelming evidence in KSI's favor, including QBC's undisputed course of conduct with respect to the operation of the Product Distribution Agreement. The contemporaneous evidence – the evidence created before QBC became involved in litigation – shows:

- QBC's Director of Venue Services confirmed that QBC's Product Distribution Agreement provides KSI "the right to serve kosher food during baseball and concert events" in exchange for KSI's sponsorship fee.

- QBC's Senior Vice President informed KSI's President that QBC's policy is: "[I]f we don't have a signed [sponsorship] contract, you will not be allowed to sell your product at Citi Field."

- QBC's formal "Activation Summary" provided by QBC to KSI before the start of the first season confirms that the Product Distribution Agreement provided KSI with the "Right to Sell" in the Ballpark.

- QBC publicly announced the Product Distribution Agreement as a multi-year agreement by which KSI would serve as the exclusive Glatt Kosher concessionaire at the Ballpark – and before KSI entered into any operational agreement with Aramark.

All of this evidence, and more, is completely irreconcilable with QBC's effort – undertaken when litigation arose – to shift the blame to its concessionaire, Aramark.

In sum, the plain language and only reasonable operation of the Production Distribution Agreement, memorializing the parties' agreements concerning the sale of Kosher food at the Ballpark, confirms that KSI had the contractual right to sell such food on Friday nights and Saturdays.  The extrinsic evidence, if even relevant, further and overwhelmingly precludes QBC's argument for judgment as a matter of law in its favor.

## STATEMENT OF FACTS

The facts and evidence relevant to QBC's motion for summary judgment are set forth in KSI's Response to QBC Rule 56.1 statement ("KSI's Response to SOF"), filed herewith.

## LEGAL STANDARDS

A motion for summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court "is required to view the record in the light most favorable to the party against which summary judgment is contemplated and to resolve all ambiguities and draw all factual inferences in favor of that party."  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d Cir. 2008).  "Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict in favor of the party against which summary judgment is contemplated."  Id.  The evidence to be considered includes "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

## ARGUMENT

### I.   QBC DOES NOT REMOTELY SATISFY THE STANDARDS FOR SUMMARY JUDGMENT IN ITS FAVOR ON KSI'S CLAIM FOR BREACH OF CONTRACT

QBC's motion reduces to the implausible contention, developed for purposes of this litigation, that it did not agree to provide KSI the right to distribute its Kosher products at any events at Citi Field from April 1, 2009, through October 31, 2018.  QBC did agree to provide such rights – and has repeatedly confirmed its agreement.  The plain language of QBC's September 2007 agreement memorandum says so.  The plain language of the January 2008 letter also agreement says so.  And the evidence in the record establishes that both written agreements reflected QBC's verbal contractual commitment to provide KSI the foregoing product distribution rights.

On those facts, QBC's argument that the "product distribution rights" it granted KSI from "April 1, 2009 through October 31, 2018" should be read to set forth no rights to distribute any products – as a matter of law – is absurd.  In the face of plain language flatly inconsistent with its argument, QBC resorts to <u>changing</u> the facts, including by (i) <u>rewriting</u> the text of the Product Distribution Agreement to provide that QBC was providing KSI only with "exclusivity for" product distribution rights (whatever that means) – instead of "product distribution rights" as stated in the agreement; (ii) <u>renaming</u> the agreement an "Advertising Agreement" – as if the phrase QBC chooses to use in its brief somehow alters the parties' rights under the Agreement; and (iii) <u>deleting</u> words from this Court's order and pretending that, in <u>granting KSI's motion</u> for a preliminary injunction, the Court actually meant to decide the core issue in this case <u>in QBC's favor</u> before discovery even commenced.

If any doubt remained, the evidence indisputably shows that QBC – in a decision that came from the "highest levels within the organization" – unilaterally barred KSI from

distributing its products at the Ballpark during Friday and Saturday games.  (Ex. 15 ("We will

not allow you [KSI] to operate your carts on Friday nights and Saturdays"). [1])  This evidence

puts to rest QBC's newly minted position that it had no control over KSI's product distribution

rights.  QBC does not even attempt to reconcile this glaring inconsistency.

> A.   The QBC-KSI Product Distribution Agreement Gives KSI
>       <u>The Right to Sell Its Kosher Products at the Ballpark.</u>

>> 1.   The Plain Terms and Only Reasonable Interpretation of
>>        <u>The QBC-KSI Product Distribution Agreement.</u>

The plain terms of the January 2008 Product Distribution Agreement, QBC's September

2007 agreement memorandum, and the verbal agreement between Messrs. Stangel (QBC) and

Katz (KSI) are all consistent – and all belie QBC's motion.

