UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

KOSHER SPORTS, INC.,

                        Plaintiff,

v.

QUEENS BALLPARK COMPANY, LLC,

                        Defendant.

CASE NO. 10-CV-2618 (JBW)(RLM)

---

**PLAINTIFF'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Dated: Armonk, New York
        February 20, 2012

                                      BOIES, SCHILLER & FLEXNER LLP
                                      Edward Normand
                                      Jason Cyrulnik
                                      Nathan Holcomb
                                      333 Main Street
                                      Armonk, New York 10504
                                      (914) 749-8200

                                      *Counsel for Plaintiff*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

LEGAL STANDARDS ............................................................................................................ 2

ARGUMENT ............................................................................................................................ 3

    I.    THE PLAIN TERMS AND ONLY REASONABLE INTERPRETATION OF THE PRODUCT DISTRIBUTION AGREEMENT GIVE KSI THE RIGHT TO DISTRIBUTE ITS PRODUCTS AT ALL EVENTS FROM 2009-2018 ............................................. 3

    II.    THE EXTRINSIC EVIDENCE CONFIRMS THAT KSI PAID FOR AND RECEIVED THE RIGHT TO DISTRIBUTE ITS PRODUCTS AT ALL EVENTS DURING THE TEN-YEAR TERM. ................. 7

    III.    QBC MISTAKENLY CONTENDS THAT KSI CANNOT RECOVER LOST PROFITS ON ITS CLAIM FOR BREACH OF CONTRACT ................................................................................. 9

CONCLUSION ....................................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

Adams v. Suozzi,
 433 F.3d 220 (2d Cir. 2005) ................................................................................................. 2

Auscape Int'l v. Nat'l Geographic Soc'y,
 282 Fed. Appx. 890 (2008)................................................................................................... 3

Best v. Nurse,
 No. CV 99-3727 (JBW), 1999 WL 1243055 (E.D.N.Y. Dec. 16, 1999).................................... 3

Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.,
 53 F. Supp. 2d 338 (E.D.N.Y. 1999) ..................................................................................... 3

Fishman v. LaSalle Nat'l Bank,
 247 F.3d 300 (1st Cir. 2001).................................................................................................. 2

Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.,
 603 F. Supp. 2d 735 (S.D.N.Y. 2009) ................................................................................... 2

Postlewaite v. McGraw-Hill, Inc.,
 411 F.3d 63 (2d Cir. 2005) ................................................................................................... 3

SCS Commc'ns, Inc. v. Herrick Co.,
 360 F.3d 329 (2d Cir. 2004) ................................................................................................. 3

Westmoreland Coal Co. v. Entech, Inc.,
 100 N.Y.2d 352 (2003).......................................................................................................... 2

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 4

Fed. R. Civ. P. 56(c)(1)(A) .................................................................................................... 4, 13

Restatement (Second) of Contracts § 243(4) (1981) .................................................................. 21

Plaintiff, Kosher Sports, Inc. ("KSI"), respectfully submits this Reply Memorandum in Further Support of Its Motion for Partial Summary Judgment.

## PRELIMINARY STATEMENT

Eighteen months ago, QBC walked into this Court and claimed that its Product Distribution Agreement with KSI was really just an "Advertising Agreement" and that QBC did not grant or control product distribution rights at its Ballpark. KSI's briefs demonstrate that QBC's newly minted litigation position cannot be reconciled with years of contrary representations and conduct, including:

- The plain language of the Agreement, granting KSI "product distribution rights" for a ten-year period;

- QBC's unilaterally drafted formal summary of the Agreement, listing KSI's "Right to Sell" as the primary right it received under the agreement;

- QBC's own internal documents describing the Agreement as providing KSI with the right to sell in the Ballpark during baseball and concert events: "What he pays for in sponsorship is the right to serve kosher food during baseball and concert events"; and

- QBC's decision to prohibit KSI from distributing its products during Friday and Saturday games.

It now appears that even QBC recognizes the absurdity of its contention that the Product Distribution Agreement has nothing to do with KSI's product distribution rights. In opposing KSI's motion for partial summary judgment, QBC (at 3) reverses course again – arguing this time that the "main deliverable" KSI received in consideration for its annual payments was the "exclusive" right to distribute its products. QBC continues to refer to the Agreement as an "Advertising Agreement," a label it concocted in connection with its initial litigation position, and continues to argue that the "common sense" reading of the Agreement is that QBC did not provide KSI the right to distribute its products.