The Product Distribution Agreement repeatedly and unambiguously states that QBC is

providing KSI the right to sell its Kosher products from April 1, 2009 to October 31, 2018:

- The opening paragraph of the January 2008 letter states that it is an agreement for "advertising, ticket and <u>product distribution rights from April 1, 2009 through October 31, 2018</u>."  (KSI's Statement of Material Facts dated January 30, 2012 ("SOF") ¶ 7.)

- Paragraph 4 of the letter provides that QBC will permit its concessionaire "to sell only Advertiser's brand" in the Ballpark.  (<u>Id.</u> ¶ 10.)

- Paragraph 4 also provides that QBC will not permit its concessionaire to sell any competing Kosher products during events open to the general public, where KSI has agreed to sell its Kosher products on customary terms and conditions.  (<u>Id.</u>)

- The Agreement sets forth an annual-fee payment schedule in consideration of the "good and services" that KSI is to receive thereunder, mirroring the payment schedule in the September 2007 deal points memo.  The total fees to be paid, from 2009 to 2018, is $725,000.  (<u>Id.</u> ¶ 12.)

---

[1]    Unless otherwise noted, references to "Ex. _" refer to the Exhibits attached to the Declaration of Nathan Holcomb in Support of Plaintiff's Motion for Summary Judgment, dated January 30, 2012 ("Holcomb Decl.").

The plain terms of the Agreement thus grant KSI "product distribution rights" and require the payment of $725,000 in cumulative annual fees in exchange for such rights, and others.

The September 2007 agreement memorandum similarly provides such rights.  This agreement memorandum is admissible to complete the terms of the Agreement (see Part I.C, below), and it is completely at odds with QBC's newly minted position.  In the memorandum, QBC wrote that it had "come to agreement" with KSI on the "deal points," which included among the "[b]enefits provided [to KSI] each year" of the ten-year term:

- Four (4) portable cart locations in mutually agreed upon areas of Citi Field; and

- Mets and Aramark agree to following splits:  57.5% on food and 2% on beverages.

(Ex. 2 at QBC0003895.)  In addition to giving KSI the right to operate four portable carts at the Ballpark, QBC negotiated the details of the arrangement, down to the specific percentage splits that QBC and its main concessionaire, Aramark, would receive from KSI sales.

It is also undisputed that despite its ten-year commitment, QBC unilaterally decided to limit KSI's right to distribute its products by banning it from almost 40% of events at the Ballpark.  Just prior to the start of KSI's first season at the Ballpark, in 2009, QBC's Adam Barrick informed KSI that "after internal discussion" that reached the Mets' "highest levels," QBC decided to prohibit KSI from exercising its product distribution rights.  After agreeing to reconsider its decision prior to the 2010 season, QBC informed KSI:

> On the Friday/Saturday, we have taken your feedback, and taken it to literally the highest levels within the organization. Unfortunately the answer remains the same and we will not allow you to operate your carts on Friday evenings/Saturday.  We understand your frustration with this but there is no room for negotiation on this as the decision has been made and is set in stone.

(Ex. 15.)

More than three years since QBC barred KSI from operating, QBC is still unable to point to a <u>single</u> limitation imposed on KSI's right to distribute its products from the four cart locations it had secured during the ten-year term delineated in the agreements (apart from the qualification of "events at the Ballpark as to which admission is made available to members of the general public"). Specifically, QBC does not dispute that the agreement – memorialized in both written agreements – did <u>not</u> impose <u>any</u> limitations on the days on which KSI could operate its cart locations and distribute its products, beyond the "2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, or 2018" seasons. There is <u>no</u> provision that permits QBC to further restrict KSI from selling its products at any events during these seasons.

2.      QBC's Attempt to Construe the Agreement Differently
<u>As a Matter of Law Is Meritless.</u>

Ignoring the foregoing facts, QBC argues only that the Product Distribution Agreement is "silent" on the issue of what days of the week KSI can exercise its rights under the agreement and that such "silence" somehow entitles it to summary judgment in its favor. The premise and conclusion are both wrong.

The Product Distribution Agreement expressly identifies the days on which KSI can exercise its rights – defining the "Term" of the Agreement to include every day from April 1, 2009, to October 31, 2018. The only limitations imposed on that time period are the Agreement's repeated references to all "events at which admission is made available to the general public" and "each Mets regular season home game" – both of which QBC ignored when it unilaterally prohibited KSI from operating during such events.[2] Unable to ground its defense

---

[2]      QBC's misplaced reliance (at 7) on the Magistrate Court's collateral observation that the Product Distribution Agreement does not provide "further details" as to when, where, and how KSI would sell its products underscores the point. The absence of "further detail" does not somehow eviscerate a clear right to distribute products during a definite term.

in any contractual provision, QBC is left to defend the even more absurd contention that it never

granted KSI the right to distribute its products at any events, because QBC does not control such

rights.  In addition to ignoring the plain language of the Agreement, QBC does not even

acknowledge the obvious inconsistency between that claim and the undisputed fact that it was

QBC who unilaterally prohibited KSI from distributing its products during Friday and Saturday

games.