There are three options on the table.  <u>First</u>, there is QBC's original litigation position that KSI was primarily paying for advertising.  That interpretation makes no sense because such advertising rights are only valuable to KSI if it can sell its products to the fans to which it is advertising.  <u>Second</u>, there is QBC's revised position that KSI was primarily paying to have QBC prevent its concessionaire, Aramark, from serving other brands of Kosher food.  This interpretation suffers from precisely the same flaw as the first:  the right to keep its competitors out of Citi Field is of no use to KSI unless it can sell its own products there.  Moreover, QBC's revised position recognizes that QBC has complete control over Aramark, as its agreement with Aramark confirms, and raises the question why KSI would have bargained for the right to have QBC exercise some control over Aramark, but not enough to be of any use to KSI.  <u>Third</u>, there is KSI's position that KSI – like every other specialty vendor at the Ballpark – entered into an agreement with QBC for the right to sell its products at Citi Field.  This is the <u>only</u> interpretation that makes any sense – and it is the interpretation that QBC executives repeatedly confirmed in writing many times before this litigation started and they needed to come up with some way of defending their obvious, material breach of the Product Distribution Agreement.  On this record, the Court should grant partial summary judgment in KSI's favor.

## LEGAL STANDARDS

QBC does not dispute the core legal principles that apply here and that support summary judgment in KSI's favor:

- A contract must be "interpreted as to give effect to its general purpose.'" <u>Adams v. Suozzi</u>, 433 F.3d 220, 228 (2d Cir. 2005) (quoting <u>Westmoreland Coal Co. v. Entech, Inc.</u>, 100 N.Y.2d 352, 358 (2003));

- "The presumption in commercial contracts is that the parties were trying to accomplish something rational. . . . Common sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." <u>Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.</u>, 603 F. Supp. 2d 735, 739 (S.D.N.Y. 2009) (citation and quotations omitted); accord <u>Postlewaite v. McGraw-Hill, Inc.</u>, 411

2

F.3d 63, 69 (2d Cir. 2005) (rejecting contract interpretation that ignored "not only common sense but also . . . objective, rational, and reasonable expectations").

- Where the text of a contract is "ambiguous as to intent, summary judgment is still proper when the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." SCS Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 342 (2d Cir. 2004) (quotations and citation omitted); accord Auscape Int'l v. Nat'l Geographic Soc'y, 282 Fed. Appx. 890, 891 (2008).

- In "the event of any ambiguity" in the contract, "established common-law principles require construction of a contract against the drafter." Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc., 53 F. Supp. 2d 338, 343 (E.D.N.Y. 1999); accord Best v. Nurse, No. CV 99-3727 (JBW), 1999 WL 1243055, at *6 (E.D.N.Y. Dec. 16, 1999).

## ARGUMENT

**I.    THE PLAIN TERMS AND ONLY REASONABLE INTERPRETATION OF THE PRODUCT DISTRIBUTION AGREEMENT GIVE KSI THE RIGHT TO DISTRIBUTE ITS PRODUCTS AT ALL EVENTS FROM 2009-2018.**

QBC argues that its tortured "plain language" reading of the agreement can survive summary judgment for two reasons. Both are wrong.

First, QBC claims (at 2) that "the Advertising Agreement does not, on its face, address the days and hours when, or locations where, KSI can sell its products." QBC is wrong. The Agreement expressly addresses the days on which KSI received its rights – all days "from April 1, 2009 to October 31, 2018." (Ex. 1 at 1.[1]) QBC's refusal to acknowledge this point – and its insistence on pretending that the Agreement (which QBC drafted) somehow needed to say something more about the particular days of the week on which KSI's rights are in force –is inscrutable. The agreement's repeated references to KSI's rights at all "Mets home games" and all "events at the Ballpark as to which admission is made available to members of the general public" cannot be squared with QBC's refrain that KSI is "ignor[ing] the larger point" by not

---

[1] Unless otherwise noted, references to "Ex. _" refer to the Exhibits attached to the Declaration of Nathan Holcomb in Support of Plaintiff's Motion for Summary Judgment, dated January 30, 2012 ("Holcomb Decl.").