The weakness of QBC's position is underscored by the fact that QBC cannot even

articulate its reading of the Product Distribution Agreement without resorting (at 1) to the opaque

phrase "exclusivity for product distribution rights," which appears nowhere in the Agreement.

QBC's contrived effort to read this phrase into the Agreement is difficult even to comprehend,

let alone a reasonable interpretation.  QBC thus overreaches (at 10) in asking the Court to

interpret the Product Distribution Agreement as giving KSI only a "negative covenant" right

rather than the "product distribution right" expressly referenced in the Agreement.

QBC's motion is all the more perplexing in light of the standard that applies on the

undisputed record that QBC drafted the agreement (KSI Statement of Facts dated 1/30/12

("SOF") ¶ 6) and the law that the interpretive rule of construction against the drafter applies to

legal construction of a contract on a motion for summary judgment.  See, e.g., Andy Warhol

Found. for Visual Arts v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999); Leo v. Stevens, 307

---

Indeed, QBC's citations to inapposite cases like Compania Embotelladora Del Pacifico,
S.A. v. Pepsi Cola Co., 650 F. Supp. 2d 314 (S.D.N.Y. 2009), confirm the point.  The plaintiff in
that case did not even allege that the defendant had breached an agreement – written or verbal.
The court dismissed the claim because the complaint alleged only that the defendant had
breached obligations that were implicit in the parties' arrangement but that were indisputably not
covered by their agreement.  By contrast, KSI's claim is based on the product distribution rights
to which QBC expressly agreed and that are the subject of the agreement at the heart of this
dispute.

A.D.2d 453, 454 (3d Dep't 2003); <u>447 Clinton Ave. LLC v. Clinton Rising, LLC</u>, 22 Misc. 3d 1104(A) (Table) (Sup. Ct. Kings Cnty. Jan. 6, 2009).  QBC does not even acknowledge these controlling standards.

The same is true of the September 2007 memorandum, which QBC declines to acknowledge.  Far from being "silent" on the issue, QBC agreed that KSI was paying for four locations at the Ballpark – for the duration of the term – and confirmed that KSI would be permitted to distribute its kosher products "on event days."  (Ex. 2.)[3]

In fact, QBC's (contrary to fact) contention that the Agreement is "silent" on the term during which KSI can distribute its products precludes summary judgment in its favor for the independent reason that such silence means that the parties' express verbal agreement on this term is binding.  The law is clear that verbal agreements are binding where they do not contradict the terms of a subsequent written agreement.  <u>U S W. Fin. Servs., Inc. v. Tollman</u>, 786 F. Supp. 333, 342 (S.D.N.Y. 1992) (where the parties' agreement "'is partly oral and partly written, parol evidence . . . may be admitted, not to contradict or vary, but to complete the entire agreement of which the writing was only a part'") (quoting <u>Laskey v. Rubel Corp.</u>, 303 N.Y. 69, 71-72 (1951)).  The record here contains more than sufficient evidence to demonstrate that QBC's negotiator, Greg Stangel, and KSI's president, Jonathan Katz, specifically agreed that in exchange for the substantial increase in annual fees over those KSI had previously paid for distribution rights at Shea Stadium, QBC agreed grant KSI the right to sell its products at all events during the ten-year term, including events that took place on Fridays and Saturdays.  (Ex.

---

[3]     QBC misapprehends the law of contracts in arguing that the Agreement is integrated in a way that would preclude the parties' express verbal agreement as setting forth the parties' respective obligations.  (<u>See</u> Part I.C, below.)

20 at 134-35; Declaration of Jonathan Katz dated January 30, 2012 ("Katz Decl.") ¶ 4; Ex. 2; Ex. 1; Ex. 3 ¶ 1.)

        3.        QBC's Reliance on a Truncated Excerpt from the
                     Preliminary Injunction Is Unavailing.

In a last-ditch effort to avoid the clear implications of the plain language of the Agreement, QBC cites a truncated excerpt from this Court's Preliminary Injunction Order, pretending that this Court must have decided – before any discovery, and as a matter of law – the scope of KSI's rights under the Agreement.