3

crediting the Agreement's "silence" on the issue. Absent further restriction, the contract's reference to all events during the ten-year period is dispositive. Conspicuously, QBC does not (because it cannot) point to any contrary term that imposes, or even suggests, that there is some subset of the term to which KSI's product distribution rights were limited.

Second, QBC is left to argue that the reference to KSI's entering into an agreement with Aramark is rendered "superfluous" if KSI had already secured the right to distribute its products under the Product Distribution Agreement. That is wrong, too.

As a threshold matter, it is undisputed that KSI did enter into an agreement with Aramark, thereby satisfying any "condition" to which QBC points. (Ex. 4.) And yet QBC addresses what would have happened had KSI not fulfilled that "condition." That academic issue is not relevant to the facts of this case, where KSI indisputably satisfied any "condition" on which QBC seeks to hang its hat. QBC is thus left to argue only that having "contemplated" that KSI would enter into such an operational agreement somehow means that the Product Distribution Agreement must not have granted KSI the right to sell its products at the events referenced therein. The conclusion does not follow.

The fact that the parties "contemplated" that KSI would enter into such an operational agreement does not speak to the question of whether the Product Distribution Agreement granted KSI the fundamental right to distribute its products at Citi Field events. The operational agreement with Aramark could and did address items that were not the subject of the Product Distribution Agreement – like maintenance, repairs, training, cleaning responsibilities, inventory, collection of monies, insurance, accounting and control procedures. Those logistics did not threaten to limit the core rights KSI had secured under its Product Distribution Agreement. But nothing in the Product Distribution Agreement even suggests that the parties were agreeing to

4

defer the fundamental question of KSI's rights to sell at Citi Field to some other party, whose agreement was executed a year later.

In addition to ignoring the plain language of the Product Distribution Agreement, QBC's reliance on KSI's entering into an agreement with Aramark is unreasonable for at least four reasons.  <u>First</u>, it makes no sense for KSI to commit to paying $725,000 over ten years when it had no assurance that it would ever receive the right to sell at even a single event.  Indeed, QBC's position now reduces to the claim that Aramark could have decided to shut KSI out of all events during the ten-year period, and yet KSI had negotiated a price for its product distribution rights without any knowledge of that decision.  That is unreasonable.  <u>Second</u>, QBC's reading cannot be squared with its official press release announcing KSI as the Ballpark's exclusive kosher product distributor <u>months</u> <u>before</u> KSI ever really secured those rights according to QBC's litigation position.  (Ex. 23.)  <u>Third</u>, QBC does not even acknowledge, let alone explain away, its repeated statements that KSI received the "right to sell" in exchange for the sponsorship fee it paid under the Product Distribution Agreement – not some subsequent operational agreement with Aramark.  (Exs. 21-23)  <u>Fourth</u>, QBC's claim is flatly inconsistent with its own conduct at the center of this litigation –it's decision to prohibit KSI from selling its products on Fridays and Saturdays. QBC did not refer the issue to Aramark; QBC's executives made the decision, confirmed with the "highest levels" at the Mets organization; and communicated QBC's decision to KSI as one that was "set in stone."  (Ex. 15)

QBC's reliance on Aramark's agreement is also predicated on the mistaken contention that there is an inconsistency between KSI's agreement with QBC and its agreement with Aramark.  There is none.  The Aramark agreement confirms that KSI was to be consulted with respect to events at which it could sell, in line with the product distribution rights it secured from

5

QBC. QBC concedes (at 3, 9), that KSI had not received from QBC the right to sell "at private corporate and social events at Citi Field" – something Aramark and KSI decided mutually under the Aramark agreement. Similarly, where KSI did not want to open its stand or stands for certain events, it agreed in the Aramark agreement that it would decide such issues in consultation with Aramark – an issue with respect to which KSI had no obligations to QBC.