As a critical threshold matter, QBC disregards the Court's emphatic qualification – "For purposes of this order" – that its statements pertained only to the preliminary injunction.  (Dckt. #21.)  QBC edits out that qualification, and in so doing ignores the obvious reason for the Court's statement:  The parties had not yet engaged in any discovery, and the only issue before the Court was whether KSI was entitled to a preliminary injunction preserving the parties' positions pending litigation.  The Court did not purport to adjudicate the issue of the parties' intent under the Agreement, as doing so was not necessary to grant KSI's motion.  The Court stated that to the extent QBC denied control over KSI's product distribution rights, QBC should have no problem with the Court's injunction, which enjoined QBC from prohibiting KSI from distributing its products.  (Id.)

The record developed over the ensuing eighteen months confirms the undeniable:  QBC did take the actions it denied having taken and in so doing it materially breached its agreement with KSI.  QBC's strained attempt to twist this Court's expressly limited remark into a dispositive holding with respect to the core issue in this case is telling.

11

It is also telling that, in addition to misconstruing the Court's order, QBC does not even attempt to argue that any language from a pre-discovery injunction order has any formal effect on the resolution of the issues currently set for trial.  It does not:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) (citations omitted).  QBC also fails to explain why the case proceeded, and why the Court enjoined QBC, if the Court had already and effectively disposed of the core issue underlying KSI's claims.  The argument is a contention of QBC's making.

QBC compounds the error by citing statements in the Magistrate Judge's order regarding a discrete issue – whether anyone had violated the injunction in 2011 – in which the Magistrate Judge observed that Aramark had certain operational rights or responsibilities in connection with KSI's operations.  As the Magistrate Judge made clear, her ruling did not reach the merits of the case, which turn on whether QBC materially breached the Product Distribution Agreement prior KSI's filing of this lawsuit in 2010.  (Mehlman Decl. Ex. 5 at 26 n.14 ("The Court's conclusion in this regard does not reach the merits of the action; the record contains evidence that, prior to the injunction, defendant indicated it would not allow plaintiff to operate on Fridays and Saturdays.") (emphasis added).)  Furthermore, the Magistrate Judge's ruling on KSI's motion for contempt applied a standard of proof more stringent than the preponderance of the evidence standard that will apply to the jury's findings on the merits.  Id. at 12.  QBC's need to twist these

12

decisions in its favor, in the face of the Court's disclaimers against doing so, further signals the weakness of its legal position.

B.     The Extrinsic Evidence Does Not Remotely Support
       Summary Judgment in QBC's Favor.

QBC's next argument (at 11) is that if the plain language does not support its motion, "the undisputed evidence" supports the conclusion that the parties never intended to permit KSI to distribute its products during events that took place on Fridays and Saturdays.  That argument does not pass the smell test.

1.     The Parties' Negotiations and Earlier Agreements on Contract Terms
       Demonstrate KSI's Right to Distribute on Fridays and Saturdays.

In addition to the plain language of the various agreements granting KSI the right to distribute its products during the "on event days," during the entire "Term," and repeated references to all "Mets home games" and during all "events at the Ballpark as to which admission is made available to members of the general public," one of the two individuals who negotiated the Agreement (the other, QBC's Greg Stangel, testified that he had no recollection of the negotiations) testified that KSI and QBC specifically agreed that KSI would be permitted to distribute its products on Fridays and Saturdays.  (SOF ¶¶ 2-3.)

QBC's "undisputed evidence" argument thus apparently turns on its inscrutable view that only "written communications" are relevant to the analysis.  Not surprisingly, QBC does not cite a single case for that proposition – which misapprehends the law:  The evidence to be considered in deciding whether a fact issue exists for trial includes "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

13

Indeed, it is well established that summary judgment should be denied even if KSI's case rested on testimony alone (it does not). See, e.g., R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 58 (2d Cir. 1997) (holding that the plaintiff's affidavit alone, which the district court found "'decidedly vague,'" created a genuine issue of fact as to the existence of an oral contract); Rule v. Brine, 85 F.3d 1002, 1014 (2d Cir. 1996) (holding that plaintiff's sworn testimony was alone sufficient to defeat summary judgment on an oral contract claim); Kramer v. Remley, No. 01 Civ. 0303, 2002 WL 31323823, at *3 (S.D.N.Y. Oct. 16, 2008) (plaintiff's "say-so" alone sufficient to create genuine issue of material fact to defeat summary judgment); Oscar Prods., Inc. v. Zacharius, 893 F. Supp. 250, 256 (S.D.N.Y.1995) (Leisure, J.) (holding that conflicting testimony concerning alleged oral agreement required credibility determination).  To the extent QBC is raising credibility arguments without calling them by name, its arguments are for the jury, not for summary adjudication.  Kramer, 2002 WL 3132823, at *3 ("Credibility assessments and choices between conflicting versions of events are matters for a jury, not for the court on summary judgment.").