Finally, blithely ignoring this Court's injunction, QBC claims that KSI "is at a complete loss to explain how" it operated last year even after QBC terminated the agreement. QBC's attempt to leverage its carefully crafted termination letter into dispositive evidence of the core issue in the case hardly warrants a response. As part of its litigation strategy, QBC adopted the position that KSI could sell its products at the Ballpark even after termination of its agreement with QBC. QBC's carefully crafted post-litigation conduct obviously does not constitute probative evidence of the parties' rights under the Agreement. That is particularly true where the parties' post-litigation conduct is governed by a Court-issued injunction. With respect to the core issues underlying the claims in this case, the parties' post-litigation, post-injunction conduct has no probative value at all.

In its prior briefs, KSI details the multiple ways in which QBC's pre-litigation conduct belies its newly minted position. Without rehashing all of those points, it is sufficient to note that, in a decision that came from the "highest levels within the organization," QBC unilaterally barred KSI from distributing its products at the Ballpark during Friday and Saturday games: "We will not allow you [KSI] to operate your carts on Friday nights and Saturdays." (Ex. 15.) That evidence alone puts to rest QBC's disingenuous contention that it did not control KSI's product distribution rights. In dozens of pages of briefing, QBC does not even attempt to reconcile this glaring inconsistency.

6

## II.  THE EXTRINSIC EVIDENCE CONFIRMS THAT KSI PAID FOR AND RECEIVED THE RIGHT TO DISTRIBUTE ITS PRODUCTS AT ALL EVENTS DURING THE TEN-YEAR TERM.

QBC's claim that it is entitled to judgment as a matter of law on the basis of the extrinsic evidence is puzzling.  Indeed, none of the evidence QBC points to is sufficient even to avoid summary judgment in KSI's favor.

Refusing even to acknowledge the controlling principle that any ambiguity must be resolved against the drafter, QBC argues (at 4) that "any doubt about the intended purpose of the Advertising Agreement must be resolved in QBC's favor" based on the extrinsic evidence.  The evidence on which QBC hangs its hat is limited to (i) KSI's operations under other agreements and at other venues; (ii) the absence of pre-deal written emails regarding KSI's operations on weekends, and (iii) a QBC employee's September 2007 comment about storage space KSI needed for its operations.  None of those arguments raises a genuine issue of fact.

KSI's operations at other venues obviously do not speak to KSI's rights under its 2008 agreement with QBC at Citi Field.  The same is true of KSI's operations at Shea Stadium, where KSI's rights at Citi Field are governed by a new contract, with new pricing, and new terms.  QBC's argument that KSI should have tried to operate at Shea Stadium on Fridays and Saturdays ignores that KSI did not operate portable cart locations at Shea, and that KSI was paying less than half the fees it was paying QBC for the right to distribute its products at all events under the new contract.

QBC's account of the pre-deal communications is wrong and unavailing.  With respect to accuracy, QBC continues to ignore written emails from September 2007 identifying KSI's right to operate four carts in mutually agreeable locations, and QBC's subsequent response in which it confirms that KSI received the right to be the exclusive provider on all "event days."  Regardless, QBC's argument is predicated on its misapprehension of the relevant forms of

7

evidence: The evidence to be considered in deciding whether a fact issue exists for trial includes "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In short, "emails" are not the only form of admissible evidence. The negotiations between QBC's negotiator, Stangel, and KSI's negotiator, Katz, are obviously relevant, indeed controlling. Mr. Katz testified:

> Mets negotiator Greg Stangel and I met at Mr. Stangel's office and negotiated the basic terms of the contract in early September 2007. During that meeting, and prior to reaching agreement, Mr. Stangel and I discussed the substantial increase in fees that QBC was proposing over the fees KSI had previously been charged. We agreed that in exchange for the substantial increase in fees, among other things, KSI would have the right to sell its products at all events during the ten-year term, including events that took place on Fridays and Saturdays. At the conclusion of that negotiation, Mr. Stangel and I agreed to the core terms of the deal and shook hands on the deal.[2]

(SOF ¶¶ 2-3.) For his part, Stangel testified that he had no recollection one way or the other of his negotiations with Mr. Katz. (Id.)