In addition to misapprehending the relevant forms of evidence, QBC also ignores dozens of pieces of documentary evidence showing that QBC conceded and represented to KSI that it was receiving the right to distribute its products under the Product Distribution Agreement.  Such evidence includes "relevant course of performance" and "course of dealing" evidence, JA Apparel Corp. v. Abboud, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010) (quotations and citation omitted), which is "weighty evidence of a party's intent in entering a contract."  Jobim v. Songs of Universal, Inc., 732 F. Supp. 2d 407, 416 (S.D.N.Y. 2010) (citation omitted).  As detailed in KSI's motion for partial summary judgment:

14

- QBC's own Director of Venue Services confirmed that QBC provides KSI "the right to serve kosher food during baseball and concert events" in exchange for KSI's sponsorship fee.  (Ex. 22.)

- QBC's Senior Vice President informed KSI's President that QBC's policy is:  "[I]f we don't have a signed [sponsorship] contract, you will not be allowed to sell your product at Citi Field."  (2/13/12 Holcomb Decl. Ex. 10.)

- QBC's formal "Activation Summary" provided by QBC to KSI before the start of the first season confirms that the Agreement provided KSI with the "Right to Sell" in the Ballpark.  (SOF ¶ 13.)

- QBC publicly announced the Product Distribution Agreement as a multi-year agreement by which KSI would serve as the exclusive Glatt Kosher concessionaire at the Ballpark –and before KSI entered into any operational agreement with Aramark.  (Ex. 23.)

QBC also, as detailed above, ignores the damning course of performance evidence that it unilaterally prohibited KSI from distributing its products during Friday and Saturday games (Ex. 15), which actions put to rest QBC's litigation position that its agreement with KSI did not concern product distribution rights.

Stripped of rhetoric, QBC's extrinsic evidence argument reduces to a citation to a single email to KSI's President, Jonathan Katz, from a QBC employee (Mike Landeen) who did not even negotiate the Product Distribution Agreement.  Landeen appears to assume in the e-mail that KSI will not be making sales on Friday nights and Saturdays, and QBC tries to make much of the fact that Katz did not correct him.  The e-mail is irrelevant given the plain language of the Product Distribution Agreement.  In addition, if considered among extrinsic evidence used to clarify any ambiguity, the e-mail is lacking in probative value:  Landeen did not even negotiate the parties' agreements, and at most his e-mail reflects only that as far as Landeen knew, KSI did not plan to sell on Friday nights and Saturdays.  This reflects only Landeen's ignorance of the parties' agreement and of Jewish law – and even construing the e-mail in QBC's favor, Landeen nowhere assumes that KSI lacks the right to sell on those days.  Just as fundamentally, Katz

15

never interpreted the e-mail as reflecting any view on QBC's part that KSI did not have a right to sell on Friday nights and Saturdays, particularly given the fact that QBC's negotiator, Greg Stangel, expressly agreed that KSI would have that right.  In addition, although QBC ignores the rest of the document, it confirms that with respect to Citi Field operations, KSI was going to be granted the right to distribute at all "event days."  (Mehlman Decl. Ex. 6.)

> 2. QBC's Attempt to Shift Blame to Aramark Is Belied by
> QBC's Own Contract with Aramark.

QBC's core defense to KSI's claims reduces to an attempt to shift the blame to its main concessionaire, Aramark.  At the preliminary injunction hearing, KSI used the limited evidence available at the time to show that QBC's "it's not me, it's him" defense is nothing more than a position it developed for this litigation.  KSI showed then, and accumulated indisputable evidence over the ensuing eighteen months, that QBC barred KSI from distributing its products at the Ballpark.  This is conduct that is only consistent with QBC's view that it had the right to do so under the Agreement.

Yet almost two years later, QBC is still offering its litigation confection.  Its motions are both predicated on the unsupportable claim that QBC's agreement with KSI did not concern product distribution rights, and that QBC had ceded all such control to its main concessionaire, Aramark.  The evidence produced in discovery confirms that QBC's claim is false.

QBC controlled KSI's product distribution rights.  QBC announced its partnership with KSI as the Ballpark's exclusive Kosher product distributer long before KSI ever entered into an agreement with Aramark regarding the logistics of its operation.  Indeed, even QBC's witnesses acknowledged the difficulty in reconciling that undisputed fact with QBC's litigation position.  (2/13/12 Holcomb Decl. Ex. 17 at 157.)