Finally, QBC's reliance on a passing comment from QBC executive Mike Landeen regarding the storage space KSI needed for its operations does not change the analysis.[3] For starters, the comment cannot be used to contradict the plain terms of the parties' written agreement. U.S.W. Fin. Servs., Inc. v. Tollman, 786 F. Supp. 333, 342 (S.D.N.Y. 1992); Laskey v. Rubel Corp., 303 N.Y. 69, 71-72 (1951).

---

[2] Insisting that the absence of pre-deal emails on the subject of weekend sales somehow warrants summary judgment in its favor, QBC concedes that there is relevant testimony on the issue but questions the "credibility" of that testimony. (QBC Br. at 12.) Obviously, QBC's "credibility" challenge cannot support its request for summary judgment in its favor.

[3] The email is the same document in which QBC confirms that KSI was given the right to sell at all events.

More damning is the fact that the comment on which QBC focuses does not concern KSI's <u>rights</u> at all.  The author, who had not negotiated the Agreement, notes only that KSI had not been operating on weekends at the time.  The email does not concern what rights KSI had secured or planned to exercise at Citi Field two years later.  Viewed against the backdrop of QBC's express agreement two weeks prior that KSI would have the right to sell at all events when Citi Field opened, the comment does not create any fact issue about the rights KSI expressly secured from QBC in its negotiations with Mr. Stangel.[4]

### III.   QBC MISTAKENLY CONTENDS THAT KSI CANNOT RECOVER LOST PROFITS ON ITS CLAIM FOR BREACH OF CONTRACT

QBC (at 14-15) completely misapprehends the legal principle that a plaintiff "may not be placed in a better position than it would have been in had the contract been satisfactorily performed."  That law precludes a plaintiff from securing a "double recovery" or from recovering expectation damages without netting out costs associated with performance.

The two cases QBC cites confirm the point.  The courts in <u>Farrell</u> and <u>Ostano</u> both <u>awarded</u> lost profits to the plaintiff, and cited the legal principle that QBC cites only for the proposition that the plaintiff could not also recover the same damages again based on different causes of action, as such a duplicative recovery would have placed the plaintiff in a better position than it would have been in had the contract been performed.

That principle has no relevance here, where it is undisputed that KSI's damages account for costs that would have been associated with performance and where KSI does not seek a double recovery.  Instead, this is a classic case of material breach of contract, as KSI repeatedly

---

[4]  The same is true of the inferences QBC attempts to draw from the fact that, in the "hundreds of emails that Mr. Katz exchanged with QBC," KSI did not mention the days of the week on which it was planning to sell its products.  Having expressly secured Mr. Stangel's agreement on the issue, KSI had no reason to doubt that the parties' repeated references to all "events" and all "Mets home games" during the ten-year term reflected the deal it had reached.

described it to QBC in 2010. QBC's multiple breaches of the Product Distribution Agreement deprived KSI of <u>more than half</u> of the expected value under the Agreement, leaving KSI with barely enough funds to make payments under the Agreement. (Ex. 18 ¶¶ 36-58.) That is precisely the type of breach that entitles a party to benefit-of-the-bargain damages in the amount of the "full value" of the contract:

> A breach is "<u>material</u>" if <u>a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions,</u> the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract. Other courts have defined a breach of contract as "material" if <u>the promisee receives something substantially less or different from that for which he or she bargained</u>.
>
> In many cases, a <u>material breach of contract is proved by the established amount of the monetary damages flowing from the breach</u>; however, proof of a specific amount of monetary damages is not required when the evidence establishes that the breach was so central to the parties' agreement that it defeated the essential purpose of the contract. Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be "material."

23 <u>Williston on Contracts</u> § 63:3 (4th ed.) In light of QBC's material breach, KSI had little choice but to cease performing and seek to remedy QBC's breach through the instant claims.

## **CONCLUSION**

KSI respectfully submits, for the reasons set forth above, that the Court should grant KSI's motion for partial summary judgment.

Dated: Armonk, New York
February 20, 2012

                              BOIES, SCHILLER & FLEXNER LLP

                              By: /s/ Nathan Holcomb
                                    Edward Normand
                                    Jason Cyrulnik
                                    Nathan Holcomb
                                    333 Main Street
                                    Armonk, New York 10504
                                    (914) 749-8200

                                    *Counsel for Plaintiff*