QBC thus misleads when it cites the text of the KSI-Aramark Agreement and pretends that Aramark made all decisions about concession sales at the Ballpark. QBC's defense to KSI's claim for breach of contract is further undermined by the Usage Agreement between QBC and Aramark. (2/13/12 Holcomb Decl. Ex. 5; KSI Response to SOF ¶ 31.) That agreement provides context for the Product Distribution Agreement between QBC and KSI as well as the Concession License Agreement between Aramark and KSI, and refutes QBC attempt to shift the blame to Aramark. That agreement, through which QBC retained bottom-line authority regarding the operations of the "specialty" vendors who operated at Citi Field or who had direct agreements with QBC, defeats QBC's claim that Aramark makes the decisions regarding KSI's operations. (Id.)

C. In Addition to Its Other Undisputed Breach,
QBC Breached Its Obligation to Provide KSI with
Four Carts in Locations That Were Mutually Agreed-Upon.

QBC does not dispute that it agreed to provide KSI with "Four (4) portable cart locations in mutually agreed upon areas of Citi Field." (Ex. 2 at QBC0003895.) QBC also does not dispute that it did not provide all such locations, but instead refused KSI's efforts to find a mutually agreeable location for its fourth cart and permitted it to operate only in a remote area at the very corner of the Ballpark, where its other vendors had themselves refused to operate. QBC's sole justification for its refusal to provide KSI with a mutually agreeable fourth cart location turns on its footnoted argument (at n.2) in which it argues that the Product Distribution Agreement is integrated. That argument fails.

It is undisputed that the Product Distribution Agreement does not include an integration clause. Absent such a provision, "all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam

17

Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) (quotations and citation omitted); accord In re Northwest Airlines Corp., 393 B.R. 337, 348 (Bankr. S.D.N.Y. 2008).

In addition to the foregoing general rule of construction,  the parties in this case went a step further and expressly disclaimed integration – a damning fact that QBC does not even acknowledge in its brief:  "[A]bsent execution of a more formal contract, a court may supply consistent additional terms as necessary to carry out the parties' intent."  (Id. (emphasis added).)  The parties' express agreement on this issue cannot be squared with QBC's current effort to fit this Agreement into the exceptional category of agreements that are integrated without an integration clause.  That is, the parties expressly agreed that the January 2008 letter agreement "confirmed" their prior agreement and did not set forth the entirety of the parties' agreement.  In the absence of an integration provision – and in light of the express language making clear that the letter agreement did not include all terms of the parties' agreement – QBC's express written email setting forth the terms of the deal on which QBC and KSI had reached "agreement" (in QBC's language) easily satisfies the standard for binding contractual obligations.  That is particularly true where the subsequent agreement did not purport to alter the specific terms in question.[4]

It is undisputed that in September 2007, the parties agreed that QBC would provide KSI with four carts in mutually agreed upon locations.  (Ex. 2.)  It is also undisputed that in reliance on that agreement, KSI designed and invested in the construction of four carts for the sale of its

---

[4]     QBC's argument that the Agreement is integrated also relies heavily on the fact that it was preceded by negotiations over a period of time.  The Second Circuit has, however, made clear that "evidence of the parties' negotiations and the presence of counsel" is only "one of many non-dispositive factors used in determining the intent to make the contract fully integrated," and should not be the "centerpiece of the 'surrounding circumstances' test."  Starter Corp. v. Converse, Inc., 170 F.3d 286, 295 (2d Cir. 1999) (emphasis added).  As the court observed, "[i]t is the rare contract that is not the product of the parties' and their respective counsels' negotiations."  Id.

products.  (Katz Decl. ¶ 8.)  It is also undisputed that KSI did <u>not</u> provide KSI with carts in four

such locations.  Instead, it relegated one of KSI's carts to an absurd location in an unpopulated

area of the Ballpark, from which KSI could not generate the requisite profit to justify its

operation.  (2/13/12 Holcomb Decl. Exs. 3, 9; Declaration of Jonathan Katz dated February 13,

2012 ("Katz Supp. Decl.") ¶ 4.)  The financial records produced demonstrate that the location

generated a minimal amount of revenue compared with the other locations provided.  (Ex. 18

¶¶ 41-45, 49-50.)  In fact, the record demonstrates that even Aramark closed its cart in that

location – which it tried to operate on weekends, when QBC banned KSI from operating.

(2/13/12 Holcomb Decl. Ex. 3.)

    A party can enforce the terms of a verbal or written agreement.  <u>Dimario v. Coppola</u>, 10

F. Supp. 2d 213, 220 (E.D.N.Y. 1998) ("Where there is no understanding that an agreement will

not be binding until reduced to writing and formally executed, and '[w]here all the substantial

terms of a contract have been agreed on, and there is nothing left for future settlement,' an oral

promise or handshake is all that is needed to effectuate the contract.").  It is undisputed that this

term was agreed upon.  (Ex. 2.)  In fact, QBC previously admitted that the terms of the

September 2007 agreement memorandum are binding.  (2/13/12 Holcomb Decl. Exs. 15, 16.)

    QBC's final argument that KSI cannot recover damages for QBC's failure to provide it

with a mutually agreeable location for KSI's fourth cart is nonsensical.  Ignoring the express

requirement that the location be mutually agreeable, QBC argues that KSI unilaterally declined

to distribute its products from the fourth location that QBC provided.  QBC does not

acknowledge the overwhelming evidence of KSI's repeated objections to the location, KSI's

sustained losses at the location, and the fact that even Aramark closed its cart in that location –

which cart it tried to operate on weekends, when QBC banned KSI from operating.

## II.      QBC MISTAKENLY CONTENDS THAT KSI CANNOT RECOVER LOST PROFITS ON ITS CLAIM FOR BREACH OF CONTRACT

QBC is wrong to contend (at 20) that KSI is barred from recovering future lost profits as a matter of law because "because the undisputed evidence demonstrates that KSI has not, and cannot, establish any causal link between QBC's alleged breach and KSI's ability to realize future profits."  Neither the fact that KSI has served at Citi Field Sunday-Thursday during the 2010 and 2011 seasons nor QBC's termination letter, which purported to disclaim any implications for KSI's contractual relationship with Aramark, supports QBC's position.

QBC ignores the central issue in the case – namely, whether KSI has the right to sell at Citi Field on Fridays and Saturdays under its Agreement with QBC.  As shown above, the meaning of the Agreement is at least an issue of fact, and QBC cannot (and does not) seriously dispute that it precluded KSI from distributing its products at the Ballpark on Fridays and Saturdays.

In seeking to limit KSI's damages as a matter of law, QBC ignores the well-settled legal rules that when one party to a contract is in material breach, the non-breaching party is excused from further performance, and can recover damages equal to the full value of the breaching party's performance.  See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."); Restatement (Second) of Contracts § 243(4) (1981) (defendant's "total breach" of contract entitles plaintiff to "recover damages based on all his remaining rights to performance").  Contrary to these established rules, QBC suggests that even if KSI could establish QBC's material breach of the Agreement, QBC could preclude KSI from recovering damages equal to the full value of QBC's performance simply by permitting

20

KSI to recoup some of the same benefits it would have enjoyed if QBC not breached and both parties had continued performance under the contract.  The law does not provide this option to a party found to be in material breach.

Nor is QBC helped by its termination letter, which it sent after KSI brought suit.  In a transparent attempt to bolster its litigation position regarding the meaning of the Agreement, QBC's termination letter states that "the actions we are taking relate only to the advertising/sponsorship rights granted to KSI pursuant to the Agreement and shall have no impact upon any rights and obligations of KSI pursuant to the Concession License Agreement between KSI and Aramark Sports and Entertainment Services, LLC dated as of January 1, 2009."  (Mehlman Decl. Ex. 10.)  This post-litigation disclaimer is inconsistent with QBC's pre-litigation position that it had the right to exclude KSI from Citi Field on Fridays and Saturdays irrespective of any independent arrangements between KSI and Aramark.  KSI's burden is to prove that QBC's pre-litigation position was a material breach of the Agreement; if KSI meets this burden, then no amount of post-litigation maneuvering by QBC can alter KSI's entitlement to damages for the full value of QBC's performance under the Agreement.

The fact that KSI has served in Citi Field at limited events during the 2010 and 2011 seasons, moreover, does not in any way preclude KSI from seeking damages equal to the full value of QBC's performance.  During early 2010, KSI and QBC were engaged in discussions in an attempt to resolve their dispute without need for litigation.  KSI repeatedly pressed QBC to honor its commitment to allow KSI to serve at Friday and Saturday home games, and for a time QBC indicated that it might agree to do so.  (Katz Decl. ¶ 9; 1/30/12 Mehlman Decl. Ex. 13, ¶ 12; Ex. 12, 14, 16; see, e.g., S.D. Hicks & Son Co. v. J.T. Baker Chem. Co., 307 F.2d 750, 752 (2d Cir. 1962) ("[T]here is no warrant for the position that a party to a contract waives his rights

21

under the contract by failing to insist upon performance at the due date and by urging and

encouraging the other party to perform thereafter."). After it became clear that QBC's position

was final, KSI filed suit. KSI's complaint requested both specific performance and damages,

and throughout the litigation KSI has made clear that it intends to preserve its damages claim,

including with its expert report. (Dckt. #56, ¶¶ 28-29; Ex. 18, ¶¶ 51-58.)

Since August 25, 2010, KSI has been able to serve at Citi Field pursuant to this Court's

preliminary injunction (Dckt. #21), which KSI sought pending resolution of this litigation in

order to prevent the destruction of KSI's business and financial ruin for Katz and his family.

(Mehlman Dec. Ex. 13, ¶¶ 3, 22.) A preliminary injunction for the purpose of avoiding damage

to a plaintiff's business pending resolution of litigation does not preclude the plaintiff from

pursuing damages for future lost profits as its remedy. As the court in Guidance Endodontics,

LLC v. Dentsply International, Inc., No. Civ. 08-1101, 2010 WL 4054115 (D.N.M. Aug. 26,

2010), explained clearly, the purpose of a preliminary injunction is "merely to preserve the

relative positions of the parties until a trial on the merits can be reached," whereas "[t]he purpose

of future damages, on the other hand, is to compensate for damages that the plaintiff will suffer,

but has not yet incurred." Id. at *19. "The forms of relief are not inconsistent, nor would it be

inconsistent for a small business, like [plaintiff], to want to stay in business during a litigation in

which they would ultimately prefer to receive damages for the opposing party's breach." Id.

## III.   KSI IS PERMITTED TO PURSUE ITS ALTERNATIVE CLAIM FOR UNJUST ENRICHMENT.

QBC relies on two points in arguing that KSI's unjust enrichment claim fails as a matter

of law. Both are meritless.

First, as detailed above, QBC is not entitled to summary judgment on the issue of

whether KSI has a right under the Agreement to operate during the Term on Fridays and

22

Saturdays.  Although QBC does not explain itself, it claims that it is "factually inaccurate" to

allege that QBC has operated food carts on Fridays and Saturdays, QBC presumably means to

refer to Aramark's operational role.  If so, QBC relies on an unduly cramped reading of KSI's

allegation, the clear gravamen of which is that QBC has derived profits from the operation of

food carts other than KSI's carts on Fridays and Saturdays.  Moreover, there is evidence that

QBC viewed food carts operated in Citi Field as their own:  In an e-mail about the ices carts Katz

operated, Mike Landeen of the Mets stated "I have carts that go into those spots on Friday and

Saturday when [Katz] is not open."  (Ex. 10.)

Second, a contract between the parties precludes an unjust enrichment claim only for

"events arising out of the same subject matter."  Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,

70 N.Y.2d 382, 388 (1987); see also Spirit Locker v. EVO Direct, LLC, 696 F. Supp. 2d 296,

305 (E.D.N.Y. 2010) (observing that the contention that "an unjust enrichment claim is never

cognizable where a valid contract exists between the parties . . . is too broadly stated").  While it

is KSI's position that the Agreement permits it to sell its Kosher food products on Fridays and

Saturdays, QBC (at 6) disputes this position and contends that the Agreement does not "govern

or even address the time and manner of KSI's operations and Citi Field."  In the event that

QBC's position regarding the Agreement prevails, KSI may advance an unjust enrichment claim

as an alternative to its breach of contract claim.  This claim is supported by evidence that, prior

to the Agreement executed in January 2009, QBC granted four cart locations at Citi Field to KSI

(1/30/12/ Holcomb Decl. Ex. 2), and that QBC subsequently approved KSI's plans for specially

constructed food carts with one grill for Sunday-Thursday use and a separate grill for Friday-

Saturday use (Exs. 6, 7; Katz Decl. ¶ 6).  This evidence raises an issue of fact as to whether QBC

benefitted at KSI's expense by using cart locations that it had previously granted to KSI – while

23

causing KSI to undergo the expense of adapting its carts for Friday and Saturday use – such that equity and good conscience require restitution.  Spirit Locker, 696 F. Supp. 2d at 306.

## IV.      QBC IS NOT ENTITLED TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM.

QBC concedes (at 23) that its counterclaim for breach of contract turns on resolution of KSI's claim for breach of the Product Distribution Agreement.  If QBC materially breached the Product Distribution Agreement, then QBC's breach relieved KSI of its obligation to render performance by making installment payments to QBC.  Merrill Lynch, 500 F.3d at 186.  QBC cannot prevail on its motion for summary judgment on its counterclaim unless it is entitled to summary judgment on KSI's claim for breach of contract.  As detailed above and in KSI's motion for partial summary judgment, QBC cannot remotely satisfy the standards for summary judgment on any of KSI's claims.

<u>CONCLUSION</u>

KSI respectfully submits, for the reasons set forth above, that the Court should deny QBC's motion for summary judgment.

Dated: Armonk, New York
          February 13, 2012

                                    BOIES, SCHILLER & FLEXNER LLP


                              By: /s/ Nathan Holcomb                    
                                    Edward Normand
                                    Jason Cyrulnik
                                    Nathan Holcomb
                                    333 Main Street
                                    Armonk, New York 10504
                                    (914) 749-8200

                                    *Counsel for Plaintiff*